**UNITED STATES DISTRICT COURT**

MIDDLE DISTRICT OF ALABAMA

OFFICE OF THE CLERK

POST OFFICE BOX 711

MONTGOMERY, ALABAMA 36101-0711

DEBRA P. HACKETT, CLERK

TELEPHONE (334) 954-3600

September 29, 2006

# NOTICE OF CORRECTION

**From:   Clerk's Office**

**Case Style:  Oscar Manuel Reyes Pasten v. Flavia Cecilia Ruiz Velasquez**
**Case Number: 2:06-cv-832-MHT**

**Pleading : #12 - Letter**

**Notice is being  filed this date to advise that  the referenced  pleading was filed on 9/22/2006 without the referenced attachments.**

**The referenced pdf documents are attached to this notice.**



United States Department of State

*Washington, D.C. 20520*
*www.state.gov*

Hague Convention Text

# HAGUE CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION

The States signatory to the present Convention, Firmly convinced that the interests of children are of paramount importance in matters relating to their custody, Desiring to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access,
Have resolved to conclude a Convention to this effect, and have agreed upon the following provisions -

CHAPTER I - SCOPE OF THE CONVENTION
Article 1
The objects of the present Convention are -
a. to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and
b. to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States.
Article 2
Contracting States shall take all appropriate measures to secure within their territories the implementation of the objects of the Convention. For this purpose they shall use the most expeditious procedures available.
Article 3
The removal or the retention of a child is to be considered wrongful where -
a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.
Article 4
The Convention shall apply to any child who was habitually

resident in a Contracting State immediately before any breach of custody or access rights.

The Convention shall cease to apply when the child attains the age of 16 years.

Article 5

For the purposes of this Convention -

a. 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;

b. 'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

CHAPTER II - CENTRAL AUTHORITIES

Article 6

A Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities.

Federal States, States with more than one system of law or States having autonomous territorial organizations shall be free to appoint more than one Central Authority and to specify the territorial extent of their powers. Where a State has appointed more than one Central Authority, it shall designate the Central Authority to which applications may be addressed fortransmission to the appropriate Central Authority within that State.

Article 7

Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.

In particular, either directly or through any intermediary, they shall take all appropriate measures -

a. to discover the whereabouts of a child who has been wrongfully removed or retained;

b. to prevent further harm to the child or prejudice to interested parties by taking or causing to be taken provisional measures;

c. to secure the voluntary return of the child or to bring about an amicable resolution of the issues;

d. to exchange, where desirable, information relating to the social background of the child;

e. to provide information of a general character as to the law of their State in connection with the application of the Convention;

f. to initiate or facilitate the institution of judicial or administrative proceedings with a view to obtaining the return of the child and, in a proper case, to make arrangements for organizing or securing the effective exercise of rights of access;

g. where the circumstances so require, to provide or facilitate the provision of legal aid and advice, including the participation of legal counsel and advisers;

h. to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child;

i. to keep other each other informed with respect to the operation of this Convention and, as far as possible, to eliminate any obstacles to its application.

CHAPTER III - RETURN OF CHILDREN
Article 8
Any person, institution or other body claiming that a child has been removed or retained in breach of custody rights may apply either to the Central Authority of the child's habitual residence or to the Central Authority of any other Contracting State for assistance in securing the return of the child.
The application shall contain -
a. information concerning the identity of the applicant, of the child and of the person alleged to have removed or retained the child;
b. where available, the date of birth of the child;
c. the grounds on which the applicant's claim for return of the child is based;
d. all available information relating to the whereabouts of the child and the identity of the person with whom the child is presumed to be.
The application may be accompanied or supplemented by -
e. an authenticated copy of any relevant decision or agreement;
f. a certificate or an affidavit emanating from a Central Authority, or other competent authority of the State of the child's habitual residence, or from a qualified person, concerning the relevant law of that State;
g. any other relevant document.
Article 9
If the Central Authority which receives an application referred to in Article 8 has reason to believe that the child is in another Contracting State, it shall directly and without delay transmit the application to the Central Authority of that Contracting State and inform the requesting Central Authority, or the applicant, as the case may be.
Article 10
The Central Authority of the State where the child is shall take or cause to be taken all appropriate measures in order to obtain the voluntary return of the child.
Article 11
The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children.
If the judicial or administrative authority concerned has not reached a decision within six weeks from the date of commencement of the proceedings, the applicant or the Central Authority of the requested State, on its own initiative or if asked by the Central Authority of the requesting State, shall have the right to request the Central Authority of the requested State, that Authority shall transmit the reply to the Central Authority of the requesting State, or to the applicant, as the case may be.
Article 12
Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings

before the judicial or administrative authority of the Contracting
State where the child is, a period of less than one year has elapsed
from the date of the wrongful removal or retention, the authority
concerned shall order the return of the child forthwith.
The judicial or administrative authority, even where the
proceedings have been commenced after the expiration of the
period of one year referred to in the preceding paragraph, shall
also order the return of the child, unless it is demonstrated
that the child is now settled in its new environment.
Where the judicial or administrative authority in the requested
State has reason to believe that the child has been taken to
another State, it may stay the proceedings or dismiss the
application for the return of the child.
Article 13
Notwithstanding the provisions of the preceding Article, the
judicial or administrative authority of the requested State is
not bound to order the return of the child if the person,
institution or other body which opposes its return establishes
that -
a. the person, institution or other body having the care of
the person of the child was not actually exercising the custody
rights at the time of removal or retention, or had consented to
or subsequently acquiesced in the removal of retention; or
b. there is a grave risk that his or her return would expose
the child to physical or psychological harm or otherwise place
the child in an intolerable situation.
The judicial or administrative authority may also refuse
to order the return of the child if it finds that the child objects
to being returned and has attained an age and degree of maturity
at which it is appropriate to take account of its views.
In considering the circumstances referred to in this Article,
the judicial and administrative authorities shall take into account
the information relating to the social background of the child
provided by the Central Authority or other competent authority
of the child's habitual residence.
Article 14
In ascertaining whether there has been a wrongful removal of
retention within the meaning of Article 3, the judicial or
administrative authorities of the requested State may take notice
directly of the law of, and of judicial or administrative
decisions, formally recognized or not in the State of the
habitual residence of the child, without recourse to the specific
procedures for the proof of that law or for the recognition of
foreign decisions which would otherwise be applicable.
Article 15
The judicial or administrative authorities of a Contracting
State may, prior to the making of an order for the return
of the child, request that the applicant obtain from the
authorities of the State of the habitual residence of the
child a decision or other determination that the removal
or retention was wrongful within the meaning of Article 3
of the Convention, where such a decision or determination
may be obtained in that State. The Central Authorities of
the Contracting States shall so far as practicable assist
applicants to obtain such a decision or determination.
Article 16
After receiving notice of a wrongful removal or retention of a

child in the sense of Article 3, the judicial or administrative
authorities of the Contracting State to which the child has been
removed or in which it has been retained shall not decide on the
merits of rights of custody until it has been determined that the
child is not to be returned under this Convention or unless an
application under the Convention is not lodged within a
reasonable time following receipt of the notice.
Article 17
The sole fact that a decision relating to custody has been given
in or is entitled to recognition in the requested State shall not be
a ground for refusing to return a child under this Convention,
but the judicial or administrative authorities of the requested
State may take account of the reasons for that decision in
applying this Convention.
Article 18
The provisions of this Chapter do not limit the power of a
judicial or administrative authority to order the return of the
child at any time.
Article 19
A decision under this Convention concerning the return of the
child shall not be taken to be determination on the merits of any custody issue.
Article 20
The return of the child under the provision of Article 12 may be
refused if this would not be permitted by the fundamental
principles of the requested State relating to the protection of
human rights and fundamental freedoms.


CHAPTER VI - RIGHTS OF ACCESS
Article 21
An application to make arrangements for organizing or securing
the effective exercise of rights of access may be presented to
the Central Authorities of the Contracting States in the same way
as an application for the return of a child.
The Central Authorities are bound by the obligations of
co-operation which are set forth in Article 7 to promote the
peaceful enjoyment of access rights and the fulfillment of any
conditions to which the exercise of such rights may be subject.
The central Authorities shall take steps to remove, as far as possible,
all obstacles to the exercise of such rights. The Central Authorities,
either directly or through intermediaries, may initiate or assist in the
institution of proceedings with a view to organizing or protecting
these rights and securing respect for the conditions to which the
exercise of these rights may be subject.
Article 22
No security, bond or deposit, however described, shall be
required to guarantee the payment of costs and expenses in the
judicial or administrative proceedings falling within the scope
of this Convention.
Article 23
No legalization or similar formality may be required in the
context of this Convention.
Article 24
Any application, communication or other document sent to the
Central Authority of the requested State shall be in the original
language, and shall be accompanied by a translation into the

official language or one of the official languages of the
requested State or, where that is not feasible, a translation
into French or English.
However, a Contracting State may, by making a reservation in
accordance with Article 42, object to the use of either French
or English, but not both, in any application, communication
or other document sent to its Central Authority.
Article 25
Nationals of the Contracting States and persons who are
habitually resident within those States shall be entitled in
matters concerned with the application of this Convention to
legal aid and advice in any other Contracting State on the same
conditions as if they themselves were nationals of and habitually
resident in that State.
Article 26
Each Central Authority shall bear its own costs in applying this
Convention.
Central Authorities and other public services of Contracting
States shall not impose any charges in relation to applications
submitted under this Convention. In particular, they may not
require any payment from the applicant towards the costs and
expenses of the proceedings or, where applicable, those arising
from the participation of legal counsel or advisers. However,
they may require the payment of the expenses incurred or to be
incurred in implementing the return of the child.
However, a Contracting State may, by making a reservation in
accordance with Article 42, declare that it shall not be bound to
assume any costs referred to in the preceding paragraph resulting
from the participation of legal counsel or advisers or from court
proceedings, except insofar as those costs may be covered by its
system of legal aid and advice.
Upon ordering the return of a child or issuing an order
concerning rights of access under this Convention, the judicial
or administrative authorities may, where appropriate, direct the
person who removed or retained the child, or who prevented the
exercise of rights of access, to pay necessary expenses incurred
by or on behalf of the applicant, including travel expenses, any
costs incurred or payments made for locating the child, the costs of
legal representation of the applicant, and those of returning the child.
Article 27
When it is manifest that the requirements of this Convention are
not fulfilled or that the application is otherwise not well
founded, a Central Authority is not bound to accept the application.
In that case, the Central Authority shall forthwith
inform the applicant or the Central Authority through which the
application was submitted, as the case may be, of its reasons.
Article 28
A Central Authority may require that the application be
accompanied by a written authorization empowering it to act on
behalf of the applicant, or to designate a representative so to
act.
Article 29
This Convention shall not preclude any person, institution or
body who claims that there has been a breach of custody or
access rights within the meaning of Article 3 or 21 from
applying directly to the judicial or administrative authorities
of a Contracting State, whether or not under the provisions

of this Convention.

Article 30

Any application submitted to the Central Authorities or directly to the judicial or administrative authorities of a Contracting State in accordance with the terms of this Convention, together with documents and any other information appended thereto or provided by a Central Authority, shall be admissible in the courts or administrative authorities of the Contracting States.

Article 31

In relation to a State which in matters of custody of children has two or more systems of law applicable in different territorial units -

a. any reference to habitual residence in that State shall be construed as referring to habitual residence in a territorial unit of that State;

b. any reference to the law of the State of habitual residence shall be construed as referring to the law of the territorial unit in that State where the child habitually resides.

Article 32

In relation to a State which in matters of custody of children has two or more systems of law applicable to different categories of persons, any reference to the law of that State shall be construed as referring to the legal system specified by the law of that State.

Article 33

A State within which different territorial units have their own rules of law in respect of custody of children shall not be bound to apply this Convention where a State with a unified system of law would not be bound to do so.

Article 34

This Convention shall take priority in matters within its scope over the Convention of 5 October 1961 concerning the powers of authorities and the law applicable in respect of the protection of minors, as between Parties to both Conventions. Otherwise the present Convention shall not restrict the application of an international instrument in force between the State of origin and the State addressed or other law of the State addressed for the purposes of obtaining the return of a child who has been wrongfully removed or retained or of organizing access rights.

Article 35

This Convention shall apply as between Contracting States only to wrongful removals or retentions occurring after its entry into force in those States.

Where a declaration has been made under Article 39 or 40, the reference in the preceding paragraph to a Contracting State shall be taken to refer to the territorial unit or units in relation to which this Convention applies.

Article 36

Nothing in this Convention shall prevent two or more Contracting State, in order to limit the restrictions to which the return of the child may be subject, from agreeing among themselves to derogate from any provision of this Convention which may imply such a restriction.

CHAPTER VI - FINAL CLAUSES

Article 37

The Convention shall be open for signature by the States which
were Members of the Hague Conference on Private International
Law at the time of its Fourteenth Session.
It shall be ratified, accepted or approved and the instruments of
ratification, acceptance or approval shall be deposited with the
Ministry of Foreign Affairs of the Kingdom of the Netherlands.

Article 38

Any other State may accede to the Convention. The instrument of
accession shall be deposited with the Ministry of Foreign Affairs
of the Kingdom of the Netherlands.
The Convention shall enter into force for a State acceding to it
on the first day of the third calendar month after the deposit of its
instrument of accession.
The accession will have effect only as regards the relations
between the acceding State and such Contracting States as will
have declared their acceptance of the accession. Such a
declaration will also have to be made by any Member State
ratifying, accepting or approving the Convention after an
accession. Such declaration shall be deposited at the Ministry
of Foreign Affairs of the Kingdom of the Netherlands; this
Ministry shall forward, through diplomatic channels, a
certified copy to each of the Contracting States.
The Convention will enter into force as between the acceding
State and the State that has declared its acceptance of the
accession on the first day of the third calendar month after the
deposit of the declaration of acceptance.

Article 39

Any State may, at the time of signature, ratification,
acceptance, approval or accession, declare that the Convention
shall extend to all the territories for the international
relations of which it is responsible, or to one or more of
them. Such a declaration shall take effect at the time the
Convention enters into force for that State.
Such declaration, as well as any subsequent extension, shall be
notified to the Ministry of Foreign Affairs of the Kingdom of the
Netherlands.

Article 40

If a Contracting State has two or more territorial units in which
different systems of law are applicable in relation to matters
dealt with in this Convention, it may at the time of signature,
ratification, acceptance, approval or accession declare that this
Convention shall extend to all its territorial units or only to one
or more of them and may modify this declaration by submitting
another declaration at any time.
Any such declaration shall be notified to the Ministry of Foreign
Affairs of the Kingdom of the Netherlands and shall state expressly
the territorial units to which the Convention applies.

Article 41

Where a Contracting State has a system of government under which
executive, judicial and legislative powers are distributed
between central and other authorities within that State, its
signature or ratification, acceptance or approval of, or
accession to this Convention, or its making of any declaration
in terms of Article 40 shall carry no implication as to the

internal distribution of powers within that State.

Article 42

Any State may, not later than the time of ratification, acceptance, approval or accession, or at the time of making a declaration in terms of Article 39 or 40, make one or both of the reservations provided for in Article 24 and Article 26, third paragraph. No other reservations shall be permitted.

Any State may at any time withdraw a reservation it has made. The withdrawal shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands. The reservation shall cease to have effect on the first day of the third calendar month after the notification referred to in the preceding paragraph.

Article 43

The Convention shall enter into force on the first day of the third calendar month after the deposit of the third instrument of ratification, acceptance, approval or accession referred to in Articles 37 and 38.

Thereafter the Convention shall enter into force -

1. for each State ratifying, accepting, approving or acceding to it subsequently, on the first day of the third calendar month after the deposit of its instrument of ratification, acceptance, approval or accession;
2. for any territory or territorial unit to which the Convention has been extended in conformity with Article 39 or 40, on the first day of the third calendar month after the notification referred to in that Article.

Article 44

The Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 43 even for States which subsequently have ratified, accepted, approved it or acceded to it.

If there has been no denunciation, it shall be renewed tacitly every five years.

Any denunciation shall be notified to the Ministry of Foreign Affairs of the Kingdom of the netherlands at least six months before the expiry of the five year period. It may be limited to certain of the territories or territorial units to which the Convention applies.

The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

Article 45

The Ministry of Foreign Affairs of the Kingdom of the Netherlands shall notify the States Members of the Conference, and the States which have acceded in accordance with Article 38, of the following -

1. the signatures and ratifications, acceptances and approvals referred to in Article 37;
2. the accession referred to in Article 38;
3. the date on which the Convention enters into force in accordance with Article 43;
4. the extensions referred to in Article 39;
5. the declarations referred to in Articles 38 and 40;
6. the reservations referred to in Article 24 and Article 26, third paragraph, and the withdrawals referred to in Article 42;
7. the denunciation referred to in Article 44.

In witness whereof the undersigned, being duly authorized
thereto, have signed this Convention.
Done at The Hague, on the 25th day of October, 1980, in the
English and French languages, both texts being equally authentic,
in a single copy which shall be deposited in the archives of the
Government of the Kingdom of the Netherlands, and of which
a certified copy shall be sent, through diplomatic channels, to each
of the States Members of the Hague Conference on Private International
Law at the date of its Fourteenth Session.
International Adoption & Child Abduction



**United States Department of State**

*Washington, D.C. 20520*

# United States Codes

**PUBLIC LAW 100-300**
**100th Congress**
**(H.R. 3971, 29 April 1988)**

## 42 USC 11601 et seq.
## INTERNATIONAL CHILD ABDUCTION REMEDIES ACT (ICARA)

*To establish procedures to implement the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980 and for other purposes.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled.*

**Short Title: "This act may be cited as the 'International Child Abduction Remedies Act'."**

### Section 11601. - Findings and declarations

**(a)** Findings: The Congress makes the following findings:

**(1)** The international abduction or wrongful retention of children is harmful to their well-being.

**(2)** Persons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention.

**(3)** International abductions and retentions of children are increasing, and only concerted cooperation pursuant to an international agreement can effectively combat this problem.

**(4)** The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights. Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies. The Convention provides a sound treaty framework to help resolve the problem of international abduction and retention of children and will deter such wrongful removals and retentions.

**(b)** Declarations: The Congress makes the following declarations:

**(1)** It is the purpose of this chapter to establish procedures for the implementation of the Convention in the United States.

**(2)** The provisions of this chapter are in addition to and not in lieu of the provisions of the Convention.

**(3)** In enacting this chapter the Congress recognizes -

**(A)** the international character of the Convention; and

**(B)** the need for uniform international interpretation of the Convention.

**(4)** The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims

**Section 11602. - Definitions**

For the purposes of this chapter -

**(1)** the term "applicant" means any person who, pursuant to the Convention, files an application with the United States Central Authority or a Central Authority of any other party to the Convention for the return of a child alleged to have been wrongfully removed or retained or for arrangements for organizing or securing the effective exercise of rights of access pursuant to the Convention;

**(2)** the term "Convention" means the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980;

**(3)** the term "Parent Locator Service" means the service established by the Secretary of Health and Human Services under section 653 of this title;

**(4)** the term "petitioner" means any person who, in accordance with this chapter, files a petition in court seeking relief under the Convention;

**(5)** the term "person" includes any individual, institution, or other legal entity or body;

**(6)** the term "respondent" means any person against whose interests a petition is filed in court, in accordance with this chapter, which seeks relief under the Convention;

**(7)** the term "rights of access" means visitation rights;

**(8)** the term "State" means any of the several States, the District of Columbia, and any commonwealth, territory, or possession of the United States; and

**(9)** the term "United States Central Authority" means the agency of the Federal Government designated by the President under section 11606(a) of this title

**Section 11603. - Judicial remedies**

**(a)** Jurisdiction of courts

The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention.

**(b)** Petitions

Any person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for organizing or securing the effective exercise of rights of access to a child may do so by commencing a civil action by filing a petition for the relief sought in any court which has jurisdiction of such action and which is authorized to exercise its jurisdiction in the place where the child is located at the time the petition is filed.

**(c)** Notice

Notice of an action brought under subsection (b) of this section shall be given in accordance with the applicable law governing notice in interstate child custody proceedings.

**(d)** Determination of case

The court in which an action is brought under subsection (b) of this section shall decide the case in accordance with the Convention.

**(e)** Burdens of proof

**(1)** A petitioner in an action brought under subsection (b) of this section shall establish by a preponderance of the evidence -

**(A)** in the case of an action for the return of a child, that the child has been wrongfully removed or retained within the meaning of the Convention; and

**(B)** in the case of an action for arrangements for organizing or securing the effective exercise of rights of access, that the petitioner has such rights.

**(2)** In the case of an action for the return of a child, a respondent who opposes the return of the child has the burden of establishing -

**(A)** by clear and convincing evidence that one of the exceptions set forth in article 13b or 20 of the Convention applies; and

**(B)** by a preponderance of the evidence that any other exception set forth in article 12 or 13 of the Convention applies.

**(f)** Application of Convention

For purposes of any action brought under this chapter -

**(1)** the term "authorities", as used in article 15 of the Convention to refer to the authorities of the state of the habitual residence of a child, includes courts and appropriate government agencies;

**(2)** the terms "wrongful removal or retention" and "wrongfully removed or retained", as used in the Convention, include a removal or retention of a child before the entry of a custody order regarding that child; and

**(3)** the term "commencement of proceedings", as used in article 12 of the Convention, means, with respect to the return of a child located in the United States, the filing of a petition in accordance with subsection (b) of this section.

**(g)** Full faith and credit

Full faith and credit shall be accorded by the courts of the States and the courts of the United States to the judgment of any other such court ordering or denying the return of a child, pursuant to the Convention, in an action brought under this chapter.

**(h)** Remedies under Convention not exclusive

The remedies established by the Convention and this chapter shall be in addition to remedies available under other laws or international agreements

**Section 11604. - Provisional remedies**

**(a)** Authority of courts

In furtherance of the objectives of article 7(b) and other provisions of the Convention, and subject to the provisions of subsection (b) of this section, any court exercising jurisdiction of an action brought under section 11603(b) of this title may take or cause to be taken measures under Federal or

State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment before the final disposition of the petition.

**(b)** Limitation on authority

No court exercising jurisdiction of an action brought under section 11603(b) of this title may, under subsection (a) of this section, order a child removed from a person having physical control of the child unless the applicable requirements of State law are satisfied

**Section 11605. - Admissibility of documents**

With respect to any application to the United States Central Authority, or any petition to a court under section 11603 of this title, which seeks relief under the Convention, or any other documents or information included with such application or petition or provided after such submission which relates to the application or petition, as the case may be, no authentication of such application, petition, document, or information shall be required in order for the application, petition, document, or information to be admissible in court

**Section 11606. - United States Central Authority**

**(a)** Designation

The President shall designate a Federal agency to serve as the Central Authority for the United States under the Convention.

**(b)** Functions

The functions of the United States Central Authority are those ascribed to the Central Authority by the Convention and this chapter.

**(c)** Regulatory authority

The United States Central Authority is authorized to issue such regulations as may be necessary to carry out its functions under the Convention and this chapter.

**(d)** Obtaining information from Parent Locator Service

The United States Central Authority may, to the extent authorized by the Social Security Act (42 U.S.C. 301 et seq.), obtain information from the Parent Locator Service.

**(e)** Grant authority

The United States Central Authority is authorized to make grants to, or enter into contracts or agreements with, any individual, corporation, other Federal, State, or local agency, or private entity or organization in the United States for purposes of accomplishing its responsibilities under the Convention and this chapter

**Section 11607. - Costs and fees**

**(a)** Administrative costs

No department, agency, or instrumentality of the Federal Government or of any State or local government may impose on an applicant any fee in relation to the administrative processing of applications submitted under the Convention.

**(b)** Costs incurred in civil actions

**(1)** Petitioners may be required to bear the costs of legal counsel or advisors, court costs incurred in connection with their petitions, and travel costs for the return of the child involved and any accompanying persons, except as provided in paragraphs (2) and (3).

**(2)** Subject to paragraph (3), legal fees or court costs incurred in connection with an action brought under section 11603 of this title shall be borne by the petitioner unless they are covered by payments from Federal, State, or local legal assistance or other programs.

**(3)** Any court ordering the return of a child pursuant to an action brought under section 11603 of this title shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such order would be clearly inappropriate

**Section 11608. - Collection, maintenance, and dissemination of information**

**(a)** In general

In performing its functions under the Convention, the United States Central Authority may, under such conditions as the Central Authority prescribes by regulation, but subject to subsection (c) of this section, receive from or transmit to any department, agency, or instrumentality of the Federal Government or of any State or foreign government, and receive from or transmit to any applicant, petitioner, or respondent, information necessary to locate a child or for the purpose of otherwise implementing the Convention with respect to a child, except that the United States Central Authority -

**(1)** may receive such information from a Federal or State department, agency, or instrumentality only pursuant to applicable Federal and State statutes; and

**(2)** may transmit any information received under this subsection notwithstanding any provision of law other than this chapter.

**(b)** Requests for information

Requests for information under this section shall be submitted in such manner and form as the United States Central Authority may prescribe by regulation and shall be accompanied or supported by such documents as the United States Central Authority may require.

**(c)** Responsibility of government entities

Whenever any department, agency, or instrumentality of the United States or of any State receives a request from the United States Central Authority for information authorized to be provided to such Central Authority under subsection (a) of this section, the head of such department, agency, or instrumentality shall promptly cause a search to be made of the files and records maintained by such department, agency, or instrumentality in order to determine whether the information requested is contained in any such files or records. If such search discloses the information requested, the head

of such department, agency, or instrumentality shall immediately transmit such information to the United States Central Authority, except that any such information the disclosure of which -

**(1)** would adversely affect the national security interests of the United States or the law enforcement interests of the United States or of any State; or

**(2)** would be prohibited by section 9 of title 13; shall not be transmitted to the Central Authority. The head of such department, agency, or instrumentality shall, immediately upon completion of the requested search, notify the Central Authority of the results of the search, and whether an exception set forth in paragraph (1) or (2) applies. In the event that the United States Central Authority receives information and the appropriate Federal or State department, agency, or instrumentality thereafter notifies the Central Authority that an exception set forth in paragraph (1) or (2) applies to that information, the Central Authority may not disclose that information under subsection (a) of this section.

**(d)** Information available from Parent Locator Service

To the extent that information which the United States Central Authority is authorized to obtain under the provisions of subsection (c) of this section can be obtained through the Parent Locator Service, the United States Central Authority shall first seek to obtain such information from the Parent Locator Service, before requesting such information directly under the provisions of subsection (c) of this section.

**(e)** Recordkeeping

The United States Central Authority shall maintain appropriate records concerning its activities and the disposition of cases brought to its attention

**Section 11608a. - Office of Children's Issues**

**(a)** Director requirements

The Secretary of State shall fill the position of Director of the Office of Children's Issues of the Department of State (in this section referred to as the "Office") with an individual of senior rank who can ensure long-term continuity in the management and policy matters of the Office and has a strong background in consular affairs.

**(b)** Case officer staffing

Effective April 1, 2000, there shall be assigned to the Office of Children's Issues of the Department of State a sufficient number of case officers to ensure that the average caseload for each officer does not exceed 75.

**(c)** Embassy contact

The Secretary of State shall designate in each United States diplomatic mission an employee who shall serve as the point of contact for matters relating to international abductions of children by parents. The Director of the Office shall regularly inform the designated employee of children of United States citizens abducted by parents to that country.

**(d)** Reports to parents

**(1)** In general

Except as provided in paragraph (2), beginning 6 months after November 29, 1999, and at least once every 6 months thereafter, the Secretary of State shall report to each parent who has requested assistance regarding an abducted child overseas. Each such report shall include information on the current status of the abducted child's case and the efforts by the Department of State to resolve the case.

**(2)** Exception

The requirement in paragraph (1) shall not apply in a case of an abducted child if -

**(A)** the case has been closed and the Secretary of State has reported the reason the case was closed to the parent who requested assistance; or

**(B)** the parent seeking assistance requests that such reports not be provided

**Section 11609. - Interagency coordinating group**

The Secretary of State, the Secretary of Health and Human Services, and the Attorney General shall designate Federal employees and may, from time to time, designate private citizens to serve on an interagency coordinating group to monitor the operation of the Convention and to provide advice on its implementation to the United States Central Authority and other Federal agencies. This group shall meet from time to time at the request of the United States Central Authority. The agency in which the United States Central Authority is located is authorized to reimburse such private citizens for travel and other expenses incurred in participating at meetings of the interagency coordinating group at rates not to exceed those authorized under subchapter I of chapter 57 of title 5 for employees of agencies

**Section 11610. - Authorization of appropriations**

There are authorized to be appropriated for each fiscal year such sums as may be necessary to carry out the purposes of the Convention and this chapter

# Jurisdiction in Child Custody and Abduction Cases: A Judge's Guide to the UCCJA, PKPA, and the Hague Child Abduction Convention

*by*

*Patricia M. Hoff, Esq.*
*Adrienne E. Volenik, Esq.*
*Linda K. Girdner, Ph.D.*

*American Bar Association*
*Center on Children and the Law*

740 15th Street, NW, 9th Floor
Washington, D.C. 20005-1009





This bench book was written under grant 93-MC-CX-0002 from the Office of Juvenile Justice and Delinquency Prevention, U.S. Department of Justice, to the American Bar Association Fund for Justice and Education. The official grant title is "Obstacles to the Recovery and Return of Parentally Abducted Children: Training, Technical Assistance, and Product Resources."

Points of view or opinions in these materials are those of the authors and do not necessarily represent the official position of the Department of Justice.

The views expressed herein have not been approved by the House of Delegates or the Board of Governors of the American Bar Association and accordingly, should not be construed as representing the policy of the American Bar Association.

© American Bar Association
December 1996
Permission is granted to reproduce with proper attribution.

# Jurisdiction in Child Custody and Abduction Cases: A Judge's Guide to the UCCJA, PKPA, and Hague Child Abduction Convention

## Foreword

Hundreds of child custody cases are fought across state and national borders every year. Some involve child abduction. Others are the consequence of parents moving with their children to different states or countries following the breakup of their relationships. Very often courts in different states — or countries — exercise custody jurisdiction and issue conflicting orders, raising questions about which order is enforceable.

Litigating custody and pursuing appeals in two different forums can leave parents emotionally and financially exhausted. Worse, children are subjected to long periods of uncertainty and the emotional trauma of being the objects of these prolonged conflicts.

The administration of justice is greatly enhanced when judges have a clear understanding of the complex state, federal and international laws applicable to litigation pending before them. Despite its obvious importance, ongoing judicial education in every aspect of the court's jurisdiction is often difficult, if not impossible. I am sure that most judges would agree that having all of the necessary information available prior to rendering a decision from the bench would be the ideal. However, when considering whether to exercise jurisdiction in an interstate child custody or abduction case all of the necessary information is rarely presented or even available within the state. During heightened litigation, often involving *pro se* litigants, it is often difficult to frame the right questions in order to obtain the information critical to a proper determination. The availability of a handy reference book, to assist the judge in sorting through applicable statutes and ever-changing case facts is an invaluable aid.

This unique volume is the first comprehensive study of jurisdiction in child custody and abduction cases specifically designed for use by the judiciary from the bench. Comprehensive yet succinct, the bench book is a valuable resource for judges faced with deciphering the requirements of the Uniform Child Custody Jurisdiction Act (UCCJA), the federal Parental Kidnapping Prevention Act (PKPA), and the Hague Convention of the Civil Aspects of International Child Abduction (Convention), amidst burgeoning caseloads, limited resources and parties deep in the emotional throes of custody litigation.

However, in order for a bench book to be helpful it must be useable. A judge should be able to peruse it at his or her leisure for detailed understanding or, be able to flip it open, amidst arguments of counsel if need be, and locate information quickly and easily. This well-crafted bench book is designed to assist judges to do just that.

The UCCJA and the PKPA were enacted to prevent jurisdictional gridlock in child custody and abduction cases, and to facilitate interstate enforcement of custody and visitation decrees. The United States ratified the Hague Convention on the Civil Aspects of International Child Abduction (Convention), which requires the prompt return of children who have been wrongfully taken or kept abroad. Federal legislation, the International Child Abduction Remedies Act (ICARA), provides procedures for implementing the Convention in this country.

Judges have a critical role in making these laws work. Yet research conducted by the American Bar Association found that many judges have not applied these laws correctly or at all. Lack of knowledge was identified as a key

reason.[1] The Obstacles Report recommended continuing education for judges and lawyers on the UCCJA, PKPA, Hague Convention and ICARA.[2] Collaborative efforts between judges' organizations and the ABA were suggested to disseminate information about these laws to the legal community.[3] This *Journal* issue implements these recommendations. It is the product of a successful collaboration between the ABA Center on Children and the Law and the National Council of Juvenile and Family Court Judges.

Another effort is underway to improve the handling of interstate child custody and visitation cases. The National Conference of Commissioners on Uniform State Laws (NCCUSL) is in the process of revising the UCCJA. The Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), as the draft bill is called, makes the UCCJA consistent with the PKPA, establishes a uniform procedure for expedited interstate enforcement of custody and visitation orders, clarifies some UCCJA provisions to better reflect the drafter's original intent, and codifies good practice.

The National Council of Juvenile and Family Court Judges and the ABA have been involved, in an advisory capacity, with the NCCUSL committee that is drafting the UCCJEA. The UCCJEA is scheduled for its second reading in July 1997. It is difficult to determine how long it will take the 50 states to enact the UCCJEA once it is available for adoption, presumably in 1998. In the interim, the imperative remains for judges to accurately and efficiently apply the existing statutes as they were intended to be used. This bench book will assist judges to fulfill this mandate.

It is a book for all judges, whether on the family court, the juvenile bench, or a court of general jurisdiction, who preside over any civil case involving child custody. The UCCJA and PKPA apply to a broad range of "custody proceedings" and not solely when custody is at

issue in proceedings for divorce or separation. The book should be consulted routinely whenever custody is at issue. This book does not cover how judges should decide the merits of a custody dispute once it is determined they have jurisdiction.

For those judges who are already knowledgeable about the intricacies of the UCCJA, PKPA and the Hague Convention, a review of the bench book will provide solid evidence that thousands of other judges will soon join the ranks of the well-informed. The rest of us, still struggling to make sense of the UCCJA *et al*, will welcome this bench book with open arms confident that much needed help has arrived.

The authors have made a valuable contribution to the library of judicial resources that improve the courts' ability to administer justice. It is a privilege to be associated with this publication.

Janice Brice Wellington
Board of Trustees
National Council of Juvenile and Family Court Judges

# Chapter 7
# Drafting the Custody Order

## Summary

This chapter outlines provisions that should be included in custody orders to aid interstate enforcement. When there is risk of child abduction, the court should include preventive measures in the custody order. This chapter also helps judges identify families at risk for child abduction, and suggests appropriate safeguards to put in the order.

## CHECKLIST

**1. What should be included in every custody order?**

- Jurisdiction
  The legal basis for jurisdiction
  The factual basis for jurisdiction
- Parties
- Notice and opportunity to be heard
- Specific custody and visitation rights, with supporting facts
- Penalties for violating the provisions of the order

**What optional provisions should be included in the custody order to prevent abduction?**

- Supervised visitation
- Restrictions on removing the child from the state or the country
- Posting of a bond
- Limitations on access to the child's passport
- "Mirror image" order from a foreign court
- Notification of school personnel and other individuals

**2. What risk factors for abduction should prompt the court to order preventive measures?**

- Prior threat of or actual abduction
- Distrust due to belief abuse has occurred
- Paranoid or sociopathic parent
- End of mixed culture marriage
- Disenfranchised parents with family/social support
- Likely degree of difficulty to secure a child's return.

## Applicable statutes

FEDERAL

PKPA 28 U.S.C. § 1738A

STATE

UCCJA § 3
UCCJA § 10
UCCJA § 12

## What should be included in every custody order?

A well drafted custody order should inform the parties of their rights and obligations about custody of the child and contain provisions that will facilitate enforcement and deter violations. The following provisions should be included in every well structured custody order.

### Statement of jurisdiction

Clearly detail the basis for exercising jurisdiction in every custody order. This simple step will facilitate interstate enforcement and reduce the chances of it being modified improperly by a sister state.

If this is the child's home state, say so and state the facts that support this conclusion. With this information in the order, another court can decide whether or not it must be enforced or

accorded full faith and credit or whether it can be modified according to provisions of the UCCJA and PKPA. This information also helps a court decide whether the jurisdictional determination is *res judicata* with respect to the parties, according to UCCJA § 12.

The Full Faith and Credit clause of Article IV of the U.S. Constitution, and its implementing statute, 28 U.S.C. 1738, forbid F2 to re-examine a jurisdictional issue decided in F1, if the law of F1 would forbid an F1 court to re-examine it and F1 provided due process.

**Example 1.** This court has home state jurisdiction to determine custody in accordance with PKPA, 28 U.S.C. § 1738A(c)(2)(A) and UCCJA § 3(a)(1).[1] The court finds that [name of state] is the "home state" within the meaning of UCCJA § 2(5) and PKPA, 28 U.S.C. 1738A(b)(4). The court should then set forth jurisdictional facts that support the conclusion of law, including the length of time the child has resided in the state. Example: The parties presented evidence to establish jurisdiction and the court finds that the child has lived in this state for four years and three months consecutively with his natural parents. This state is, therefore, the child's home state.

**Example 2.** This court has significant connection jurisdiction to determine custody in accordance with PKPA, 28 U.S.C. § 1738A(c)(2)(B) and UCCJA § 3(a)(2), the court having found that no other state has "home state" jurisdiction within the meaning of UCCJA § 2(5) and PKPA, 28 U.S.C. 1738A(b)(4) [or that the child's "home state" has deferred to this court].

The court should set forth the jurisdictional facts that support the conclusion of law, including the length of time the child has resided in the state and availability of evidence in the state. *Example:* The parties presented evidence to establish jurisdiction and the court finds that the child was born in F1 where she lived for three months with her natural parents. The parents subsequently moved to F2 (this state), where the child lived for five months prior to the time this action for custody was filed. The child continues to reside here with her mother. The father also resides here as do the child's paternal grandparents. The child, therefore, had no home state when this action was filed.

The court further finds that it was in the child's best interest for this court to assume jurisdiction because the child and her parents have significant connections with the state and there is available in this state substantial evidence concerning the child's present and future care, protection, training, and personal relationships.

In these examples, the court states a conclusion of law, *i.e.*, that it had jurisdiction pursuant to a specific section of the PKPA and UCCJA, and the court states the jurisdictional facts that support the conclusions of law.

## Parties

The order should state that all persons required to be joined as parties and entitled to notification of the custody proceedings under UCCJA § 4 and § 10 were joined and properly notified. Most often the individuals included here will be grandparents claiming visitation rights pursuant to state statutes or a person who has physical custody of the child.

UCCJA § 10 requires any person, not a party to a custody proceeding, who has physical custody of the child or who claims to have custody or visitation rights with the child, be joined as a party and notified both of the joinder and the proceedings. Section 4 requires notification and opportunity to be heard be given to the contestants, any parent whose parental rights have not previously been terminated, and any person who has physical custody of the child.

These requirements exist to prevent or minimize relitigation of custody and visitation issues by people with legitimate claims. If the state recognizes grandparent visitation rights, grandparents who intend to make claims should

do so at the same time the parents' rights are being determined so these issues can be resolved at one time.[2] This is important because each time custody and visitation issues are relitigated, the child is put through the stress of new proceedings. Therefore, make sure all persons with legitimate custody claims litigate or get the opportunity to litigate them at one time.

When information showing people with custody claims were properly notified and joined is included in the order, the possibility that any of these persons could successfully collaterally attack the decree is reduced.

**Example.** All persons required to be joined as parties and notified under UCCJA § 10 and § 4 and § 28 U.S.C. § 1738A(e) were ordered joined and were duly notified of the proceedings and of being joined as a party.

The following persons were ordered joined as parties and were notified of the joinder. Notification was by registered mail, return receipt requested and returned on the date which follows each name (or otherwise served in accordance with UCCJA § 5).

- Maternal grandparents X/X/XX;
- Paternal grandparents X/X/XX;
- Notice and opportunity to be heard

## Notice and opportunity to be heard

Both the UCCJA and PKPA require reasonable notice and opportunity to be heard be provided to contestants, parents whose rights have not been terminated and persons with physical custody of the child before making child custody determinations. These basic elements of due process are critical if a resulting order is to be recognized and enforced or given full faith and credit by courts in other jurisdictions.

In addition, UCCJA § 12 notes the *res judicata* effect of orders entered when the parties have been properly notified and given an opportunity to be heard. For these reasons, the custody order should address these issues. It should state:

- how service of process occurred
- how much notice of the proceedings the party received, and
- what opportunity the party had to be heard.

By including this information in the order, the judge enhances the probability the order will be recognized or given full faith and credit in another jurisdiction. If a party seeks to enforce the order at a later time and in a different state, the order itself demonstrates that the other party was given adequate notice and opportunity to be heard. This makes possible the enforcement court's application of *res judicata* to issues of law and fact decided by the issuing court.

**Example.** The party was accorded full due process in that he was served with process according to the law of this state and the law of the state where he was located (if not within the jurisdiction) and was given ample notice of the proceedings and a full opportunity to be heard.

The party was personally served with the complaint in this action pursuant to (list appropriate statutory citations, which may be § 5 of the UCCJA) with return of service dated ____ and filed with the court on ____. The party received notice of the custody hearing on ____ which was (20) days in advance of the scheduled hearing. The party was present for the hearing at which he was represented by counsel and fully participated in it.

Note, the example states both findings of fact and conclusions of law. The findings of fact support the conclusion that the party's due process rights were protected.

### Specifying custody and visitation rights

Clearly state the custody and visitation rights of each party. This includes grandparents if they have been granted visitation. If custody and visitation rights are clearly established, then parties cannot allege a violation from lack of understanding. For example, if a court awards "reasonable visitation" to a parent, the question of what is "reasonable" may become the subject of post-judgment litigation. The original fact-finder is in the best position to define what 'reasonable visitation' means in concrete terms, and should do so in the court order. The decree will be easier to enforce in another jurisdiction because its terms are precise. Even when parents appear to be working together amicably, it is wise to include specific terms in case the relationship deteriorates.

The need for precision and clarity about the rights of the parents with respect to the child is greater today than ever before, as states adopt new terminology to describe the parent-child relationship that may be unfamiliar to courts in sister states. For instance, the terms "custody and visitation" have been replaced in some states by "parenting responsibilities," "parenting plans," "parental functions," "parenting time," "primary caretaker," etc. The language of parent-child relationships will continue to evolve and enforcement problems will likely result if orders are left vague. Judges can minimize enforcement problems by spelling out when and with whom the child is to be at all times. This will help a court in another jurisdiction implement the plan as it was meant to be implemented.

### Restrictions on access to the child in domestic violence cases

If the case involves a battered spouse or abused child or if one party has threatened or harassed another, and as a result, the court intends to permit only supervised visitation, the court should clearly state this in the order. The order should recite the facts that support the decision to restrict visitation. The order should include specific provisions for the drop-off and pick-up of the child to prevent confrontations between the abused and abusive parent. This information will be useful to any court asked to modify the existing decree. For example, if a party seeks to modify the decree in another state, the judge in the second state would know of the abuse or harassment problem by reading the decree, which could have a significant impact on how the judge would handle the matter. Because the order shows that the issues of abuse or harassment were already litigated by the parties, the finding of fact would not be subject to challenge.

### Orders for joint custody

A decision to award joint custody is a substantive one, and therefore, beyond the scope of this manual. However, when considering such an award, the judge is encouraged to consider it in terms of whether it would encourage violations, and the subsequent need for enforcement actions. For example, the judge should be reluctant to order joint custody if the parents appear unable to work cooperatively. If there is a history of, or the potential for, child abuse, spouse abuse, or parental kidnapping, the court should have reservations about the appropriateness of joint custody.[3] In addition, if the parents are not in agreement on joint custody and they do not live in geographical proximity to one another, the court should give serious thought to whether joint custody would be appropriate.[4] When these conditions are present, the likelihood of one party violating the decree increases substantially. If joint custody is ordered, the order should clearly identify residential arrangements for the child at all times.

### Penalties for violating the provisions of the order

In every state, a party who violates a custody order can be held in contempt. In addition, every

state has enacted criminal custodial interference statutes, and many states have made these laws applicable to interference with visitation as well.[5] The court order should state that violating the custody or visitation provisions of the order could result in the violator being held in contempt. It should also state the violator could face criminal charges under state and federal law.

By including this information, the court puts both parties on notice of the possible consequences of violating the decree.

**Example.** A party who violates the provisions of this order may be held in contempt of court and punished accordingly.

Violation of the provisions of this order could subject the violator to criminal prosecution pursuant to (insert state statute) and penalties of (state the possible penalties) in accordance with (insert state statute).

## What safeguards can the court include in the custody order to reduce the risk of abduction?

The court should seriously consider a party's concern that the other parent will abduct the child, particularly if threats to abduct have been made. The court should assess the level of abduction risk, the likelihood of the child being returned promptly if the child were abducted, and the harm the child would likely incur if abducted. Six profiles of abduction risk, with specific preventive measures suited to each, follows this general discussion of prevention. See pages 7-10 to 7-16.

In cases in which there is a high risk of abduction and a low likelihood of recovery, combined with a substantial negative impact on the child should an abduction occur, the court should order the most stringent and restrictive preventive measures. In cases in which there is a low risk of abduction with a high likelihood of recovery, less restrictive measures may be warranted.

Measures courts can use alone or in combination to reduce the risk of abduction include:

- supervised visitation
- removal restrictions
- bonds
- passport restrictions
- "mirror image" orders
- notifying schools of custody orders.

## Supervised visitation

Some situations will warrant supervised (or "monitored") visitation orders, such as where an abduction has already occurred,[6] or threats to abduct the child have been made. The court can order that supervised visitation take place at the home of the custodial parent or at another designated location. There may be a supervised visitation center available for this purpose. The person responsible for supervising the visits may be a law enforcement officer, a social worker, a clergyman, relative, or other person designated by the court.

**Example.** The mother shall have supervised visitation with the child on alternating Saturdays from noon to six o'clock. Visits are restricted to father's house. Visits are to be supervised at all times by the deputy sheriff.

## Restrictions on removing the child from the state or the country

When parents reside in different states or different countries or have the intention of doing so, the possibility that one parent will abduct the child to the other state or nation or refuse to return the child after a visit always exists. If the judge concludes the risk of this is more than minimal based on evidence introduced in the custody proceeding, the judge should consider enjoining the parent from removing the child from the state or nation[7] without the written consent of the other party or prior consent of the

court.

A provision in the custody order restricting the right of a parent to remove the child from the state or country will enable the other parent to prevent issuance of a passport for the minor child pursuant to federal regulations. 22 C.F.R. 51.27 See "Passport Restrictions," *infra*.

## Bond requirements

If flight is a serious concern, the judge must consider ordering the parent to post a bond. The bond would be forfeited to the left-behind parent to cover enforcement and recovery costs, if the parent violated the custody decree by removing the child from state or country. Posting a substantial bond can deter removal of the child. Bonds may also be required to encourage compliance with visitation orders.[8]

**Example.** The father is ordered to post a cash bond in the amount of [$5000] with the court. This bond shall be subject to forfeiture to the mother in the event that the father removes the child from the country without securing advance written permission from the mother or the court.

## Passport restrictions

If there is a risk one parent will remove the child from the United States, the judge should consider passport restrictions. This could be done by ordering one parent to surrender the child's passport to the other parent, or by enjoining one or both parents from applying for a passport for the child.[9]

Federal regulations governing passport applications for minors are found at 22 C.F.R. 51.27. When custody is in dispute, the regulations provide that the Department of State may deny issuance of a passport for a minor child if a custody order has been filed with the Department which (A) grants sole custody to the objecting parent; or (B) establishes joint legal

custody; or (C) prohibits the child's travel without permission of both parents or the court; or (D) requires written permission of both parents or the court for important decisions. The State Department reserves the right to withhold passports for minor children until the custody conflict is resolved by an appropriate court, and may issue a passport notwithstanding the restrictions noted above if compelling humanitarian or emergency reasons exist.

The State Department will accept a court order from a state court in the U.S. as well as from a foreign court in the child's "home state" or country of habitual residence. In cases involving joint legal custody, written permission of both parents is required before a passport will be issued for a child unless the court specifies otherwise.

The clearer the court order, the easier it is for the State Department to comply with the court's intent regarding passport issuance, thereby safeguarding against the child's removal from the country.

Restricting access to passports is not fail safe in the case of children and parents with dual nationality. Foreign embassies and consulates are not required to comply with a U.S. court order forbidding the foreign national parent from obtaining a passport for himself/herself and the children, although some countries will comply voluntarily. The court should consider additional safeguards in dual citizenship cases. For instance, the court may order the foreign parent to advise his/her consulate in writing as to any court restrictions on obtaining original or replacement passports for the parent and child, and to obtain a written acknowledgment from the consulate, addressed to the court, evidencing that the foreign parent has neither applied for nor received passports for himself/herself or the child.

**Example.** Surrendering passport - The father is hereby ordered to surrender the child's

passport to the mother prior to visitation with the child. The visitation schedule shall not take effect until after the passport is surrendered. The mother shall provide the father with a written receipt for the passport and is ordered to retain the passport in a secure location. The mother is also required to file an Acknowledgment of Receipt of Passport with the court, with a copy provided to the father. This Acknowledgment shall inform the court of the date the passport was surrendered.

### "Mirror image" orders

The court may direct a parent who lives (or is likely to live) abroad to obtain an order from a court in the foreign country recognizing the jurisdiction of the U.S. court, and agreeing to enforce the order should that be necessary. The state court may require the parent to obtain such a "mirror image" order from a foreign court before the child is permitted to travel abroad to visit.

Example. Before the child is permitted to travel overseas to visit the mother, the mother shall obtain an order from a tribunal in [ ] [specify the country]. The order shall recognize the continuing jurisdiction of this court over child custody matters, and shall recognize an obligation to enforce the order of this court in the event the mother refuses to return the child at the end of the lawful visitation period.

### Notification of school personnel and other individuals

When custody proceedings are hostile and there are restrictions on access to the child by one party, the court should consider requiring that school personnel and certain individuals be informed of the restrictions. If, for example, a mother is granted visitation only in the presence of the father, the court should consider ordering the father to notify school personnel of the court order and its restrictions. Similarly, grandparents and other relatives or child care providers should be informed of the contents of the order. If they know of the restrictions on access to the child by the mother, they are less likely to allow the mother unsupervised contact with the child. Finally, by requiring a parent to notify these people, the court may deter anyone who might assist the mother in abducting the child, because they might be subject to contempt.[10]

Example. The custodial parent is ordered to provide a copy of this order to the following individuals:

- The principal of the child's school;
- The child's teacher;
- The driver of the child's bus;
- The child's maternal and paternal grandparents;
- The child's maternal and paternal aunts and uncles;
- The child's after school day care provider.

Alternatively, the court may admonish the custodial parent to provide copies of the custody order to the noted individuals.

## SAMPLE CUSTODY ORDER[11]

### [Provisions to be included in every custody order]

It is ordered adjudged and decreed that:

### Jurisdiction
### [Home State Jurisdiction]

This court has home state jurisdiction to determine custody pursuant to the Uniform Child Custody Jurisdiction Act (UCCJA) § 3(a )(1) and consistently with the Parental Kidnapping Prevention Act (PKPA) 28 U.S.C. § 1738A(c)(2 )(A). The court finds that ______ is the child's "home state" within the meaning of UCCJA § 2(5) and PKPA, 28 U.S.C. 1738A(b)(4).

The parties presented evidence to establish jurisdiction and the court finds that the child has lived in this state for four years and three months consecutively with his natural parents immediately before the commencement of this proceeding. This state is, therefore, the child's home state.

**[Significant connection jurisdiction when there is no home state]**

This court has jurisdiction to determine custody pursuant to UCCJA § 3(a)(2) and consistently with the PKPA, 28 U.S.C. § 1738A(c)(2)(B), the court having found that no other state has jurisdiction as the child's "home state" within the meaning of UCCJA § 2(5) and PKPA, 28 U.S.C. § 1738A(b)(4).

The parties presented evidence to establish jurisdiction. The court finds that the child was born in F1 where she resided for three months with her natural parents. The parents then moved to (this state) where the child lived for five months prior to the time this action for custody was filed. The child continues to live here with her mother. The father also resides here as do the child's paternal grandparents. The child, therefore, had no home state when this action was commenced. The court finds that it is in the child's best interest for this court to assume jurisdiction because the child and her parents have significant connections with the state and there is available in this state substantial evidence concerning the child's present and future care, protection, training, and personal relationships.

**[Emergency jurisdiction][12]**

The court has emergency jurisdiction pursuant to UCCJA § 3(a)(3) because the child is physically present in this state and has been [abandoned, subjected to or threatened with mistreatment or abuse, or is otherwise neglected or dependent]. [Court should set forth supporting facts.]

**[Last resort (vacuum) jurisdiction]**

This state has jurisdiction to make a child custody determination under UCCJA § 3(a)(4), and consistently with PKPA, 28 U.S.C. 1738A(c)(2)(D), because [it appears that no other state has jurisdiction under UCCJA § 3 or continuing jurisdiction under PKPA, 28 U.S.C. 1738A(d)] or [another state has declined to exercise jurisdiction because this State is the more appropriate forum to determine custody] and it is in the child's best interest that this court assume jurisdiction.

**[Declining jurisdiction on inconvenient forum grounds]**

State the basis of the court's jurisdiction. See above. Then add: The court finds that this state is an inconvenient forum under UCCJA § 7. The court further finds that [insert name of state] is a more appropriate forum to determine custody because [insert reasons, referring to factors set forth in § 7(c)]. Accordingly, this court [dismisses] [stays] this proceeding. If, however, [insert name of state] declines to exercise jurisdiction over custody of the subject child, this court shall exercise jurisdiction and determine custody. [If the forum is clearly inappropriate the court can order the petitioner to pay the costs of the proceedings, and necessary travel and other expenses, including attorneys' fees, incurred by other parties or their witnesses. Payment is to be made to the clerk of the court for remittance to the proper party.]

**[Declining jurisdiction based on petitioner's unclean hands]**

**Declining jurisdiction to make an initial custody determination.** This court declines to exercise jurisdiction to make an initial custody determination because petitioner has wrongfully taken the child from another state or has engaged in similar reprehensible conduct. [Court should describe the conduct that supports the decision to

decline jurisdiction.]

**Declining modification jurisdiction.** This court declines to modify a custody decree made by [insert name of State] because petitioner, unilaterally and without consent [improperly removed the child from the physical custody of the person entitled to custody][improperly retained the child after a visit or other temporary relinquishment of physical custody] [violated a provision of the custody decree]. [Court should set forth supporting facts.]

**Attorneys' fees.** The court orders petitioner to pay necessary travel and other expenses, including attorneys' fees, to respondent and [insert names of witnesses], incurred in connection with this proceeding.

**Parties**

All persons required to be joined as parties pursuant to UCCJA § 10 were ordered joined and were duly notified of the proceedings and of being joined as a party. The following persons were ordered joined as parties and were notified of the joinder. Notification was by registered mail, return receipt requested, and returned on the date which follows each name (or otherwise served in accordance with UCCJA § 5):

- Maternal grandparents X/X/XX;
- Paternal grandparents X/X/XX.

**Notice and opportunity to be heard**

The party was accorded full due process in that he was served with process in accordance with the law of this state (the law of the state where he was residing) and was given ample notice of the proceedings and a full opportunity to be heard.

The party was personally served with the complaint in this action pursuant to (list statutory citation, which may be § 5 of the UCCJA) with return of service dated ____ and filed with the court on ____. The party received notice of the custody hearing on ____which was (20) days in advance of the scheduled hearing. The party was present for the hearing, where he was represented by counsel.

**Custody and visitation**

Mother is awarded primary custody of the child and shall provide primary residence for the child. The father shall have visitation with the child at his residence every other weekend beginning (insert date). Visitation with father shall begin at 2:30 p.m. on Friday and shall end at 7:30 p.m. Sunday evening. The father shall have visitation from July 1 at 2:30 p.m. until July 31 at 7:30 p.m. Mother shall have unlimited telephone access with the child in July. The child shall alternate the following holidays with each parent:

1. New Year's Eve and Day
2. [Passover][Easter]
3. Memorial Day Weekend
4. Fourth of July Weekend
5. Labor Day Weekend
6. Thanksgiving
7. [Christmas][Chanukah]

The child shall spend holidays 1, 2, 4, and 6 with the mother in odd-numbered years and with the father in even-numbered years. The child will spend holidays 3, 5, and 7 with the mother in even-numbered years and with the father in odd-numbered years.

Parents may alter this schedule temporarily upon mutual agreement. They shall put each agreement for a temporary change in writing and shall both sign it. Note: Temporary changes are not enforceable; however, compliance with a temporary change that has been put in writing and agreed to by the parties cannot serve as the basis for a finding of contempt.

Grandparent visitation - (1) Maternal grandparents are hereby awarded visitation rights as follows. Visitation shall occur one weekend

per month beginning Saturday at 1:00 p.m. and ending Sunday at 1:00 p.m. This visit shall occur on the first weekend of the month the child would normally spend with the mother unless that weekend coincides with a holiday, in which case, it shall be the next weekend the child is scheduled to spend with the mother.

(2) Paternal grandparents are hereby awarded visitation rights as follows. Visitation shall occur one weekend per month beginning Saturday at 1:00 p.m. and ending Sunday at 1:00 p.m. This visit shall occur on the first weekend of the month that the child would normally spend with the Father unless that weekend coincides with a holiday, in which case, it shall be the next weekend the child is scheduled to spend with the father.

### [Optional provisions]['Mother' should be substituted for 'father' as appropriate]

1. Restrictions on movement - The father is prohibited from removing the child from this country for any reason unless he first obtains the express written consent of the mother or receives advance permission from the court.

2. Surrender of passport - The father is hereby ordered to surrender the child's passport to the mother prior to the first visitation with the child. The visitation schedule shall not take effect until after the passport is surrendered. The mother shall provide the father with a written receipt for the passport and is ordered to retain the passport in a secure location. The mother is also required to file an Acknowledgment of Receipt of Passport with the court, with a copy provided to the father. This Acknowledgment shall inform the court of the date that the passport was surrendered. [The court may order the passport surrendered to the court, to an attorney, to the court clerk, etc., instead of to the other parent. The court may dispense with the requirement that the parent file an Acknowledgment with the court, if this is too burdensome. This paragraph would be modified accordingly.]

3. Posting of bond - The father is ordered to post a cash bond in the amount of [$5000] with the court. This bond shall be forfeited to the mother if the father removes the child from [the state] [the country] without securing advance written permission from the mother or the court.

### Notify school personnel and individuals

The custodial parent is required to provide a copy of this order to the following individuals:

- The principal of the child's school;
- The child's teacher;
- The driver of the child's bus;
- The child's maternal and paternal grandparents;
- The child's maternal and paternal aunts and uncles;
- The child's after school day care provider.

### Violating the terms of the order

A party who violates the provisions of this order may be held in contempt of court and punished accordingly. A violation of the provisions of this order may subject the violator to criminal prosecution under state and federal law.

## RISK PROFILES OF ABDUCTION

Six profiles of abduction risk have been identified in the recent groundbreaking research on "Prevention of Parent and Family Abduction through Early Identification of Risk Factors.[13]" The profiles are descriptive of abductors and must be used with caution as a predictive device. The court should consider the reasonableness of the parent's concern about the abduction, any previous threats or actual abductions or custody violations, the degree of social support for the person who may abduct, and the person's entrenchment in the community. The court should hear evidence regarding specific planning activities, such as changing jobs, applying for passports, etc., because any planning activities

significantly increase the risk determined by the profile.

The six profiles of abduction risk, discussed below, are:

- when there has been a prior threat of or actual abduction
- when a parent is suspicious and distrustful due to belief abuse has occurred and has social support for the beliefs
- when a parent is paranoid or sociopathic
- when one or both parents are foreigners ending a mixed-culture marriage
- when the parents are disenfranchised but have family/social support.

**Profile 1. When there has been a prior threat of or actual abduction.**

When parents have made credible threats to abduct a child or have a history of hiding the child, withholding visitation, or snatching the child back and forth, there is obviously great distrust and a heightened risk of custody violation. This profile of abduction risk is usually combined with one or more of the other profiles, and in such instances other underlying psychological and social dynamics need to be understood and addressed. General indicators of imminent threat of flight with the child where other risk factors are also present are: (1) when a parent is unemployed, homeless and without emotional or financial ties to the area, and/or (2) when they have divulged plans to abduct and have the resources to survive in hiding or the support of extended kin and underground networks to keep themselves hidden.

There are a number of specific measures that can be taken when there is imminent threat or a history of prior abduction. The safeguards identified earlier in this chapter should be included in the order in these cases.

**Profile 2. When a parent is suspicious and distrustful due to belief abuse has occurred and has social support for these beliefs.**

Families that meet this criterion are characterized by one of the parents having a fixed belief that the other parent is dangerous to the child (either abusive, molesting or neglectful) without there being sufficient substantiating evidence for the court to take action on these allegations. Moreover, the parent is supported in these beliefs by an extended family or social network which can collude in a child abduction in order to "protect the child."

First, order that a prompt, careful and thorough investigation of the allegations be undertaken. During this investigative stage, precautions need to be taken to ensure that there is no ongoing abuse, or, alternatively, to protect an innocent parent from further allegations. Such precautions may include supervised visitation, especially if the child is very young, clearly frightened, or distressed and symptomatic in response to visits.

Along with the investigation, the alleging parent should be shown how to respond to the child and how to make accurate observations without confounding the evaluation process. Whenever possible, the concerned extended kin and other social support persons are also involved in this intervention. All relevant professionals involved with the family should be authorized by the parents to talk with one another so that they can support the family cohesively during the evaluation process and not incite anxiety with discrepant, premature conclusions.

As the data about the allegations and the child's symptomatic behavior are assembled by the investigating professionals (preferably with expertise in both child abuse and the dynamics of highly conflictual divorcing families), there should be a careful sifting through of the

significantly increase the risk determined by the profile.

The six profiles of abduction risk, discussed below, are:

- when there has been a prior threat of or actual abduction
- when a parent is suspicious and distrustful due to belief abuse has occurred and has social support for the beliefs
- when a parent is paranoid or sociopathic
- when one or both parents are foreigners ending a mixed-culture marriage
- when the parents are disenfranchised but have family/social support.

**Profile 1. When there has been a prior threat of or actual abduction.**

When parents have made credible threats to abduct a child or have a history of hiding the child, withholding visitation, or snatching the child back and forth, there is obviously great distrust and a heightened risk of custody violation. This profile of abduction risk is usually combined with one or more of the other profiles, and in such instances other underlying psychological and social dynamics need to be understood and addressed. General indicators of imminent threat of flight with the child where other risk factors are also present are: (1) when a parent is unemployed, homeless and without emotional or financial ties to the area, and/or (2) when they have divulged plans to abduct and have the resources to survive in hiding or the support of extended kin and underground networks to keep themselves hidden.

There are a number of specific measures that can be taken when there is imminent threat or a history of prior abduction. The safeguards identified earlier in this chapter should be included in the order in these cases.

**Profile 2. When a parent is suspicious and distrustful due to belief abuse has occurred and has social support for these beliefs.**

Families that meet this criterion are characterized by one of the parents having a fixed belief that the other parent is dangerous to the child (either abusive, molesting or neglectful) without there being sufficient substantiating evidence for the court to take action on these allegations. Moreover, the parent is supported in these beliefs by an extended family or social network which can collude in a child abduction in order to "protect the child."

First, order that a prompt, careful and thorough investigation of the allegations be undertaken. During this investigative stage, precautions need to be taken to ensure that there is no ongoing abuse, or, alternatively, to protect an innocent parent from further allegations. Such precautions may include supervised visitation, especially if the child is very young, clearly frightened, or distressed and symptomatic in response to visits.

Along with the investigation, the alleging parent should be shown how to respond to the child and how to make accurate observations without confounding the evaluation process. Whenever possible, the concerned extended kin and other social support persons are also involved in this intervention. All relevant professionals involved with the family should be authorized by the parents to talk with one another so that they can support the family cohesively during the evaluation process and not incite anxiety with discrepant, premature conclusions.

As the data about the allegations and the child's symptomatic behavior are assembled by the investigating professionals (preferably with expertise in both child abuse and the dynamics of highly conflictual divorcing families), there should be a careful sifting through of the

evidence for a differential diagnosis and reasoned conclusions. All of these are to be shared in a timely manner with both parents and important supportive others.

In some rare cases, especially where there is severe psychopathology in both parents or their extended families, the child can be placed in the temporary care of a neutral third party with supervised visitation to both parents. This may help sort out who or what is fueling the extremely troubling, persistent claims of abuse.

Unsubstantiated allegations of abuse are usually not equivalent to proof of innocence of the accused. Rather, a huge degree of mistrust and anger is often the legacy of unproven accusations, which can shadow the fragmented divorced family for years, putting the child at risk for continued emotional, if not physical, abuse. A structure for rebuilding trust between parents and ensuring protection of the child needs to be put into place for the long term in these families.

This structure includes one or more of the following: (1) mandated counseling for one or both parents to ensure appropriate parenting practices where there has been poor judgment or unclear boundaries on the part of a parent; (2) appointment of a special master (coparenting coordinator and arbitrator) to help parents communicate and reality-test their distrust of one another, to monitor the situation and make necessary decisions in an ongoing way; (3) provision of long-term therapy for the child which offers a safe place for the child to sort through their realistic fears and phobias and to disclose abuse should it occur or recur; and (4) appointment of a guardian ad litem to represent the child in any ongoing litigation.

### Profiles 3 and 4. When a parent is paranoid or sociopathic

These two profiles of abduction-risk require similar kinds of response by the family courts. Although only a small percentage of parents fit these profiles, these parents present the greatest potential risk of harm to the child.

In the case of the paranoid profile, parents hold markedly irrational or psychotic delusions that the other parent will definitely harm them and/or the child. Believing themselves to be betrayed and exploited by their ex-partner, these parents urgently take what they consider to be necessary measures to protect themselves and the child.

The psychotic parent does not perceive the child as a separate other person, but rather he or she is either experienced as fused with the self as a victim (in which case they take unilateral measures to rescue their offspring), or the child is viewed as part of the hated other (in which case the child can be precipitously abandoned or even destroyed). In general, the marital separation and the instigation of the custody dispute triggers an acute phase of danger, which can mount to the threat not only of abduction but also of murder/suicide.

In the case of the sociopathic parent, he or she usually has a long history of flagrant violations of the law and contempt for any authority, including that of the legal system. Relationships with other people are self-serving, exploitive, and highly manipulative. These people are also likely to hold exaggerated beliefs about their own superiority and entitlement and are highly gratified by being able to exert unilateral power and control over others. As with the paranoid personality, they are unable to perceive their children as having separate needs or rights so that their offspring are often used blatantly as instruments of revenge, punishment, or trophies in their fight with the ex-partner. The sociopathic parent believes that domestic violence and child abduction can be perpetrated with impunity.

To the extent that a parent meets either the criteria for paranoid psychosis or severe sociopathic personality disorder, traditional

therapy or mediation is an inappropriate and possibly dangerous intervention. The family court needs to have mechanisms and procedures to protect the child in cases where there is serious delusional thinking or dangerous sociopathy in one of the parents. If the disturbed person is the noncustodial parent, visitation should be supervised in a facility with high security, and the other parent should be counseled about how to devise a safety plan for themselves and the child for all other times.

Visitation with the child may need to be suspended if there are repeated violations of the visitation order; if the child is highly distressed by the contact; or if the parent uses his or her time with the child to denigrate the other parent, obtain information about the other parent's whereabouts, or transmit messages of physical harm, death threats or child abduction.

Reinstatement of access to the child may be permitted after clear conditions are met by the offending parent, and upon careful evaluation and recommendation by a designated agency (child protective or family court services). If the evaluation determines that reinstatement of parent-child contact is appropriate, any "in person" contact should typically begin with supervised visitation, preferably in the presence of a mental health professional.

If the disturbed person is the custodial or primary care person for the child, extreme care needs to be taken in order that the litigation and evaluation process does not precipitate abduction or violence. The family court may need to obtain an emergency psychiatric screening, and use emergency *ex parte* hearings that might result in the temporary removal of the child to the other parent, or to a third party, while a more comprehensive psychiatric and custody evaluation is being undertaken. In these emergency situations there needs to be some waiver of confidentiality permissible that will allow all relevant professionals to share information about the case with one another. The psychotic parent may need legal representation and an attorney for the child may also need to be appointed in any subsequent litigation.

Where there is blatant disregard of custody orders and violations of restraining orders by a sociopathic parent, the court should prosecute, fine or impose jail time to send a clear message that it will not tolerate contempt of its authority. A coparenting coordinator with arbitration powers (as stipulated by parents and ordered by the court), who is prepared to testify in court, may be needed over the longer term to monitor the family situation for any further threat of abuse or abduction. Only when these control mechanisms are in place can it be expected that counseling and therapy for the child will be beneficial.

**Profile 5: When one or both parents are foreigners ending a mixed-culture marriage.**

Parents who are citizens of another country (or who have dual citizenship with the U.S.) and also have strong ties to their extended family in their country of origin have long been recognized as abduction risks. The risk is especially acute at the time of parental separation and divorce, when they feel cast adrift from a mixed-culture marriage and need to return to their ethnic or religious roots for emotional support and to reconstitute a shaken self-identity. Often in reaction to being rendered helpless, or to the insult of feeling rejected and discarded by the ex-spouse, a parent may try to take unilateral action by returning with the child to their family of origin. This is a way of insisting that their cultural identity be given preeminent status in the child's upbringing.

Culturally sensitive counseling that will discern and address these underlying psychological dynamics is needed to help these parents settle their internal conflicts. They also have to be reminded of the child's need for both

parents, and how it is important to provide opportunities for the child to appreciate and integrate his or her mixed cultural and/or racial identities.

Often the parent will have idealized their own culture, childhood and family of origin, and may need to be encouraged to adopt a more realistic perspective. It may also be necessary to provide the homesick parent with alternative emotional support and financial assistance to stay in the area; or to help them make a custody plan that allows for visiting their homeland with the child, with the approval of the other parent.

If their country of origin is not a party to the Hague Convention on the Civil Aspects of International Child Abduction, the stakes are particularly high, as recovery can be difficult, if not impossible. One possible solution is for the parents to file the same custody agreement (which also specifies jurisdictional authority) in both the U.S. courts and those of the other country, to increase the likelihood the order will be enforced in both countries. A number of other controls can also be put in place as precautions (such as holding passports and posting bonds), as discussed earlier in this chapter.

### Profile 6: When the parents are disenfranchised but have family/social support.

A large group of potential abductors are parents who feel disenfranchised by the judicial system. Many of these parents are economically indigent and poorly educated. They lack knowledge of custody and abduction laws and cannot afford legal representation or psychological counseling. Those who have extended family or other social, emotional and economic support in another geographical community may be abduction risks. Many parents do not access the court system, because they can't afford to, they are unaware of the need to, or they do not believe it is responsive to their values or their plight. Parents belonging to certain ethnic, religious, or cultural groups that hold views about child rearing contrary to the prevailing custody laws (emphasizing the rights of both parents regardless of gender) often prefer seeking resolution of custody disputes outside the courts, sometimes by abducting or snatching back and forth.

Parents having had a transient unmarried relationship often view the child as the property of the mother and are supported in this belief by extended family. Finally, victims of domestic violence are at risk for abducting, especially when the courts and community have failed to take the necessary steps to protect them from abuse or to hold the abuser accountable. In these cases, the violent partners may be successful in obscuring the facts about the abuse and in activating the abduction laws to regain control of their victims.[14]

Of all the profiles of risk, these disenfranchised parents have the best prognosis for an effective preventive intervention, limited only by the lack of resources in the community available to help them. First, they need legal counseling and advocacy, *i.e.*, access to information and education about custody and abduction laws, and about the rights of both parents even where there has been no marriage or sustained relationship between them. If unable to afford representation in court, they need a user-friendly court system, a cooperative clerical staff, and support persons who will accompany them through the legal process and language translation services.

Second, they need access to affordable psychological counseling services for themselves and their children that will help them manage their emotional distress and vulnerability and strengthen their parenting capacities at the time of separation and divorce. Third, they need family advocates who can help them bridge the cultural, economic and logistical chasms to other community resources, such as domestic violence

services, substance abuse monitoring and counseling, training and employment opportunities, and mental health services. Finally, important members of their informal extended social networks may need to be included in any brief intervention in order to guide their efforts to support and protect the disenfranchised family, fractured by separation and divorce, over the long-term process of abduction prevention and family restructuring.

### Likelihood of return

If a child is abducted, how likely is it that the child will be promptly recovered and returned and that the court order will be promptly enforced? By considering the obstacles to the location, recovery and return of the child,[15] the court can assess the likelihood of the child being returned promptly, if abducted. Preventive measures are especially needed when, in the event of an abduction, numerous difficult obstacles exist to the prompt location, recovery, and return of the child.

Obstacles are greater when the abduction is to or from a state or country not covered by laws which would facilitate the apprehension of the abductor and the recovery of the child. If the state's criminal custodial interference statute would not apply to the case in the event of an abduction, it presents a major obstacle.

**Examples:** Soon after the court awards the parents joint custody, the father disappears with the child. An abduction by a joint custodial parent is not a criminal violation under the state's law. An unwed father, with no custody order, tries to locate his child. Precustodial abductions are not a criminal violation under the state's law. Because criminal custodial interference is a misdemeanor offense in this state, law enforcement makes no effort to locate the child. The courts in the state in which the child resides claims not to have jurisdiction in the criminal custodial interference case because the retention of the child after a visitation took place in another state.

If the state does not have flagging statutes[16] that mandate that birth and school records of missing children be flagged and that law enforcement be notified if an abductor requests the records, it can present an obstacle to locating the child.

If an international abduction is suspected, chances for return of the child are better if the country is a party to the Hague Convention on the Civil Aspects of International Child Abduction. However, if the application of the Hague Convention has not led to prompt returns in other cases, the seeming advantage of the Convention may be lost, presenting an additional obstacle.

If the country is not a party to the Hague Convention, the child may never be returned, although this varies somewhat depending on the country. Countries with family laws that have a strong religious base and give preferential rights to one gender over another, such as Islamic countries, are the most problematic. No abducted children have been returned from some of these countries. In other cases, for instance Jordan, returns to the U.S. have only been possible with the highest level of diplomacy and particularly heinous circumstances surrounding the abduction, such as the case in which the father murdered the mother and abducted the two children from New Jersey. He was tried in Jordan for the murder charge, and the children were returned to the U.S.

If there is no extradition treaty covering criminal custodial interference cases with a particular country or the state is unwilling to pay for extradition, the obstacles to recovering the child are great. It is also an obstacle when there is an extradition treaty, but the actual practice is not to extradite.

If the courts in the country to which the child

is likely to be abducted do not provide the left-behind parent an equal chance at custody, then the child may not be returned. For example, the courts may be hostile to American parents or may not give equal rights to women in custody disputes.

If citizenship laws in a parent's home country provide that person, and perhaps the children, with dual citizenship, the parent can obtain a passport even if a U.S. passport has been denied.

When local law enforcement agencies are not pro-active, they become obstacles to locating, recovering, and returning the child. According to research, this continues to be a problem in communities across the United States. Obstacles exist when local law enforcement delay or refuse to take missing child reports or to enter missing children and their abductors into the National Crime Information Center (NCIC), despite the mandate of the National Child Search Assistance Act. Additional obstacles exist when local law enforcement delay or refuse to proceed with investigations as to the whereabouts of parentally abducted children or to obtain Unlawful Flight to Avoid Prosecution (UFAP) warrants when felony charges exist and the abductors are suspected of having left the state. Further obstacles exist if local law enforcement avoid involvement in the civil enforcement of child custody orders, when directed to do so by the court.

Obstacles are more likely to exist when the abduction is premeditated and well-supported or when the left-behind parent has few resources. When an abduction is methodically planned and resources exist to sustain it, it becomes more difficult to locate and recover the child. The left-behind parent is handicapped if he or she cannot afford to bring an enforcement action (possibly involving attorneys in two states or countries), to hire a private investigator, or to cover travel expenses related to recovery and return. If the left-behind parent needs to take time off work due to stress and recovery efforts, financial resources and stability may be further diminished.

## Potential harm to the child

Clearly it is not in the best interests of children to be abducted. However, the degree of harm that a child may experience in an abduction depends on numerous variables. These include the relationship of the child to the abducting parent, the consequences of the rupture of the relationship of the child with the left-behind parent, the degree of stability or lack thereof provided by the abducting parent, the degree of familiarity or lack thereof of the new surroundings, etc.

At the least harmful level, the abduction may be experienced as a relocation that cuts off a child's relationship with a parent who was abusive and requires the child to adjust to new peers, school, and community. The most harmful situations involve abductions by parents who are severely disturbed and abusive, including those who may kill the child and themselves. In some cases,[17] child protective services in a new state have placed abused children in foster care, not knowing that the other parent has been searching for them.

## Conclusion

There are no precise predictive measures that can determine for certain that a specific parent will abduct his or her child. However, preventive measures should be granted when a risk for abduction exists. More restrictive preventive measures may be warranted when the risk for abduction is higher, when obstacles to recovering the child would be difficult to overcome, or when the conditions of the abduction are likely to be particularly harmful to the child.

## Endnotes

1. The court should insert appropriate UCCJA state law citation here, and in all other places where reference is made to the Uniform Act.

2. Some states, by statute, permit grandparents to seek visitation, either in divorce or custody proceedings between parents or through independent actions. *See* Patricia Hoff et al, NATIONAL CENTER ON WOMEN AND FAMILY LAW, INTERSTATE CHILD CUSTODY DISPUTES AND PARENTAL KIDNAPPING: POLICY, PRACTICE AND LAW S2-3 to S2-4 (Supp. 1990).

3. *See* the Model Joint Custody Statute adopted by the American Bar Association in 1989, which states "[j]oint custody is inappropriate in cases in which spouse abuse, child abuse, or parental kidnapping is likely to occur."

4. *Id.* § 3(c).

5. *See* Patricia Hoff et al, NATIONAL CENTER ON WOMEN AND FAMILY LAW, INTERSTATE CHILD CUSTODY DISPUTES AND PARENTAL KIDNAPPING: POLICY, PRACTICE AND LAW S8-14 - S8-16 (Supp. 1990).

6. *See, e.g.*, Brewington v. Serrato, 336 S.E.2d 444 (N.C. Ct. App. 1985) (court upheld severe restrictions on visitation - in custodial parent's home – based on trial court's specific findings of fact that the non-custodial parent had previously taken the child to Texas under false pretenses and refused to return the child to North Carolina.); Frenke v. Frenke, 496 N.Y.S. 2d 521 (A.D.2 Dept. 1985) (Father's visitation to be supervised pending hearing on the issue of whether supervised or unsupervised visitation is in child's best interest in light of prior abduction and child's unwillingness to attend unsupervised visits).

7. *See, e.g.*, People v. Beach, 194 Cal. App. 3d 955, 240 Cal. Rptr. 50 (Ct. App. 1987) (threatened abduction from state sufficient for exercise of emergency jurisdiction and 'no removal from state' order); Mitchell v. Mitchell, 311 S.E.2d 456 (Ga. 1984) (restrictions on removal of children from country upheld based on findings that father would have no means of enforcing Georgia order if mother took children to United Arab Emirates, but restrictions on removal from state violated state case law); Soltanieh v. King, 826 P.2d 1076 (Utah Ct. App.1992) (risk of flight to Iran warrants order restricting father from removing child from the country.).

8. *See, e.g.*, Rayford v. Rayford, 456 So. 2d 833 (Ala. Civ. App. 1984) (trial court required noncustodial father to post $5000 bond to insure his compliance with visitation orders where the father had violated a visitation order and concealed the children for three years); Bullard v. Bullard, 647 P.2d 294 (Haw. Ct. App. 1982) (court upheld order requiring father to execute $2500 bond conditioned on the return of the child to Hawaii after visitation, while noting that bond requirements are viewed with disfavor and should only be imposed if there is substantial likelihood that the order will be violated.); Caldwell v. Fisk, 523 So. 2d 464 (Ala. Civ. App. 1988) (Trial court was justified in forfeiting father's bond due to his failure to comply with prior court orders and requiring him to post a new bond to guarantee compliance with the present orders).

9. *See, e.g.*, Mitchell v. Mitchell, 311 S.E.2d 456 (Ga. 1984) (The court enjoined both parents from procuring or applying for passports for the children without the written agreement of the other parent.); Al-Zouhayli v. Al-Zouhayli, 486 N.W.2d 10 (Minn. Ct. App. 1992) (mother directed to retain child's passport and father prohibited from applying for a replacement passport without mother's written consent. The father was a national of the U.S. and Syria and had family ties in Saudi Arabia.). Requests to prevent issuance of a passport, accompanied by a copy of the court order, should be sent to the U.S. Department of State, Office of Passport Services, 1111 19th Street, N.W., Suite 260, Washington, D.C. 20522-6705; Telephone–(202)955-0377; Fax–(202)955-0230.

10. *See, e.g.*, Commonwealth ex rel. Zaubi v. Zaubi, 423 A.2d 333 (Pa. 1981) (Grandparents cited for contempt for assisting their son in thwarting a court order); Hendershot v. Hadlan, 248 S.E.2d 273 (W. Va. 1978) (paternal grandparents held in contempt for aiding their son in violating a court order).

11. This sample order is not intended to be comprehensive. It does, however, contain examples of the types of provisions discussed above.

12. If emergency jurisdiction is founded on the child being abandoned, or threatened with or subjected to mistreatment or abuse, the order should also state that "jurisdiction is exercised consistently with PKPA, 28 U.S.C. 1738A(c)(2)(C)." An order based on emergency jurisdiction should be temporary, for a specified short period of time, and should direct the petitioner to petition for custody in a court with jurisdiction to make or modify permanent orders.

13. This section is by Dr. Janet Johnston and Dr. Linda Girdner, based on their research entitled "Prevention of Parent and Family Abduction through Early Identification of Risk Factors," funded by the Office of Juvenile Justice and Delinquency Prevention under grant number 92-MC-CX-0007, awarded to the American Bar Association Fund for Justice and Education and carried out collaboratively by the ABA Center on Children and the Law and the Wallerstein Center on the Family in Transition. Copies of the final research report will be available in 1997 through the Juvenile Justice Clearinghouse at 1-800-638-8736 or from Dr. Linda Girdner at 202-662-1722.

14. See Chapter 9 for further discussion of domestic violence.

15. This section is by Dr. Linda Girdner, based primarily on Final Report: Obstacles to the Recovery and Return of Parentally Abducted Children, eds. Linda Girdner and Patricia Hoff (Washington, D.C.: United States Department of Justice, OJJDP 1993). The work was carried out by the ABA Center on Children and the Law under cooperative agreement number 90-MC-CX-K001 awarded to the ABA Fund for Justice and Education. The Research Summary, Final Report, and Appendices are available from the Juvenile Justice Clearinghouse at 1-800-638-8736.

16. About half of the states have statutes requiring a missing child's school records and/or birth certificate be flagged. Flagging statutes aid in locating an abducted child by requiring that law enforcement be notified whenever a request for a missing child's school record or birth certificate is made.

10494 Federal Register / Vol. 51, No. 58 / Wednesday, March 26, 1986 / Notices

## DEPARTMENT OF STATE

[Public Notice 957]

## Hague International Child Abduction Convention; Text and Legal Analysis

On October 30, 1985 President Reagan sent the 1980 Hague Convention on the Civil Aspects of International Child Abduction to the U.S. Senate and recommended that the Senate give early and favorable consideration to the Convention and accord its advice and consent to U.S. ratification. The text of the Convention and the President's Letter of Transmittal, as well as the Secretary of State's Letter of Submittal to the President, were published shortly thereafter in Senate Treaty Doc. 99-11. On January 31, 1986 the Department of State sent to Senator Lugar, Chairman of the Senate Committee on Foreign Relations to which the Convention was referred, a detailed Legal Analysis of the Convention designed to assist the Committee and the full Senate in their consideration of the Convention. It is believed that broad availability of the Letters of Transmittal and Submittal, the English text of the Convention and the Legal Analysis will be of considerable help also to parents, the bench and the bar, as well as federal, State and local authorities, in understanding the Convention, and in resorting to or implementing it should the United States ultimately ratify it. Thus, these documents are reproduced below for the information of the general public.

Questions concerning the status of consideration of the Convention for U.S. ratification may be addressed to the Office of the Assistant Legal Adviser for Private International Law, Department of State, Washington, D.C. 20520 (telephone: (202) 653-9851). Inquiries on the action concerning the Convention taken by other countries may be addressed to the Office of the Assistant Legal Adviser for Treaty Affairs, Department of State (telephone: (202) 647-8135). Questions on the role of the federal government in the invocation and implementation of the Convention may be addressed to the Office of Citizens Consular Sevices, Department of State (telephone: (202) 647-3444).

Peter H. Pfund,

*Assistant Legal Adviser for Private International Law.*

Appendices:

A—Letters of Transmittal and Submittal from Senate Treaty Doc. 99-11

B—English text of Convention

C—Legal Analysis

BILLING CODE 4710-08-M

## Appendix C—Legal Analysis of the Hague Convention on the Civil Aspects of International Child Abduction

*Introduction*

The Hague Convention on the Civil Aspects of International Child Abduction consists of six chapters containing forty-five articles. While not formally incorporated into the Convention, a model form was prepared when the Convention was adopted by the Hague Conference on Private International Law and was recommended for use in making application for the return of wrongfully removed or retained children. A copy of that form is annexed to this Legal Analysis. (The form to be used for the return of children from the United States may seek additional information.)

*Table of Contents*

To facilitate understanding of the Convention by the Senate and the use and interpretation of the Convention by parents, judges, lawyers and public and private agency personnel, the articles are analyzed and discussed in the following categories:

*I. Children Protected by the Convention*

(Preamble, Article 1)

A. Age (Articles 4, 36, 18, 29, 34, 13)
B. Residence (Article 4)
C. Timing/cases covered (Article 35)
D. Effect of custody order concerning the child
 1. Existing custody orders (Articles 17, 3)
 2. Pre-decree removals or retentions (Article 3)

*II. Conduct Actionable Under the Convention*

A. International "child abduction" not criminal: Hague Convention distinguished from extradition treaties (Article 12)
B. "Wrongful removal or retention" (Articles 1, 3, 5(a))
 1. Holders of rights protected by the Convention (*i.e.*, with respect to whom the removal or retention is wrongful)
  (a) "Person, institution or other body" (Article 3(a), (b))
  (b) "Jointly or alone" (Article 3(a), (b))
 2. Defined
  (a) Breach of "custody rights" (Articles 3(a), 5(a))
  (b) "Custody rights" determined by law of child's habitual residence (Articles 3(a), 31, 32, 33)
  (c) Sources of "Custody rights" (Article 3, last paragraph)
   i. Operation of law (Articles 3, 15)
   ii. Judicial or administrative decision (Article 3)
   iii. Agreement having legal effect (Article 3)
  (d) "Actually exercised" (Articles 3(b), 5, 8(c), 13)

*III Judicial Proceedings for Return of the Child*

A. Right to seek return (Articles 29, 12, 34, 8)
B. Legal advice and costs (Articles 25, 26, 42)
C. Pleading requirements (Articles 8, 24)
D. Admissibility of evidence (Articles 30, 23)
E. Judicial promptitude/status report (Article 11)
F. Judicial notice (Article 14)
G. Court determination of "wrongfulness" (Articles 15, 3, 11, 12, 14)
H. Constraints upon courts in requested states in making substantive custody decisions (Article 16)
I. Duty to return not absolute
 1. Temporal qualifications
  (a) Article 4
  (b) Article 35
  (c) Article 12
 2. Article 13 limitations on return obligation
  (a) Legislative history (Articles 13, 20)
  (b) Non-exercise of custody rights (Articles 13(a), 3(b))
  (c) Grave risk of harm/intolerable situation (Article 13(b))
  (d) Child's preference (Article 13)
  (e) Role of social studies
 3. Article 20
 4. Custody order no defense to return (Article 17)
J. Return of the child (Article 12)
 1. Return order not on custody merits (Article 19)
 2. Costs, fees and expenses shifted to abductor (Article 26)

*IV. Central Authority*

(Articles 1, 10, 21)

A. Establishment of Central Authority (Article 6)
B. Duties (Article 7)
C. Other Tasks (Articles 8, 9, 10, 11, 15, 21, 26, 27, 28)
 1. Processing applications (Articles 8, 9, 27, 28)
 2. Assistance in connection with judicial proceedings
  (a) Request for status report (Article 11)
  (b) Social studies/background reports (Article 13)
  (c) Determination of "wrongfulness" (Article 15)
  (d) Costs (Article 26), reservation (Articles 42, 22)

*V. Access Rights—Article 21*

A. Remedies for breach (Articles 21, 12)
B. Defined (Article 5(b))
C. Procedure for obtaining relief (Articles 21, 8, 7)
D. Alternative remedies (Articles 18, 29, 34)

*VI. Miscellaneous and Final Clauses*

A. Article 36
B. Articles 37 and 38
C. Articles 42, 43 and 44
D. Articles 39 and 40
E. Article 41
F. Article 45

Annexes

—Recommended Return Application Form
—Bibliography

*Guide to Terminology Used in the Legal Analysis*

"Abduction" as used in the Convention title is not intended in a criminal sense. That term is shorthand for the phrase "wrongful removal or retention" which appears throughout the text, beginning with the preambular language and Article 1. Generally speaking, "wrongful removal" refers to the taking of a child from the person who was actually exercising custody of the child. "Wrongful retention" refers to the act of keeping the child without the consent of the person who was actually exercising custody. The archetype of this conduct is the refusal by the noncustodial parent to return a child at the end of an authorized visitation period. "Wrongful retention" is not intended by this Convention to cover refusal by the custodial parent to permit visitation by the other parent. Such obstruction of visitation may be redressed in accordance with Article 21.

The term "abductor" as used in this analysis refers to the person alleged to have wrongfully removed or retained a child. This person is also referred to as the "alleged wrongdoer" or the "respondent."

The term "person" as used in this analysis includes the person, institution or other body who (or which) actually exercised custody prior to the abduction and is seeking the child's return. The "person" seeking the child's return is also referred to as "applicant" and "petitioner."

The terms "court" and "judicial authority" are used throughout the analysis to mean both judicial and administrative bodies empowered to make decisions on petitions made pursuant to this Convention. "Judicial decree" and "court order" likewise include decisions made by courts or administrative bodies.

"Country of origin" and "requesting country" refer to the child's country ("State") of habitual residence prior to the wrongful removal or retention. "Country addressed" refers to the country ("State") where the child is located or the country to which the child is believed to have been taken. It is in that country that a judicial or administrative proceeding for return would be brought.

"Access rights" correspond to "visitation rights."

References to the "reporter" are to Elisa Perez-Vera, the official Hague Conference reporter for the Convention. Her explanatory report is recognized by the Conference as the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it. It is referred to herein as the "Perez-Vera Report." The Perez-Vera Report appears in *Actes et*

*documents de la Quatorzieme Session (1980), Volume III, Child Abduction,* edited by the Permanent Bureau of the Hague Conference on Private International Law, The Hague, Netherlands. (The volume may be ordered from the Netherlands Government Printing and Publishing Office, 1 Christoffel Plantijnstraat, Post-box 20014, 2500 EA The Hague, Netherlands.)

I. Children Protected by the Convention

A fundamental purpose of the Hague Convention is to protect children from wrongful international removals or retentions by persons bent on obtaining their physical and/or legal custody. Children who are wrongfully moved from country to country are deprived of the stable relationships which the Convention is designed promptly to restore. Contracting States are obliged by Article 2 to take all appropriate measures to implement the objectives of the Convention as set forth in Article 1: (1) To secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (2) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in other Contracting States. While these objectives are universal in their appeal, the Convention does not cover all children who might be victims of wrongful takings or retentions. A threshold inquiry, therefore, is whether the child who has been abducted or retained is subject to the Convention's provisions. Only if the child falls within the scope of the Convention will the administrative and judicial mechanisms of the Convention apply.

*A. Age*

The Convention applies only to children under the age of sixteen (16). Even if a child is under sixteen at the time of the wrongful removal or retention as well as when the Convention is invoked, the Convention ceases to apply when the child reaches sixteen. Article 4.

Absent action by governments to expand coverage of the Convention to children aged sixteen and above pursuant to Article 36, the Convention itself is unavailable as the legal vehicle for securing return of a child sixteen or older. However, it does not bar return of such child by other means.

Articles 18, 29 and 34 make clear that the Convention is a nonexclusive remedy in cases of international child abduction. Article 18 provides that the Convention does not limit the power of a judicial authority to order return of a child at any time, presumably under other laws, procedures or comity, irrespective of the child's age. Article 29 permits the person who claims a breach of custody or access rights, as defined by Articles 3 and 21, to bypass the Convention completely by invoking any applicable laws or procedures to secure the child's return. Likewise, Article 34 provides that the Convention shall not restrict the application of any law in the State addressed for purposes of obtaining the child's return or for organizing visitation rights. Assuming such laws are not restricted to children under sixteen, a child sixteen or over may be returned pursuant to their provisions.

Notwithstanding the general application of the Convention to children under sixteen, it should be noted that the wishes of mature children regarding their return are not ignored by the Convention. Article 13 permits, but does not require, the judicial authority to refuse to order the child returned if the child "objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views." The role of the child's preference in return proceedings is discussed further at III.I(2)(d), *infra.*

*B. Residence*

In order for the Convention to apply the child must have been "habitually resident in a Contracting State immediately before any breach of custody or access rights." Article 4. In practical terms, the Convention may be invoked only where the child was habitually resident in a Contracting State and taken to or retained in another Contracting State. Accordingly, child abduction and retention cases are actionable under the Convention if they are international in nature (as opposed to interstate), and provided the Convention has entered into force for both countries involved. *See* discussion of Article 38, VI.B, *infra.*

To illustrate, take the case of a child abducted to California from his home in New York. The Convention could not be invoked to secure the return of such child. This is true even if one of the child's parents is an American citizen and the other a foreign national. The Uniform Child Custody Jurisdiction Act (UCCJA) and/or the Parental Kidnapping Prevention Act (PKPA), domestic state and federal law, respectively, would govern the return of the child in question. If the same child were removed from New York to Canada, application under the Convention could be made to secure the child's return provided the Convention had entered into force both for the United States and the Canadian province to which the child was taken. An alternative remedy might also lie under other Canadian law. If the child had been removed from Canada and taken to the United States, the aggrieved custodial parent in Canada could seek to secure the child's return by petitioning for enforcement of a Canadian custody order pursuant to the UCCJA, or by invoking the Convention, or both.

*C. Timing/Cases Covered*

Article 35 states that the Convention shall apply as between Contracting States only to wrongful removals or retentions occurring after its entry into force in those States. Following a strict interpretation of that Article, the Convention will not apply to a child who is wrongfully shifted from one Contracting State to another if the wrongful removal or retention occurred before the Convention's entry into force in those States. However, under a liberal interpretation Article 35 could be construed to cover wrongful removal or retention cases which began before the Convention took effect but which continued and were ongoing after its entry into force.

*D. Effect of Custody Order Concerning the Child*

1. Existing Custody Orders

Children who otherwise fall within the scope of the Convention are not automatically removed from its protections by virtue of a judicial decision awarding custody to the alleged wrongdoer. This is true whether the decision as to custody was made, or is entitled to recognition, in the State to which the child has been taken. Under Article 17 that State cannot refuse to return a child solely on the basis of a court order awarding custody to the alleged wrongdoer made by one of its own courts or by the courts of another country. This provision is intended to ensure, *inter alia,* that the Convention takes precedence over decrees made in favor of abductors before the court had notice of the wrongful removal or retention.

Thus, under Article 17 the person who wrongfully removes or retains the child in a Contracting State cannot insulate the child from the Convention's return provisions merely by obtaining a custody order in the country of new residence, or by seeking there to enforce another country's order. Nor may the alleged wrongdoer rely upon a stale decree awarding him or her custody, the provisions of which have been

derogated from subsequently by agreement or acquiescence of the parties, to prevent the child's return under the Convention. Article 3.

It should be noted that Article 17 does permit a court to take into account the reasons underlying an existing custody decree when it applies the Convention.

**II. Pre-Decree Removals or Retentions**

Children who are wrongfully removed or retained prior to the entry of a custody order are protected by the Convention. There need not be a custody order in effect in order to invoke the Convention's return provisions. Accordingly, under the Convention a child will be ordered returned to the person with whom he or she was habitually resident in pre-decree abduction cases as well as in cases involving violations of existing custody orders.

Application of the Convention to pre-decree cases comes to grips with the reality that many children are abducted or retained long before custody actions have been initiated. In this manner a child is not prejudiced by the legal inaction of his or her physical custodian, who may not have anticipated the abduction, and the abductor is denied any legal advantage since the child is subject to the return provisions of the Convention.

The Convention's treatment of pre-decree abduction cases is distinguishable from the Council of Europe's Convention on Recognition and Enorcement of Decisions Relating to the Custody of Children, adopted in Strasbourg, France in November 1979 ("Strasbourg Convention"), and from domestic law in the United States, specifically the UCCJA and the PKPA, all of which provide for enforcement of custody decrees. Although the UCCJA and PKPA permit enforcement of a decree obtained by a parent in the home state after the child has been removed from that state, in the absence of such decree the enforcement provisions of those laws are inoperative. In contrast to the restoration of the *legal* status quo ante brought about by application of the UCCJA, the PKPA, and the Strasbourg Convention, the Hague Convention seeks restoration of the *factual* status quo ante and is not contingent on the existence of a custody decree. The Convention is premised upon the notion that the child should be promptly restored to his or her country of habitual residence so that a court there can examine the merits of the custody dispute and award custody in the child's best interests.

Pre-decree abductions are discussed in greater detail in the section dealing with actionable conduct. *See* II.B(2)(c)(i).

**II. Conduct Actionable Under the Convention**

*A. "International Child Abduction" not Criminal: Hague Convention Distinguished From Extradition Treaties*

Despite the use of the term "abduction" in its title, the Hague Convention is not an extradition treaty. The conduct made actionable by the Convention—the wrongful removal or retention of children—is wrongful not in a criminal sense but in a civil sense.

The Hague Convention establishes civil procedures to secure the return of so-called "abducted" children. Article 12. In this manner the Hague Convention seeks to satisfy the overriding concern of the aggrieved parent. The Convention is not concerned with the question of whether the person found to have wrongfully removed or retained the child returns to the child's country of habitual residence once the child has been returned pursuant to the Convention. This is in contrast to the criminal extradition process which is designed to secure the return of the fugitive wrong-doer. Indeed, when the fugitive-parent is extradited for trial or to serve a criminal sentence, there is no guarantee that the abducted child will also be returned.

While it is uncertain whether criminal extradition treaties will be routinely invoked in international custody cases between countries for which the Hague Convention is in force, nothing in the Convention bars their application or use.

*B. Wrongful Removal or Retention*

The Convention's first stated objective is to secure the prompt return of children who are wrongfully removed from or retained in any Contracting State. Article 1(a). (The second stated objective, i.e., to ensure that rights of custody and of access under the law of one Contracting State are effectively exercised in other Contracting States (Article 1(b)), is discussed under the heading "Access Rights," V., *infra.*) The removal or retention must be wrongful within the meaning of Article 3, as further clarified by Article 5(a), in order to trigger the return procedures established by the Convention. Article 3 provides that the removal or retention of a child is to be considered wrongful where:

(a) it is in breach of custody rights attributed to a person, an institution or another body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and (b) at the time of the removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

This Article is a cornerstone of the Convention. It is analyzed by examining two questions:

1. Who holds rights protected by the Convention (or, with respect to whom is the removal or retention deemed to be wrongful?); and

2. What are the factual and legal elements of a wrongful removal or retention?

1. Holders of Rights Protected by the Convention

(a) *"Person, institution or other body".* While the child is the ultimate beneficiary of the Convention's judicial and administrative machinery, the child's role under the Convention is passive. In contrast, it is up to the "person, institution or other body" (hereinafter referred to simply as "the person") who "actually exercised" custody of the child prior to the abduction, or who would have exercised custody but for the abduction, to invoke the Convention to secure the child's return. Article 3 (a), (b). It is this person who holds the rights protected by the Convention and who has the right to seek relief pursuant to its terms.

Since the vast majority of abduction cases arises in the context of divorce or separation, the person envisioned by Article 3(a) most often will be the child's parent. The typical scenario would involve one parent taking a child from one Contracting State to another Contracting State over objections of the parent with whom the child had been living.

However, there may be situations in which a person other than a biological parent has actually been exercising custody of the child and is therefore eligible to seek the child's return pursuant to the Convention. An example would be a grandparent who has had physical custody of a child following the death of the parent with whom the child had been residing. If the child is subsequently removed from the custody of the grandparent by the surviving parent, the aggrieved grandparent could invoke the Convention to secure the child's return. In another situation, the child may be in the care of foster parents. If custody rights exercised by the foster parents are breached, for instance, by abduction of the child by its biological pa. ent, the foster parents

could invoke the Convention to secure the child's return.

In the two foregoing examples (not intended to be exhaustive) a family relationship existed between the victim-child and the person who had the right to seek the child's return. However, institutions such as public or private child care agencies also may have custody rights the breach of which would be remediable under the Convention. If a natural parent relinquishes parental rights to a child and the child is subsequently placed in the care of an adoption agency, that agency may invoke the Convention to recover the child if the child is abducted by its parent(s).

(b) *"Jointly or alone"*. Article 3 (a) and (b) recognize that custody rights may be held either jointly or alone. Two persons, typically mother and father, can exercise joint custody, either by court order following a custody adjudication, or by operation of law prior to the entry of a decree. The Convention does not distinguish between these two situations, as the commentary of the Convention reporter indicates:

Now, from the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other, is wrongful, and this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. The Convention's true nature is revealed most clearly in these situations: it is not concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision awarding joint custody on the basis of facts which have subsequently changed. It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties. Perez-Vera Report, paragraph 71 at 447-448.

Article 3(a) ensures the application of the Convention to pre-decree abductions, since it protects the rights of a parent who was exercising custody of the child jointly with the abductor at the time of the abduction, before the issuance of a custody decree.

2. "Wrongful Removal or Retention" Defined

The obligation to return an abducted child to the person entitled to custody arises only if the removal or the retention is wrongful within the meaning of the Convention. To be considered wrongful, certain factual and legal elements must be present.

(a) *Breach of "custody rights"*. The removal or retention must be in breach of "custody rights," defined in Article 5(a) as "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence."

Accordingly, a parent who sends his or her child to live with a caretaker has not relinquished custody rights but rather has exercised them within the meaning of the Convention. Likewise, a parent hospitalized for a protracted period who places the child with grandparents or other relatives for the duration of the illness has effectively exercised custody.

(b) *"Custody rights" determined by law of child's habitual residence*. In addition to including the right to determine the child's residence (Article 5(a)), the term "custody rights" covers a collection of rights which take on more specific meaning by reference to the law of the country in which the child was habitually resident immediately before the removal or retention. Article 3(a). Nothing in the Convention limits this "law" to the internal law of the State of the child's habitual residence. Consequently, it could include the laws of another State if the choice of law rules in the State of habitual residence so indicate.

If a country has more than one territorial unit, the habitual residence refers to the particular territorial unit in which the child was resident, and the applicable laws are those in effect in that territorial unit. Article 31. In the United States, the law in force in the state in which a child was habitually resident (as possibly preempted by federal legislation enacted in connection with U.S. ratification of the Convention) would be applicable for the determination as to whether a removal or retention is wrongful.

Articles 32 and 33 also control, respectively, how and whether the Convention applies in States with more than one legal system. Perez-Vera Report, paragraphs 141 and 142 at 470.

(c) *Sources of "custody rights"*. Although the Convention does not exhaustively list all possible sources from which custody rights may derive, it does identify three sources. According to the final paragraph of Article 3, custody rights may arise: (1) by operation of law; (2) by reason of a judicial or administrative decision; or (3) by reason of an agreement having legal effect under the law of that State.

i. *Custody rights arising by operation of law*. Custody rights which arise by operation of law in the State of habitual residence are protected; they need not be conferred by court order to fall within the scope of the Convention. Article 3. Thus, a person whose child is abducted prior to the entry of a custody order is not required to obtain a custody order in the State of the child's habitual residence as a prerequisite to invoking the Convention's return provisions.

In the United States, as a general proposition both parents have equal rights of custody of their children prior to the issuance of a court order allocating rights between them. If one parent interferes with the other's equal rights by unilaterally removing or retaining the child abroad without consent of the other parent, such interference could constitute wrongful conduct within the meaning of the Convention. (See excerpts from Perez-Vera Report quoted at II.B.1(b), *supra*.) Thus, a parent left in the United States after a pre-decree abduction could seek return of a child from a Contracting State abroad pursuant to the Convention. In cases involving children wrongfully brought to or retained in the United States from a Contracting State abroad prior to the entry of a decree, in the absence of an agreement between the parties the question of wrongfulness would be resolved by looking to the law of the child's country of habitual residence.

Although a custody decree is not needed to invoke the Convention, there are two situations in which the aggrieved parent may nevertheless benefit by securing a custody order, assuming the courts can hear swiftly a petition for custody. First, to the extent that an award of custody to the left-behind parent (or other person) is based in part upon an express finding by the court that the child's removal or retention was wrongful within the meaning of Article 3, the applicant anticipates a possible request by the judicial authority applying the Convention, pursuant to Article 15, for a court determination of wrongfulness. This may accelerate disposition of a return petition under the Convention. Second, a person outside the United States who obtains a custody decree from a foreign court subsequent to the child's abduction, after notice and opportunity to be heard have been accorded to the absconding parent, may be able to invoke either the Convention or the UCCJA, or both, to secure the child's return from the United States. The UCCJA may be preferable inasmuch as its enforcement provisions are not subject to the exceptions contained in the Convention.

ii. *Custody rights arising by reason of judicial or administrative decision*. Custody rights embodied in judicial or

administrative decisions fall within the Convention's scope. While custody determinations in the United States are made by state courts, in some Contracting States, notably the Scandinavian countries, administrative bodies are empowered to decide matters relating to child custody including the allocation of custody and visitation rights. Hence the reference to "administrative decisions" in Article 3.

The language used in this part of the Convention can be misleading. Even when custody rights are conferred by court decree, technically speaking the Convention does not mandate recognition and enforcement of that decree. Instead, it seeks only to restore the factual custody arrangements that existed prior to the wrongful removal or retention (which incidentally in many cases will be the same as those specified by court order).

Finally, the court order need not have been made by a court in the State of the child's habitual residence. It could be one originating from a third country. As the reporter points out, when custody rights were exercised in the State of the child's habitual residence on the basis of a foreign decree, the Convention does not require that the decree have been formally recognized. Perez-Vera Report, paragraph 69 at 447.

iii. *Custody rights arising by reason of agreement having legal effect.* Parties who enter into a private agreement concerning a child's custody have recourse under the Convention if those custody rights are breached. Article 3. The only limitation is that the agreement have legal effect under the law of the child's habitual residence.

Comments of the United States with respect to language contained in an earlier draft of the Convention (*i.e.*, that the agreement "have the force of law") shed some light on the meaning of the expression "an agreement having legal effect". In the U.S. view, the provision should be interpreted expansively to cover more than only those agreements that have been incorporated in or referred to in a custody judgment. *Actes et documents de la Quatorzieme Session, (1980) Volume III. Child Abduction*, Comments of Governments at 240. The reporter's observations affirm a broad interpretation of this provision:

> As regards the definition of an agreement which has "legal effect" in terms of a particular law, it seems that there must be included within it any sort of agreement which is not prohibited by such a law and which may provide a basis for presenting a legal claim to the competent authorities. Perez-Vera Report, paragraph 70 at 447.

(d) *"Actually exercised"*. The most predictable fact pattern under the Convention will involve the abduction of a child directly from the parent who was actually exercising physical custody at the time of the abduction.

To invoke the Convention, the holder of custody rights must allege that he or she actually exercised those rights at the time of the breach or would have exercised them but for the breach. Article 3(b). Under Article 5, custody rights are defined to include the right to determine the child's place of residence. Thus, if a child is abducted from the physical custody of the person in whose care the child has been entrusted by the custodial parent who was "actually exercising" custody, it is the parent who placed the child who may make application under the Convention for the child's return.

Very little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised. The applicant need only provide some preliminary evidence that he or she actually exercised custody of the child, for instance, took physical care of the child. Perez-Vera Report, paragraph 73 at 448. The Report points out the informal nature of the pleading and proof requirements; Article 8(c) merely requires a statement in the application to the Central Authority as to "the grounds on which the applicant's claim for return of the child is based." *Id.*

In the scheme of the Convention it is presumed that the person who has custody actually exercised it. Article 13 places on the alleged abductor the burden of proving the nonexercise of custody rights by the applicant as an exception to the return obligation. Here, again, the reporter's comments are insightful:

> Thus, we may conclude that the Convention, taken as a whole, is built upon the tacit presumption that the person who has care of the child actually exercises custody over it. This idea has to be overcome by discharging the burden of proof which has shifted, as is normal with any presumption (*i.e.* discharged by the "abductor" if he wishes to prevent the return of the child.) Perez-Vera Report paragraph 73 at 449.

III. Judicial Proceedings for Return of Child

*A. Right To Seek Return*

When a person's custody rights have been breached by the wrongful removal or retention of the child by another, he or she can seek return of the child pursuant to the Convention. This right of return is the core of the Convention. The Convention establishes two means by which the child may be returned. One is through direct application by the aggrieved person to a court in the Contracting State to which the child has been taken or in which the child is being kept. Articles 12, 29. The other is through application to the Central Authority to be established by every Contracting State. Article 8. These remedies are not mutually exclusive; the aggrieved person may invoke either or both of them. Moreover, the aggrieved person may also pursue remedies outside the Convention. Articles 18, 29 and 34. This part of the report describes the Convention's judicial remedy in detail. The administrative remedy is discussed in IV, *infra*.

Articles 12 and 29 authorize any person who claims a breach of custody rights within the meaning of Article 3 to apply for the child's return directly to the judicial authorities of the Contracting State where the child is located.

A petition for return pursuant to the Convention may be filed any time after the child has been removed or retained up until the child reaches sixteen. While the window of time for filing may be wide in a particular case without threat of technically losing rights under the Convention, there are numerous reasons to commence a return proceeding promptly if the likelihood of a voluntary return is remote. The two most crucial reasons are to preclude adjudication of custody on the merits in a country other than the child's habitual residence (see discussion of Article 16, *infra*) and to maximize the chances for the child's return by reducing the alleged abductor's opportunity to establish that the child is settled in a new environment (see discussion of Article 12, *infra*).

A petition for return would be made directly to the appropriate court in the Contracting State where the child is located. If the return proceedings are commenced less than one year from the date of the wrongful removal or retention, Article 12 requires the court to order the return of the child forthwith. If the return proceedings are commenced a year or more after the alleged wrongful removal or retention, the court remains obligated by Article 12 to order the child returned unless it is demonstrated that the child is settled in its new environment.

Under Article 29 a person is not precluded from seeking judicially-ordered return of a child pursuant to laws and procedures other than the Convention. Indeed, Articles 18 and 34 make clear that nothing in the Convention limits the power of a court to return a child at any time by applying

other laws and procedures conducive to that end.

Accordingly, a parent seeking return of a child from the United States could petition for return pursuant to the Convention, or in the alternative or additionally, for enforcement of a foreign court order pursuant to the UCCJA. For instance, an English father could petition courts in New York either for return of his child under the Convention and/or for recognition and enforcement of his British custody decree pursuant to the UCCJA. If he prevailed in either situation, the respective court could order the child returned to him in England. The father in this illustration may find the UCCJA remedy swifter than invoking the Convention for the child's return because it is not subject to the exceptions set forth in the Convention, discussed at III.I., *infra*.

*B. Legal Advice and Costs*

Article 25 provides for the extension of legal aid and advice to foreign applicants on the same basis and subject only to the same eligibility requirements as for nationals of the country in which that aid is sought.

Article 26 prohibits Central Authorities from charging applicants for the cost and expenses of the proceedings or, where applicable, those arising from the participation of legal counsel or advisers. This provision will be of no help to an applicant, however, if the Contracting State in question has made a reservation in accordance with Articles 26 and 42 declaring that it shall not be bound to assume any costs resulting from the participation of legal counsel or advisers or from court proceedings, except insofar as those costs may be covered by its system of legal aid and advice.

It is expected that the United States will enter a reservation in accordance with Articles 26 and 42. This will place at least the initial burden of paying for counsel and legal proceedings on the applicant rather than on the federal government. Because the reservation is nonreciprocal, use of it will not automatically operate to deny applicants from the United States free legal services and judicial proceedings in other Contracting States. However, if the Contracting State in which the child is located has itself made use of the reservation in question, the U.S. applicant will not be eligible for cost-free legal representation and court proceedings. For more information on costs, including the possibility that the petitioner's costs may be levied on the abductor if the child is ordered returned, see III.J 2 and IV.C (d) of this analysis.

*C. Pleading Requirements*

The Convention does not expressly set forth pleading requirements that must be satisfied by an applicant who commences a judicial return proceeding. In contrast, Article 8 sets forth the basic requirements for an application placed before a Central Authority (discussed IV.C(1), *infra*) for the return of the child. Since the objective is identical—the child's return—whether relief is sought through the courts or through intercession of the Central Authority, it follows that a court should be provided with at least as much information as a Central Authority is to be provided in a return application filed in compliance with Article 8. To ensure that all necessary information is provided, the applicant may wish to append to the petition to the court a completed copy of the recommended model form for return of a child (see Annex A to this analysis).

In addition to providing the information set forth in Article 8, the petition for return should allege that the child was wrongfully removed or retained by the defendant in violation of custody rights that were actually being exercised by the petitioner. The petition should state the source of the custody rights, the date of the wrongful conduct, and the child's age at that time. In the prayer for relief, the petitioner should request the child's return and an order for payment by the abducting or retaining parent of all fees and expenses incurred to secure the child's return.

Any return petition filed in a court in the United States pursuant to the Convention must be in English. Any person in the United States who seeks return of a child from a foreign court must likewise follow the requirements of the foreign state regarding translation of legal documents. See Perez-Vera Report, paragraph 132 at page 467.

*D. Admissibility of Evidence*

Under Article 30, any application submitted to the Central Authority or petition submitted to the judicial authorities of a Contracting State, and any documents or information appended thereto, are admissible in the courts of the State. Moreover, under Article 23, no legalization or similar formalities may be required. However, authentication of private documents may be required. According to the official report, "any requirement of the internal law of the authorities in question that copies or private documents be authenticated remains outside the scope of this provision." Perez-Vera Report, paragraph 131 at page 467.

*E. Judicial Promptitude/Status Report*

Once an application for return has been filed, the court is required by Article 11 "to act expeditiously in proceedings for the return of children." To keep matters on the fast track, Article 11 gives the applicant or the Central Authority of the requested State the right to request a statement from the court of the reasons for delay if a decision on the application has not been made within six weeks from the commencement of the proceedings.

*F. Judicial Notice*

In ascertaining whether there has been a wrongful removal or retention of a child within the meaning of Article 3, Article 14 empowers the court of the requested State to take notice directly of the law and decisions in the State of the child's habitual residence. Standard procedures for the proof of foreign law and for recognition of foreign decisions would not need to be followed and compliance with such procedures is not to be required.

*G. Court Determination of "Wrongfulness"*

Prior to ordering a child returned pursuant to Article 12, Article 15 permits the court to request the applicant to obtain from the authorities of the child's State of habitual residence a decision or other determination that the alleged removal or retention was wrongful within the meaning of Article 3. Article 15 does not specify which "authorities" may render such a determination. It therefore could include agencies of government (*e.g.*, state attorneys general) and courts. Central Authorities shall assist applicants to obtain such a decision or determination. This request may only be made where such a decision or determination is obtainable in that State.

This latter point is particularly important because in some countries the absence of the defendant-abductor and child from the forum makes it legally impossible to proceed with an action for custody brought by the left-behind parent. If an adjudication in such an action were a prerequisite to obtaining a determination of wrongfulness, it would be impossible for the petitioner to comply with an Article 15 request. For this reason a request for a decision or determination on wrongfulness can not be made in such circumstances consistent with the limitation in Article 15. Even if local law permits an adjudication of custody in the absence of the child and defendant (*i.e.*, post-abduction) or would otherwise allow a petitioner to obtain a determination of

wrongfulness, the provisions of Article 15 will probably not be resorted to routinely. That is so because doing so would convert the purpose of the Convention from seeking to restore the *factual* status quo prior to an abduction to emphasizing substantive legal relationships.

A further consideration in deciding whether to request an applicant to comply with Article 15 is the length of time it will take to obtain the required determination. In countries where such a determination can be made only by a court, if judicial dockets are seriously backlogged, compliance with an Article 15 order could significantly prolong disposition of the return petition, which in turn would extend the time that the child is kept in a state of legal and emotional limbo. If "wrongfulness" can be established some other way, for instance by taking judicial notice of the law of the child's habitual residence as permitted by Article 14, the objective of Article 15 can be satisfied without further prejudice to the child's welfare or undue delay of the return proceeding. This would also be consistent with the Convention's desire for expeditious judicial proceedings as evidenced by Article 11.

In the United States, a left-behind parent or other claimant can petition for custody after the child has been removed from the forum. The right of action is conferred by the UCCJA, which in many states also directs courts to hear such petitions expeditiously. The result of such proceeding is a temporary or permanent custody determination allocating custody and visitation rights, or joint custody rights, between the parties. However, a custody determination on the merits that makes no reference to the Convention may not by itself satisfy an Article 15 request by a foreign court for a determination as to the wrongfulness of the conduct within the meaning of Article 3. Therefore, to ensure compliance with a possible Article 15 request the parent in the United States would be well-advised to request an explicit finding as to the wrongfulness of the alleged removal or retention within the meaning of Article 3 in addition to seeking custody.

*H. Constraints Upon Courts in Requested States in Making Substantive Custody Decisions*

Article 16 bars a court in the country to which the child has been taken or in which the child has been retained from considering the merits of custody claims once it has received notice of the removal or retention of the child. The constraints continue either until it is determined that the child is not to be returned under the Convention, or it becomes evident that an application under the Convention will not be forthcoming within a reasonable time following receipt of the notice.

A court may get notice of a wrongful removal or retention in some manner other than the filing of a petition for return, for instance by communication from a Central Authority, from the aggrieved party (either directly or through counsel), or from a court in a Contracting State which has stayed or dismissed return proceedings upon removal of the child from that State.

No matter how notice may be given, once the tribunal has received notice, a formal application for the child's return pursuant to the Convention will normally be filed promptly to avoid a decision on the merits from being made. If circumstances warrant a delay in filing a return petition, for instance pending the outcome of private negotiations for the child's return or interventions toward that end by the Central Authority, or pending determination of the location of the child and alleged abductor, the aggrieved party may nevertheless wish to notify the court as to the reason(s) for the delay so that inaction is not viewed as a failure to proceed under the Convention.

*I. Duty To Return not Absolute*

The judicial duty to order return of a wrongfully removed or retained child is not absolute. Temporal qualifications on this duty are set forth in Articles 12, 4 and 35. Additionally, Articles 13 and 20 set forth grounds upon which return may be denied.

1. Temporal Qualifications

Articles 4, 35 and 12 place time limitations on the return obligation.

(a) *Article 4.* Pursuant to Article 4, the Convention ceases to apply once the child reaches age sixteen. This is true regardless of when return proceedings were commenced and irrespective of their status at the time of the child's sixteenth birthday. *See* I.A., *supra.*

(b) *Article 35.* Article 35 limits application of the Convention to wrongful removals or retentions occurring after its entry into force between the two relevant Contracting States. *But see* I.C., *supra.*

(c) *Article 12.* Under Article 12, the court is not obligated to return a child when return proceedings pursuant to the Convention are commenced a year or more after the alleged removal or retention *and* it is demonstrated that the child is settled in its new environment. The reporter indicates that "(T)he provision does not state how this fact is to be proved, but it would seem logical to regard such a task as falling upon the abductor or upon the person who opposes the return of the child . . ." Perez-Vera Report, paragraph 109 at page 459.

If the Convention is to succeed in deterring abductions, the alleged abductor must not be accorded preferential treatment by courts in his or her country of origin, which, in the absence of the Convention, might be prone to favor "home forum" litigants. To this end, nothing less than substantial evidence of the child's significant connections to the new country is intended to suffice to meet the respondent's burden of proof. Moreover, any claims made by the person resisting the child's return will be considered in light of evidence presented by the applicant concerning the child's contacts with and ties to his or her State of habitual residence. The reason for the passage of time, which may have made it possible for the child to form ties to the new country, is also relevant to the ultimate disposition of the return petition. If the alleged wrongdoer concealed the child's whereabouts from the custodian necessitating a long search for the child and thereby delayed the commencement of a return proceeding by the applicant, it is highly questionable whether the respondent should be permitted to benefit from such conduct absent strong countervailing considerations.

2. Article 13 Limitations on the Return Obligation

(a) *Legislative history.* In drafting Articles 13 and 20, the representatives of countries participating in negotiations on the Convention were aware that any exceptions had to be drawn very narrowly lest their application undermine the express purposes of the Convention—to effect the prompt return of abducted children. Further, it was generally believed that courts would understand and fulfill the objectives of the Convention by narrowly interpreting the exceptions and allowing their use only in clearly meritorious cases, and only when the person opposing return had met the burden of proof. Importantly, a finding that one or more of the exceptions provided by Articles 13 and 20 are applicable does not make refusal of a return order mandatory. The courts retain the discretion to order the child returned even if they consider that one or more of the exceptions applies. Finally, the wording of each exception represents a compromise to accommodate the different legal systems and tenets of family law in effect in the

countries negotiating the Convention, the basic purpose in each case being to provide for an exception that is narrowly construed.

(b) *Non-exercise of custody rights.* Under Article 13(a), the judicial authority may deny an application for the return of a child if the person having the care of the child was not actually exercising the custody rights at the time of the removal or retention, or had consented to or acquiesced in the removal or retention. This exception derives from Article 3(b) which makes the Convention applicable to the breach of custody rights that were actually exercised at the time of the removal or retention, or which would have been exercised but for the removal or retention.

The person opposing return has the burden of proving that custody rights were not actually exercised at the time of the removal or retention, or that the applicant had consented to or acquiesced in the removal or retention. The reporter points out that proof that custody was not actually exercised does not form an exception to the duty to return if the dispossessed guardian was unable to exercise his rights precisely because of the action of the abductor. Perez-Vera Report, paragraph 115 at page 461.

The applicant seeking return need only allege that he or she was actually exercising custody rights conferred by the law of the country in which the child was habitually resident immediately before the removal or retention. The statement would normally include a recitation of the circumstances under which physical custody had been exercised, *i.e.*, whether by the holder of these rights, or by a third person on behalf of the actual holder of the custody rights. The applicant would append copies of any relevant legal documents or court orders to the return application. *See* III. C., *supra*, and Article 8.

(c) *Grave risk of harm/intolerable situation.* Under Article 13(b), a court in its discretion need not order a child returned if there is a grave risk that return would expose the child to physical harm or otherwise place the child in an intolerable situation.

This provision was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests. Only evidence directly establishing the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination. The person opposing the child's return must show that the risk to the child is grave, not merely serious.

A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses the child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

(d) *Child's preference.* The third, unlettered paragraph of Article 13 permits the court to decline to order the child returned if the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of the child's views. As with the other Article 13 exceptions to the return obligation, the application of this exception is not mandatory. This discretionery aspect of Article 13 is especially important because of the potential for brainwashing of the child by the alleged abductor. A child's objection to being returned may be accorded little if any weight if the court believes that the child's preference is the product of the abductor parent's undue influence over the child.

(e) *Role of social studies.* The final paragraph of Article 13 requires the court, in considering a respondent's assertion that the child should not be returned, to take into account information relating to the child's social background provided by the Central Authority or other competent authority in the child's State of habitual residence. This provision has the dual purpose of ensuring that the court has a balanced record upon which to determine whether the child is to be returned, and preventing the abductor from obtaining an unfair advantage through his or her own forum selection with resulting ready access to evidence of the child's living conditions in that forum.

3. Article 20

Article 20 limits the return obligation of Article 12. It states: "The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms."

The best explanation for this unique formulation is that the Convention might never have been adopted without it. The negotiating countries were divided on the inclusion of a public policy exception in the Convention. Those favoring a public policy exception believed that under some extreme circumstances not covered by the exceptions of Article 13 a court should be excused from returning a child to the country of habitual residence. In contrast, opponents of a public policy exception felt that such an exception could be interpreted so broadly as to undermine the fabric of the entire Convention.

A public policy clause was nevertheless adopted at one point by a margin of one vote. That clause provided: "Contracting States may reserve the right not to return the child when such return would be manifestly incompatible with the fundamental principles of the law relating to the family and children in the State addressed." To prevent imminent collapse of the negotiating process engendered by the adoption of this clause, there was a swift and determined move to devise a different provision that could be invoked on the rare occasion that return of a child would utterly shock the conscience of the court or offend all notions of due process.

The resulting language of Article 20 has no known precedent in other international agreements to serve as a guide in its interpretation. However, it should be emphasized that this exception, like the others, was intended to be restrictively interpreted and applied, and is not to be used, for example, as a vehicle for litigating custody on the merits or for passing judgment on the political system of the country from which the child was removed. Two characterizations of the effect to be given Article 20 are recited below for illumination.

The following explanation of Article 20 is excerpted from paragraph 118 of the Perez-Vera Report at pages 461–2:

> It is significant that the possibility, acknowledged in *article 20*, that the child may not be returned when its return 'would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms' has been placed in the last article of the chapter: it was thus intended to emphasize the always clearly exceptional nature of this provision's application. As for the substance of this provision, two comments only are required. Firstly, even if its literal meaning is strongly reminiscent of the terminology used in international texts concerning the protection

Case 2:06-cv-00832-MHT-VPM Document 20-5 Filed 09/29/2006 Page 10 of 25

of human rights, this particular rule is not directed at developments which have occurred on the international level, but is concerned only with the principles accepted by the law of the requested State, either through general international law and treaty law, or through internal legislation. Consequently, so as to be able to refuse to return a child on the basis of this article, it will be necessary to show that the fundamental principles of the requested State concerning the subject-matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles. Secondly, such principles must not be invoked any more frequently, nor must their invocation be more readily admissible than they would be in their application to purely internal matters. Otherwise, the provision would be discriminatory in itself, and opposed to one of the most widely recognized fundamental principles in internal laws. A study of the case law of different countries shows that the application by ordinary judges of the laws on human rights and fundamental freedoms is undertaken with a care which one must expect to see maintained in the international situations which the Convention has in view.

A.E. Anton, Chairman of the Commission on the Hague Conference on Private International Law that drafted the Convention, explained Article 20 in his article, "The Hague Convention on International Child Abduction," 30 I.C.L.Q. 537, 551–2 (July, 1981), as follows:

> Its acceptance may in part have been due to the fact that it states a rule whch many States would have been bound to apply in any event, for example, by reason of the terms of their constitutions. The reference in this provision to "the fundamental principles of the requested State" make it clear that the reference is not one to international conventions or declarations concerned with the protection of human rights and fundamental freedoms which have been ratified or accepted by Contracting States. It is rather to the fundamental provisions of the law of the requested State in such matters . . . If the United Kingdom decides to ratify the Hague Convention, it will, of course, be for the implementing legislation or the courts to specify what provisions of United kingdom law come within the scope of Article 20. The Article, however, is merely permissive and it is to be hoped that States will exercise restraint in availing themselves of it.

4. Custody Order no Defense to Return

*See* I.D.1, *supra, for discussion of Article 17.*

*J. Return of the Child*

Assuming the court has determined that the removal or retention of the child was wrongful within the meaning of the Convention and that no exceptions to the return obligation have been satisfactorily established by the respondent, Article 12 provides that "the authority concerned shall order the return of the child forthwith." The Convention does not technically require that the child be returned to his or her State of habitual residence, although in the classic abduction case this will occur. If the petitioner has moved from the child's State of habitual residence the child will be returned to the petitioner, not the State of habitual residence.

1. Return Order not on Custody merits

Under Article 19, a decision under the Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue. It follows that once the factual status quo ante has been restored, litigation concerning custody or visitation issues could proceed. Typically this will occur in the child's State of habitual residence.

2. Costs, Fees and Expenses Shifted to Abductor

In connection with the return order, Article 26 permits the court to direct the person who removed or retained the child to pay necessary expenses incurred by or on behalf of the applicant to secure the child's return, including expenses, costs incurred or payments made for locating the child, costs of legal representation of the applicant, and those of returing the child. The purposes underlying Article 26 are to restore the applicant to the financial position he or she would have been in had there been no removal or retention, as well as to deter such conduct from happening in the first place. This fee shifting provision has counterparts in the UCCJA (sections 7(g), 8(c), 15(b)) and the PKPA (28 U.S.C. 1738A note).

IV. Central Authority

In addition to creating a judicial remedy for cases of wrongful removal and retention, the Convention requires each Contracting State to establish a Centeral Authority (hereinafter "CA") with the broad mandate of assisting applicants to secure the return of their children or the effective excercise of their visitation rights. Articles 1, 10, 21. The CA is expressly directed by Article 10 to take all appropriate measures to obtain the voluntary return of children. The role of the CA with respect to visitation rights is discussed in V., *infra.*

*A. Establishment of Central Authoirty*

Article 6 requires each Contracting State to designate a Central Authority to discharge the duties enumerated in Articles 7, 9, 10, 11, 15, 21, 26, 27, and 28.

In France, the Central Authority is located within the Ministry of Justice. Switzerland has designated its Federal Justice Office as CA, and Canada has designated its Department of Justice. However, each Canadian province and territory in which the Convention has come into force has directed its Attorney General to serve as local CA for cases involving that jurisdiction.

In the United States it is very unlikely that the volume of cases will warrant the establishment of a new agency or office to fulfill Convention responsibilities. Rather, the duties of the CA will be carried out by an existing agency of the federal government with experience in dealing with authorities of other countries.

The Department of State's Office of Citizens Consular Services (CCS) within its Bureau of Consular Affairs will most likely serve as CA under the Hague Convention. CCS presently assists parents here and abroad with child custody-related problems within the framework of existing laws and procedures. The Convention should systematize and expedite CCS handling of requests from abroad for assistance in securing the return of children wrongfully abducted to or retained in the United States, and will provide additional tools with which CCS can help parents in the United States who are seeking return of their children from abroad.

The establishment of an interagency coordinating body is envisioned to assist the State Department in executing its functions as CA. This body is to include representatives of the Departments of State, Justice, and Health and Human Services.

In addition to the mandatory establishment of a CA in the national government, Contracting States are free to appoint similar entities in political subdivisions throughout the country. Rather than mandating the establishment of a CA in every state, it is expected that state governments in the United States will be requested on a case-by-case basis to render specified assistance, consistent with the Convention, aimed at resolving international custody and visitation disputes with regard to children located within their jurisdiction.

*B. Duties*

Article 7 enumerates the majority of the tasks to be carried out either directly by the CA or through an intermediary. The CA is to take "all appropriate measures" to execute these responsibilities. Although they are free to do so, the Convention does not obligate Contracting States to amend their internal laws to discharge

Convention tasks more efficaciously. *See* Perez-Vera Report, paragraph 63 at page 444.

The following paragraphs of subsections of Article 7 of the Convention are couched in terms of the tasks and functions of the United States CA. The corresponding tasks and functions of the CA's in other States party to the Convention will be carried out somewhat differently in the context of each country's legal system.

*Article 7(a).* When the CA in the United States is asked to locate a child abducted from a foreign contracting State to this country, it would utilize all existing tools for determining the whereabouts of missing persons. Federal resources available for locating missing persons include the FBI-operated National Crime Information Center (NCIC) computer (pursuant to Pub. L. No. 97-292, the Missing Children Act), the Federal Parent Locator Service (pursuant to section 9 of Pub. L. No. 96-611, the Parental Kidnapping Prevention Act) and the National Center for Missing and Exploited Children. If the abductor's location is known or suspected, the relevant state's Parent Locator Service or Motor Vehicle Bureau and the Internal Revenue Service, Attorney General and Secretary of Education may be requested to conduct field and/or record searches. Also at the state level, public or private welfare agencies can be called upon to verify discreetly any address information about the abductor that may be discovered.

*Article 7(b).* To prevent further harm to the child, the CA would normally call upon the state welfare agency to take whatever protective measures are appropriate and available consistent with that state's child abuse and neglect laws. The CA, either directly or with the help of state authorities, may seek a written agreement from the abductor (and possibly from the applicant as well) not to remove the child from the jurisdiction pending procedures aimed at return of the child. Bonds or other forms of security may be required.

*Article 7(c).* The CA either directly or through local public or private mediators, attorneys, social workers, or other professionals, would attempt to develop an agreement for the child's voluntary return and/or resolution of other outstanding issues. The obligation of the CA to take or cause to be taken all appropriate measures to obtain the voluntary return of the child is so fundamental a purpose of this Convention that it is restated in Article 10. However, overtures to secure the voluntary return of a child may not be advisable if advance awareness by the abductor that the Convention has been invoked is likely to prompt further flight and concealment of the child. If the CA and state authorities are successful in facilitating a voluntary agreement between the parties, the applicant would have no need to invoke or pursue the Convention's judicial remedy.

*Article 7(d).* The CA in the United States would rely upon court personnel or social service agencies in the child's state of habitual residence to compile information on the child's social background for the use of courts considering exceptions to a return petition in another country in which an abducted or retained child is located. *See* Article 13.

*Article 7(e).* The CA in the United States would call upon U.S. state authorities to prepare (or have prepared) general statements about the law of the state of the child's habitual residence for purposes of application of the Convention in the country where the child is located, *i.e.*, to determine whether a removal or retention was wrongful.

*Articles 7 (f) and (g).* In the United States the federal CA will not act as legal advocate for the applicant. Rather, in concert with state authorities and interested family law attorneys, the CA, through state or local bodies, will assist the applicant in identifying competent private legal counsel or, if eligible, in securing representation by a Legal Aid or Legal Services lawyer. In some states, however, the Attorney General or local District Attorney may be empowered under state law to intervene on behalf of the applicant-parent to secure the child's return.

In some foreign Contracting States, the CA may act as the legal representative of the applicant for all purposes under the Convention.

Article 28 permits the CA to require written authorization empowering it to act on behalf of the applicant, or to designate a representative to act in such capacity.

*Article 7(h).* Travel arrangements for the return of a child from the United States would be made by the CA or by state authorities closest to the case in cooperation with the petitioner and/or interested foreign authorities. If it is necessary to provide short-term care for the child pending his or her return, the CA presumably will arrange for the temporary placement of the child in the care of the person designated for that purpose by the applicant, or, failing that, request local authorities to appoint a guardian, foster parent, etc. The costs of transporting the child are borne by the applicant unless the court, pursuant to Article 26, orders the wrongdoer to pay.

*Article 7(i).* The CA will monitor all cases in which its assistance has been sought. It will maintain files on the procedures followed in each case and the ultimate disposition thereof. Complete records will aid in determining how frequently the Convention is invoked and how well it is working.

*C. Other Tasks*

1. Processing Applications

Article 8 sets forth the required contents of a return application submitted to a CA, all of which are incorporated into the model form recommended for use when seeking a child's return pursuant to the Convention (see Annex A of this analysis). Article 8 further provides that an application for assistance in securing the return of a child may be submitted to a CA in either the country of the child's habitual residence or in any other Contracting State. If a CA receives an application with respect to a child whom it believes to be located in another Contracting State, pursuant to Article 9 it is to transmit the application directly to the appropriate CA and inform the requesting CA or applicant of the transmittal.

It is likely that an applicant who knows the child's whereabouts can expedite the return process by electing to file a return application with the CA in the country in which the child is located. The applicant who pursues this course of action may also choose to file a duplicate copy of the application for information purposes with the CA in his or her own country. Of course, the applicant may prefer to apply directly to the CA in his or her own country even when the abductor's location is known, and rely upon the CA to transfer documents and communicate with the foreign CA on his or her behalf. An applicant who does not know the whereabouts of the child will most likely file the return application with the CA in the child's State of habitual residence.

Under Article 27, a CA may reject an application if "it is manifest that the requirements of the Convention are not fulfilled or that the application is otherwise not well founded." The CA must promptly inform the CA in the requesting State, or the applicant directly, of its reasons for such rejection. Consistent with the spirit of the Convention and in the absence of any prohibition on doing so, the applicant should be allowed to correct the defects and refile the application.

Under Article 28, a CA may require the applicant to furnish a written

authorization empowering it to act on behalf of the applicant, or designating a representative so to act.

2. Assistance in Connection With Judicial Proceedings

(a) *Request for status report.* When an action has been commenced in court for the return of a child and no decision has been reached by the end of six weeks, Article 11 authorizes the applicant or the CA of the requested State to ask the judge for a statement of the reasons for the delay. The CA in the country where the child is located may make such a request on its own initiative, or upon request of the CA of another Contracting State. Replies received by the CA in the requested State are to be transmitted to the CA in the requesting State or directly to the applicant, depending upon who initiated the request.

(b) *Social studies/background reports.* Information relating to the child's social background collected by the CA in the child's State of habitual residence pursuant to Article 7(d) may be submitted for consideration by the court in connection with a judicial return proceeding. Under the last paragraph of Article 13, the court must consider home studies and other social background reports provided by the CA or other competent authorities in the child's State of habitual residence.

(c) *Determination of "wrongfulness".* If a court requests an applicant to obtain a determination from the authorities of the child's State of habitual residence that the removal or retention was wrongful, Central Authorities are to assist applicants, so far as practicable, to obtain such a determination. Article 15.

(d) *Costs.* Under Article 26, each CA bears its own costs in applying the Convention. The actual operating expenses under the Convention will vary from one Contracting State to the next depending upon the volume of incoming and outgoing requests and the number and nature of the procedures available under internal law to carry out specified Convention tasks.

Subject to limited exceptions noted in the next paragraph, the Central Authority and other public services are prohibited from imposing any charges in relation to applications submitted under the Convention. Neither the applicant nor the CA in the requesting State may be required to pay for the services rendered directly or indirectly by the CA of the requested State.

The exceptions relate to transportation and legal expenses to secure the child's return. With respect to transportation, the CA in the requested State is under no obligation to pay for the child's return. The applicant can therefore be required to pay the costs of transporting the child. With respect to legal expenses, if the requested State enters a reservation in accordance with Articles 26 and 42, the applicant can be required to pay all costs and expenses of the legal proceedings, and those arising from the participation of legal counsel or advisers. However, see III. J 2 of this analysis discussing the possibility that the court ordering the child's return will levy these and other costs upon the abductor. Even if the reservation under Articles 26 and 42 is entered, under Article 22 no security, bond or deposit can be required to guarantee the payment of costs and expenses of the judicial or administrative proceedings falling within the Convention.

Under the last paragraph of Article 26 the CA may be able to recover some of its expenses from the person who engaged in the wrongful conduct. For instance, a court that orders a child returned may also order the person who removed or retained the child to pay the expenses incurred by or on behalf of the petitioner, including costs of court proceedings and legal fees of the petitioner. Likewise, a court that issues an order concerning visitation may direct the person who prevented the exercise of visitation rights to pay necessary expenses incurred by or on behalf of the petitioner. In such cases, the petitioner could recover his or her expenses, and the CA could recover its outlays on behalf of the petitioner, including costs associated with, or payments made for, locating the child and the legal representation of the petitioner.

V. Access Rights—Article 21

*A. Remedies for Breach*

Up to this point this analysis has focussed on judicial and administrative remedies for the removal or retention of children in breach of custody rights. "Access rights," which are synonymous with "visitation rights", are also protected by the Convention, but to a lesser extent than custody rights. While the Convention preamble and Article 1(b) articulate the Convention objective of ensuring that rights of access under the law of one state are respected in other Contracting States, the remedies for breach of access rights are those enunciated in Article 21 and do not include the return remedy provided by Article 12.

*B. Defined*

Article 5(b) defines "access rights" as including "the right to take a child for a limited period of time to a place other than the child's habitual residence."

A parent who takes a child from the country of its habitual residence to another country party to the Convention for a summer visit pursuant to either a tacit agreement between the parents or a court order is thus exercising his or her access rights. Should that parent fail to return the child at the end of the agreed upon visitation period, the retention would be wrongful and could give rise to a petition for return under Article 12. If, on the other hand, a custodial parent resists permitting the child to travel abroad to visit the noncustodial parent, perhaps out of fear that the child will not be returned at the end of the visit, this interference with access rights does not constitute a wrongful retention within the meaning of Article 3 of the Convention. The parent whose access rights have been infringed is not entitled under the Convention to the child's "return," but may request the Central Authority to assist in securing the exercise of his or her access rights pursuant to Article 21.

Article 21 may also be invoked as a precautionary measure by a custodial parent who anticipates a problem in getting the child back at the end of a visit abroad. That parent may apply to the CA of the country where the child is to visit the noncustodial parent for steps to ensure the return of the child at the end of the visit—for example, through appropriate imposition of a performance bond or other security.

*C. Procedure for Obtaining Relief*

Procedurally Article 21 authorizes a person complaining of, or seeking to prevent, a breach of access rights to apply to the CA of a Contracting State in the same way as a person seeking return of the child. The application would contain the information described in Article 8, except that information provided under paragraph (c) would be the grounds upon which the claim is made for assistance in organizing or securing the effective exercise of rights of access.

Once the CA receives such application, it is to take all appropriate measures pursuant to Article 7 to promote the peaceful enjoyment of access rights and the fulfillment of any conditions to which the exercise of those rights is subject. This includes initiating or facilitating the institution of proceedings, either directly or through intermediaries, to organize or protect access rights and to secure respect for conditions to which these rights are subject.

If legal proceedings are instituted in the Contracting State in which the noncustodial parent resides, Article 21 may not be used by the noncustodial parent to evade the jurisdiction of the courts of the child's habitual residence, which retain authority to define and/or condition the exercise of visitation rights. A parent who has a child abroad for a visit is not to be allowed to exploit the presence of the child as a means for securing from the CA (or court) in that country more liberal visitation rights than those set forth in a court order agreed upon in advance of the visit. Such result would be tantamount to sanctioning forum-shopping contrary to the intent of the Convention. Any such application should be denied and the parent directed back to the appropriate authorities in the State of the child's habitual residence for consideration of the desired modification. Pending any such modification, once the lawful visitation period has expired, the custodial parent would have the right to seek the child's return under Article 3.

The Perez-Vera Report gives some limited guidance as to how CA's are to cooperate to secure the exercise of access rights:

> . . . it would be advisable that the child's name not appear on the passport of the holder of the right of access, whilst in 'transfrontier' access cases it would be sensible for the holder of the access rights to give an undertaking to the Central Authority of the child's habitual residence to return the child on a particular date and to indicate also the places where he intends to stay with the child. A copy of such an undertaking would then be sent to the Central Authority of the habitual residence of the holder of the access rights, as well as to the Central Authority of the State in which he has stated his intention of staying with the child. This would enable the authorities to know the whereabouts of the child at any time and to set in motion proceedings for bringing about its return, as soon as the stated time-limit has expired. Of course, none of the measures could by itself ensure that access rights are exercised properly, but in any event we believe that this Report can go no further: the specific measures which the Central Authorities concerned are able to take will depend on the circumstances of each case and on the capacity to act enjoyed by each Central Authority. Perez-Vera Report, paragraph 128 at page 466.

*D. Alternative Remedies*

In addition to or in lieu of invoking Article 21 to resolve visitation-related problems, under Articles 18, 29 and 34 an aggrieved parent whose access rights have been violated may bypass the CA and the Convention and apply directly to the judicial authorities of a Contracting State for relief under other applicable laws.

In at least one case it is foreseeable that a parent abroad will opt in favor of local U.S. law instead of the Convention. A noncustodial parent abroad whose visitation rights are being thwarted by the custodial parent resident in the United States could invoke the UCCJA to seek enforcement of an existing foreign court order conferring visitation rights. Pursuant to section 23 of the UCCJA, a state court in the United States could order the custodial parent to comply with the prescribed visitation period by sending the child to the parent outside the United States. This remedy is potentially broader and more meaningful than the Convention remedy, since the latter does not include the right of return when a custodial parent obstructs the noncustodial parent's visitation rights, *i.e.*, by refusing to allow the other parent to exercise those rights. It is possible that a parent in the United States seeking to exercise access rights with regard to a child habitually resident abroad may similarly find greater relief under foreign law than under the Convention.

VI. Miscellaneous and Final Clauses

*A. Article 36*

Article 36 permits Contracting States to limit the restrictions to which a child's return may be subject under the Convention, *i.e.*, expand the return obligation or cases to which the Convention will apply. For instance, two or more countries may agree to extend coverage of the Convention to children beyond their sixteenth birthdays, thus expanding upon Article 4. Or, countries may agree to apply the Convention retroactively to wrongful removal and retention cases arising prior to its entry into force for those countries. Such agreement would remove any ambiguity concerning the scope of Article 35. The Department of State is not proposing that the United States make use of this Article.

*B. Articles 37 and 38*

Chapter VI of the Hague Convention consists of nine final clauses concerned with procedural aspects of the treaty, most of which are self-explanatory. Article 37 provides that states which were members of the Hague Conference on Private International Law at the time of the Fourteenth Session (October 1980) may sign and become parties to the Convention by ratification, acceptance or approval. Significantly, under Article 38 the Convention is open to accession by non-member States, but enters into force only between those States and member Contracting States which specifically accept their accession to the Convention. Article 38.

*C. Articles 43 and 44*

In Article 43 the Convention provides that it enters into force on the first day of the third calendar month after the third country has deposited its instrument of ratification, acceptance, approval or accession. For countries that become parties to the Convention subsequently, the Convention enters into force on the first day of the third calendar month following the deposit of the instrument of ratification. Pursuant to Article 43, the Convention entered into force on December 1, 1983 among France, Portugal and five provinces of Canada, and on January 1, 1984 for Switzerland. As of January, 1986 it is in force for all provinces and territories of Canada with the exception of Alberta, the Northwest Territories, Prince Edward Island and Saskatchewan.

The Convention enters into force in ratifying countries subject to such declarations or reservations pursuant to Articles 39, 40, 24 and 26 (third paragraph) as may be made by each ratifying country in accordance with Article 42.

The Convention remains in force for five years from the date it first entered into force (*i.e.*, December 1, 1983), and is renewed tacitly every five years absent denunciations notified in accordance with Article 44.

*D. Articles 39 and 40*

Article 39 authorizes a Contracting State to declare that the Convention extends to some or all of the territories for the conduct of whose international relations it is responsible.

Under Article 40, countries with two or more territorial units having different systems of law relative to custody and visitation rights may declare that the Convention extends to all or some of them. This federal state clause was included at the request of Canada to take account of Canada's special constitutional situation. The Department of State is not proposing that the United States make use of this provision. Thus, if the United States ratifies the Convention, it would come into force throughout the United States as the supreme law of the land in every state and other jurisdiction.

*E. Article 41*

Article 41 is another provision inserted at the request of one country, and is best understood by reciting the reporter's explanatory comments:

> Finally a word should be said on Article 41, since it contains a wholly novel provision in

Hague Conventions. It also appears in the other Conventions adopted at the Fourteenth Session, *i.e.*, the *Convention on International Access to Justice*, at the express request of the Australian delegation.

This article seeks to make it clear that ratification of the Convention by a State will carry no implication as to the internal distribution of executive, judicial and legislative powers in that State.

This may seem self-evident, and this is the point which the head of the Canadian delegation made during the debates of the Fourth Commission where it was decided to insert such a provision in both Conventions (see P.-v. No. 4 of the Plenary Session). The Canadian delegation, openly expressing the opinion of a large number of delegations, regarded the insertion of this article in the two Conventions as unnecessary. Nevertheless, Article 41 was adopted, largely to satisfy the Australian delegation, for which the absence of such a provision would apparently have created insuperable constitutional difficulties. Perez-Vera Report, paragraph 149 at page 472.

*F. Article 45*

Article 45 vests the Ministry of Foreign Affairs of the Kingdom of the Netherlands, as depository for the Convention, with the responsibility to notify Hague Conference member States and other States party to the Convention of all actions material to the operation of the Convention.

Annex A

The following model form was recommended by the Fourteenth Session of the Hague Conference on Private International Law (1980) for use in making applications pursuant to the 1980 Hague Convention on the Civil Aspects of International Child Abduction for the return of wrongfully removed or retained children. The version of the form to be used for requesting the return of such children from the United States will probably seek additional information, in particular to help authorities in the United States in efforts to find a child whose whereabouts are not known to the applicant.

Request for Return

Hague Convention of 25 October 1980 on the Civil Aspects of International Child Abduction.

Requesting Central Authority or Applicant

Requested Authority

Concerns the following child: ——————— who will attain the age of 16 on ——————— 19—.

Note.—The following particulars should be completed insofar as possible.

I—Identity of the Child and its Parents

1 Child

Name and first names.......................................

Date and place of birth.......................................

Passport or identity card No., if any.............

Description and photo, if possible (see annexes).......................................

2 Parents

2.1 Mother:

Name and first names.......................................

Date and place of birth.......................................

Nationality.......................................

Occupation.......................................

Habitual residence.......................................

Passport or identity card No., if any.............

2.2 Father:

Name and first names.......................................

Date and place of birth.......................................

Nationality.......................................

Occupation.......................................

Habitual residence.......................................

Passport or identity card No., if any.............

2.3 Date and place of marriage.....................

II—Requesting Individual or Institution (who actually exercised custody before the removal or retention)

3 Name and first names

Nationality of individual applicant................

Occupation of individual applicant................

Address.......................................

Passport or identity card No., if any.............

Relation to the child.......................................

Name and address of legal adviser, if any.......................................

III—Place Where the Child Is Thought To Be

4.1 Information concerning the person alleged to have removed or retained the child

Name and first names.......................................

Date and place of birth, if known................

Nationality, if known.......................................

Occupation.......................................

Last known address.......................................

Passport or identity card No., if any.............

Description and photo, if possible (see annexes).......................................

4.2 Address of the child.......................................

4.3 Other persons who might be able to supply additional information relating to the whereabouts of the child.......................................

IV—Time, Place, Date and Circumstances of the Wrongful Removal or Retention

.......................................

V—Factual or Legal Grounds Justifying the Request

.......................................

VI—Civil Proceedings in Progress

.......................................

VII—Child Is To Be Returned To:

a. Name and first names.......................................

Date and place of birth.......................................

Address.......................................

Telephone number.......................................

b. Proposed arrangements for return of the child.......................................

VIII—Other Remarks

.......................................

IX—List of Documents Attached*

.......................................

Date.......................................

Place.......................................

Signature and/or stamp of the requesting Central Authority or applicant

.......................................

Annex B.—Bibliography

Explanatory Report by E. Perez-Vera, Hague Conference on Private International Law, Actes et documents de la Quatorzieme session, vol. III, 1980, p. 426.

Anton, A.E.—The Hague Convention on International Child Abduction; 30 Int'l & Comp. L.Q. (1981), p. 537.

Bodenheimer, B.—The Hague Convention on International Child Abduction; XIV Fam. L.Q. (1980), p. 99.

Chatin, L.—Les conflicts relatifs a la garde des enfants et au droit de visite en droit international prive; Travaux du Comite francais de droit international prive, Seance du 12 mai 1982, Publication du Ministere de la Justice.

Crouch, R.E.—Effective Measures Against International Child Snatching; 131 New L.J. (1981), p. 592.

Deschenaux, D.—La Convention de La Haye sur les aspects civils de l'enlevement international d'enfants, du 25 octobre 1980; XXXVII Schweizerisches Jahrbuch fur internationales Recht (1981), p. 119.

Dyer, A.—International child abduction by parents; 168 Recueil des Cours de l'Academie de droit international de La Haye (1980), p. 231.

Eekelaar, J.M.—The Hague Convention on the Civil Aspects of International Child Abduction; Explanatory Documentation prepared for Commonwealth Jurisdictions, Commonwealth Secretariat, 1981.

Farquhar, K.B.—The Hague Convention on International Child Abduction Comes to Canada; 4 Can. J. Fam. L. (1983), p. 5.

Frank, R.J.—American and International Responses to International Child Abductions, 16 N.Y.U. J. Int'l L. & Pol. (Winter 1984), p. 415.

Hoff, P., Schulman, J. and Volenik, A.—Interstate Child Custody Disputes and Parental Kidnapping: Policy, Practice and Law, Legal Services Corporation—American Bar Association, 1982.

Huessiege, R.—Internationale Kindesentfuehrungen und

*E.g. Certified copy of relevant decision or agreement concerning custody or access; certificate or affidavit as to the applicable law; information relating to the social background of the child; authorization empowering the Central Authority to act on behalf of applicant.

Landesverfassungsrecht: IPRax (1982), p. 95—Der Uniform Child Custody Jurisdiction Act—Rechtsvergleichende Betrachtungen zu Internationalen Kindesentfuehrengen, Verlag fur Standesamtswesen, Frankfurt am Main, 1982.

Morgenstern, B.R.—The Hague Convention on the Civil Aspects of International Child Abduction: The Need for Ratification; 10 N.C.J. Int'l L. & Com. Reg. (1985), p. 463.

Reymond, P.H.—Convention de La Haye et Convention de Strasbourg. Aspects comparatifs des conventions concernant l'enlevement d'un enfant par l'un de ses parents; Revue de droit suisse 1981, p. 329.

Schulman, J.—cf. Hoff, P.

Vink, E.L.M.—Enkele civielrechtelijke aspecten van de internationale ontvoeringen van kinderen door een van de ouders; Leiden, mai 1981.

Volenik, A.—cf. Hoff, P.

Westbrook, G.R.—Law and Treaty Responses to International Child Abductions; 20 Va. J. Int'l L. (1980), p. 669.

[FR Doc. 86-6495 Filed 3-25-86; 8:45 am]

BILLING CODE 4710-06-M

| Name | Title or relationship | Percent of partnership interest |
|---|---|---|
| Robert W. Hughes. | Limited Partner...... | 1.562 |
| Chris Harte .......... | Limited Partner...... | .294 |
| Kenneth P. DeAngelis. | Limited Partner...... | 2.00 |
| Joseph C. Aregona. | Limited Partner...... | 1.00 |
| Peter T. Flawn...... | Limited Partner...... | .500 |
| Robert W. Foss...... | Limited Partner...... | 177 |
| Jeffery C. Garvey... | Limited Partner...... | 7.537 |

The Licensee will retain its present name and location.

Matters involved in SBA's consideration of the Application include the general business reputation and character of the proposed owners and management, and the probability of successful operations of the new company under their management including profitability and financial soundness in accordance with the Small Business Investment Act and the SBA Rules and Regulations.

Notice is further given that any person may, not later than 30 days from the date of publication of this Notice, submit written comments on the proposed SBIC to the Deputy Associate Administrator for Investment, Small Business Administration, 1441 L Street, NW., Washington, DC 20416.

A copy of the Notice shall be published in a newspaper of general circulation in Austin, Texas.

(Catalog of Federal Domestic Assistance Program No. 59.011, Small Business Investment Companies)

Dated: June 17, 1988.

**Robert G. Lineberry,**

*Deputy Associate Administrator for Investment.*

[FR Doc. 88-14303 Filed 6-23-88; 8:45 am]

BILLING CODE 8025-01-M

## DEPARTMENT OF STATE

[Public Notice 1067]

### Hague Convention (Multilateral Treaty) on International Child Adduction Enters Into Force on July 1, 1988

The 1980 Hague Convention on the Civil Aspects of International Child Abduction will enter into force for the United States on July 1, 1988. From that date on the Convention will be in force between the United States and the following countries already parties to it: Australia, Canada, France, Hungary, Luxembourg, Portugal, Spain, Switzerland and the United Kingdom.

The Convention provides for the prompt return of children abducted to, or wrongfully retained in, a country when both that country and the country of the child's habitual residence are parties to the Convention and for so long as the child is under age 16. The return obligation, which is subject to certain limited exceptions, applies whether or not there is an outstanding custody decree for the child and regardless of the child's nationality.

The U.S. Central Authority under the Convention, which will provide limited assistance to those seeking to avail themselves of the Convention benefits and screen incoming requests from other countries, will be located in the State Department's Bureau of Consular Affairs. Additional information concerning the Convention, including a guide for child abduction victims and advice about prevention, may be requested by telephoning (202) 647-3666 or writing to the following address: Office of Citizens Consular Services (CA/OCS/CCS), U.S. Department of State, Washington, D.C. 20520. Regulations setting out the procedures that will be followed by the U.S. Central Authority are being published in the Federal Register of June 23, 1988 and in 22 CFR Part 94.

The United States ratified the Convention subject to two reservations that require the translation into English of return requests and accompanying documents addressed to the United States and specify that the United States will not be bound to assume the costs arising from court proceedings and use of legal counsel. In order to provide for the uniform and effective implementation of the Convention in the United States, Congress enacted the "International Child Abduction Remedies Act", Pub. L. No. 100-300, which deals primarily with requests for the return of children from the United States and which addresses such matters as the courts having jurisdiction to hear return requests in the United States, venue, the burden of proof to be met by the petitioning parent and the respondent, and certain functions of the U.S. Central Authority.

The certified English text of the Hague Convention, certain other documents, and the lengthy legal analysis of the Convention that was before the Senate Foreign Relations Committee during its deliberations on the Convention, may be found in the notice of the Department of State in the Federal Register of March 26, 1986 (Vol. 51, No. 58) at pages 10494 to 10516. That notice constitutes the only official U.S. Government publication of the English text of the Convention currently available.

Information about present and future countries party to the Convention may be obtained from the U.S. Central Authority, above, and from the Department's Office of Treaty Affairs at (202) 647-1736.

Peter H. Pfund,

*Assistant Legal Adviser for Private International Law.*

June 21, 1988.

[FR Doc. 88-14334 Filed 6-23-88; 8:45 am]

BILLING CODE 4710-08-M

## DEPARTMENT OF TRANSPORTATION

### Coast Guard

[CGD 88-046]

### Meeting of the Training and Qualifications Working Group for the Subcommittee on Vapor Control, Chemical Transportation Advisory Committee

**AGENCY:** Coast Guard, DOT.

**ACTION:** Notice of meeting.

**SUMMARY:** Pursuant to section 10(a)(2) of the Federal Advisory Committee Act (Pub. L. 92-463; 5 U.S.C. App. I), notice is hereby given of a meeting of the Training and Qualifications Working Group for the Subcommittee on Vapor Control of the Chemical Transportation Advisory Committee (CTAC). The Subcommittee is considering requirements for tank vessels and waterfront facilities which use vapor control systems. The purpose of the working group is to develop recommended standards for the training and qualifications of personnel involved in the loading of tank vessels with vapor control systems in use. The meeting will be held on Thursday, July 21, 1988 in Room 1303, U.S. Coast Guard Headquarters, 2100 Second Street, SW., Washington, DC. The meeting is scheduled to begin at 9:00 a.m. This will be the initial organizational meeting of the working group.

**DATE:** Attendance is open to the public. Members of the public may present oral statements at the meetings. Persons wishing to present oral statements should notify the Executive Director of CTAC no later than the day before the meeting. Any member of the public may present a written statement to the Subcommittee at any time.

**FOR FURTHER INFORMATION CONTACT:** Lieutenant Commander R.H. Fitch, U.S. Coast Guard Headquarters (G-MTH-1), 2100 Second Street SW., Washington, DC 20593-0001, (202) 267-1217.

Public Law 100-300
100th Congress

An Act

To establish procedures to implement the Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, and for other purposes.

Apr. 29, 1988
[H.R. 3971]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

International Child Abduction Remedies Act. 42 USC 11601 note.

**SECTION 1. SHORT TITLE.**

This Act may be cited as the "International Child Abduction Remedies Act".

**SEC. 2. FINDINGS AND DECLARATIONS.**

42 USC 11601.

(a) FINDINGS.—The Congress makes the following findings:

(1) The international abduction or wrongful retention of children is harmful to their well-being.

(2) Persons should not be permitted to obtain custody of children by virtue of their wrongful removal or retention.

(3) International abductions and retentions of children are increasing, and only concerted cooperation pursuant to an international agreement can effectively combat this problem.

(4) The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980, establishes legal rights and procedures for the prompt return of children who have been wrongfully removed or retained, as well as for securing the exercise of visitation rights. Children who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies. The Convention provides a sound treaty framework to help resolve the problem of international abduction and retention of children and will deter such wrongful removals and retentions.

(b) DECLARATIONS.—The Congress makes the following declarations:

(1) It is the purpose of this Act to establish procedures for the implementation of the Convention in the United States.

(2) The provisions of this Act are in addition to and not in lieu of the provisions of the Convention.

(3) In enacting this Act the Congress recognizes—

(A) the international character of the Convention; and

(B) the need for uniform international interpretation of the Convention.

(4) The Convention and this Act empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.

**SEC. 3. DEFINITIONS.**

42 USC 11602.

For the purposes of this Act—

(1) the term "applicant" means any person who, pursuant to the Convention, files an application with the United States

Appendix A

## LETTER OF TRANSMITTAL

THE WHITE HOUSE, *October 30, 1985.*

*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith a certified copy of the Hague Convention on the Civil Aspects of International Child Abduction, adopted on October 24, 1980 by the Fourteenth Session of the Hague Conference on Private International Law and opened for signature on October 25, 1980.

The Convention is designed to secure the prompt return of children who have been abducted from their country of habitual residence or wrongfully retained outside that country. It also seeks to facilitate the exercise of visitation rights across international borders. The Convention reflects a worldwide concern about the harmful effects on children of parental kidnapping and a strong desire to fashion an effective deterrent to such conduct.

The Convention's approach to the problem of international child abduction is a simple one: The Convention is designed promptly to restore the factual situation that existed prior to a child's removal or retention. It does not seek to settle disputes about legal custody rights, nor does it depend upon the existence of court orders as a condition for returning children. The international abductor is denied legal advantage from the abduction to or retention in the country where the child is located, as resort to the Convention is to effect the child's swift return to his or her circumstances before the abduction or retention. In most cases this will mean return to the country of the child's habitual residence where any dispute about custody rights can be heard and settled.

The Convention calls for the establishment of a Central Authority in every Contracting State to assist applicants in securing the return of their children or in exercising their custody or visitation rights, and to cooperate and coordinate with their counterparts in other countries toward these ends. Moreover, the Convention establishes a judicial remedy in wrongful removal or retention cases which permits an aggrieved parent to seek a court order for the prompt return of the child when voluntary agreement cannot be achieved. An aggrieved parent may pursue both of these courses of action or seek a judicial remedy directly without involving the Central Authority of the country where the child is located.

The Convention would represent an important addition to the State and Federal laws currently in effect in the United States that are designed to combat parental kidnapping—specifically, the Uniform Child Custody Jurisdiction Act now in effect in every State in the country, the Parental Kidnapping Prevention Act of 1980, the 1982 Missing Children Act and the Missing Children's Assistance

Act. It would significantly improve the chances a parent in the United States has of recovering a child from a foreign Contracting State. It also provides a clear-cut method for parents abroad to apply for the return of children who have been wrongfully taken to or retained in this country. In short, by establishing a legal right and streamlined procedures for the prompt return of internationally abducted children, the Convention should remove many of the uncertainties and the legal difficulties that now confront parents in international child abduction cases.

Federal legislation will be submitted to provide for the smooth implementation of the Convention within the United States. This legislation will be consistent with the spirit and intent of recent congressional initiatives dealing with the problem of interstate child abduction and missing children.

United States ratification of the Convention is supported by the American Bar Association. The authorities of many States have indicated a willingness to do their part to assist the Federal government in carrying out the mandates of the Convention.

I recommend that the Senate give early and favorable consideration to the Convention and accord its advice and consent to ratification, subject to the reservations described in the accompanying report of the Secretary of State.

RONALD REAGAN.

## LETTER OF SUBMITTAL

DEPARTMENT OF STATE,
*Washington, October 4, 1985.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Hague Convention on the Civil Aspects of International Child Abduction with the recommendation that it be transmitted to the Senate for its advice and consent to ratification.

The Convention was adopted on October 24, 1980 at the Fourteenth Session of the Hague Conference on Private International Law in Plenary Session by unanimous vote of twenty-three member states of that organization. The Convention was opened for signature on October 25, 1980, at which time it was signed by Canada, France, Greece and Switzerland. It was signed on behalf of the United States on December 23, 1981, and has also been signed by Belgium and Portugal. The Convention is in force for France, Portugal, Switzerland and most parts of Canada.

The Convention stemmed from a proposal first advanced at a Hague Conference Special Commission meeting in 1976 that the Conference prepare a treaty responsive to the global problem of international child abduction. The overriding objective was to spare children the detrimental emotional effects associated with transnational parental kidnapping.

The Convention establishes a system of administrative and legal procedures to bring about the prompt return of children who are wrongfully removed to or retained in a Contracting State. A removal or retention is wrongful within the meaning of the Convention if it violates custody rights that are defined in an agreement or court order, or that arise by operation of law, provided these rights are actually exercised (Article 3), i.e., custody has not in effect been abandoned. The Convention applies to abductions that occur both before and after issuance of custody decrees, as well as abductions by a joint custodian (Article 3). Thus, a custody decree is not a prerequisite to invoking the Convention with a view to securing the child's return. By promptly restoring the *status quo ante*, subject to express requirements and exceptions, the Convention seeks to deny the abductor legal advantage in the country to which the child has been taken, as the courts of that country are under a treaty obligation to return the child without conducting legal proceedings on the merits of the underlying conflicting custody claims.

Each country must establish at least one national Central Authority primarily to process incoming and outgoing requests for assistance in securing the return of a child or the exercise of visitation rights (Article 6). In the United States the Central Authority

is to be located in an existing agency of the federal government which will, however, need to rely on state and local facilities, including the Federal Parent Locator Service and the private bar, in carrying out the measures listed in Article 7 of the Convention. These measures include best efforts to locate abducted or retained children, explore possibilities for their voluntary return, facilitate provision of legal services in connection with judicial proceedings, and coordinate arrangements for the child's return travel (Article 7).

Articles 11–17 are the major provisions governing legal proceedings for the return of an abducted child. Under the Convention, if a proceeding is brought less than a year from the date of the removal or retention and the court finds that the conduct was wrongful, the court is under a treaty obligation to order the child returned. When proceedings are brought a year or more after the date of the removal or retention, the court is still obligated to order the child returned unless the person resisting return demonstrates that the child is settled in the new environment (Article 12).

Although the Convention ceases to apply as soon as a child reaches sixteen years of age (Article 4), it does not limit the power of appropriate authorities to order the return of an abducted or wrongfully retained child at any time pursuant to other laws or procedures that may make return in the absence of a treaty obligation possible (Article 18).

Articles 13 and 20 enumerate those exceptional circumstances under which the court is not obligated by the Convention to order the child returned. The person opposing return of the child bears the burden of proving that: (1) custody rights were not actually being exercised at the time of the removal or retention by the person seeking return or the person seeking return had consented to or subsequently acquiesced in the removal or retention; or (2) there is a grave risk that return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. A court also has discretion to refuse to order a child returned if it finds that the child objects to being returned and has reached an age or degree of maturity making it appropriate to consider his or her views (Article 13). A court may also deny a request to return a child if the return would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms (Article 20). Unless one of the enumerated exceptions to the return obligation is deemed to apply, courts in Contracting States will be under a treaty obligation to order a child returned.

Visitation rights are also protected by the Convention, but to a lesser extent than custody rights (Article 21). The remedies for breach of the "access rights" of the non-custodial parent do not include the return remedy provided by Article 12. However, the non-custodial parent may apply to the Central Authority under Article 21 for "organizing or securing the effective exercise of rights of access." The Central Authority is to promote the peaceful enjoyment of these rights. The Convention is supportive of the exercise of visitation rights, i.e., visits of children with non-custodial parents, by providing for the prompt return of children if the non-custodial parent should seek to retain them beyond the end of the visi-

tation period. In this way the Convention seeks to address the major concern of a custodial parent about permitting a child to visit the non-custodial parent abroad.

If the Convention machinery succeeds in rapidly restoring children to their pre-abduction or pre-retention circumstances, it will have the desirable effect of deterring parental kidnapping, as the legal and other incentives for wrongful removal or retention will have been eliminated. Indeed, while it is hoped that the Convention will be effective in returning children in individual cases, the full extent of its success may never by quantifiable as an untold number of potential parental kidnappings may have been deterred.

This country's participation in the development of the Convention was a logical extension of U.S. membership in the Hague Conference on Private International Law and bipartisan domestic concern with interstate parental kidnapping, a phenomenon with roots in the high U.S. divorce rate and mobility of the population. In response to the public outcry over parental kidnapping, all states and the District of Columbia enacted the Uniform Child Custody Jurisdiction Act (UCCJA), and Congress has enacted the Parental Kidnapping Prevention Act (PKPA), the Missing Children Act, and the Missing Children's Assistance Act. These statutes address almost exclusively problems associated with inter-state parental kidnapping. The Convention will expand the remedies available to victims of parental kidnapping from or to the United States.

The Convention will be of great assistance to parents in the United States whose children are wrongfully taken to or retained in other Contracting States. Such persons now have no choice but to utilize laws and procedures applicable to recognition and enforcement of foreign custody decrees in the country in which the child is located. It is often necessary to retain a foreign lawyer and to apply or reapply for custody to a foreign court, which typically pits the U.S. petitioner against the abducting parent who may have his or her origins in that foreign country and may thus have the benefit of defending the custody suit in what may be a friendly forum. The Convention will be especially meaningful to parents whose children are abducted before U.S. custody orders have been issued because return proceedings under the Convention are not contingent upon the existence of such orders.

At any given time during the past several years, about half of the several hundred requests to the Department of State for assistance in recovering children taken out of the United States have involved abductions to countries which participated in the preparation and negotiation of the Hague Convention. This suggests that U.S. ratification of the Convention, and its ultimate ratification by many of those other countries, is likely to benefit a substantial number of future victim children and parents residing in the United States.

For parents residing outside the United States whose children have been wrongfully taken to or retained in this country, the Convention will likewise serve as a vehicle for prompt return. In such cases involving violations of existing foreign court orders, the victim parent outside the United States may either invoke the Convention or seek return of the child in connection with an action for recognition of the foreign custody decree pursuant to the UCCJA

or other available means. The Convention will be expecially advantageous in pre-decree abduction cases where no court order exists that may be enforced under the UCCJA.

The Convention has received widespread support. The Secretary of State's Advisory Committee on Private International Law—on which ten major national legal organizations interested in international efforts to unify private law are represented—has endorsed the Convention for U.S. ratification. The House of Delegates of the American Bar Association adopted a resolution in February, 1981 urging U.S. signature and ratification of the Convention. U.S. ratification is also supported by the Department of Justice and the Department of Health Services. In reply to a State Department letter inquiring whether and how the states of the United States could assist in implementing the Convention if it were ratified by the United States, officials of many states welcomed the Convention in principle and expressed general willingness to cooperate with the federal Central Authority in its implementation.

The Department believes that federal legislation will be needed fully to give effect to various provisions of the Convention. Draft legislation is being prepared for introduction in both houses of Congress. The United States instrument of ratification would be deposited only after satisfactory legislation has been enacted.

I recommend that the United States enter two reservations at the time of deposit of its instrument of ratification, both of which are specifically permitted by the Convention.

(1) The United States should enter a reservation to ensure that all documents sent to the U.S. Central Authority in a foreign language are accompanied by a translation into English. The reservation should read:

> Pursuant to the second paragraph of Article 24, and Article 42, the United States makes the following reservation: All applications, communications and other documents sent to the United States Central Authority should be accompanied by their translation into English.

(2) The second reservation should read:

> Pursuant to the third paragraph of Article 26, the United States declares that it will not be bound to assume any costs or expenses resulting from the participation of legal counsel or advisers or from court and legal proceedings in connection with efforts to return children from the United States pursuant to the Convention except insofar as those costs or expenses are covered by a legal aid program.

It is hoped that the Senate will promptly consider this Convention and give its advice and consent to its ratification by the United States.

Respectfully submitted,

GEORGE P. SHULTZ.

Appendix B

CONVENTION ON THE CIVIL ASPECTS OF INTERNATIONAL CHILD ABDUCTION

The States signatory to the present Convention,

Firmly convinced that the interests of children are of paramount importance in matters relating to their custody,

Desiring to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access,

Have resolved to conclude a Convention to this effect, and have agreed upon the following provisions —

CHAPTER I — SCOPE OF THE CONVENTION

*Article 1*

The objects of the present Convention are —

*a* to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and

*b* to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.

*Article 2*

Contracting States shall take all appropriate measures to secure within their territories the implementation of the objects of the Convention. For this purpose they shall use the most expeditious procedures available.

*Article 3*

The removal or the retention of a child is to be considered wrongful where —

*a* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

*b* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph *a* above, may arise in particular by operation of law or by reason of a judicial or administative decision, or by reason of an agreement having legal effect under the law of that State.

*Article 4*

The Convention shall apply to any child who was habitually resident in a Contracting State immediately before any breach of custody or access rights. The Convention shall cease to apply when the child attains the age of 16 years.

*Article 5*

For the purposes of this Convention —

*a* 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;

*b* 'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

CHAPTER II — CENTRAL AUTHORITIES

*Article 6*

A Contracting State shall designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities.

Federal States, States with more than one system of law or States having autonomous territorial organizations shall be free to appoint more than one Central Authority and to specify the territorial extent of their powers. Where a State has appointed more than one Central Authority, it shall designate the Central Authority to which applications may be addressed for transmission to the appropriate Central Authority within that State.

*Article 7*

Central Authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective States to secure the prompt return of children and to achieve the other objects of this Convention.

In particular, either directly or through any intermediary, they shall take all appropriate measures —

*a* to discover the whereabouts of a child who has been wrongfully removed or retained;

*b* to prevent further harm to the child or prejudice to interested parties by taking or causing to be taken provisional measures;

*c* to secure the voluntary return of the child or to bring about an amicable resolution of the issues;

*d* to exchange, where desirable, information relating to the social background of the child;

*e* to provide information of a general character as to the law of their State in connection with the application of the Convention;

*f* to initiate or facilitate the institution of judicial or administrative proceedings with a view to obtaining the return of the child and, in a proper case, to make arrangements for organizing or securing the effective exercise of rights of access;

*g* where the circumstances so require, to provide or facilitate the provision of legal aid and advice, including the participation of legal counsel and advisers;

*h* to provide such administrative arrangements as may be necessary and appropriate to secure the safe return of the child;

*i* to keep each other informed with respect to the operation of this Convention and, as far as possible, to eliminate any obstacles to its application.

CHAPTER III — RETURN OF CHILDREN

*Article 8*

Any person, institution or other body claiming that a child has been removed or retained in breach of custody rights may apply either to the Central Authority of the child's habitual residence or to the Central Authority of any other Contracting State for assistance in securing the return of the child.

The application shall contain —

*a* information concerning the identity of the applicant, of the child and of the person alleged to have removed or retained the child;

*b* where available, the date of birth of the child;

*c* the grounds on which the applicant's claim for return of the child is based;

*d* all available information relating to the whereabouts of the child and the identity of the person with whom the child is presumed to be.

The application may be accompanied or supplemented by —

*e* an authenticated copy of any relevant decision or agreement;

*f* a certificate or an affidavit emanating from a Central Authority, or other competent authority of the State of the child's habitual residence, or from a qualified person, concerning the relevant law of that State;

*g* any other relevant document.

*Article 9*

If the Central Authority which receives an application referred to in Article 8 has reason to believe that the child is in another Contracting State, it shall directly and without delay transmit the application to the Central Authority of that Contracting State and inform the requesting Central Authority, or the applicant, as the case may be.

*Article 10*

The Central Authority of the State where the child is shall — take or cause to be taken all appropriate measures in order to obtain the voluntary return of the child.

*Article 11*

The judicial or administrative authorities of Contracting States shall act expeditiously in proceedings for the return of children.

If the judicial or administrative authority concerned has not reached a decision within six weeks from the date of commencement of the proceedings, the applicant or the Central Authority of the requested State, on its own initiative or if asked by the Central Authority of the requesting State, shall have the right to request a statement of the reasons for the delay. If a reply is received by the Central Authority of the requested State, that Authority shall transmit the reply to the Central Authority of the requesting State, or to the applicant, as the case may be.

*Article 12*

Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

Where the judicial or administrative authority in the requested State has reason to believe that the child has been taken to another State, it may stay the proceedings or dismiss the application for the return of the child.

*Article 13*

Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that —

*a* the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or

*b* there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation.

The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views.

In considering the circumstances referred to in this Article, the judicial and administrative authorities shall take into account the information relating to the social background of the child provided by the Central Authority or other competent authority of the child's habitual residence.

*Article 14*

In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable.

*Article 15*

The judicial or administrative authorities of a Contracting State may, prior to the making of an order for the return of the child, request that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination that the removal or retention was wrongful within the meaning of Article 3 of the Convention, where such a decision or determination may be obtained in that State. The Central Authorities of the Contracting States shall so far as practicable assist applicants to obtain such a decision or determination

*Article 16*

After receiving notice of a wrongful removal or retention of a child in the sense of Article 3, the judicial or administrative authorities of the Contracting State to which the child has been removed or in which it has been retained shall not decide on the merits of rights of custody until it has been determined that the child is not to be returned under this Convention or unless an application under this Convention is not lodged within a reasonable time following receipt of the notice.

*Article 17*

The sole fact that a decision relating to custody has been given in or is entitled to recognition in the requested State shall not be a ground for refusing to return a child under this Convention, but the judicial or administrative authorities of the requested State may take account of the reasons for that decision in applying this Convention.

*Article 18*

The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time.

*Article 19*

A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.

*Article 20*

The return of the child under the provisions of Article 12 may be refused if this would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms.

CHAPTER IV — RIGHTS OF ACCESS

*Article 21*

An application to make arrangements for organizing or securing the effective exercise of rights of access may be presented to the Central Authorities of the Contracting States in the same way as an application for the return of a child.

The Central Authorities are bound by the obligations of co-operation which are set forth in Article 7 to promote the peaceful enjoyment of access rights and the fulfilment of any conditions to which the exercise of those rights may be subject. The Central Authorities shall take steps to remove, as far as possible, all obstacles to the exercise of such rights.

The Central Authorities, either directly or through intermediaries, may initiate or assist in the institution of proceedings with a view to organizing or protecting these rights and securing respect for the conditions to which the exercise of these rights may be subject.

CHAPTER V — GENERAL PROVISIONS

*Article 22*

No security, bond or deposit, however described, shall be required to guarantee the payment of costs and expenses in the judicial or administrative proceedings falling within the scope of this Convention.

*Article 23*

No legalization or similar formality may be required in the context of this Convention.

*Article 24*

Any application, communication or other document sent to the Central Authority of the requested State shall be in the original language, and shall be accompanied by a translation into the official language or one of the official languages of the requested State or, where that is not feasible, a translation into French or English.

However, a Contracting State may, by making a reservation in accordance with Article 42, object to the use of either French or English, but not both, in any application, communication or other document sent to its Central Authority.

*Article 25*

Nationals of the Contracting States and persons who are habitually resident within those States shall be entitled in matters concerned with the application of this Convention to legal aid and advice in any other Contracting State on the same conditions as if they themselves were nationals of and habitually resident in that State.

*Article 26*

Each Central Authority shall bear its own costs in applying this Convention.

Central Authorities and other public services of Contracting States shall not impose any charges in relation to applications submitted under this Convention. In particular, they may not require any payment from the applicant towards the costs and expenses of the proceedings or, where applicable, those arising from the participation of legal counsel or advisers. However, they may require the payment of the expenses incurred or to be incurred in implementing the return of the child.

However, a Contracting State may, by making a reservation in accordance with Article 42, declare that it shall not be bound to assume any costs referred to in the preceding paragraph resulting from the participation of legal counsel or advisers or from court proceedings, except insofar as those costs may be covered by its system of legal aid and advice.

Upon ordering the return of a child or issuing an order concerning rights of access under this Convention, the judicial or administrative authorities may, where appropriate, direct the person who removed or retained the child, or who prevented the exercise of rights of access, to pay necessary expenses incurred by or on behalf of the applicant, including travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child.

*Article 27*

When it is manifest that the requirements of this Convention are not fulfilled or that the application is otherwise not well founded, a Central Authority is not bound to accept the application. In that case, the Central Authority shall forthwith inform the applicant or the Central Authority through which the application was submitted, as the case may be, of its reasons.

*Article 28*

A Central Authority may require that the application be accompanied by a written authorization empowering it to act on behalf of the applicant, or to designate a representative so to act.

*Article 29*

This Convention shall not preclude any person, institution or body who claims that there has been a breach of custody or access rights within the meaning of Article 3 or 21 from applying directly to the judicial or administrative authorities of a Contracting State, whether or not under the provisions of this Convention.

*Article 30*

Any application submitted to the Central Authorities or directly to the judicial or administrative authorities of a Contracting State in accordance with the terms of this Convention, together with documents and any other information appended thereto or provided by a Central Authority, shall be admissible in the courts or administrative authorities of the Contracting States.

*Article 31*

In relation to a State which in matters of custody of children has two or more systems of law applicable in different territorial units —

*a* any reference to habitual residence in that State shall be construed as referring to habitual residence in a territorial unit of that State;

*b* any reference to the law of the State of habitual residence shall be construed as referring to the law of the territorial unit in that State where the child habitually resides.

*Article 32*

In relation to a State which in matters of custody of children has two or more systems of law applicable to different categories of persons, any reference to the law of that State shall be construed as referring to the legal system specified by the law of that State.

*Article 33*

A State within which different territorial units have their own rules of law in respect of custody of children shall not be bound to apply this Convention where a State with a unified system of law would not be bound to do so.

*Article 34*

This Convention shall take priority in matters within its scope over the *Convention of 5 October 1961 concerning the powers of authorities and the law applicable in respect of the protection of minors*, as between Parties to both Conventions. Otherwise the present Convention shall not restrict the application of an international instrument in force between the State of origin and the State addressed or other law of the State addressed for the purposes of obtaining the return of a child who has been wrongfully removed or retained or of organizing access rights.

*Article 35*

This Convention shall apply as between Contracting States only to wrongful removals or retentions occurring after its entry into force in those States.

Where a declaration has been made under Article 39 or 40, the reference in the preceding paragraph to a Contracting State shall be taken to refer to the territorial unit or units in relation to which this Convention applies.

*Article 36*

Nothing in this Convention shall prevent two or more Contracting States, in order to limit the restrictions to which the return of the child may be subject, from agreeing among themselves to derogate from any provisions of this Convention which may imply such a restriction.

CHAPTER VI — FINAL CLAUSES

*Article 37*

The Convention shall be open for signature by the States which were Members of the Hague Conference on Private International Law at the time of its Fourteenth Session.

It shall be ratified, accepted or approved and the instruments of ratification, acceptance or approval shall be deposited with the Ministry of Foreign Affairs of the Kingdom of the Netherlands.

*Article 38*

Any other State may accede to the Convention.

The instrument of accession shall be deposited with the Ministry of Foreign Affairs of the Kingdom of the Netherlands.

The Convention shall enter into force for a State acceding to it on the first day of the third calendar month after the deposit of its instrument of accession.

The accession will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession. Such a declaration will also have to be made by any Member State ratifying, accepting or approving the Convention after an accession. Such declaration shall be deposited at the Ministry of Foreign Affairs of the Kingdom of the Netherlands; this Ministry shall forward, through diplomatic channels, a certified copy to each of the Contracting States.

The Convention will enter into force as between the acceding State and the State that has declared its acceptance of the accession on the first day of the third calendar month after the deposit of the declaration of acceptance

*Article 39*

Any State may, at the time of signature, ratification, acceptance, approval or accession, declare that the Convention shall extend to all the territories for the international relations of which it is responsible, or to one or more of them. Such a declaration shall take effect at the time the Convention enters into force for that State.

Such declaration, as well as any subsequent extension, shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands.

*Article 40*

If a Contracting State has two or more territorial units in which different systems of law are applicable in relation to matters dealt with in this Convention, it may at the time of signature, ratification, acceptance, approval or accession declare that this Convention shall extend to all its territorial units or only to one or more of them and may modify this declaration by submitting another declaration at any time.

Any such declaration shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands and shall state expressly the territorial units to which the Convention applies.

*Article 41*

Where a Contracting State has a system of government under which executive, judicial and legislative powers are distributed between central and other authorities within that State, its signature or ratification, acceptance or approval of, or accession to this Convention, or its making of any declaration in terms of Article 40 shall carry no implication as to the internal distribution of powers within that State.

*Article 42*

Any State may, not later than the time of ratification, acceptance, approval or accession, or at the time of making a declaration in terms of Article 39 or 40, make one or both of the reservations provided for in Article 24 and Article 26, third paragraph. No other reservation shall be permitted.

Any State may at any time withdraw a reservation it has made. The withdrawal shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands.
The reservation shall cease to have effect on the first day of the third calendar month after the notification referred to in the preceding paragraph.

*Article 43*

The Convention shall enter into force on the first day of the third calendar month after the deposit of the third instrument of ratification, acceptance, approval or accession referred to in Articles 37 and 38.
Thereafter the Convention shall enter into force –

1 for each State ratifying, accepting, approving or acceding to it subsequently, on the first day of the third calendar month after the deposit of its instrument of ratification, acceptance, approval or accession;

2 for any territory or territorial unit to which the Convention has been extended in conformity with Article 39 or 40, on the first day of the third calendar month after the notification referred to in that Article.

*Article 44*

The Convention shall remain in force for five years from the date of its entry into force in accordance with the first paragraph of Article 43 even for States which subsequently have ratified, accepted, approved it or acceded to it.
If there has been no denunciation, it shall be renewed tacitly every five years.
Any denunciation shall be notified to the Ministry of Foreign Affairs of the Kingdom of the Netherlands at least six months before the expiry of the five year period. It may be limited to certain of the territories or territorial units to which the Convention applies.
The denunciation shall have effect only as regards the State which has notified it. The Convention shall remain in force for the other Contracting States.

*Article 45*

The Ministry of Foreign Affairs of the Kingdom of the Netherlands shall notify the States Members of the Conference, and the States which have acceded in accordance with Article 38, of the following –

1 the signatures and ratifications, acceptances and approvals referred to in Article 37;

2 the accessions referred to in Article 38;

3 the date on which the Convention enters into force in accordance with Article 43;

4 the extensions referred to in Article 39;

5 the declarations referred to in Articles 38 and 40;

6 the reservations referred to in Article 24 and Article 26, third paragraph, and the withdrawals referred to in Article 42;

7 the denunciations referred to in Article 44.

In witness whereof the undersigned, being duly authorized thereto, have signed this Convention.

Done at The Hague, on the 25th day of October, 1980, in the English and French languages, both texts being equally authentic, in a single copy which shall be deposited in the archives of the Government of the Kingdom of the Netherlands, and of which a certified copy shall be sent, through diplomatic channels, to each of the States Members of the Hague Conference on Private International Law at the date of its Fourteenth Session.

BILLING CODE 4710-08-C

# Rapport

# Rapport explicatif de Mlle Elisa Pérez-Vera

## Introduction

*I Conclusions des travaux de la Conférence de La Haye de droit international privé*

1 La Convention sur les aspects civils de l'enlèvement international d'enfants a été adoptée en séance plénière le 24 octobre 1980 par la Quatorzième session de la Conférence de La Haye de droit international privé, à l'unanimité des Etats présents.[1] Le 25 octobre 1980, les délégués signèrent l'Acte final de la Quatorzième session contenant le texte de la Convention et une Recommandation qui contient la formule modèle à utiliser pour les demandes de retour des enfants déplacés ou retenus illicitement.

A cette occasion, la Conférence de La Haye s'est écartée de sa pratique, les projets de Conventions adoptés au cours de la Quatorzième session ayant été ouverts à la signature des Etats immédiatement après la séance de clôture. Quatre Etats ont signé la Convention à cette occasion (le Canada, la France, la Grèce et la Suisse), de sorte qu'elle porte la date du 25 octobre 1980.

2 En ce qui concerne le point de départ des travaux qui ont abouti à l'adoption de la Convention, ainsi que les conventions existantes en la matière ou ayant un rapport direct avec elle, nous renvoyons à l'introduction du Rapport de la Commission spéciale.[2]

3 La Quatorzième session de la Conférence, qui a siégé du 6 au 25 octobre 1980, a confié l'élaboration de la Convention à sa Première commission, dont le Président était le professeur A. E. Anton (Royaume-Uni) et le Vice-président le doyen Leal (Canada); l'un et l'autre avaient déjà été respectivement Président et Vice-président de la Commission spéciale. D'autre part, le professeur Elisa Pérez-Vera a été confirmé dans ses fonctions de Rapporteur. M. Adair Dyer, Premier secrétaire au Bureau Permanent, qui avait élaboré d'importants documents pour les travaux de la Conférence, a été chargé de la direction scientifique du secrétariat.

4 Au cours de treize séances, la Première commission a procédé à une première lecture de l'avant-projet élaboré par la Commission spéciale. Simultanément, elle a nommé un Comité de rédaction qui, au fur et à mesure de la pro-

[1] Allemagne, Australie, Autriche, Belgique, Canada, Danemark, Espagne, Etats-Unis, Finlande, France, Grèce, Irlande, Japon, Luxembourg, Norvège, Pays-Bas, Portugal, Royaume-Uni, Suède, Suisse, Tchécoslovaquie, Venezuela et Yougoslavie. Les Représentants de la République Arabe d'Egypte, d'Israël et de l'Italie, quoique ayant pris une part active aux travaux de la Première commission, n'ont pas participé au vote. Le Maroc, le Saint-Siège et l'Union des Républiques Socialistes Soviétiques ont envoyé des observateurs. Au cours des travaux, la Première commission a également disposé du concours précieux des observateurs du Conseil de l'Europe, du Commonwealth Secretariat et du Service Social International.

[2] Rapport de la Commission spéciale, Nos 3 et 7 à 15.

# Explanatory Report by Elisa Pérez-Vera

TRANSLATION OF THE PERMANENT BUREAU

## Introduction

*I Results of the work of the Hague Conference on private international law*

1 The Convention on the Civil Aspects of International Child Abduction was adopted on 24 October 1980 by the Fourteenth Session of the Hague Conference on private international law in Plenary Session, and by unanimous vote of the States which were present.[1] On 25 October 1980, the delegates signed the Final Act of the Fourteenth Session which contained the text of the Convention and a Recommendation containing the model form which is to be used in applications for the return of children who have been wrongfully abducted or retained.
On this occasion, the Hague Conference departed from its usual practice, draft Conventions adopted during the Fourteenth Session being made available for signature by States immediately after the Closing Session. Four States signed the Convention then (Canada, France, Greece and Switzerland), which thus bears the date 25 October 1980.

2 As regards the starting point of the proceedings which resulted in the adoption of the Convention, as well as the matter of existing conventions on the subject or those directly related to it, we shall refer to the introduction to the Report of the Special Commission.[2]

3 The Fourteenth Session of the Conference, which took place between 6 and 25 October 1980, entrusted the task of preparing the Convention to its First Commission, the Chairman of which was Professor A. E. Anton (United Kingdom) and the Vice-Chairman Dean Leal (Canada), who had already been Chairman and Vice-Chairman respectively of the Special Commission. Professor Elisa Pérez-Vera was confirmed in her position as Reporter. Mr Adair Dyer, First Secretary of the Permanent Bureau, who had prepared important documents for the Conference proceedings, was in charge of the scientific work of the secretariat.

4 In the course of thirteen sittings, the First Commission gave a first reading to the Preliminary Draft drawn up by the Special Commission. At the same time, it named the members of a Drafting Committee which drafted the text

[1] Australia, Austria, Belgium, Canada, Czechoslovakia, Denmark, Finland, France, Germany, Greece, Ireland, Japan, Luxemburg, Netherlands, Norway, Portugal, Spain, Sweden, Switzerland, United Kingdom, United States, Venezuela and Yugoslavia.
Representatives of the Arab Republic of Egypt, Israel and Italy did not participate in the vote, despite having played an active part in the proceedings of the First Commission. Morocco, the Holy See and the Union of the Soviet Socialist Republics sent observers. In the course of the proceedings, the First Commission also had at its disposal the invaluable assistance of observers from the Council of Europe, the Commonwealth Secretariat and International Social Service.
[2] Report of the Special Commission, Nos 3 and 7 to 15.

gression des travaux, a mis les textes au point.[3] Sept autres séances ont été consacrées à la discussion du texte préparé par le Comité de rédaction,[4] ainsi qu'à celle des clauses visant l'application de la Convention au regard des Etats à systèmes juridiques non unifiés («*Application Clauses*») et de la formule modèle[5] rédigées par des Comités *ad hoc*.[6] Les clauses finales, suggérées par le Bureau Permanent, ont été incorporées dans l'avant-projet établi par le Comité de rédaction.

II *Objet et plan du présent Rapport*

5 Le Rapport explicatif d'un texte destiné à devenir du droit positif, c'est-à-dire d'un texte qui devra être invoqué et appliqué, doit remplir au moins deux objectifs essentiels. D'une part, le Rapport doit mettre en relief aussi fidèlement que possible les principes qui sont à la base de la Convention et, quand cela s'avère nécessaire, l'évolution des idées qui ont conduit à consacrer de tels principes parmi les options existantes. Il ne s'agit certes pas de faire état d'une manière exhaustive des positions adoptées tout au long du processus d'élaboration de la Convention, mais le point de vue retenu par celle-ci sera parfois plus facile à comprendre s'il est confronté à d'autres idées avancées.

Or, étant donné que l'avant-projet de Convention préparé par la Commission spéciale a obtenu un large appui[7] et que, par conséquent, le texte définitif maintient l'essentiel de la structure et des principes fondamentaux de l'avant-projet, le présent Rapport final reprendra, surtout dans sa première partie, certains passages du Rapport de la Commission spéciale préparé en avril 1980 à l'intention de la Quatorzième session.[8]

6 Ce Rapport final doit remplir aussi un autre objectif: fournir à ceux qui auront à appliquer la Convention un commentaire détaillé de ses dispositions. Ce commentaire étant en principe destiné à éclairer la teneur littérale des dispositions conventionnelles, nous nous préoccuperons beaucoup moins d'en retracer la genèse que d'en préciser le contenu.

7 Des considérations précédentes nous pouvons conclure que les deux objectifs envisagés sont nettement différenciés et que les méthodes mêmes d'analyse utilisées pour atteindre l'un et l'autre ne peuvent pas être identiques. Toutefois, la référence dans les deux cas à un texte unique, celui de la Convention, impliquera certaines redites, qui nous semblent inévitables. En dépit de ce risque et étant donné le double objectif souligné, nous avons divisé le Rapport en deux parties: la première est consacrée à l'étude des principes généraux qui inspirent la Convention; la seconde est destinée à l'examen du texte article par article.

8 Finalement, comme le soulignait en 1977 le professeur von Overbeck,[9] il semble opportun de rappeler que ce Rapport a été établi, à l'issue de la Quatorzième session, à partir des procès-verbaux et des notes du Rapporteur. Il n'a

[3] Le Comité de rédaction, sous la présidence de M. Leal en tant que Vice-président de la Première commission, comprenait MM. Savolainen (Finlande), Chatin (France), Jones (Royaume-Uni) et le Rapporteur. M. Dyer et plusieurs des secrétaires rédacteurs lui ont fourni un concours extrêmement précieux.

[4] Doc. trav. Nos 45, 66, 75, 78, 79 et 83.

[5] Doc. trav. No 59, complété par la proposition du Secrétariat contenue dans le Doc. trav. No. 71. Le Sous-comité «*Application Clauses*» a décidé de ne pas changer la teneur des articles élaborés à ce sujet par la Commission spéciale (P.-v. No 12).

[6] Le Sous-comité «Formule-modèle», sous la présidence du professeur Müller-Freienfels (République fédérale d'Allemagne), comprenait MM. Deschenaux (Suisse), Hergen (Etats-Unis), Barbosa (Portugal), Minami (Japon) et Mlle Pripp (Suède). Le Sous-comité «*Application Clauses*», présidé par M. van Boeschoten (Pays-Bas), était formé par MM. Hétu (Canada), Hjorth (Danemark), Creswell (Australie), Salem (Egypte) et Mlle Selby (Etats-Unis).

[7] Voir notamment les *Observations des Gouvernements*, Doc. prél. No. 7.

[8] Doc. prél. No. 6.

[9] Rapport explicatif de la Convention sur la loi applicable aux régimes matrimoniaux, *Actes et documents de la Treizième session*, tome II, p. 329.

concurrently with the progress of the main proceedings.[3] Seven other sittings were devoted to a discussion of the text prepared by the Drafting Committee,[4] as well as of clauses relating to the application of the Convention to States with non-unified legal systems ('Application Clauses') and of the model form[5] drafted by *ad hoc* Committees.[6] The final clauses had been suggested by the Permanent Bureau and were incorporated into the preliminary draft Convention drawn up by the Drafting Committee.

II *Aim and structure of this Report*

5 The Explanatory Report on a text which is destined to become positive law, that is to say a text which will require to be cited and applied, must fulfil at least two essential aims. On the one hand, it must throw into relief, as accurately as possible, the principles which form the basis of the Convention and, wherever necessary, the development of those ideas which led to such principles being chosen from amongst existing options. It is certainly not necessary to take exhaustive account of the various attitudes adopted throughout the period during which the Convention was being drawn up, but the point of view reflected in the Convention will sometimes be more easily grasped by being set opposite other ideas which were put forward.
Now, given the fact that the preliminary draft Convention prepared by the Special Commission enjoyed widespread support[7] and that the final text essentially preserves the structure and fundamental principles of the Preliminary Draft, this final Report and in particular its first part, repeats certain passages in the Report of the Special Commission prepared in April 1980, for the Fourteenth Session.[8]

6 This final Report must also fulfil another purpose, *viz.* to supply those who have to apply the Convention with a detailed commentary on its provisions. Since this commentary is designed in principle to throw light upon the literal terms of these provisions, it will be concerned much less with tracing their origins than with stating their content accurately.

7 We can conclude from the foregoing considerations that these two objectives must be clearly distinguished and that even the methods of analysis used cannot be the same for each of them. Nevertheless, the need to refer in both cases to the one text, that of the Convention, implies that a certain amount of repetition will be necessary and indeed inevitable. Despite this risk and in view of the emphasis which is placed on a double objective, the Report has been divided into two parts, the first being devoted to a study of the general principles underlying the Convention, the second containing an examination of the text, article by article.

8 Finally, as Professor von Overbeck emphasized in 1977,[9] it would be as well to remember that this Report was prepared at the end of the Fourteenth Session, from the *procès-verbaux* and the Reporter's notes. Thus it has not

[3] The Drafting Committee, under the chairmanship of Mr Leal as Vice-Chairman of the First Commission, included Messrs Savolainen (Finland), Chatin (France), Jones (United Kingdom) and the Reporter. Mr Dyer and several recording secretaries provided the Committee with extremely valuable assistance.

[4] Working Documents Nos 45, 66, 75, 78, 79 and 83.

[5] Working Document No 59, supplemented by the proposal of the Secretariat in Working Document No. 71. The Subcommittee on 'Application Clauses' decided against changing the terms of the articles on this topic which had been prepared by the Special Commission (*Procès-verbal* No 12).

[6] The 'Model Forms' Subcommittee, under the chairmanship of Professor Müller-Freienfels (Federal Republic of Germany) comprised Messrs Deschenaux (Switzerland), Hergen (United States), Barbosa (Portugal), Minami (Japan) and Miss Pripp (Sweden). The Subcommittee on 'Application Clauses', chaired by Mr van Boeschoten (Netherlands), was made up of Messrs Hetu (Canada), Hjorth (Denmark), Creswell (Australia), Salem (Egypt) and Miss Selby (United States).

[7] See in particular the *Observations of Governments*, Prel. Doc. No 7.

[8] Prel. Doc. No 6.

[9] Explanatory Report on the Convention on the Law Applicable to Matrimonial Property Regimes, *Acts and Documents of the Thirteenth Session*, Book II, p. 329.

donc pas été approuvé par la Conférence et il est possible que, malgré les efforts faits par le Rapporteur pour rester objectif, certains passages répondent à une appréciation partiellement subjective.

## Première partie – Caractères généraux de la Convention

9 La Convention reflète, dans son ensemble, un compromis entre deux conceptions, partiellement différentes, du but à atteindre. On perçoit, en effet, dans les travaux préparatoires, la tension existant entre le désir de protéger les situations de fait altérées par le déplacement ou le non-retour illicites d'un enfant et le souci de garantir surtout le respect des rapports juridiques pouvant se trouver à la base de telles situations. A cet égard, l'équilibre consacré par la Convention est assez fragile. D'une part, il est clair que la Convention ne vise pas le fond du droit de garde (article 19); mais d'autre part il est également évident que le fait de qualifier d'illicite le déplacement ou le non-retour d'un enfant est conditionné par l'existence d'un droit de garde qui donne un contenu juridique à la situation modifiée par les actions que l'on se propose d'éviter.

### I OBJET DE LA CONVENTION

10 Le titre de ce chapitre fait allusion tant au problème auquel répond la Convention, qu'aux objectifs qu'elle a adoptés pour lutter contre le développement des enlèvements. Après avoir abordé ces deux points, nous traiterons d'autres questions connexes qui nuancent sensiblement la portée des objectifs visés: il s'agit en particulier de l'importance accordée à l'intérêt de l'enfant et des exceptions possibles au retour immédiat des enfants déplacés ou retenus illicitement.

#### A *Délimitation du sujet*

11 En ce qui concerne la délimitation du sujet,[10] nous nous limiterons à rappeler très brièvement que les situations envisagées découlent de l'utilisation de voies de fait pour créer des liens artificiels de compétence judiciaire internationale, en vue d'obtenir la garde d'un enfant. La diversité des circonstances qui peuvent concourir dans un cas d'espèce fait échouer toute tentative d'établir une définition plus précise d'un point de vue juridique. Cependant, deux éléments se font jour de façon inéluctable dans toutes les situations examinées et confirment la caractérisation approximative que l'on vient d'ébaucher.

12 En premier lieu, dans toutes les hypothèses nous nous trouvons confrontés au déplacement d'un enfant hors de son milieu habituel, où il se trouvait confié à une personne physique ou morale qui exerçait sur lui un droit légitime de garde. Bien entendu, il faut assimiler à une telle situation le refus de réintégrer l'enfant dans son milieu, après un séjour à l'étranger consenti par la personne qui exerçait la garde. Dans les deux cas, la conséquence est en effet la même: l'enfant a été soustrait à l'environnement familial et social dans lequel sa vie se déroulait. D'ailleurs, dans ce contexte, peu importe la nature du titre juridique qui était à la base de

[10] Voir notamment *Questionnaire et Rapport sur l'enlèvement international d'un enfant par un de ses parents*, établi par M. Adair Dyer, Doc. prél. No 1, août 1977, *supra*, p. 18-25 (cité par la suite, «Rapport Dyer»), et Rapport sur l'avant-projet de Convention adopté par la Commission spéciale, Doc. prél. No 6, mai 1980, *supra*, p. 172-173.

been approved by the Conference, and it is possible that, despite the Rapporter's efforts to remain objective, certain passages reflect a viewpoint which is in part subjective.

## First Part – General characteristics of the Convention

9 The Convention reflects on the whole a compromise between two concepts, different in part, concerning the end to be achieved. In fact one can see in the preliminary proceedings a potential conflict between the desire to protect factual situations altered by the wrongful removal or retention of a child, and that of guaranteeing, in particular, respect for the legal relationships which may underlie such situations. The Convention has struck a rather delicate balance in this regard. On the one hand, it is clear that the Convention is not essentially concerned with the merits of custody rights (article 19), but on the other hand it is equally clear that the characterization of the removal or retention of a child as wrongful is made conditional upon the existence of a right of custody which gives legal content to a situation which was modified by those very actions which it is intended to prevent.

### I OBJECT OF THE CONVENTION

10 The title of this chapter alludes as much to the problem addressed by the Convention as to the objectives by which it seeks to counter the increase in abductions. After tackling both of these points, we shall deal with other connected questions which appreciably affect the scope of the Convention's objectives, and in particular the importance which has been placed on the interest of the child and on the possible exceptions to the rule requiring the prompt return of children who have been wrongfully removed or retained.

#### A *Definition of the Convention's subject-matter*

11 With regard to the definition of the Convention's subject-matter,[10] we need only remind ourselves very briefly that the situations envisaged are those which derive from the use of force to establish artificial jurisdictional links on an international level, with a view to obtaining custody of a child. The variety of different circumstances which can combine in a particular case makes it impossible to arrive at a more precise definition in legal terms. However, two elements are invariably present in all cases which have been examined and confirm the approximate nature of the foregoing characterization.

Firstly, we are confronted in each case with the removal from its habitual environment of a child whose custody had been entrusted to and lawfully exercised by a natural or legal person. Naturally, a refusal to restore a child to its own environment after a stay abroad to which the person exercising the right of custody had consented must be put in the same category. In both cases, the outcome is in fact the same: the child is taken out of the family and social environment in which its life has developed. What is more, in this context the type of legal title which underlies the exercise of custody rights over the child matters little, since

[10] See in particular the *Questionnaire and Report on international child abduction by one parent*, prepared by Mr Adair Dyer, Prel. Doc. No 1, August 1977, *supra*, pp. 18-25 (hereafter referred to as the 'Dyer Report'), and the Report on the preliminary draft Convention, adopted by the Special Commission, Prel. Doc. No 6, May 1980, *supra*, pp. 172-173.

l'exercice du droit de garde sur la personne de l'enfant: de ce point de vue, l'existence ou l'absence d'une décision relative à la garde ne change en rien les données sociologiques du problème.

13 En second lieu, la personne qui déplace l'enfant (ou qui est responsable du déplacement, quand l'action matérielle est exécutée par un tiers) a l'espoir d'obtenir des autorités du pays où l'enfant a été emmené le droit de garde sur celui-ci. Il s'agit donc de quelqu'un qui appartient au cercle familial de l'enfant, au sens large du terme; en fait, dans la plupart des cas, la personne en question est le père ou la mère.

14 Il est fréquent que la personne qui retient l'enfant essaie d'obtenir qu'une décision judiciaire ou administrative de l'Etat de refuge légalise la situation de fait qu'elle vient de créer; mais si elle n'est pas sûre du sens de la décision, il est aussi possible qu'elle opte pour l'inactivité, laissant ainsi l'initiative à la personne dépossédée. Or, même si cette dernière agit rapidement, c'est-à-dire même si elle évite la consolidation dans le temps de la situation provoquée par le déplacement de l'enfant, l'enleveur se trouvera dans une position avantageuse, car c'est lui qui aura choisi le for qui va juger de l'affaire, un for que, par principe, il considère comme le plus favorable à ses prétentions.

15 En conclusion, nous pouvons affirmer que le problème dont s'occupe la Convention — avec tout ce qu'implique de dramatique le fait qu'il concerne directement la protection de l'enfance dans les relations internationales – prend toute son acuité juridique par la possibilité qu'ont les particuliers d'établir des liens plus ou moins artificiels de compétence judiciaire. En effet, par ce biais, le particulier peut altérer la loi applicable et obtenir une décision judiciaire qui lui soit favorable. Certes, une telle décision, surtout quand elle coexiste avec d'autres décisions de contenu contradictoire rendues par d'autres fors, aura une validité géographiquement restreinte, mais en tout état de cause elle apportera un titre juridique suffisant pour «légaliser» une situation de fait qu'aucun des systèmes juridiques en présence ne souhaitait.

B *Les objectifs de la Convention*

16 Les objectifs de la Convention, qui apparaissent dans l'article premier, pourraient être résumés comme suit: étant donné qu'un facteur caractéristique des situations considérées réside dans le fait que l'enleveur prétend que son action soit légalisée par les autorités compétentes de l'Etat de refuge, un moyen efficace de le dissuader est que ses actions se voient privées de toute conséquence pratique et juridique. Pour y parvenir, la Convention consacre en tout premier lieu, parmi ses objectifs, le rétablissement du *statu quo*, moyennant le «retour immédiat des enfants déplacés ou retenus illicitement dans tout Etat contractant». Les difficultés insurmontables rencontrées pour fixer conventionnellement des critères de compétence directe en la matière[11] ont en effet conduit au choix de cette voie qui, bien que détournée, va, dans la plupart des cas, permettre que la décision finale sur la garde soit prise par les autorités de la résidence habituelle de l'enfant, avant son déplacement.

17 D'ailleurs, bien que l'objectif exprimé au point *b*, «faire respecter effectivement dans les autres Etats contractants les

[11] Une telle option a été rejetée au cours de la première réunion de la Commission spéciale. *Cf. Conclusions des discussions de la Commission spéciale de mars 1979 sur le kidnapping légal*, établies par le Bureau Permanent, Doc. prél. No 5, juin 1979 *supra*, p. 163-164.

whether or not a decision on custody exists in no way alters the sociological realities of the problem.

Secondly, the person who removes the child (or who is responsible for its removal, where the act of removal is undertaken by a third party) hopes to obtain a right of custody from the authorities of the country to which the child has been taken. The problem therefore concerns a person who, broadly speaking, belongs to the family circle of the child; indeed, in the majority of cases, the person concerned is the father or mother.

14 It frequently happens that the person retaining the child tries to obtain a judicial or administrative decision in the State of refuge, which would legalize the factual situation which he has just brought about. However, if he is uncertain about the way in which the decision will go, he is just as likely to opt for inaction, leaving it up to the dispossessed party to take the initiative. Now, even if the latter acts quickly, that is to say manages to avoid the consolidation through lapse of time of the situation brought about by the removal of the child, the abductor will hold the advantage, since it is he who has chosen the forum in which the case is to be decided, a forum which, in principle, he regards as more favourable to his own claims.

15 To conclude, it can firmly be stated that the problem with which the Convention deals — together with all the drama implicit in the fact that it is concerned with the protection of children in international relations – derives all of its legal importance from the possibility of individuals establishing legal and jurisdictional links which are more or less artificial. In fact, resorting to this expedient, an individual can change the applicable law and obtain a judicial decision favourable to him. Admittedly, such a decision, especially one coexisting with others to the opposite effect issued by the other forum, will enjoy only a limited geographical validity, but in any event it bears a legal title sufficient to 'legalize' a factual situation which none of the legal systems involved wished to see brought about.

B *The objectives of the Convention*

16 The Convention's objects, which appear in article 1, can be summarized as follows: since one factor characteristic of the situations under consideration consists in the fact that the abductor claims that his action has been rendered lawful by the competent authorities of the State of refuge, one effective way of deterring him would be to deprive his actions of any practical or juridical consequences. The Convention, in order to bring this about, places at the head of its objectives the restoration of the *status quo*, by means of 'the prompt return of children wrongfully removed to or retained in any Contracting State'. The insurmountable difficulties encountered in establishing, within the framework of the Convention, directly applicable jurisdictional rules[11] indeed resulted in this route being followed which, although an indirect one, will tend in most cases to allow a final decision on custody to be taken by the authorities of the child's habitual residence prior to its removal.

17 Besides, although the object stated in sub-paragraph *b*, 'to ensure that rights of custody and of access under the law

[11] Such an option was rejected in the course of the first meeting of the Special Commission. *Cf. Conclusions drawn from the discussions of the Special Commission of March 1979 on legal kidnapping*, prepared by the Permanent Bureau, Prel. Doc. No 5, June 1979, *supra*, pp. 163-164.

droits de garde et de visite existant dans un Etat contractant», présente un caractère autonome, sa connexion téléologique avec l'objectif «retour de l'enfant» n'en est pas moins évidente. En réalité, on pourrait estimer qu'il ne s'agit que d'un seul objectif considéré à deux moments différents: tandis que le retour immédiat de l'enfant répond au désir de rétablir une situation que l'enleveur a modifiée unilatéralement par une voie de fait, le respect effectif des droits de garde et de visite se place sur un plan préventif, dans la mesure où ce respect doit faire disparaître l'une des causes les plus fréquentes de déplacements d'enfants.

Or, puisque la Convention ne précise pas les moyens que chaque Etat doit employer pour faire respecter le droit de garde existant dans un autre Etat contractant, il faut conclure qu'exception faite de la protection indirecte, qui implique l'obligation de retourner l'enfant à celui qui en avait la garde, le respect du droit de garde échappe presque entièrement au domaine conventionnel. Par contre, le droit de visite fait l'objet d'une régulation incomplète certes, mais indicative de l'intérêt accordé aux contacts réguliers entre parents et enfants, même quand la garde a été confiée à un seul des parents ou à un tiers.

18 Si on admet le bien-fondé des considérations précédentes, il faut en conclure que toute tentative de hiérarchisation des objectifs de la Convention ne peut avoir qu'une signification symbolique. En effet, il semble presque impossible d'établir une hiérarchisation entre deux objectifs qui prennent leurs racines dans une même préoccupation. Car, en définitive, il revient à peu près au même de faciliter le retour d'un enfant déplacé ou de prendre les mesures nécessaires pour éviter un tel déplacement.

Or, comme nous le verrons par la suite, l'aspect que la Convention a essayé de régler en profondeur est celui du retour des enfants déplacés ou retenus illicitement. La raison nous semble évidente: c'est après la retenue illicite d'un enfant que se produisent les situations les plus douloureuses, celles qui, tout en exigeant des solutions particulièrement urgentes, ne peuvent pas être résolues de façon unilatérale par chaque système juridique concerné. Prises dans leur ensemble, toutes ces circonstances justifient à notre avis le développement que la réglementation du retour de l'enfant reçoit dans la Convention et en même temps accordent, sur le plan des principes, une certaine priorité à l'objectif visé. Ainsi donc, bien qu'en théorie les deux objectifs mentionnés doivent être placés sur un même plan, dans la pratique c'est le désir de garantir le rétablissement de la situation altérée par l'action de l'enleveur qui a prévalu dans la Convention.

19 Dans un dernier effort de clarification des objectifs de la Convention, il convient de souligner qu'ainsi qu'il résulte en particulier des dispositions de son article premier, elle ne cherche pas à régler le problème de l'attribution du droit de garde. Sur ce point, le principe non explicite sur lequel repose la Convention est que la discussion sur le fond de l'affaire, c'est-à-dire sur le droit de garde contesté, si elle se produit, devra être engagée devant les autorités compétentes de l'Etat où l'enfant avait sa résidence habituelle avant son déplacement; et cela aussi bien si le déplacement a eu lieu avant qu'une décision sur la garde ait été rendue — situation dans laquelle le droit de garde violé s'exerçait *ex lege* — que si un tel déplacement s'est produit en violation d'une décision préexistante.

C *Importance accordée à l'intérêt de l'enfant*

20 Avant tout, il est nécessaire de justifier les raisons qui nous amènent à insérer l'examen de ce point dans le contexte des considérations sur l'objet de la Convention. Elles apparaissent clairement si l'on considère, d'une part que

of one Contracting State are effectively respected in the other Contracting States' appears to stand by itself, its teleological connection with the 'return of the child' object is no less evident. In reality, it can be regarded as one single object considered at two different times; whilst the prompt return of the child answers to the desire to re-establish a situation unilaterally and forcibly altered by the abductor, effective respect for rights of custody and of access belongs on the preventive level, in so far as it must lead to the disappearance of one of the most frequent causes of child abductions.

Now, since the Convention does not specify the means to be employed by each State in bringing about respect for rights of custody which exist in another Contracting State, one must conclude that, with the exception of the indirect means of protecting custody rights which is implied by the obligation to return the child to the holder of the right of custody, respect for custody rights falls almost entirely outwith the scope of the Convention. On the other hand, rights of access form the subject of a rule which, although undoubtedly incomplete, nevertheless is indicative of the interest shown in ensuring regular contact between parents and children, even when custody has been entrusted to one of the parents or to a third party.

18 If the preceding considerations are well-founded, it must be concluded that any attempt to establish a hierarchy of objects of the Convention could have only a symbolic significance. In fact, it would seem almost impossible to create a hierarchy as between two objects which spring from the same concern. For at the end of the day, promoting the return of the child or taking the measures necessary to avoid such removal amount to almost the same thing.

Now, as will be seen below, the one matter which the Convention has tried to regulate in any depth is that of the return of children wrongfully removed or retained. The reason for this seems clear: the most distressing situations arise only after the unlawful retention of a child and they are situations which, while requiring particularly urgent solutions, cannot be resolved unilaterally by any one of the legal systems concerned. Taken as a whole, all these circumstances justify, in our opinion, the Convention's development of rules for regulating the return of the child, whilst at the same time they give in principle a certain priority to that object. Thus, although theoretically the two above-mentioned objects have to be placed on the same level, in practice the desire to guarantee the re-establishment of the *status quo* disturbed by the actions of the abductor has prevailed in the Convention.

19 In a final attempt to clarify the objects of the Convention, it would be advisable to underline the fact that, as is shown particularly in the provisions of article 1, the Convention does not seek to regulate the problem of the award of custody rights. On this matter, the Convention rests implicitly upon the principle that any debate on the merits of the question, *i.e.* of custody rights, should take place before the competent authorities in the State where the child had its habitual residence prior to its removal; this applies as much to a removal which occurred prior to any decision on custody being taken — in which case the violated custody rights were exercised *ex lege* — as to a removal in breach of a pre-existing custody decision.

C *Importance attached to the interest of the child*

20 Above all, one has to justify the reasons for including an examination of this matter within the context of a consideration of the Convention's objects. These reasons will appear clearly if one considers, on the one hand, that the

l'intérêt de l'enfant est souvent invoqué à ce sujet, et d'autre part que l'on pourrait argumenter que l'objectif conventionnel touchant au retour de l'enfant devrait toujours être subordonné à la prise en considération de son intérêt.

21 A cet égard, il a été à juste titre mis en relief que «la norme juridique reposant sur «l'intérêt supérieur de l'enfant» est, à première vue, d'une telle imprécision qu'elle ressemble davantage à un paradigme social qu'à une norme juridique concrète. Comment étoffer cette notion pour décider quel est l'intérêt *final* de l'enfant sans faire des suppositions qui ne prennent leur source que dans le contexte moral d'une culture déterminée? En introduisant le mot «final» dans l'équation, on fait aussitôt naître de sérieux problèmes, puisque l'énoncé général de la norme ne permet pas de savoir clairement si «l'intérêt» de l'enfant qu'il faut protéger est celui qui suit immédiatement la décision, ou celui de son adolescence, de son existence de jeune adulte, de son âge mûr ou de sa vieillesse».[12]

22 D'autre part, on ne doit pas oublier que c'est en invoquant «l'intérêt supérieur de l'enfant» que souvent, dans le passé, les juridictions internes ont accordé finalement la garde en litige à la personne qui l'avait déplacé ou retenu illicitement. Il a pu se trouver que cette décision soit la plus juste; nous ne pouvons cependant pas ignorer le fait que le recours, par des autorités internes, à une telle notion implique le risque de traduire des manifestations du particularisme culturel, social, etc., d'une communauté nationale donnée et donc, au fond, de porter des jugements de valeur subjectifs sur l'autre communauté nationale d'où l'enfant vient d'être arraché.

23 Pour les motifs invoqués, parmi d'autres, la partie dispositive de la Convention ne contient aucune allusion explicite à l'intérêt de l'enfant en tant que critère correcteur de l'objectif conventionnel qui vise à assurer le retour immédiat des enfants déplacés ou retenus illicitement. Cependant, il ne faudrait pas déduire de ce silence que la Convention ignore le paradigme social qui proclame la nécessité de prendre en considération l'intérêt des enfants pour régler tous les problèmes les concernant. Bien au contraire, dès le préambule, les Etats signataires déclarent être «profondément convaincus que l'intérêt de l'enfant est d'une importance primordiale pour toute question relative à sa garde»; c'est précisément dans cette conviction qu'ils ont élaboré la Convention, «désirant protéger l'enfant, sur le plan international, contre les effets nuisibles d'un déplacement ou d'un non-retour illicites».

24 Ces deux paragraphes du préambule reflètent assez clairement quelle a été la philosophie de la Convention à cet égard, philosophie que l'on pourrait définir comme suit: la lutte contre la multiplication des enlèvements internationaux d'enfants doit toujours être inspirée par le désir de protéger les enfants, en se faisant l'interprète de leur véritable intérêt. Or, parmi les manifestations les plus objectives de ce qui constitue l'intérêt de l'enfant figure le droit de ne pas être déplacé ou retenu au nom de droits plus ou moins discutables sur sa personne. En ce sens, il est souhaitable de rappeler la Recommandation 874 (1979) de l'Assemblée parlementaire du Conseil de l'Europe dont le premier principe général dit que «les enfants ne doivent plus être considérés comme la propriété de leurs parents, mais être reconnus comme des individus avec leurs droits et leurs besoins propres».[13]

[12] Rapport Dyer, *supra*, p. 22-23
[13] Assemblée parlementaire du Conseil de l'Europe 31ème Session ordinaire, *Recommandation relative à une Charte européenne des droits de l'enfant*. Texte adopté le 4 octobre 1979.

interests of the child are often invoked in this regard, and on the other hand, that it might be argued that the Convention's object in securing the return of the child ought always to be subordinated to a consideration of the child's interests.

21 In this regard, one fact has rightly been highlighted, *viz.* that 'the legal standard 'the best interests of the child' is at first view of such vagueness that it seems to resemble more closely a sociological paradigm than a concrete juridical standard. How can one put flesh on its bare bones without delving into the assumptions concerning the *ultimate* interests of a child which are derived from the moral framework of a particular culture? The word 'ultimate' gives rise to immediate problems when it is inserted into the equation since the general statement of the standard does not make it clear whether the 'interests' of the child to be served are those of the immediate aftermath of the decision, of the adolescence of the child, of young adulthood, maturity, senescence or old age'.[12]

22 On the other hand, it must not be forgotten that it is by invoking 'the best interests of the child' that internal jurisdictions have in the past often finally awarded the custody in question to the person who wrongfully removed or retained the child. It can happen that such a decision is the most just, but we cannot ignor the fact that recourse by internal authorities to such a notion involves the risk of their expressing particular cultural, social etc. attitudes which themselves derive from a given national community and thus basically imposing their own subjective value judgments upon the national community from which the child has recently been snatched.

23 For these reasons, among others, the dispositive part of the Convention contains no explicit reference to the interests of the child to the extent of their qualifying the Convention's stated object, which is to secure the prompt return of children who have been wrongfully removed or retained. However, its silence on this point ought not to lead one to the conclusion that the Convention ignores the social paradigm which declares the necessity of considering the interests of children in regulating all the problems which concern them. On the contrary, right from the start the signatory States declare themselves to be 'firmly convinced that the interests of children are of paramount importance in matters relating to their custody'; it is precisely because of this conviction that they drew up the Convention, 'desiring to protect children internationally from the harmful effects of their wrongful removal or retention'.

24 These two paragraphs in the preamble reflect quite clearly the philosophy of the Convention in this regard. It can be defined as follows: the struggle against the great increase in international child abductions must always be inspired by the desire to protect children and should be based upon an interpretation of their true interests. Now, the right not to be removed or retained in the name of more or less arguable rights concerning its person is one of the most objective examples of what constitutes the interests of the child. In this regard it would be as well to refer to Recommendation 874(1979) of the Parliamentary Assembly of the Council of Europe, the first general principle of which states that 'children must no longer be regarded as parents' property, but must be recognised as individuals with their own rights and needs'.[13]

[12] Dyer Report, *supra*, pp. 22-23.
[13] Parliamentary Assembly of the Council of Europe, 31st Ordinary Session, *Recommendation on a European Charter on the Rights of the Child*. Text adopted on 4 October 1979.

En effet, comme l'a souligné M. Dyer, dans la littérature consacrée à l'étude de ce problème, «l'opinion qu'on y trouve le plus souvent exprimée est que la véritable victime d'un «enlèvement d'enfant» est l'enfant lui-même. C'est lui qui pâtit de perdre brusquement son équilibre, c'est lui qui subit le traumatisme d'être séparé du parent qu'il avait toujours vu à ses côtés, c'est lui qui ressent les incertitudes et les frustrations qui découlent de la nécessité de s'adapter à une langue étrangère, à des conditions culturelles qui ne lui sont pas familières, à de nouveaux professeurs et à une famille inconnue».[14]

25 Il est donc légitime de soutenir que les deux objectifs de la Convention — l'un préventif, l'autre visant la réintégration immédiate de l'enfant dans son milieu de vie habituel — répondent dans leur ensemble à une conception déterminée de «l'intérêt supérieur de l'enfant». Cependant, même dans l'optique choisie, il fallait admettre que le déplacement d'un enfant peut parfois être justifié par des raisons objectives touchant soit à sa personne, soit à l'environnement qui lui était le plus proche. De sorte que la Convention reconnaît certaines exceptions à l'obligation générale assumée par les Etats d'assurer le retour immédiat des enfants déplacés ou retenus illicitement. Pour la plupart, ces exceptions ne sont que des manifestations concrètes du principe trop imprécis qui proclame que l'intérêt de l'enfant est le critère vecteur en la matière.

26 D'ailleurs, la réglementation du droit de visite répond aussi au souci de fournir aux enfants des rapports familiaux aussi complets que possible, afin de favoriser un développement équilibré de leur personnalité. Pourtant, ici encore les avis ne sont pas unanimes, ce qui met une fois de plus en relief le caractère ambigu du principe de l'intérêt de l'enfant. En effet, à l'encontre du critère admis par la Convention, certaines tendances soutiennent qu'il est préférable pour l'enfant de ne pas avoir de contacts avec ses deux parents quand le couple est séparé *de jure* ou *de facto*. A cet égard, la Conférence a été consciente du fait qu'une telle solution peut parfois s'avérer la plus souhaitable. Tout en sauvegardant la marge d'appréciation des circonstances concrètes inhérente à la fonction judiciaire, la Conférence a néanmoins préféré l'autre option et la Convention fait prévaloir sans équivoque l'idée que le droit de visite est la contrepartie naturelle du droit de garde; contrepartie qui, par conséquent, doit en principe être reconnue à celui des parents qui n'a pas la garde de l'enfant.

D *Exceptions à l'obligation d'assurer le retour immédiat des enfants*

27 Etant donné que le retour de l'enfant est en quelque sorte l'idée de base de la Convention, les exceptions à l'obligation générale de l'assurer constituent un aspect important pour en comprendre avec exactitude la portée. Il ne s'agit évidemment pas d'examiner ici en détail les dispositions qui établissent ces exceptions, mais d'en esquisser le rôle, en insistant particulièrement sur les raisons qui ont déterminé leur inclusion dans la Convention. De ce point de vue, nous pouvons distinguer des exceptions basées sur trois justifications différentes.

28 D'une part, l'article 13*a* reconnaît que les autorités judiciaires ou administratives de l'Etat requis ne sont pas

[14] Rapport Dyer, *supra*, p. 21.

In fact, as Mr Dyer has emphasized, in the literature devoted to a study of this problem, 'the presumption generally stated is that the true victim of the 'childnapping' is the child himself, who suffers from the sudden upsetting of his stability, the traumatic loss of contact with the parent who has been in charge of his upbringing, the uncertainty and frustration which come with the necessity to adapt to a strange language, unfamiliar cultural conditions and unknown teachers and relatives'.[14]

25 It is thus legitimate to assert that the two objects of the Convention — the one preventive, the other designed to secure the immediate reintegration of the child into its habitual environment — both correspond to a specific idea of what constitutes the 'best interests of the child'. However, even when viewing from this perspective, it has to be admitted that the removal of the child can sometimes be justified by objective reasons which have to do either with its person, or with the environment with which it is most closely connected. Therefore the Convention recognizes the need for certain exceptions to the general obligations assumed by States to secure the prompt return of children who have been unlawfully removed or retained. For the most part, these exceptions are only concrete illustrations of the overly vague principle whereby the interests of the child are stated to be the guiding criterion in this area.

26 What is more, the rule concerning access rights also reflects the concern to provide children with family relationships which are as comprehensive as possible, so as to encourage the development of a stable personality. However, opinions differ on this, a fact which once again throws into relief the ambiguous nature of this principle of the interests of the child. In fact, there exists a school of thought opposed to the test which has been accepted by the Convention, which maintains that it is better for the child not to have contact with both parents where the couple are separated in law or in fact. As to this, the Conference was aware of the fact that such a solution could sometimes prove to be the most appropriate. Whilst safeguarding the element of judicial discretion in individual cases, the Conference nevertheless chose the other alternative, and the Convention upholds unequivocally the idea that access rights are the natural counterpart of custody rights, a counterpart which must in principle be acknowledged as belonging to the parent who does not have custody of the child.

D *Exceptions to the duty to secure the prompt return of children*

27 Since the return of the child is to some extent the basic principle of the Convention, the exceptions to the general duty to secure it form an important element in understanding the exact extent of this duty. It is not of course necessary to examine in detail the provisions which constitute these exceptions, but merely to sketch their role in outline, while at the same time stressing in particular the reasons for their inclusion in the Convention. From this vantage point can be seen those exceptions which derive their justification from three different principles.

28 On the one hand, article 13*a* accepts that the judicial or administrative authorities of the requested State are not

[14] Dyer Report, *supra*, p. 21.

tenues d'ordonner le retour de l'enfant lorsque le demandeur n'exerçait pas de façon effective, avant le déplacement prétendûment illicite, la garde qu'il invoque maintenant, ou lorsqu'il a donné son accord postérieur à l'action qu'il attaque désormais. Il s'agit par conséquent des situations dans lesquelles, ou bien les conditions préalables au déplacement ne comportaient pas l'un des éléments essentiels des relations que la Convention entend protéger (celui de l'exercice effectif de la garde), ou bien le comportement postérieur du parent dépossédé montre une acceptation de la nouvelle situation ainsi créée, ce qui la rend plus difficilement contestable.

29 D'autre part, les alinéas *1b* et 2 du même article 13 retiennent des exceptions s'inspirant clairement de la prise en considération de l'intérêt de l'enfant. Or, comme nous l'avons signalé auparavant, la Convention a donné un contenu précis à cette notion. Ainsi, l'intérêt de l'enfant de ne pas être déplacé de sa résidence habituelle, sans garanties suffisantes de stabilité de la nouvelle situation, cède le pas devant l'intérêt primaire de toute personne de ne pas être exposée à un danger physique ou psychique, ou placée dans une situation intolérable.

30 De surcroît, la Convention admet aussi que l'avis de l'enfant sur le point essentiel de son retour ou de son non-retour puisse être décisif, si d'après les autorités compétentes il a atteint un âge et une maturité suffisante. Par ce biais, la Convention donne aux enfants la possibilité de se faire l'interprète de leur propre intérêt. Evidemment, cette disposition peut devenir dangereuse si son application se traduit par des interrogatoires directs de jeunes qui peuvent, certes, avoir une conscience claire de la situation, mais qui peuvent aussi subir des dommages psychiques sérieux s'ils pensent qu'on les a obligés à choisir entre leurs deux parents. Pourtant, une disposition de ce genre était indispensable étant donné que le domaine d'application de la Convention *ratione personae* s'étend aux enfants jusqu'à leur seizième anniversaire; il faut avouer que serait difficilement acceptable le retour d'un enfant, par exemple de quinze ans, contre sa volonté. D'ailleurs, sur ce point précis, les efforts faits pour se mettre d'accord sur un âge minimum à partie duquel l'opinion de l'enfant pourrait être prise en considération ont échoué, tous les chiffres ayant un caractère artificiel, voire arbitraire; il est apparu préférable de laisser l'application de cette clause à la sagesse des autorités compétentes.

31 En troisième lieu, il n'existe pas d'obligation de faire revenir l'enfant quand, aux termes de l'article 20, ceci «ne serait pas permis par les principes fondamentaux de l'Etat requis sur la sauvegarde des droits de l'homme et des libertés fondamentales». Nous nous trouvons ici devant une disposition peu habituelle dans les conventions concernant le droit international privé et dont la portée exacte est difficile à établir. En renvoyant au commentaire de l'article 20 pour tenter d'y parvenir, il nous paraît surtout intéressant ici d'en considérer l'origine. Or cette règle est le produit d'un compromis entre délégations favorables et délégations contraires à l'inclusion dans la Convention d'une clause d'ordre public.

Une telle possibilité a été largement débattue au sein de la Première commission, sous des formules différentes. Finalement, après quatre scrutins négatifs et par une seule voix de différence, la Commission a admis la possibilité de rejeter la demande en retour de l'enfant, avec mention d'une réserve faisant état de l'exception d'ordre public sous une formule restreinte en relation avec le droit de la famille et de l'enfance de l'Etat requis. La réserve prévue était formulée littéralement comme suit: «*Contracting States may reserve the right not to return the child when such return would be manifestly incompatible with the fundamental principles of the*

bound to order the return of the child if the person requesting its return was not actually exercising, prior to the allegedly unlawful removal, the rights of custody which he now seeks to invoke, or if he had subsequently consented to the act which he now seeks to attack. Consequently, the situations envisaged are those in which either the conditions prevailing prior to the removal of the child do not contain one of the elements essential to those relationships which the Convention seeks to protect (that of the actual exercise of custody rights), or else the subsequent behaviour of the dispossessed parent shows his acceptance of the new situation thus brought about, which makes it more difficult for him to challenge.

29 On the other hand, paragraphs *1b* and 2 of the said article 13 contain exceptions which clearly derive from a consideration of the interests of the child. Now, as we pointed out above, the Convention invests this notion with definite content. Thus, the interest of the child in not being removed from its habitual residence without sufficient guarantees of its stability in the new environment, gives way before the primary interest of any person in not being exposed to physical or psychological danger or being placed in an intolerable situation.

30 In addition, the Convention also provides that the child's views concerning the essential question of its return or retention may be conclusive, provided it has, according to the competent authorities, attained an age and degree of maturity sufficient for its views to be taken into account. In this way, the Convention gives children the possibility of interpreting their own interests. Of course, this provision could prove dangerous if it were applied by means of the direct questioning of young people who may admittedly have a clear grasp of the situation but who may also suffer serious psychological harm if they think they are being forced to choose between two parents. However, such a provision is absolutely necessary given the fact that the Convention applies, *ratione personae*, to all children under the age of sixteen; the fact must be acknowledged that it would be very difficult to accept that a child of, for example, fifteen years of age, should be returned against its will. Moreover, as regards this particular point, all efforts to agree on a minimum age at which the views of the child could be taken into account failed, since all the ages suggested seemed artificial, even arbitrary. It seemed best to leave the application of this clause to the discretion of the competent authorities.

31 Thirdly, there is no obligation to return a child when, in terms of article 20, its return 'would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms'. Here, we are concerned with a provision which is rather unusual in conventions involving private international law, and the exact scope of which is difficult to define. Although we shall refer to the commentary on article 20 for the purpose of defining such scope, it is particularly interesting to consider its origins here. This rule was the result of a compromise between those delegations which favoured, and those which were opposed to, the inclusion in the Convention of a 'public policy' clause.

The inclusion of such a clause was debated at length by the First Commission, under different formulations. Finally, after four votes against inclusion, the Commission accepted, by a majority of only one, that an application for the return of a child could be refused, by reference to a reservation which took into account the public policy exception by way of a restrictive formula concerning the laws governing the family and children in the requested State. The reservation provided for was formulated exactly as follows: 'Contracting States may reserve the right not to return the child when such return would be manifestly incompatible with the

*law relating to the family and children in the State addressed*».[15] En adoptant ce texte, on ouvrait une brèche grave dans le *consensus* qui avait présidé fondamentalement jusqu'alors aux travaux de la Conférence; c'est pourquoi, conscientes de ce qu'il fallait trouver une solution largement acceptable, toutes les délégations se sont engagées dans cette voie qui constituait le chemin le plus sûr pour garantir la réussite de la Convention.

32 Le point débattu était particulièrement important, car il reflétait en partie deux conceptions partiellement différentes de l'objectif de la Convention en matière de retour de l'enfant. En effet, jusqu'ici le texte élaboré par la Première commission (en accord avec l'avant-projet préparé par la Commission spéciale) avait limité les exceptions possibles au retour de l'enfant à la considération des situations de fait et de la conduite des parties ou à une appréciation spécifique de l'intérêt de l'enfant. Par contre, la réserve qu'on venait d'accepter impliquait qu'on admettait la possibilité de refuser le retour d'un enfant sur la base d'arguments purement juridiques, tirés du droit interne de l'Etat requis. Droit interne qui aurait pu jouer dans le contexte de la disposition transcrite, soit pour «évaluer» le titre invoqué par le parent dépossédé, soit pour apprécier le bien-fondé juridique de l'action de l'enleveur. Or, de telles conséquences altéraient considérablement un édifice conventionnel construit sur l'idée qu'il fallait éviter le détournement, par voies de fait, de la compétence normale des autorités de la résidence habituelle de l'enfant.

33 Dans cette situation, l'adoption par une majorité[16] rassurante de la formule qui figure à l'article 20 de la Convention représente un louable effort de compromis entre les différentes positions, le rôle accordé à la loi interne de l'Etat de refuge ayant considérablement diminué. D'une part, la référence aux principes fondamentaux concernant la sauvegarde des droits de l'homme et des libertés fondamentales porte sur un secteur du droit où il existe de nombreux compromis internationaux. D'autre part, la règle de l'article 20 va également plus loin que les formules traditionnelles de la clause d'ordre public en ce qui concerne le degré d'incompatibilité existant entre le droit invoqué et l'action envisagée; en effet, pour pouvoir refuser le retour de l'enfant en invoquant le motif qui figure dans cette disposition, l'autorité en question doit constater non seulement l'existence d'une contradiction, mais aussi le fait que les principes protecteurs des droits de l'homme interdisent le retour demandé.

34 Pour clore les considérations sur les problèmes traités à cet alinéa, il semble nécessaire de souligner que les exceptions de trois types au retour de l'enfant doivent être appliquées en tant que telles. Cela implique avant tout qu'elles doivent être interprétées restrictivement si l'on veut éviter que la Convention devienne lettre morte. En effet, la Convention repose dans sa totalité sur le rejet unanime du phénomène des déplacements illicites d'enfants et sur la conviction que la meilleure méthode pour les combattre, au niveau international, est de ne pas leur reconnaître des conséquences juridiques. La mise en pratique de cette méthode exige que les Etats signataires de la Convention soient convaincus de ce qu'ils appartiennent, malgré leurs différences, à une même communauté juridique au sein de laquelle les autorités de chaque Etat reconnaissent que les autorités de l'un d'entre eux – celles de la résidence

[15] Voir P.-v. No 9 et Doc. trav. connexes.
[16] Le texte a été adopté par 14 suffrages positifs, 6 négatifs et 4 abstentions, voir P.-v. No 13.

fundamental principles of the law relating to the family and children in the State addressed'.[15] The adoption of this text caused a serious breach in the consensus which basically had prevailed up to this point in the Conference proceedings. That is why all the delegations, aware of the fact that a solution commanding wide acceptance had to be found, embarked upon this road which provided the surest guarantee of the success of the Convention.

32 The matter under debate was particularly important since to some extent it reflected two partly different concepts concerning the Convention's objects as regards the return of the child. Actually, up to now the text drawn up by the First Commission (like the Preliminary Draft drawn up by the Special Commission) had limited the possible exceptions to the rule concerning the return of the child to a consideration of factual situations and of the conduct of the parties or to a specific evaluation of the interests of the child. On the other hand, the reservation just accepted implicitly permitted the possibility of the return of a child being refused on the basis of purely legal arguments drawn from the internal law of the requested State, an internal law which could come into play in the context of the quoted provision either to 'evaluate' the right claimed by the dispossessed parent or to assess whether the action of the abductor was well-founded in law. Now, such consequences would alter considerably the structure of the Convention which is based on the idea that the forcible denial of jurisdiction ordinarily possessed by the authorities of the child's habitual residence should be avoided.

33 In this situation, the adoption by a comforting majority[16] of the formula which appears in article 20 of the Convention represents a laudable attempt to compromise between opposing points of view, the role given to the internal law of the State of refuge having been considerably diminished. On the one hand, the reference to the fundamental principles concerning the protection of human rights and fundamental freedoms relates to an area of law in which there are numerous international agreements. On the other hand, the rule in article 20 goes further than the traditional formulation of 'public policy' clauses as regards the extent of incompatibility between the right claimed and the action envisaged. In fact, the authority concerned, in order to be able to refuse to order the return of the child by invoking the grounds which appear in this provision, must show not only that such a contradiction exists, but also that the protective principles of human rights prohibit the return requested.

34 To conclude our consideration of the problems with which this paragraph deals, it would seem necessary to underline the fact that the three types of exception to the rule concerning the return of the child must be applied only so far as they go and no further. This implies above all that they are to be interpreted in a restrictive fashion if the Convention is not to become a dead letter. In fact, the Convention as a whole rests upon the unanimous rejection of this phenomenon of illegal child removals and upon the conviction that the best way to combat them at an international level is to refuse to grant them legal recognition. The practical application of this principle requires that the signatory States be convinced that they belong, despite their differences, to the same legal community within which the authorities of each State acknowledge that the authorities of one of them – those of the child's habitual residence – are in

[15] See *P.-v.* No 9 and associated Working Documents.
[16] The text was adopted with 14 votes in favour, 6 against and 4 abstentions, see *P.-v.* No 13.

habituelle de l'enfant — sont en principe les mieux placées pour statuer en toute justice sur les droits de garde et de visite. De sorte qu'une invocation systématique des exceptions mentionnées, substituant ainsi au for de la résidence de l'enfant le for choisi par l'enleveur, fera s'écrouler tout l'édifice conventionnel, en le vidant de l'esprit de confiance mutuelle qui l'a inspiré.

principle best placed to decide upon questions of custody and access. As a result, a systematic invocation of the said exceptions, substituting the forum chosen by the abductor for that of the child's residence, would lead to the collapse of the whole structure of the Convention by depriving it of the spirit of mutual confidence which is its inspiration.

## II   NATURE DE LA CONVENTION

### A   *Une convention de coopération entre autorités*

35   En délimitant les buts poursuivis par les Etats contractants, les objectifs d'une convention en déterminent en dernier ressort la nature. Ainsi, la Convention sur les aspects civils de l'enlèvement international d'enfants est avant tout une convention qui cherche à éviter les déplacements internationaux d'enfants en instituant une coopération étroite entre les autorités judiciaires et administratives des Etats contractants. Une telle collaboration porte sur les deux objectifs que nous venons d'examiner, d'une part l'obtention du retour immédiat de l'enfant dans le milieu d'où il a été éloigné, d'autre part le respect effectif des droits de garde et de visite existant dans un des Etats contractants.

36   Cette caractérisation de la Convention peut aussi être effectuée à travers une approche négative. Ainsi, nous pouvons constater avant tout qu'il ne s'agit pas d'une convention sur la loi applicable à la garde des enfants. En effet, les références faites au droit de l'Etat de la résidence habituelle de l'enfant ont une portée restreinte, puisque le droit en question n'est pris en considération que pour établir le caractère illicite du déplacement (par exemple, à l'article 3). En second lieu, la Convention n'est pas non plus un traité sur la reconnaissance et l'exécution des décisions en matière de garde. On a sciemment évité cette option, qui a pourtant suscité de longs débats au sein de la première réunion de la Commission spéciale. Etant donné les conséquences sur le fond de la reconnaissance d'une décision étrangère, cette institution est normalement entourée de garanties et d'exceptions qui peuvent prolonger la procédure. Or, en cas de déplacement d'un enfant, le facteur temps prend une importance décisive. En effet, les troubles psychologiques que l'enfant peut subir du fait d'un tel déplacement pourraient se reproduire si la décision sur son retour n'était adoptée qu'après un certain délai.

37   Une fois acquis que nous nous trouvons devant une convention axée sur l'idée de coopération entre autorités, il faut préciser qu'elle n'essaie de régler que les situations entrant dans son domaine d'application et touchant deux ou plusieurs Etats parties. En effet, l'idée d'une convention «universaliste» (c'est-à-dire dont le domaine s'applique à toute espèce internationale) est difficile à soutenir en dehors des conventions en matière de loi applicable. En ce sens, nous devons rappeler que les systèmes prévus, qu'il s'agisse du retour des enfants ou d'assurer l'exercice effectif du droit de visite, s'appuient largement sur une coopération entre les Autorités centrales reposant sur des droits et des devoirs réciproques. De même, quand des particuliers s'adressent directement aux autorités judiciaires ou administratives d'un Etat contractant en invoquant la Convention, l'application des bénéfices conventionnels répond aussi à une idée de réciprocité qui exclut en principe son extension aux ressortissants des Etats tiers.

Par ailleurs, bien que la Convention n'atteigne la plénitude de ses objectifs qu'entre les Etats contractants, les autorités de chacun de ces Etats ont parfaitement le droit de s'inspirer

## II   NATURE OF THE CONVENTION

### A   *A convention of co-operation among authorities*

35   By defining the ends pursued by the Contracting States, a convention's objects in the final analysis determine its nature. Thus, the Convention on the Civil Aspects of International Child Abduction is above all a convention which seeks to prevent the international removal of children by creating a system of close co-operation among the judicial and administrative authorities of the Contracting States. Such collaboration has a bearing on the two objects just examined, *viz.* on the one hand, obtaining the prompt return of the child to the environment from which it was removed, and on the other hand the effective respect for rights of custody and access which exist in one of the Contracting States.

36   This description of the Convention can also be drawn in a negative way. Thus, it can be said at the outset that the Convention is not concerned with the law applicable to the custody of children. In fact, the references to the law of the State of the child's habitual residence are of limited significance, since the law in question is taken into consideration only so as to establish the wrongful nature of the removal (see, for example, article 3). Secondly, the Convention is certainly not a treaty on the recognition and enforcement of decisions on custody. This option, which gave rise to lengthy debates during the first meeting of the Special Commission, was deliberately rejected. Due to the substantive consequences which flow from the recognition of a foreign judgment, such a treaty is ordinarily hedged around by guarantees and exceptions which can prolong the proceedings. Now, where the removal of a child is concerned, the time factor is of decisive importance. In fact, the psychological problems which a child may suffer as a result of its removal could reappear if a decision on its return were to be taken only after some delay.

37   Once it is accepted that we are dealing with a convention which is centred upon the idea of co-operation amongst authorities, it must also be made clear that it is designed to regulate only those situations that come within its scope and which involve two or more Contracting States. Indeed, the idea of a 'universalist' convention (*i.e.* a convention which applies in every international case) is difficult to sustain outwith the realm of conventions on applicable law. In this regard, we must remember that the systems which have been designed either to return children or to secure the actual exercise of access rights, depend largely on co-operation among the Central Authorities, a co-operation which itself rests upon the notion of reciprocal rights and duties. In the same way, when individuals, by invoking the provisions of the Convention, apply directly to the judicial or administrative authorities of a Contracting State, the applicability of the Convention's benefits will itself depend on the concept of reciprocity which in principle excludes its being extended to nationals of third countries.

What is more, although the Convention attains its objectives in full only as among the Contracting States, the authorities in each of those States have the absolute right to be guided

des dispositions conventionnelles pour traiter d'autres situations similaires.

B *Caractère autonome de la Convention*

38 Axée comme elle l'est sur la notion de coopération entre autorités, en vue d'atteindre des objectifs précis, la Convention est autonome par rapport aux conventions existantes en matière de protection des mineurs ou relatives au droit de garde. Ainsi, l'une des premières décisions prises par la Commission spéciale a été d'orienter ses travaux dans le sens d'une convention indépendante, plutôt que d'élaborer un protocole à la *Convention de La Haye du 5 octobre 1961 concernant la compétence des autorités et la loi applicable en matière de protection des mineurs.* Dans cette même optique, elle ne pouvait pas non plus s'en tenir aux modèles proposés par les conventions sur la reconnaissance et l'exécution des décisions en matière de garde, y compris celui de la Convention du Conseil de l'Europe.[17]

39 Cette autonomie ne signifie pas que les dispositions prétendent régler tous les problèmes posés par les enlèvements internationaux d'enfants. Bien au contraire, dans la mesure où les objectifs de la Convention, quoique ambitieux, ont une portée très concrète, le problème de fond du droit de garde se situe hors du domaine d'application de la Convention. Elle est donc appelée à coexister inévitablement avec les règles sur la loi applicable et sur la reconnaissance et l'exécution des décisions étrangères de chaque Etat contractant, indépendamment du fait que leur source soit interne ou conventionnelle.

D'autre part, même dans son domaine propre, la Convention ne prétend pas être appliquée de façon exclusive: elle désire, avant tout, la réalisation des objectifs conventionnels et reconnaît donc explicitement la possibilité d'invoquer, simultanément à la Convention, toute autre règle juridique qui permette d'obtenir le retour d'un enfant déplacé ou retenu illicitement, ou l'organisation d'un droit de visite (article 34).

C *Rapports avec d'autres conventions*

40 La Convention se présente comme un instrument devant apporter une solution d'urgence, en vue d'éviter la consolidation juridique des situations, initialement illicites, provoquées par le déplacement ou le non-retour d'un enfant. Dans la mesure où elle n'essaie pas de trancher sur le fond des droits des parties, sa compatibilité avec d'autres conventions s'impose. Néanmoins, une telle compatibilité ne pouvait être obtenue qu'en assurant l'application prioritaire des dispositions susceptibles de fournir une solution d'urgence et, dans une certaine mesure, provisoire. C'est en effet après le retour de l'enfant à sa résidence habituelle que devront être soulevées, devant les tribunaux compétents, les questions relatives au droit de garde. A ce sujet, l'article 34 déclare que «dans les matières auxquelles elle s'applique, la Convention prévaut sur la *Convention du 5 octobre 1961 concernant la compétence des autorités et la loi applicable en matière de protection des mineurs*, entre les Etats parties aux deux Conventions». D'ailleurs, étant donné qu'on a essayé d'éviter que l'on puisse ajourner l'application des dispositions conventionnelles en invoquant des dispositions qui touchent le fond du droit de garde, le principe incorporé à l'article 34 devrait s'étendre à toute

[17] Il s'agit de la *Convention européenne sur la reconnaissance et l'exécution des décisions en matière de garde des enfants et sur le rétablissement de la garde des enfants*, adoptée par le Comité des Ministres du Conseil de l'Europe le 30 novembre 1979 et ouverte à la signature des Etats membres, au Luxembourg, le 20 mai 1980.

by the provisions of the Convention when dealing with other, similar situations.

B *The autonomous nature of the Convention*

38 The Convention, centred as it is upon the notion of co-operation among authorities with a view to attaining its stated objects, is autonomous as regards existing conventions concerning the protection of minors or custody rights. Thus, one of the first decisions taken by the Special Commission was to direct its proceedings towards the drawing up of an independent Convention, rather than the preparation of a protocol to the *Hague Convention of 5 October 1961 concerning the powers of authorities and the law applicable to the protection of minors.* Seen from this perspective, the Convention could not possibly be confined within the framework provided by the conventions on the recognition and enforcement of custody decisions, including that of the Council of Europe Convention.[17]

39 This autonomous character does not mean that the provisions purport to regulate all the problems arising out of international child abductions. On the contrary, to the extent that the Convention's aims, although ambitious, are given concrete expression, the basic problem of custody rights is not to be found within the scope of the Convention. The Convention must necessarily coexist with the rules of each Contracting State on applicable law and on the recognition and enforcement of foreign decrees, quite apart from the fact that such rules are derived from internal law or from treaty provisions.

On the other hand, even within its own sphere of application, the Convention does not purport to be applied in an exclusive way. It seeks, above all, to carry into effect the aims of the Convention and so explicitly recognizes the possibility of a party invoking, along with the provisions of the Convention, any other legal rule which may allow him to obtain the return of a child wrongfully removed or retained, or to organize access rights (article 34).

C *Relations with other conventions*

40 The Convention is designed as a means for bringing about speedy solutions so as to prevent the consolidation in law of initially unlawful factual situations, brought about by the removal or retention of a child. In as much as it does not seek to decide upon the merits of the rights of parties, its compatibility with other conventions must be considered. Nonetheless, such compatibility can be achieved only by ensuring that priority is given to those provisions which are likely to bring about a speedy and, to some extent, temporary solution. In fact it is only after the return of the child to its habitual residence that questions of custody rights will arise before the competent tribunals. On this point, article 34 states that 'This Convention shall take priority in matters within its scope over the *Convention of 5 October 1961 concerning the powers of authorities and the law applicable in respect of the protection of minors*, as between Parties to both Conventions.' Moreover, since one is trying to avoid delays in the application of the Convention's provisions caused by claims concerning the merits of custody rights, the principle in article 34 ought to be extended to any provision which has a bearing upon custody rights, whatever the reason. On the other hand, as has just been emphasized in the preceding

[17] The *European Convention on Recognition and Enforcement of Decisions Concerning Custody of Children and on Restoration of Custody of Children*, adopted by the Committee of Ministers of the Council of Europe on 30 November 1979 and opened for signing by the Member States at Luxemburg on 20 May 1980.

disposition portant sur le droit de garde, quelle qu'en soit la source. Par contre, comme nous venons de le souligner au paragraphe précédent, les parties peuvent faire appel à toute règle qui facilite la réalisation des objectifs conventionnels.

*D Ouverture de la Convention aux Etats non-membres de la Conférence de La Haye*

41 Sur ce point aussi, la Convention s'est manifestée en tant que Convention de coopération, en déterminant son caractère semi-ouvert. En principe, tout Etat pourra adhérer à la Convention, mais son adhésion «n'aura d'effet que dans les rapports entre l'Etat adhérant et les Etats contractants qui auront déclaré accepter cette adhésion» (article 38). En agissant de la sorte, les Etats contractants ont cherché à maintenir l'équilibre nécessaire entre le désir d'universalisme et la conviction qu'un système de coopération n'est efficace que lorsqu'il existe entre les Parties un degré de confiance mutuelle suffisant.

Plus encore, le choix du système de l'acceptation explicite de l'adhésion par chaque Etat membre, afin que celle-ci devienne effective à leur égard,[18] de préférence au système, plus ouvert, qui entend que l'adhésion produit ses effets sauf dans les rapports avec l'Etat membre qui s'y oppose dans un délai fixé,[19] montre l'importance accordée par les Etats à la sélection de ses cocontractants dans la matière qui fait l'objet de la Convention.

III INSTRUMENTS D'APPLICATION DE LA CONVENTION

*A Les Autorités centrales*

42 Une convention de coopération comme celle qui nous occupe peut en principe s'orienter dans deux directions différentes: imposer la coopération directe entre les autorités internes compétentes dans le domaine d'application de la Convention, ou baser son action sur la création d'Autorités centrales dans chaque Etat contractant, en vue de coordonner et de canaliser la coopération souhaitée. L'avant-projet mis au point par la Commission spéciale consacrait assez nettement le choix fait en faveur de la deuxième option et la Convention elle-même continue à être bâtie, dans une large mesure, sur l'intervention et les compétences des Autorités centrales.

43 Néanmoins, l'admission sans équivoque de la possibilité reconnue aux particuliers de s'adresser directement aux autorités judiciaires ou administratives compétentes dans l'application de la Convention (article 29), accroît l'importance du devoir qui est fait à celles-ci de coopérer, à tel point qu'on pourra qualifier de «système mixte» le système suivi par la Convention du fait qu'en marge des obligations des Autorités centrales, il en introduit d'autres qui sont propres aux autorités judiciaires ou administratives.

44 D'ailleurs, ce serait une erreur de prétendre construire une convention pour lutter contre les enlèvements internationaux d'enfants sans tenir compte du rôle important joué par les autorités judiciaires ou administratives internes dans toutes les questions concernant la protection des mineurs.

[18] A l'instar de l'article 39 de la *Convention sur l'obtention des preuves à l'étranger en matière civile ou commerciale, du 18 mars 1970*, voir P.-v. No 13

[19] Système consacré, parmi d'autres, dans la *Convention tendant à faciliter l'accès international à la justice*, adopté également au cours de la Quatorzième session de la Conférence.

paragraph, the parties may have recourse to any rule which promotes the realization of the Convention's aims.

*D Opening of the Convention to States not Members of the Hague Conference*

41 On this point also, by virtue of the decision that it be of a 'semi-open' type, the Convention is shown to be one of co-operation. In principle, any State can accede to the Convention, but its accession 'will have effect only as regards the relations between the acceding State and such Contracting States as will have declared their acceptance of the accession' (article 38). The Contracting States, by this means, sought to maintain the requisite balance between a desire for universality and the belief that a system based on co-operation could work only if there existed amongst the Contracting Parties a sufficient degree of mutual confidence.

What is more, the choice of a system based on the express acceptance of accession by each Member State, by which such acceptance becomes effective as amongst themselves,[18] in preference to a more open system by which accession has effect except as regards Member States which raise objections thereto within a certain period of time,[19] demonstrates the importance which the States attached to the selection of their co-signatories in those questions which form the subject-matter of the Convention.

III INSTRUMENTS FOR APPLYING THE CONVENTION

*A The Central Authorities*

42 A convention based on co-operation such as the one which concerns us here can in theory point in two different directions: it can impose direct co-operation among competent internal authorities, in the sphere of the Convention's application, or it can act through the creation of Central Authorities in each Contracting State, so as to co-ordinate and 'channel' the desired co-operation. The Preliminary Draft drawn up by the Special Commission expressed quite clearly the choice made in favour of the second option, and the Convention itself was also built in large measure upon the intervention and powers of Central Authorities.

43 Nevertheless, the unequivocal acceptance of the possibility for individuals to apply directly to the judicial or administrative authorities which have power to apply the provisions of the Convention (article 29), increases the importance of the duty of co-operation laid upon them, so much so that the system adopted by the Convention could be characterized as a 'mixed system', due to the fact that, aside from the duties imposed upon the Central Authorities, it creates other obligations which are peculiar to judicial or administrative authorities.

44 What is more, it would be a mistake to claim to have constructed a convention to counter international child abduction without taking account of the important role played by the internal judicial or administrative authorities in all matters concerning the protection of minors. In this context,

[18] As in article 39 of the *Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters*, see *P.-v.* No 13.

[19] The system adopted, among others, by the *Convention on International Access to Justice*, also adopted during the Fourteenth Session of the Conference.

Dans ce contexte, la référence aux autorités administratives doit être comprise comme le simple reflet du fait que, dans certains Etats membres de la Conférence, cette tâche est confiée à des autorités d'une telle nature, tandis que dans la plupart des systèmes juridiques la compétence en la matière appartient aux autorités judiciaires. Somme toute, c'est aux autorités chargées à l'intérieur de chaque Etat de statuer sur la garde et la protection des enfants que la Convention confie le soin de trancher les problèmes posés, qu'il s'agisse du retour d'un enfant déplacé ou retenu illicitement, ou de l'organisation de l'exercice du droit de visite. Ainsi, la Convention fait sienne l'exigence de sécurité juridique qui inspire dans ce domaine tous les droits internes. En effet, quoique les décisions sur le retour des enfants ne préjugent pas du fond du droit de garde (voir article 19), elles vont largement influencer la vie des enfants; l'adoption de telles décisions, la prise d'une semblable responsabilité doivent obligatoirement revenir aux autorités qui sont normalement compétentes selon le droit interne.

45 Cependant, dans ses grandes lignes et dans une large majorité des cas, l'application de la Convention dépendra du fonctionnement des instruments qu'elle-même instituera à cette fin, c'est-à-dire des Autorités centrales. En ce qui concerne leur réglementation par la Convention, la première remarque à faire est que la Conférence a eu conscience des différences profondes existant dans l'organisation interne des Etats membres; c'est la raison pour laquelle la Convention ne précise point quelles doivent être la structure et la capacité d'action des Autorités centrales, deux aspects qui seront nécessairement régis par la loi interne de chaque Etat contractant. L'acceptation de cette prémisse se traduit dans la Convention par la reconnaissance du fait que les tâches assignées en particulier aux Autorités centrales pourront être accomplies soit directement par elles-mêmes, soit avec le concours d'un intermédiaire (article 7). Il est évident, par exemple, que la localisation d'un enfant peut requérir l'intervention de la police; de même, l'adoption de mesures provisoires ou l'introduction de procédures judiciaires sur des rapports privés peuvent tomber hors des compétences susceptibles d'être dévolues aux autorités administratives par certaines lois internes. Néanmoins, dans tous les cas, l'Autorité centrale reste le destinataire des obligations que la Convention lui impose, en tant que «monteur» de la coopération voulue pour lutter contre les déplacements illicites d'enfants. D'autre part, c'est encore pour tenir compte des particularités des différents systèmes juridiques que la Convention admet que l'Autorité centrale pourra exiger que la demande qui lui est adressée soit accompagnée d'une autorisation «par écrit lui donnant le pouvoir d'agir pour le compte du demandeur, ou de désigner un représentant habilité à agir en son nom» (article 28).

46 Par ailleurs, la Convention, suivant une tradition bien établie de la Conférence de La Haye,[20] dispose que tant les Etats fédéraux que les Etats plurilégislatifs ou ayant des organisations territoriales autonomes sont libres de désigner plus d'une Autorité centrale. Pourtant, les problèmes constatés dans l'application pratique des conventions qui prévoient l'existence de plusieurs Autorités centrales sur le territoire d'un seul Etat, ainsi que, tout particulièrement, les caractéristiques spéciales de la matière qui fait l'objet de la présente Convention, ont amené la Conférence, suivant le critère déjà établi par la Commission spéciale, à faire un pas

[20] Par exemple, *cf* l'article 18, troisième alinéa de la *Convention relative à la signification et la notification à l'étranger des actes judiciaires et extrajudiciaires en matière civile ou commerciale, du 15 novembre 1965. Id.* les articles 24 et 25 de la *Convention sur l'obtention des preuves à l'étranger en matière civile ou commerciale, du 18 mars 1970.*

references to administrative authorities must be understood as a simple reflection of the fact that, in certain Member States, the task in question is entrusted to such authorities, while in the majority of legal systems jurisdiction belongs to the judicial authorities. *In fine*, it is for the appropriate authorities within each State to decide questions of custody and protection of minors; it is to them that the Convention has entrusted the responsibility of solving the problems which arise, whether they involve the return of a child wrongfully removed or retained or organizing the exercise of access rights. Thus, the Convention adopts the demand for legal certainty which inspires all internal laws in this regard. In fact, although decisions concerning the return of children in no way prejudge the merits of any custody issue (see article 19), they will in large measure influence children's lives; such decisions and such responsibilities necessarily belong ultimately to the authorities which ordinarily have jurisdiction according to internal law.

45 However, the application of the Convention, both in its broad outline and in the great majority of cases, will depend on the working of the instruments which were brought into being for this purpose, *i.e.* the Central Authorities. So far as their regulation by the Convention is concerned, the first point to be made is that the Conference was aware of the profound differences which existed as regards the internal organization of the Contracting States. That is why the Convention does not define the structure and capacity to act of the Central Authorities, both of which are necessarily governed by the internal law of each Contracting State. Acceptance of this premise is shown in the Convention by its recognition of the fact that the tasks specifically assigned to Central Authorities can be performed either by themselves, or with the assistance of intermediaries (article 7). For example, it is clear that discovering a child's whereabouts may require the intervention of the police; similarly, the adoption of provisional measures or the institution of legal proceedings concerning private relationships may fall outwith the scope of those powers which can be devolved upon administrative authorities in terms of some internal laws. Nonetheless, the Central Authority in every case remains the repository of those duties which the Convention imposes upon it, to the extent of its being the 'engine' for the desired co-operation which is designed to counter the wrongful removal of children. On the other hand, it is so as to take account of the peculiarities of different legal systems that the Convention allows a Central Authority to require that applications addressed to it be accompanied by a 'written authorization empowering it to act on behalf of the applicant, or to designate a representative so to act' (article 28).

46 In other respects, the Convention follows a long-established tradition of the Hague Conference,[20] by providing that States with more than one system of law or which have autonomous territorial organizations, as well as Federal States, are free to appoint more than one Central Authority. However, the problems encountered in the practical application of those Conventions which provide for several Central Authorities within the territory of a single State, as well as, in particular, the special characteristics of the subject-matter of this Convention, led the Conference to adopt the text previously established by the Special Commission and

[20] Compare, for example, article 18(3) of the *Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters.* Also, articles 24 and 25 of the *Convention of 18 March 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters.*

en avant vers une sorte de «hiérarchisation» des Autorités centrales dans ces Etats. En effet, en nous limitant au deuxième aspect mentionné, si la personne qui a déplacé ou retenu un enfant se sert de l'extrême facilité des communications à l'intérieur d'un Etat, le demandeur ou l'Autorité centrale de l'Etat requérant pourraient être contraints de répéter plusieurs fois leur demande en vue d'obtenir le retour de l'enfant; de surcroît, il existe la possibilité que, même en ayant des raisons sérieuses de croire que l'enfant se trouve dans un Etat contractant, on ignore quelle est l'unité territoriale de sa résidence.

47 Pour fournir une solution à ces situations et à d'autres similaires, la Convention prévoit que les Etats qui établissent plus d'une Autorité centrale, désigneront simultanément «l'Autorité centrale à laquelle les demandes peuvent être adressées en vue de leur transmission à l'Autorité centrale compétente au sein de cet Etat» (article 6). La question est importante, du fait que la Convention limite, dans le temps, l'obligation imposée aux autorités judiciaires ou administratives de l'Etat requis, en ce qui concerne le retour immédiat de l'enfant;[21] une erreur dans le choix de l'Autorité centrale requise peut donc avoir des conséquences décisives pour les prétentions des parties. Or, pour éviter qu'un facteur non prévu par la Convention en modifie l'application normale, il faudra que cette sorte de «super Autorité centrale», envisagée à l'article 6, adopte une attitude active. En effet, puisqu'elle devra servir de pont entre l'Autorité centrale de son propre Etat qui est compétente dans chaque cas d'espèce d'une part, et les Autorités centrales des autres Etats contractants d'autre part, elle se verra contrainte de choisir entre procéder à la localisation de l'enfant pour pouvoir transmettre l'affaire à l'Autorité centrale adéquate, ou transmettre une copie de la demande à toutes les Autorités centrales de l'Etat, ce qui provoquera inévitablement une multiplication des services bureaucratiques. Mais il est hors de doute qu'une telle Autorité centrale jouera un rôle fondamental dans l'application de la Convention quant aux rapports qui affectent les Etats susmentionnés.

B *La formule modèle*

48 Suivant en cela la décision prise par la Commission spéciale lors de sa seconde réunion, la Quatorzième session de la Conférence a adopté, en même temps que la Convention, une Recommandation qui incorpore une formule modèle pour les demandes en vue du retour des enfants déplacés ou retenus illicitement. A son sujet, il convient de faire deux remarques. La première concerne la valeur juridique de la Recommandation en question: pour l'établir, il semble souhaitable de recourir au droit général des organisations internationales. Or, dans cette optique, une recommandation est en substance une invitation non contraignante adressée par une organisation internationale à un, plusieurs ou tous les Etats membres. Par conséquent, les Etats ne sont pas tenus *stricto sensu* d'utiliser la formule modèle contenue dans cette Recommandation; on a même soigneusement évité de la présenter comme une annexe à la Convention.

Les motifs en sont évidents. Avant tout, étant donné l'absence d'expérience internationale préalable dans le domaine couvert par la Convention, on peut penser qu'après quelques années l'application pratique des dispositions

[21] *Cf. infra*, commentaire de l'article 12 de la Convention.

take a step towards creating a sort of 'hierarchy' of Central Authorities in those States. In fact, by confining our discussion to the latter point, we can see that if the person responsible for the removal or retention of a child avails himself of the excellent means of communication within a particular State, the applicant or Central Authority of the requesting State could be forced to re-apply several times in order to obtain the return of the child. Moreover, it is still possible that, even if there are valid reasons for believing that the child is in a Contracting State, the territorial unit of the child's residence will be ignored.

47 The Convention supplies a solution to these and other situations by providing that States which establish more than one Central Authority should at the same time designate 'the Central Authority to which applications may be addressed for transmission to the appropriate Central Authority within that State' (article 6). The matter is important, because the Convention imposes a time-limit upon the duty of judicial or administrative authorities in the requested State for the prompt return of the child;[21] a mistaken choice as to the requested Central Authority could therefore have decisive consequences for the claims of the parties. Now, so as to prevent a factor which was not provided for in the Convention modifying the Convention's normal application, this type of 'super-Central Authority' envisaged in article 6 will have to adopt a positive approach. As a matter of fact, if it is to act as a bridge between on the one hand the Central Authority of its own State which has jurisdiction in each particular case, and on the other hand the Central Authorities of the other Contracting States, it will find itself obliged to choose between proceeding to locate a child in order to transmit the matter to the appropriate Central Authority, and transmitting a copy of the application to all the Central Authorities of the State concerned, which would inevitably cause a great increase in administrative duties. However it is undoubtedly the case that such a Central Authority will play a fundamental role in the application of the Convention in regard to relations affecting the aforementioned States.

B *The model form*

48 Following the decision taken by the Special Commission at its second meeting, the Fourteenth Session of the Conference adopted simultaneously with its adoption of the Convention, a Recommendation containing a model form for applications for the return of children wrongfully removed or retained. Two comments are appropriate here. The first concerns the legal force of this Recommendation. In drawing it up, it seemed advisable to have recourse to the general law governing international organizations. Now, viewed from this perspective, a recommendation is in substance a non-obligatory invitation addressed by one international organization to one, several or all Member States. Consequently, States are not strictly required to make use of the model form contained in the Recommendation; indeed, the Commission took care to avoid presenting the form as an annex to the Convention.

The reasons for this are clear. Most importantly, given the lack of prior international experience in this field, it can well be imagined that, after a number of years, the practical application of the Convention's provisions will result in

[21] *Cf. infra*, the commentary on article 12 of the Convention.

conventionnelles amène à conseiller l'introduction de certaines modifications dans la formule adoptée. Or, il semble préférable de ne pas soumettre une éventuelle révision du texte aux formalités qu'exigerait le droit international public en matière de révision des traités internationaux. On peut d'ailleurs soutenir qu'en marge d'une future action concertée de la Conférence sur ce point, l'adaptation de la formule recommandée aux Etats pourra aussi être l'oeuvre des contacts bilatéraux entrepris par les Autorités centrales, en exécution de l'obligation générale visée à l'article 7, alinéa 2, lettre *i*.

D'autre part, une conséquence directe de la décision de ne pas rendre obligatoire l'emploi de la formule modèle est que la Convention contient une énumération des données que doit nécessairement inclure toute demande adressée à une Autorité centrale (article 8).

49 La deuxième remarque porte sur le domaine d'application et sur la teneur de la formule recommandée. En effet, bien que la Convention règle aussi des aspects importants concernant le droit de visite, la formule proposée se limite à offrir une requête modèle en vue du retour de l'enfant. Ceci montre la polarisation de l'intérêt de la Conférence sur la solution des problèmes posés après le déplacement de l'enfant, tout en mettant en relief l'originalité de la voie choisie pour y parvenir. C'est justement parce que cette voie est nouvelle qu'on a cru souhaitable d'insérer une indication concernant son mode d'utilisation.

50 Quant à la teneur de la formule, elle développe très justement les éléments exigés par la Convention; pourtant, nous voudrions attirer l'attention sur deux points mineurs. D'abord, sur la mention «date et lieu du mariage» des parents de l'enfant concerné: dans la mesure où elle n'est pas suivie, entre parenthèses, de l'expression «s'il y a lieu», il semble qu'on donne un traitement exceptionnel et discriminatoire à la situation des enfants naturels. D'ailleurs, l'absence de cette même expression à côté de la référence à la date et au lieu de naissance de l'enfant s'accorde mal avec la précision dont fait preuve sur ce point l'article 8 de la Convention, quand il ajoute en se référant à la date de naissance, «s'il est possible de se la procurer».

51 D'autre part, on constate un manque de concordance entre le texte français et le texte anglais, du point de vue des «renseignements concernant la personne dont il est allégué qu'elle a enlevé ou retenu l'enfant». A cet égard, il semble préférable de suivre le texte anglais, plus complet, surtout en ce qui concerne la mention de la nationalité du prétendu enleveur, un élément qui sera parfois décisif dans la localisation de l'enfant.

## IV STRUCTURE ET TERMINOLOGIE

### A *La structure de la Convention*

52 Les articles 1, 2, 3 et 5 définissent le domaine d'application matériel de la Convention, en précisant ses objectifs et les conditions requises pour pouvoir considérer que le déplacement ou le non-retour d'un enfant sont illicites. L'article 4 s'attache au domaine d'application personnel de la Convention, tandis que l'article 35 détermine son application dans le temps. Les articles 6 et 7 sont consacrés à la création des Autorités centrales et à leurs obligations. Les articles 8, 27 et 28 se réfèrent à la saisine des Autorités centrales et aux documents qui peuvent accompagner ou compléter une demande qui leur aurait été présentée. Les articles 9 à 12 et 14 à 19 traitent des différentes voies instaurées pour obtenir le retour d'un enfant, ainsi que de la portée juridique d'une décision à cet effet. Les articles 13 et 20 s'occupent des exceptions à l'obligation générale de renvoyer l'enfant. L'article 21 établit les devoirs spécifiques

certain modifications to the present form being thought advisable. Now, it seems better not to subject future revisions of the text to the formalities required by public international law for the revision of international treaties. Besides, it could be said, in connection with any future concerted action by the Conference in this regard, that adaptation of the form which was recommended to States should also be a matter for bilateral negotiations between Central Authorities, in implementation of their general obligation contained in article 7(2)(*i*).

On the other hand, a direct consequence of the decision not to make the use of the model form obligatory is the catalogue of details which every application to a Central Authority must contain (article 8).

49 The second comment bears upon the sphere of application and the terms of the recommended form. Although the Convention also governs important matters concerning access rights, the model form proposed is merely a model application for the return of the child. This demonstrates the concentration of interest within the Conference on the resolution of problems arising out of the removal of a child, whilst at the same time throwing into relief the novelty of the means chosen to resolve them. It is precisely because the means are new that it was thought advisable to include some indication of the way in which they should be used.

50 The actual terms of the form narrate precisely those points required by the Convention itself. We should however like to draw attention to two minor points. Firstly, the phrase 'date and place of marriage' of the parents of the child in question: in as much as it is not followed, in parentheses, by the words 'if any', it would seem to treat natural children in an exceptional and discriminatory fashion. Moreover, the absence of the same phrase alongside the reference to the date and place of birth of the child compares badly with the precision shown by article 8 of the Convention which adds, referring to the date of birth, the words 'where available'.

51 Secondly, there is an inconsistency between the French and English texts regarding the 'information concerning the person alleged to have removed or retained the child'. It would be advisable to follow the English text here, since it is more comprehensive, especially as regards its reference to the nationality of the alleged abductor, a fact which will sometimes prove decisive in efforts to locate the child.

## IV STRUCTURE AND TERMINOLOGY

### A *The structure of the Convention*

52 Articles 1, 2, 3 and 5 define the Convention's scope with regard to its subject-matter, by specifying its aims and the criteria by which the removal or retention of a child can be regarded as wrongful. Article 4 concerns the persons to whom the Convention applies, while article 35 determines its temporal application. Articles 6 and 7 are devoted to the creation of the Central Authorities and their duties. Articles 8, 27 and 28 are concerned with applications to Central Authorities and the documents which may accompany or supplement an application to them. Articles 9 to 12, and 14 to 19, deal with the various means established for bringing about the return of a child, as well as the legal significance of a decree to that effect. Articles 13 and 20 concern the exceptions to the general rule for the return of the child. Article 21 lays down the specific duties which the States have taken upon themselves with regard to access rights.

assumés par les Etats à l'égard du droit de visite. Les articles 22 à 26 et 30 (ainsi que les articles 27 et 28 susmentionnés) s'occupent de certains aspects techniques concernant la procédure et les frais qui peuvent découler des demandes introduites par l'application de la Convention. Les articles 29 et 36 reflètent le point de vue non exclusif qui a présidé à l'élaboration de la Convention en précisant, d'une part l'action directe possible des particuliers devant les autorités judiciaires ou administratives des Etats contractants, hors du cadre des dispositions conventionnelles, et d'autre part la faculté reconnue aux Etats contractants de déroger conventionnellement aux restrictions auxquelles le retour de l'enfant peut être soumis d'après la présente Convention. Les articles 31 à 34 ont trait aux Etats plurilégislatifs et aux rapports avec d'autres conventions. Finalement, les articles 37 à 45 contiennent les clauses finales.

B *Terminologie utilisée par la Convention*

53 Selon une tradition bien établie de la Conférence de La Haye, la Convention a évité de définir les termes utilisés, sauf ceux contenus à l'article 5 sur les notions de droit de garde et de droit de visite, indispensables pour établir le domaine d'application matériel de la Convention. Ceci sera examiné dans son contexte. Nous voulons simplement considérer ici un aspect qui concerne la terminologie et qui mérite, à notre avis, un bref commentaire. Il s'agit du manque de concordance entre le titre de la Convention et la terminologie utilisée dans son texte. En effet, tandis que le premier emploie l'expression «enlèvement international d'enfants», les dispositions conventionnelles ont recours à des périphrases ou, en tous cas, à des tournures moins évocatrices, telles que «déplacement» ou «non-retour». L'explication est directement en rapport avec la délimitation du domaine de la Convention. Sur ce point, comme nous l'avons souligné ci-dessus (voir Nos 12 à 16), une étude du sujet dont s'occupe la Convention met en relief qu'en ce qui concerne aussi bien les rapports normalement existants entre «enleveur» et «enfant» que les intentions du premier, nous sommes fort loin des délits visés sous les dénominations d'«enlèvement», «*kidnapping*» ou «*secuestro*». Comme on est fort éloignés des problèmes propres au droit pénal, on a donc évité d'utiliser dans le texte de la Convention des appellations pouvant avoir une signification équivoque. Par contre, on a cru souhaitable de retenir le terme d'«enlèvement» dans le titre de la Convention, étant donné son emploi habituel par les «mass-media» et son retentissement dans l'opinion publique. Néanmoins, pour éviter toute équivoque, ce même titre précise, comme le faisait déjà le titre de l'avant-projet, que la Convention n'a pour objet que de régler les «aspects civils» du phénomène visé. Si tout au long de ce Rapport nous employons de temps en temps des expressions telles qu'«enlèvement» ou «enleveur», comme on les trouve d'ailleurs dans la formule modèle, c'est parce qu'elles permettent parfois une rédaction plus aisée; mais il faudra en tout état de cause les entendre avec les nuances que comporte leur application au problème spécifique dont la Convention s'occupe.

**Deuxième partie – Commentaire des articles de la Convention**

CHAPITRE PREMIER – CHAMP D'APPLICATION DE LA CONVENTION

54 Le chapitre premier définit le domaine d'application de la Convention quant à la matière et aux personnes concernées (domaine d'application *ratione materiae* et *ratione*

Articles 22 to 26 and 30 (like the aforementioned articles 27 and 28) deal with certain technical matters regarding proceedings and the costs which can result from applications submitted pursuant to the provisions of the Convention. Articles 29 and 36 reflect the 'non-exclusive' view which prevailed during the preparation of the Convention in stating, on the one hand, that applications may be submitted directly by individuals to the judicial or administrative authorities of the Contracting States, outwith the framework of the provisions of the Convention, and on the other hand that Contracting States have the acknowledged right to derogate by agreement from the restrictions which the present Convention allows to be imposed upon the return of the child. Articles 31 to 34 refer to States with more than one system of law and to the Convention's relations with other conventions. Lastly, articles 37 to 45 contain the Final Clauses.

B *Terminology used in the Convention*

53 Following a long-established tradition of the Hague Conference, the Convention avoided defining its terms, with the exception of those in article 5 concerning custody and access rights, where it was absolutely necessary to establish the scope of the Convention's subject-matter. These will be examined in their context. At this point we wish merely to consider one aspect of the terminology used which in our opinion merits a brief comment. It has to do with lack of correspondence between the title of the Convention and the terms used in the text. Whilst the former uses the phrase 'international child abduction', the provisions of the Convention avail themselves of circumlocutions or at any event of less evocative turns of phrase, such as 'removal' or 'retention'. The reason for this is quite in keeping with the Convention's limited scope. As was stressed above (see Nos 12 to 16), studies of the topic with which the Convention deals show clearly that, with regard both to the relationship which normally exists between 'abductor' and 'child' and to the intentions of the former, we are far removed from the offences associated with the terms 'kidnapping', '*enlèvement*' or '*secuestro*'. Since one is far removed from problems peculiar to the criminal law, the use in the text of the Convention of possibly ambiguous terms was avoided.

On the other hand, it was felt desirable to keep the term 'abduction' in the title of the Convention, owing to its habitual use by the 'mass media' and its resonance in the public mind. Nonetheless, so as to avoid any ambiguity, the same title, as in the Preliminary Draft, states clearly that the Convention only aims to regulate the 'civil aspects' of this particular phenomenon. If, in the course of this Report, expressions such as 'abduction' or 'abductor' are used from time to time, and one will find them also in the model form, that is because they sometimes permit of easier drafting; but at all events, they will have to be understood to contain nuances which their application to the specific problem with which the Convention deals may call for.

**Second Part – Commentary on the specific articles of the Convention**

CHAPTER ONE – SCOPE OF THE CONVENTION

54 The first chapter defines the scope of the Convention as regards its subject-matter and the persons concerned (its scope *ratione materiae* and *ratione personae*). However, so as

*personae*). Cependant, pour avoir une perspective globale du domaine conventionnel, il faut considérer aussi l'article 34 sur les relations avec d'autres conventions, l'article 35 concernant son domaine d'application dans le temps et les articles 31 à 33 qui ont trait à l'application de la Convention dans les Etats plurilégislatifs.

*Article premier – Les objectifs de la Convention*

*a Observations générales*

55 Cet article expose en deux paragraphes les objectifs conventionnels que nous avons traités assez largement dans la première partie de ce Rapport. Il est donc évident que l'absence de parallélisme entre le titre et le contenu de la Convention va plus loin que la question purement terminologique.[22] De toute façon, il faut reconnaître que les termes employés dans le titre, malgré leur manque de rigueur juridique, ont un pouvoir évocateur et une force qui attirent l'attention, ce qui est l'essentiel.

56 En ce qui concerne la nature des espèces réglées, une remarque de portée générale s'impose. Quoique la Convention n'inclue aucune disposition proclamant le caractère international des situations envisagées, une telle conclusion découle aussi bien du titre que des divers articles. Or, dans le cas présent, le caractère international provient d'une situation de fait, à savoir de la dispersion des membres d'une famille entre différents pays. Une situation purement interne lors de sa naissance peut donc tomber dans le domaine d'application de la Convention par le fait, par exemple, qu'un des membres de la famille se soit déplacé à l'étranger avec l'enfant, ou du désir d'exercer un droit de visite dans un autre pays où réside la personne qui prétend avoir ce droit. Par contre, la différence de nationalité des personnes concernées n'implique pas nécessairement que nous soyons devant un cas d'espèce international auquel la Convention doive s'appliquer, bien qu'il s'agisse d'un indice clair d'une internationalisation possible, au sens où nous l'avons décrit.

*b Lettre* a

57 L'objectif d'assurer le retour immédiat des enfants déplacés ou retenus illicitement a été déjà longuement présenté. D'ailleurs, la Quatorzième session n'a changé en rien la teneur littérale de la formule élaborée par la Commission spéciale. Nous ne ferons donc ici que deux brèves considérations d'éclaircissement relatives à son libellé. La première concerne la caractérisation des comportements que l'on voudrait éviter par la réalisation de cet objectif. En résumé comme nous le savons déjà, il s'agit de toute conduite qui altère les rapports familiaux existant avant ou après toute décision judiciaire, en utilisant un enfant, transformé par ce fait en instrument et principale victime de la situation. Dans ce contexte, la référence aux enfants «retenus illicitement» entend couvrir les cas où l'enfant qui se trouvait dans un lieu autre que celui de sa résidence habituelle – avec le consentement de la personne qui exerçait normalement sa garde – n'est pas renvoyé par la personne avec laquelle il séjournait. C'est la situation type qui se produit quand le déplacement de l'enfant est la conséquence d'un exercice abusif du droit de visite.

[22] Voir sur ce point Rapport de la Commission spéciale, No 52.

to have an overall picture of the Convention's scope, one must consider also article 34 which deals with the Convention's relationship with other conventions, article 35 which concerns the Convention's temporal application, and articles 31 to 33 which relate to the application of the Convention in States with more than one legal system.

*Article 1 – The aims of the Convention*

*a General observations*

55 This article sets out in two paragraphs the objects of the Convention which were discussed in broad terms in the first part of this Report. It is therefore clear that the lack of correspondence between the title and the specific provisions of the Convention is more than merely a matter of terminology.[22] In any event, it must be realized that the terms used in the title, while lacking legal exactitude, possess an evocative power and force which attract attention, and this is essential.

56 As for the nature of the matters regulated by the Convention, one general comment is required. Although the Convention does not contain any provision which expressly states the international nature of the situations envisaged, such a conclusion derives as much from its title as from its various articles. Now, in the present case, the international nature of the Convention arises out of a factual situation, that is to say the dispersal of members of a family among different countries. A situation which was purely internal to start with can therefore come within the scope of the Convention through, for example, one of the members of the family going abroad with the child, or through a desire to exercise access rights in a country other than that in which the person who claims those rights lives. On the other hand, the fact that the persons concerned hold different nationality does not necessarily mean that the international type of case to which the Convention applies automatically will arise, although it would clearly indicate the possibility of its becoming 'international' in the sense described.

*b Sub-paragraph* a

57 The aim of ensuring the prompt return of children wrongfully removed or retained has already been dealt with at length. Besides, the Fourteenth Session in no way altered the literal meaning of the wording devised by the Special Commission. Thus only two brief points by way of explanation will be put forward here. The first concerns the characterization of the behaviour which the realization of this objective seeks to prevent. To sum up, as we know, the conduct concerned is that which changes the family relationships which existed before or after any judicial decision, by using a child and thus turning it into an instrument and principal victim of the situation. In this context, the reference to children 'wrongfully retained' is meant to cover those cases where the child, with the consent of the person who normally has custody, is in a place other than its place of habitual residence and is not returned by the person with whom it was staying. This is the typical situation which comes about when the removal of the child results from the wrongful exercise of access rights.

[22] See the Report of the Special Commission, No 52.

58 En second lieu, le texte commenté précise que les enfants dont on essaie d'assurer le retour sont ceux qui ont été déplacés ou retenus «dans tout Etat contractant». Une telle précision a une double signification. D'une part, en ce qui concerne la disposition contenue à l'article 4, elle délimite le domaine d'application *ratione personae* de la Convention aux enfants qui, ayant leur résidence habituelle dans un des Etats contractants, sont déplacés ou retenus sur le territoire d'un autre Etat contractant.

59 Mais ces quelques mots ont aussi une signification toute différente. En effet, par ce biais, l'objectif de la Convention examinée, considéré en soi ou par rapport à la disposition de l'article 2, devient général, c'est-à-dire applicable à tous les enfants qui, dans les conditions décrites, se trouvent dans un Etat contractant. Pourtant, il y aura toujours une différence dans la situation juridique entre les enfants qui avaient leur résidence habituelle, avant le déplacement, dans un autre Etat contractant et les autres enfants. Ainsi, la situation des premiers devra être résolue par application directe des dispositions conventionnelles. Par contre, l'obligation des Etats envers les autres sera plus nuancée, dans la mesure où elle découlerait (abstraction faite de la législation interne) du devoir consacré par l'article 2, qui pourrait être décrit comme celui de prendre les mesures appropriées pour éviter que leurs territoires ne se convertissent en lieux de refuge d'éventuels «enleveurs».

*c Lettre* b

60 L'objectif conventionnel visé à ce sous-alinéa a été clarifié dans la rédaction qu'il a reçue lors de la Quatorzième session.[23] En ce qui concerne son domaine, il est maintenant manifeste que les situations considérées sont les mêmes que celles auxquelles s'applique la Convention, c'est-à-dire les situations internationales qui mettent en relation deux ou plusieurs Etats contractants. La précision n'est pas superflue, surtout si l'on tient compte du fait que le texte de l'avant-projet permettait d'autres interprétations, notamment la référence à des situations internes.

61 Quant à savoir quelle est la portée qu'on a voulu donner à l'objectif qui y est consacré, il s'impose de faire une distinction entre droit de garde et droit de visite. En ce qui concerne le droit de garde, on peut dire que la Convention n'a pas essayé de le développer de manière autonome. C'est donc dans l'obligation générale exprimée dans l'article 2, ainsi que dans la régulation du retour de l'enfant – basée, comme nous le verrons dans le cadre du commentaire à l'article 3, sur le respect d'un droit de garde effectivement exercé et attribué par le droit de l'Etat de la résidence habituelle – qu'on doit trouver la suite de la disposition qui nous occupe à cet égard. Par contre, le droit de visite a eu un sort plus favorable et les bases sur lesquelles doit se construire son respect effectif apparaissent fixées, au moins dans leurs grandes lignes, dans le contexte de l'article 21.

*Article 2 – Obligation générale des Etats contractants*

62 En étroite relation avec les objectifs vastes et souples de l'article 1*b*, cet article consacre une obligation générale de comportement des Etats contractants; il s'agit donc d'une obligation qui, à l'encontre des obligations de résultat, normalement incluses dans une convention, n'exige pas de

[23] *Cf.* Doc. trav. No 2 (*Proposal of the United Kingdom delegation*) et P.-v. No 2.

58 Secondly, the text states clearly that the children whose return it is sought to secure are those who have been removed to, or retained in, 'any Contracting State'. This wording is doubly significant. On the one hand, the provision in article 4 limits the scope of the Convention *ratione personae* to those children who, while being habitually resident in one of the Contracting States, are removed to or retained in, the territory of another Contracting State.

59 But these same words also have a quite diferent meaning. In fact, through this formulation this particular object of the Convention, whether considered in its own right or in relation to article 2, becomes indirectly a general one, applicable to all children who, in the circumstances set forth, are in any Contracting State. However, there will always be a difference between the legal position of those children who, prior to their removal, were habitually resident in another Contracting State, and that of other children. The position of the former will have to be resolved by the direct application of the provisions of the Convention. On the other hand, the duty of States towards the other children is less clear (leaving aside provisions of internal law) in so far as it derives from the obligation stated in article 2, which could be described as a duty to take appropriate measures to prevent their territory being turned into a place of refuge for potential 'abductors'.

*c Sub-paragraph* b

60 The aim of the Convention contained in this sub-paragraph was clarified in the course of drafting at the Fourteenth Session.[23] So far as its scope is concerned, it is now clear that the situations under consideration are the same as those to which the Convention applies, that is to say international situations which involve two or more Contracting States. It should not be thought that precision in this matter is unnecessary, especially when one considers that the text of the Preliminary Draft allowed of other interpretations, and in particular a reference to internal situations.

61 As for knowing the desired meaning of the aim stated therein, it is necessary to draw a distinction between custody rights and access rights. With regard to custody rights, it can be said that the Convention has not attempted to deal with them separately. It is thus within the general obligation stated in article 2, and the regulation governing the return of the child – which is based, as we shall see in the commentary on article 3, upon respect for custody rights actually exercised and attributed under the law of the child's habitual residence – that one must look in order to find the consequences of the provision which concerns us here. On the other hand, access rights are treated more favourably, and the foundations upon which respect for their effective exercise seem fixed, at least in broad outline, within the context of article 21.

*Article 2 – General obligation of Contracting States*

62 Closely related to the objects stated in broad and flexible fashion in article 1*b* is the fact that this article sets forth a general duty incumbent upon Contracting States. It is thus a duty which, unlike obligations to achieve a result which are normally to be found in conventions, does not require

[23] *Cf.* Working Document No 2 (Proposal of the United Kingdom delegation) and *P.-v.* No 2

réalisations concrètes, mais plus simplement l'adoption d'une attitude déterminée en vue d'aboutir à de telles réalisations. Dans le cas présent, l'attitude, le comportement demandé aux Etats se traduit par le fait de prendre «toutes les mesures appropriées pour assurer, dans les limites de leur territoire, la réalisation des objectifs de la Convention». La Convention essaie ainsi, tout en sauvegardant le caractère *self-executing* de ses autres articles, d'encourager les Etats contractants à s'inspirer de ces normes pour résoudre les situations similaires à celles dont elle s'occupe, mais ne rentrant pas dans son domaine d'application *ratione personae* ou *ratione temporis*. D'une part, cela doit conduire à une considération attentive des normes conventionnelles quand l'Etat envisagera une modification de sa législation interne en matière de droits de garde ou de visite; d'autre part, l'extension des objectifs de la Convention à des cas non couverts par ses dispositions devrait influencer l'action des tribunaux et se traduire par une diminution du jeu de l'exception d'ordre public au moment de se prononcer sur des relations internationales tombant hors du domaine d'application de la Convention.

63 De plus, dans sa dernière phrase, l'article précise une des mesures envisagées, en soulignant l'importance accordée par la Conférence à l'utilisation de procédures rapides dans les affaires concernant les droits de garde ou de visite. Pourtant, cette disposition n'impose pas aux Etats l'obligation d'adopter dans leur loi interne de nouvelles procédures; la concordance établie entre le texte français et le texte anglais cherche justement à éviter une telle interprétation, que le texte français original rendait possible. Elle se limite donc à demander aux Etats contractants d'utiliser, dans toute question concernant la matière objet de la Convention, les procédures les plus urgentes figurant dans leur propre droit.

*Article 3 — Le caractère illicite d'un déplacement ou d'un non-retour*

*a Observations générales*

64 L'ensemble de l'article 3 constitue une disposition clé de la Convention, puisque de son application dépend le déclenchement des mécanismes conventionnels en vue du retour de l'enfant; en effet, la Convention n'impose l'obligation de retourner l'enfant que lorsqu'il y a eu un déplacement ou un non-retour considérés par elle comme illicites. Or, en précisant les conditions que doit réunir une situation pour que son altération unilatérale puisse être qualifiée d'illicite, cet article met indirectement en relief les rapports que la Convention entend protéger; ces rapports sont basés sur un double élément: *primo*, l'existence d'un droit de garde attribué par l'Etat de la résidence habituelle de l'enfant; *secundo*, l'exercice effectif de cette garde, avant le déplacement. Examinons de plus près la teneur des conditions mentionnées.

*b L'élément juridique*

65 En ce qui concerne l'élément des situations visées qu'on pourrait appeler juridique, ce que la Convention se propose de défendre ce sont les relations qui se trouvent déjà protégées, au moins par l'apparence d'un titre valable sur le droit de garde, dans l'Etat de la résidence habituelle de l'enfant; c'est-à-dire par le droit de l'Etat où ces relations se déroulaient avant le déplacement. L'affirmation antérieure exige certaines précisions sur deux points. Le premier aspect que nous devons considérer a trait au droit dont la violation détermine l'existence d'un déplacement ou d'un non-retour illicites, au sens de la Convention. Il s'agit, comme nous venons de le dire, du droit de garde; en effet, bien qu'au

that actual results be achieved but merely the adoption of an attitude designed to lead to such results. In the present case, the attitude and behaviour required of States is expressed in the requirement to 'take all appropriate measures to secure within their territories the implementation of the objects of the Convention'. The Convention also seeks, while safeguarding the 'self-executing' character of its other articles, to encourage Contracting States to draw inspiration from these rules in resolving problems similar to those with which the Convention deals, but which do not fall within its scope *ratione personae* or *ratione temporis*. On the one hand, this should lead to careful examination of the Convention's rules whenever a State contemplates changing its own internal laws on rights of custody or access; on the other hand, extending the Convention's objects to cases which are not covered by its own provisions should influence courts and be shown in a decreasing use of the public policy exception when questions concerning international relations which are outwith the scope of the Convention fall to be decided.

63 Moreover, the last sentence of the article specified one of the particular means envisaged, while stressing also the importance placed by the Convention on the use of speedy procedures in matters of custody or access rights. However, this provision does not impose an obligation upon States to bring new procedures into their internal law, and the correspondence now existing between the French and English texts rightly seeks to avoid such an interpretation, which the original French text made possible. It is therefore limited to requesting Contracting States, in any question concerning the subject-matter of the Convention, to use the most expeditious procedures available in their own law.

*Article 3 — The unlawful nature of a removal or retention*

*a General observations*

64 Article 3 as a whole constitutes one of the key provisions of the Convention, since the setting in motion of the Convention's machinery for the return of the child depends upon its application. In fact, the duty to return a child arises only if its removal or retention is considered wrongful in terms of the Convention. Now, in laying down the conditions which have to be met for any unilateral change in the *status quo* to be regarded as wrongful, this article indirectly brings into clear focus those relationships which the Convention seeks to protect. Those relationships are based upon the existence of two facts, firstly, the existence of rights of custody attributed by the State of the child's habitual residence and, secondly, the actual exercise of such custody prior to the child's removal. Let us examine more closely the import of these conditions.

*b The juridical element*

65 As for what could be termed the juridical element present in these situations, the Convention is intended to defend those relationships which are already protected, at any rate by virtue of an apparent right to custody in the State of the child's habitual residence, *i.e.* by virtue of the law of the State where the child's relationships developed prior to its removal. The foregoing remark requires further explanation in two respects. The first point to be considered concerns the law, a breach of which determines whether a removal or retention is wrongful, in the Convention sense. As we have just said, this is a matter of custody rights. Although the problems which can arise from a breach of

cours de la Quatorzième session les problèmes pouvant dériver de la violation d'un droit de visite, surtout quand le titulaire de la garde déplace l'enfant à l'étranger, aient été soulevés, l'opinion majoritaire a été qu'on ne peut pas assimiler une telle situation aux déplacements illicites qu'on essaie de prévenir.[24]
Cet exemple, et d'autres similaires où la violation du droit de visite altère profondément l'équilibre de la situation établie par une décision, sont certes la preuve de ce que les décisions sur la garde des enfants devraient toujours être susceptibles de révision. Mais ce problème échappe à l'effort de coordination entrepris par la Conférence de La Haye; on aurait abouti à des résultats contestables si, à travers une égale protection accordée aux droits de garde et de visite, l'application de la Convention avait conduit, au fond, à la substitution des titulaires de l'un par ceux de l'autre.

66 La deuxième question à examiner se réfère au droit choisi pour évaluer la validité initiale du titre invoqué. Nous ne nous arrêterons pas ici sur le concept de la résidence habituelle; il s'agit en effet d'une notion familière à la Conférence de La Haye, où elle est comprise comme une notion de pur fait, qui diffère notamment de celle de domicile. D'ailleurs, le choix du droit de la résidence habituelle en tant que critère déterminant de la légalité de la situation violée par l'enlèvement est logique. En fait, aux arguments qui ont agi en faveur de lui accorder un rôle prééminent en matière de protection des mineurs, comme dans la Convention de La Haye de 1961, vient s'ajouter la propre nature même de la Convention, c'est-à-dire sa portée limitée. En ce sens, il faut faire deux considérations: d'une part, la Convention n'essaie pas de régler définitivement la garde des enfants, ce qui affaiblit considérablement les arguments favorables à la loi nationale; d'autre part, les normes conventionnelles reposent, dans une large mesure, sur l'idée sous-jacente qu'il existe une sorte de compétence naturelle des tribunaux de la résidence habituelle de l'enfant dans un litige relatif à sa garde.
Dans une perspective différente, nous devons aussi attirer l'attention sur le fait que la Convention parle du «droit» de l'Etat de la résidence habituelle, s'écartant ainsi de la tradition bien établie par les Conventions de La Haye sur la loi applicable, élaborées à partir de 1955, qui soumettent la réglementation du sujet dont elles s'occupent à une loi interne déterminée. Certes, dans ces cas, le terme de «loi» doit être compris dans son sens le plus large, celui qui recouvre aussi bien les règles écrites et coutumières – quel qu'en soit le rang – que les précisions apportées par leur interprétation jurisprudentielle. Cependant, l'adjectif «interne» implique l'exclusion de toute référence aux règles de conflit de la loi désignée. Donc, si la Convention a abandonné la formule traditionnelle pour parler du «droit de la résidence habituelle», la différence ne saurait être purement terminologique. En effet, comme le montrent les travaux préparatoires,[25] dès le début, l'intention a été d'élargir davantage l'éventail des dispositions qui doivent être prises en considération dans ce contexte. En fait, il y a même eu, au cours de la Quatorzième session, une proposition tendant à expliciter dans cet article que la référence au droit de la résidence habituelle s'étend à ces normes de droit international privé; si la proposition a été rejetée, c'est parce que la Conférence était convaincue qu'une telle inclusion était superflue et s'avérait implicite du moment que le texte

[24] *Cf.* Doc. trav. No 5 (Proposition de la délégation canadienne) et P.-v. No 3.

[25] *Cf.* le Rapport de la Commission spéciale, No 62, *supra*, p. 90.

access rights, especially where the child is taken abroad by its custodian, were raised during the Fourteenth Session, the majority view was that such situations could not be put in the same category as the wrongful removals which it is sought to prevent.[24]

This example, and others like it where breach of access rights profoundly upsets the equilibrium established by a judicial or administrative decision, certainly demonstrate that decisions concerning the custody of children should always be open to review. This problem however defied all efforts of the Hague Conference to co-ordinate views thereon. A questionable result would have been attained had the application of the Convention, by granting the same degree of protection to custody and access rights, led ultimately to the substitution of the holders of one type of right by those who held the other.

66 The second question which should be examined concerns the law which is chosen to govern the initial validity of the claim. We shall not dwell at this point upon the notion of habitual residence, a well-established concept in the Hague Conference, which regards it as a question of pure fact, differing in that respect from domicile. Moreover, the choice of the law of habitual residence as the factor which is to determine the lawfulness of the situation flouted by the abduction is logical. In actual fact, to the arguments in favour of its being accorded a pre-eminent role in the protection of minors, as in the Hague Convention of 1961, must be added the very nature of the Convention itself, *viz.* its limited scope. In this regard, two points must be made: on the one hand, the Convention does not seek to govern definitively questions concerning the custody of children, a fact which weakens considerably those arguments favouring the application of national law; on the other hand, the rules of the Convention rest largely upon the underlying idea that there exists a type of jurisdiction which by its nature belongs to the courts of a child's habitual residence in cases involving its custody.
From a different viewpoint, our attention should also be drawn to the fact that the Convention speaks of the 'law' of the State of habitual residence, thus breaking with a long-established tradition of Hague Conventions on applicable law since 1955, which refer to a particular internal law to govern the matters with which they deal. Of course, in such cases, the word 'law' has to be understood in its widest sense, as embracing both written and customary rules of law – whatever their relative importance might be – and the interpretations placed upon them by case-law. However, the adjective 'internal' implies the exclusion of all reference to the conflict of law rules of the particular legal system. Therefore, since the Convention has abandoned its traditional formulation by speaking of 'the law of the habitual residence', this difference cannot be regarded as just a matter of terminology. In fact, as the preliminary proceedings of the Commission demonstrate,[25] it was intended right from the start to expand considerably the range of provisions which have to be considered in this context. Actually, a proposal was made during the Fourteenth Session that this article should make it clear that the reference to the law of the habitual residence extends also to the rules of private international law. The fact that this proposal was rejected was due to the Conference's view that its inclusion was unnecessary and became implicit anyway

[24] *Cf.* Working Document No 5 (Proposal of the Canadian delegation) and *P.-v.* No 3.

[25] *Cf.* the Special Commission Report, No 62, *supra*, p. 90.

n'exclut ni directement ni indirectement les règles en question.[26]

67 Les considérations antérieures nous montrent que l'invocation du droit de la résidence habituelle de l'enfant est aussi large que possible. De même, les sources dont peut découler le droit de garde qu'on essaie de protéger sont toutes celles qui peuvent fonder une réclamation dans le cadre du système juridique en question. A cet égard, l'alinéa 2 de l'article 3 considère certaines — les plus importantes sans doute — de ces sources, mais en soulignant la nature non exhaustive de l'énumération; cet alinéa dispose en effet que «le droit de garde visé en *a* peut notamment résulter . . .», en soulignant de la sorte l'existence possible d'autres titres non considérés dans le texte. Or, comme nous le verrons dans les paragraphes suivants, les sources retenues couvrent un vaste éventail juridique; la précision de leur caractère partiel doit donc être surtout comprise comme favorisant une interprétation souple des concepts employés, qui permette d'appréhender le maximum d'hypothèses possibles.

68 La première des sources à laquelle l'article 3 fait allusion est la loi, quand il dit que la garde peut «résulter d'une attribution de plein droit». Cela nous amène à insister sur l'un des traits caractéristiques de cette Convention, nommément son applicabilité à la protection des droits de garde exercés avant toute décision en la matière. Le point est important, car on ne peut pas ignorer que, dans une perspective statistique, les cas où l'enfant est déplacé avant qu'une décision concernant sa garde n'ait été prononcée sont assez fréquents. D'ailleurs, dans de telles situations, les possibilités existantes, en marge de la Convention, pour le parent dépossédé de récupérer l'enfant sont presque nulles, sauf s'il recourt à son tour à des voies de fait toujours pernicieuses pour l'enfant. A cet égard, en introduisant ces cas dans son domaine d'application, la Convention a progressé de manière significative dans la solution des problèmes réels qui échappaient auparavant, dans une large mesure, aux mécanismes traditionnels du droit international privé.

Quant à savoir quel est, selon la Convention, le système juridique qui peut attribuer le droit de garde qu'on désire protéger, il nous faut en revenir aux considérations développées au paragraphe précédent. Ainsi donc, la garde *ex lege* pourra se baser soit sur la loi interne de l'Etat de la résidence habituelle de l'enfant, soit sur la loi désignée par les règles de conflit de cet Etat. Le jeu de la première option est parfaitement clair; en ce qui concerne la seconde, elle impliquerait, par exemple, que le déplacement par son père français d'un enfant naturel ayant sa résidence habituelle en Espagne où il habitait avec sa mère, tous les deux étant aussi de nationalité française, devrait être considéré comme illicite au sens de la Convention, par application de la loi française désignée comme compétente par la règle de conflit espagnole en matière de garde et indépendamment du fait que l'application de la loi interne espagnole aurait vraisemblablement conduit à une autre solution.

69 La deuxième source du droit de garde, retenue à l'article 3, est l'existence d'une décision judiciaire ou administrative. Etant donné que la Convention n'ajoute aucune précision sur ce point, il faut considérer, d'une part que le mot «décision» est utilisé dans son sens le plus large, de manière à embrasser toute décision ou élément de décision (judiciaire ou administrative) concernant la garde d'un

[26] *Cf.* Doc. trav. No 2 (*Proposal of the United Kingdom delegation*) et P.-v. No 2.

once the text neither directly nor indirectly excluded the rules in question.[26]

67 The foregoing considerations show that the law of the child's habitual residence is invoked in the widest possible sense. Likewise, the sources from which the custody rights which it is sought to protect derive, are all those upon which a claim can be based within the context of the legal system concerned. In this regard, paragraph 2 of article 3 takes into consideration some — no doubt the most important — of those sources, while emphasizing that the list is not exhaustive. This paragraph provides that 'the rights of custody mentioned in sub-paragraph *a* above may arise in particular', thus underlining the fact that other sorts of rights may exist which are not contained within the text itself. Now, as we shall see in the following paragraphs, these sources cover a vast juridical area, and the fact that they are not exhaustively set out must be understood as favouring a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration.

68 The first source referred to in article 3 is law, where it is stated that custody 'may arise . . . by operation of law'. That leads us to stress one of the characteristics of this Convention, namely its application to the protection of custody rights which were exercised prior to any decision thereon. This is important, since one cannot forget that, in terms of statistics, the number of cases in which a child is removed prior to a decision on its custody are quite frequent. Moreover, the possibility of the dispossessed parent being able to recover the child in such circumstances, except within the Convention's framework, is practically non-existent, unless he in his turn resorts to force, a course of action which is always harmful to the child. In this respect, by including such cases within its scope, the Convention has taken a significant step towards resolving the real problems which in the past largely escaped the control of the traditional mechanisms of private international law.

As for knowing the legal system which, according to the Convention, is to attribute the custody rights, which it is desired to protect, it is necessary to go back to the considerations developed in the previous paragraph. Thus, custody *ex lege* can be based either on the internal law of the State of the child's habitual residence, or on the law designated by the conflict rules of that State. The scope of the first option is quite clear; the second implies, for example, that the removal by its French father of a child born out of wedlock which had its habitual residence in Spain where it lived with its mother, both mother and child being of French nationality, should be considered wrongful in the Convention sense, by means of the application of French law designated as applicable by the Spanish conflict rule on questions of custody, quite independently of the fact that application of internal Spanish law would probably have led to a different result.

69 The second source of custody rights contained in article 3 is a judicial or administrative decision. Since the Convention does not expand upon this, it must be deemed, on the one hand, that the word 'decision' is used in its widest sense, and embraces any decision or part of a decision (judicial or administrative) on a child's custody and, on the other hand, that these decisions may have been issued by the courts of

[26] *Cf.* Working Document No 2 (Proposal of the United Kingdom delegation), and P.-v. No 2.

enfant; d'autre part que les décisions visées peuvent avoir été rendues aussi bien par les tribunaux de l'Etat de la résidence habituelle de l'enfant que par ceux d'un Etat tiers.[27] Or, dans cette dernière hypothèse, c'est-à-dire lorsque le droit de garde s'exerçait dans l'Etat de la résidence habituelle de l'enfant sur la base d'une décision étrangère, la Convention n'exige pas qu'elle ait été formellement reconnue. En conséquence, il doit suffire aux effets considérés que la décision soit telle au regard du droit de l'Etat de la résidence habituelle, c'est-à-dire, en principe, qu'elle présente les caractéristiques *minima* pour pouvoir déclencher une procédure en vue de son homologation ou de sa reconnaissance;[28] interprétation large qui se trouve d'ailleurs confirmée par la teneur de l'article 14 de la Convention.

70 Finalement, le droit de garde peut découler, d'après l'article 3, «d'un accord en vigueur selon le droit de cet Etat». En principe, les accords envisagés peuvent être de simples transactions privées entre les parties, au sujet de la garde des enfants. La condition d'être «en vigueur» selon le droit de l'Etat de la résidence habituelle, a été introduite au cours de la Quatorzième session en substitution de l'exigence d'avoir «force de loi», qui figurait dans l'avant-projet. La modification répond à un désir de clarification, mais aussi d'assouplissement, autant que possible, des conditions posées à l'acceptation d'un accord en tant que source de la garde protégée par la Convention. Sur le point précis de savoir ce qu'est un accord «en vigueur» selon un droit déterminé, il nous semble que l'on doive inclure sous cette appellation tout accord qui ne soit pas interdit par un tel droit et qui puisse servir de base à une prétention juridique devant les autorités compétentes. Or, pour en revenir au sens large que la notion «droit de l'Etat de la résidence habituelle de l'enfant» a reçu dans cet article 3, le droit en question peut être aussi bien la loi interne de cet Etat que la loi désignée par ses règles de conflit; le choix entre les deux branches de l'option appartient aux autorités de l'Etat concerné, quoique l'esprit de la Convention semble incliner pour celle qui, dans chaque cas d'espèce, légitime la garde effectivement exercée. D'autre part, la Convention ne précise point les conditions de fond ou de forme que ces accords doivent remplir; elles changeront donc selon la teneur du droit impliqué.

71 Tout en ajournant l'étude de la personne qui peut être titulaire d'un droit de garde au commentaire de l'article 4 sur le domaine d'application *ratione personae* de la Convention, il convient d'insister ici sur le fait qu'on s'est proposé de protéger toutes les modalités d'exercice de la garde d'enfants. En effet, aux termes de l'article 3, le droit de garde peut avoir été attribué, seul ou conjointement, à la personne qui demande qu'on en respecte l'exercice. Il ne pouvait en être autrement à une époque où les législations internes introduisent progressivement la modalité de la garde conjointe, considérée comme la mieux adaptée au principe général de la non-discrimination à raison du sexe. D'ailleurs, la garde conjointe n'est pas toujours une garde *ex lege*, dans la mesure où les tribunaux se montrent de plus en plus favorables, si les circonstances le permettent, à partager entre les deux parents les responsabilités inhérentes au droit de garde. Or, dans l'optique adoptée par la Convention, le déplacement d'un enfant par l'un des titulaires de la garde

[27] Cette interprétation s'appuie sur les travaux qui ont conduit à l'adoption d'un texte, similaire à l'actuel, au sein de la Commission spéciale. Voir Rapport de la Commission spéciale, No 64, *supra*, p. 191-192.
[28] Sur l'intérêt de ce que la Convention inclue un tel cas, voir le Doc. trav. No 58, «Document de clarification présenté par la délégation italienne».

the State of the child's habitual residence as well as by the courts of a third country.[27] Now, in the latter case, that is to say when custody rights were exercised in the State of the child's habitual residence on the basis of a foreign decree, the Convention does not require that the decree had been formally recognized. Consequently, in order to have the effect described, it is sufficient that the decision be regarded as such by the State of habitual residence, *i.e.* that it contain in principle certain minimum characteristics which are necessary for setting in motion the means by which it may be confirmed or recognized.[28] This wide interpretation is moreover confirmed by the whole tenor of article 14.

70 Lastly, custody rights may arise according to article 3, 'by reason of an agreement having legal effect under the law of that State'. In principle, the agreements in question may be simple private transactions between the parties concerning the custody of their children. The condition that they have 'legal effect' according to the law of the State of habitual residence was inserted during the Fourteenth Session in place of a requirement that it have the 'force of law', as stated in the Preliminary Draft. The change was made in response to a desire that the conditions imposed upon the acceptance of agreements governing matters of custody which the Convention seeks to protect should be made as clear and as flexible as possible. As regards the definition of an agreement which has 'legal effect' in terms of a particular law, it seems that there must be included within it any sort of agreement which is not prohibited by such a law and which may provide a basis for presenting a legal claim to the competent authorities. Now, to go back to the wide interpretation given by article 3 to the notion of 'the law of the State of the child's habitual residence', the law concerned can equally as well be the internal law of that State as the law which is indicated as applicable by its conflict rules. It is for the authorities of the State concerned to choose between the two alternatives, although the spirit of the Convention appears to point to the choice of the one which, in each particular case, would recognize that custody had actually been exercised. On the other hand, the Convention does not state, in substance or form, the conditions which these agreements must fulfil, since these will change according to the terms of the law concerned.

71 Leaving aside a consideration of those persons who can hold rights of custody, until the commentary on article 4 which concerns the scope of the Convention *ratione personae*, it should be stressed now that the intention is to protect *all* the ways in which custody of children can be exercised. Actually, in terms of article 3, custody rights may have been awarded to the person who demands that their exercise be respected, and to that person in his own right or jointly. It cannot be otherwise in an era when types of joint custody, regarded as best suited to the general principle of sexual non-discrimination, are gradually being introduced into internal law. Joint custody is, moreover, not always custody *ex lege*, in as much as courts are increasingly showing themselves to be in favour, where circumstances permit, of dividing the responsibilities inherent in custody rights between both parents. Now, from the Convention's standpoint, the removal of a child by one of the joint holders without the consent of the other, is equally wrongful, and

[27] This interpretation is based upon the deliberations of the Special Commission which led to its adopting a similar text to the current one. See Report of the Special Commission, No 64, *supra*, pp. 191-192.
[28] See Working Document No 58, '*Document de clarification présenté par la délégation italienne*', for the desirability of including such a case in the Convention.

conjointe, sans le consentement de l'autre titulaire, est également illicite; ce caractère illicite proviendrait, dans ce cas précis, non pas d'une action contraire à la loi, mais du fait qu'une telle action aurait ignoré les droits de l'autre parent, également protégé par la loi, et interrompu leur exercice normal. La véritable nature de la Convention apparaît plus clairement dans ces situations: elle ne cherche pas à établir à qui appartiendra dans l'avenir la garde de l'enfant, ni s'il s'avérera nécessaire de modifier une décision de garde conjointe rendue sur la base de données qui ont été altérées par la suite; elle essaie plus simplement d'éviter qu'une décision ultérieure à cet égard puisse être influencée par un changement des circonstances introduit unilatéralement par l'une des parties.

*c L'élément de fait*

72 Le deuxième élément qui caractérise les rapports protégés par la Convention est que le droit de garde, qu'on prétend violé par le déplacement, ait été exercé de façon effective par son titulaire. En effet, du moment qu'on a choisi une approche du sujet conventionnel s'écartant de la pure et simple reconnaissance internationale des droits de garde attribués aux parents, la Convention a mis l'accent sur la protection du droit des enfants au respect de leur équilibre vital; c'est-à-dire du droit des enfants à ne pas voir altérées les conditions affectives, sociales, etc., qui entourent leur vie, à moins qu'il n'existe des arguments juridiques garantissant la stabilité d'une nouvelle situation. Cette approche est reflétée dans la limite du domaine d'application de la Convention aux droits de garde effectivement exercés. De plus, une telle conception se trouve justifiée dans le cadre des relations internationales par un argument complémentaire, touchant au fait que, dans ce contexte, il est relativement fréquent qu'il existe des décisions contradictoires peu à même de servir de base à la protection de la stabilité de la vie d'un enfant.

73 En réalité, cette conception a été à peine contestée. Pourtant, plusieurs propositions[29] ont été présentées en vue de supprimer de l'article 3 toute référence à l'exercice effectif de la garde; la raison en était que, par ce biais, on imposait au demandeur le fardeau d'une preuve sur un point qui serait parfois difficile à établir. La situation semblait encore plus compliquée si on tenait compte du fait que l'article 13 consacré aux exceptions possibles à l'obligation de faire retourner l'enfant exige, de «l'enleveur» cette fois, la preuve que la personne dépossédée n'exerçait pas effectivement la garde qu'elle réclame maintenant. Or, c'est justement en rapprochant les deux dispositions que l'on fait apparaître nettement la véritable nature de la condition prévue à l'article 3. En effet, cette condition, en délimitant le domaine d'application de la Convention, n'exige du demandeur qu'une première évidence du fait qu'il exerçait réellement les soins sur la personne de l'enfant; cette circonstance doit être, en général, assez facile à établir. D'ailleurs, le caractère non formel de cette exigence est mis en relief à l'article 8 lorsque, parmi les données que doit contenir la demande introduite auprès des Autorités centrales, il indique simplement sous *c* «les motifs sur lesquels se base le demandeur pour réclamer le retour de l'enfant».
Par contre, l'article 13 de la Convention (12 de l'avant-projet) nous place devant un véritable fardeau de la preuve à la charge de «l'enleveur»; c'est en effet lui qui doit établir,

[29] *Cf.* Doc. trav. No 1 (*Proposal of the United States delegation*) et No 10 (*Proposal of the Finnish delegation*), ainsi que le P.-v. No 3.

this wrongfulness derives in this particular case, not from some action in breach of a particular law, but from the fact that such action has disregarded the rights of the other parent which are also protected by law, and has interfered with their normal exercise. The Convention's true nature is revealed most clearly in these situations: it is not concerned with establishing the person to whom custody of the child will belong at some point in the future, nor with the situations in which it may prove necessary to modify a decision awarding joint custody on the basis of facts which have subsequently changed. It seeks, more simply, to prevent a later decision on the matter being influenced by a change of circumstances brought about through unilateral action by one of the parties.

*c The factual element*

72 The second element characterizing those relationships protected by the Convention is that the custody rights which it is claimed have been breached by the child's removal were actually exercised by the holder. In fact, as soon as an approach to the subject-matter of the Convention was adopted which deviated from the pure and simple international recognition of custody rights attributed to parents, the Convention put its emphasis on protecting the right of children to have the stability which is so vital to them respected. In other words, the Convention protects the right of children not to have the emotional, social etc. aspects of their lives altered, unless legal arguments exist which would guarantee their stability in a new situation. This approach is reflected in the scope of the Convention, which is limited to custody rights actually exercised. What is more, such a notion is justified within the framework of international relations by a complementary argument which concerns the fact that contradictory decisions arise quite frequently in this particular context, decisions which are basically of little use in protecting the stability of a child's life.

73 Actually, this idea was not opposed to any extent. However, several proposals[29] were put forward for the deletion from article 3 of any reference to the actual exercise of custody rights. The reason for this was that its retention could place on the applicant the burden of proving a point which would sometimes be difficult to establish. The situation became even more complicated when account was taken of the fact that article 13, which concerns the possible exceptions to the obligation to order the return of the child, requires the 'abductor' this time to prove that the dispossessed party had not actually exercised the custody rights he now claims. Now, it is indeed by considering both provisions together that the true nature of the condition set forth in article 3 can be seen clearly. This condition, by defining the scope of the Convention, requires that the applicant provide only some preliminary evidence that he actually took physical care of the child, a fact which normally will be relatively easy to demonstrate. Besides, the informal nature of this requirement is highlighted in article 8 which simply includes, in sub-paragraph *c*, 'the grounds on which the applicant's claim for return of the child is based', amongst the facts which it requires to be contained in applications to the Central Authorities.
On the other hand, article 13 of the Convention (12 in the Preliminary Draft) shows us the real extent of the burden of proof placed upon the 'abductor'; it is for him to show, if he

[29] *Cf.* Working Documents Nos 1 (Proposal of the United States delegation) and 10 (Proposal of the Finnish delegation), and also *P.-v.* No 3.

pour éviter le retour de l'enfant, que le gardien n'exerçait pas effectivement le droit de garde. Donc, nous pouvons en arriver à la conclusion que l'ensemble de la Convention est construit sur la présomption non explicite que celui qui a le soin de la personne de l'enfant en exerce effectivement la garde; cette idée devra être détruite en vertu de l'inversion du fardeau de la preuve qui est le propre de toute présomption, (par «l'enleveur» s'il veut éviter que l'enfant ne soit renvoyé).

74 Cependant, la Convention inclut expressément dans le domaine qu'elle entend protéger la situation qui se pose quand la garde n'a pas pu devenir effective à cause précisément du déplacement de l'enfant; c'est en ce sens que se prononce le dernier membre de phrase de la lettre *b* de l'article 3. En théorie, l'idée sous-jacente s'accorde parfaitement avec l'esprit qui inspire la Convention; c'est donc d'un point de vue pratique qu'on peut se demander si un tel ajout était nécessaire.[30] Dans cette optique, les hypothèses que cette précision essaie de protéger visent deux situations type possibles, dont l'une rentrerait clairement dans le domaine d'application de la Convention, tandis que l'autre, à défaut de cette norme, exigerait vraisemblablement une interprétation trop forcée de ses dispositions. Il s'agit, d'une part, des cas soulevés lorsqu'une première décision sur la garde est mise en échec par le déplacement de l'enfant; or, dans la mesure où une telle décision suit, dans un délai raisonnable, la rupture de la vie familiale commune, on peut considérer que le titulaire de la garde l'avait exercée au préalable et qu'en conséquence la situation décrite remplit toutes les conditions que fixe le domaine d'application conventionnel. Pourtant, si nous nous plaçons devant une décision sur la garde, rendue par les tribunaux de la résidence habituelle de l'enfant, qui modifie une décision précédente et dont l'exécution est rendue impossible par l'action du ravisseur, il peut se trouver que le nouveau titulaire de la garde ne l'ait pas exercée dans un délai étendu; les difficultés qu'on rencontrerait dans de telles situations, et peut-être dans d'autres non visées dans ces lignes, pour invoquer la Convention sont évidentes. En conclusion, et quoiqu'il faille s'attendre à ce que le jeu de cette disposition ne soit pas fréquent, nous devons conclure que son inclusion dans la Convention peut s'avérer utile.

*Article 4 — Domaine d'application* ratione personae

75 Cet article ne concerne que le domaine d'application *ratione personae* de la Convention par rapport aux enfants protégés. Pourtant dans un souci de systématisation, nous traiterons aussi dans son contexte les autres aspects du problème, c'est-à-dire les titulaires possibles des droits de garde et de visite et les personnes qui pourraient être considérées comme «enleveurs», aux termes de la Convention.

*a Les enfants protégés*

76 La Convention s'applique aux enfants âgés de moins de seize ans qui avaient «leur résidence habituelle dans un Etat contractant immédiatement avant l'atteinte aux droits de garde ou de visite». En relation avec l'exigence concernant la résidence habituelle, il faut revenir aux considérations émises sur la nature de la Convention, qui aboutissent à la conclusion qu'une convention de coopération entre

[30] *Cf.* Doc. trav. No 2 (*Proposal of the United Kingdom delegation*) et les débats sur ce point aux P.-v. Nos 3 et 13.

wishes to prevent the return of the child, that the guardian had not actually exercised his rights of custody. Thus, we may conclude that the Convention, taken as a whole, is built upon the tacit presumption that the person who has care of the child actually exercises custody over it. This idea has to be overcome by discharging the burden of proof which has shifted, as is normal with any presumption (*i.e.* discharged by the 'abductor' if he wishes to prevent the return of the child).

74 However, there is expressly included amongst the matters which the Convention is intended to protect the situation which arises when actual custody cannot be exercised precisely because of the removal of the child; that is the situation envisaged in the last alternative set out in article 3*b*. Theoretically, the underlying idea is perfectly in keeping with the spirit of the Convention, and it is therefore from a practical point of view that it may be wondered whether such a provision needed to be added.[30] From this viewpoint, the hypothetical situations which this provision is designed to protect are of two types, one of which falls clearly within the scope of the Convention, while the other, failing this rule, would probably require too strained an interpretation of its provisions. On the one hand, there are cases where an initial decision on custody is rendered worthless by the removal of the child. In so far as such a description follows the disruption of normal family life after a reasonable lapse of time, the holder of the rights could be regarded as having exercised them from the outset, so that the situation described fulfils all the conditions laid down within the scope of the Convention. However, if a decision on custody by the courts of the child's habitual residence is considered, which modifies a prior decision and cannot be enforced because of the action of the abductor, it could be that the new holder of the right to custody has not exercised it within the extended time-limit. The difficulties which would be encountered in seeking to apply the Convention to such situations and perhaps to others not herein mentioned, are obvious. To conclude, although this provision must not be expected to come into play very often, it has to be said finally that its inclusion in the Convention might prove to be useful.

*Article 4 — Convention's scope* ratione personae

75 This article concerns only the Convention's scope *ratione personae* as regards the children who are to be protected. However, for the sake of completeness, we shall also deal with the other aspects of the problem in their proper context, that is to say those potential holders of custody and access rights and those who could be regarded as 'abductors', within the terms of the Convention.

*a The children protected*

76 The Convention applies to children of less than sixteen years of age, who were 'habitually resident in a Contracting State immediately before any breach of custody or access rights'. As regards the requirement that they be habitually resident, reference must again be made to those considerations previously expressed about the nature of the Convention, which lead to the conclusion that a convention

[30] *Cf.* Working Document No 2 (Proposal of the United Kingdom delegation) and the debate on this point in *P.-v.* Nos 3 and 13.

autorités ne peut atteindre toute son efficacité que si les rapports visés se produisent entre Etats contractants.

77 L'âge limite pour l'application de la Convention soulève deux questions importantes. La première, la question de l'âge *stricto sensu*, a été à peine débattue. La Convention retient l'âge de seize ans, consacrant ainsi une notion d'enfant plus restrictive que celle admise par d'autres Conventions de La Haye.[31] La raison découle des objectifs conventionnels eux-mêmes; en effet, une personne de plus de seize ans a en général une volonté propre qui pourra difficilement être ignorée, soit par l'un ou l'autre de ses parents, soit par une autorité judiciaire ou administrative.

Quant à la détermination du moment où cet âge interdit l'application de la Convention, celle-ci, parmi les diverses options possibles, retient la plus limitative; en conséquence, aucune action ou décision basée sur les dispositions conventionnelles ne peut être adoptée à l'égard d'un enfant après son seizième anniversaire.

78 Le deuxième problème a trait à la situation des enfants âgés de moins de seize ans qui ont le droit de fixer leur lieu de résidence. Compte tenu du fait que ce droit fait en général partie du droit de garde, une proposition a été faite dans le sens de la non-application de la Convention dans de tels cas.[32] Cependant, cette proposition a été rejetée sur la base de divers arguments, parmi lesquels on peut citer: 1) la difficulté de choisir le système juridique qui devrait consacrer l'existence d'une telle possibilité, étant donné qu'il existe au moins trois possibilités qui sont, respectivement, la loi nationale, la loi de la résidence habituelle avant le déplacement et la loi de l'Etat de refuge; 2) la limitation excessive que cette proposition apporterait au domaine d'application de la Convention, par rapport notamment au droit de visite; 3) le fait que la faculté de décider du lieu de résidence d'un enfant n'est qu'un élément possible du droit de garde qui n'en épuise pas le contenu.
D'autre part, la décision prise à cet égard ne peut pas être isolée de la disposition de l'article 13, alinéa 2, qui donne la possibilité aux autorités compétentes de tenir compte de l'opinion de l'enfant sur son retour, dès qu'il atteint un âge et une maturité suffisants; en effet, cette norme permettra aux autorités judiciaires ou administratives, quand il sera question du retour d'un mineur ayant capacité de décider sur son lieu de résidence, de considérer que l'opinion de l'enfant est toujours déterminante. On peut arriver ainsi à l'application automatique d'une disposition facultative de la Convention, mais une telle conséquence semble préférable à la réduction globale du domaine d'application de la Convention.

*b Les titulaires des droits de garde et de visite*

79 Les problèmes soulevés à cet égard par l'un et l'autre des droits visés sont nettement différents. D'abord, en ce qui concerne le droit de visite, il est évident que par la nature même des choses, ses titulaires seront toujours des personnes physiques, dont la détermination dépendra de la loi appliquée à l'organisation de ce droit. En principe, ces personnes appartiendront à la proche famille de l'enfant, et il s'agira normalement soit du père, soit de la mère.

[31] Par exemple: *Convention sur la loi applicable aux obligations alimentaires envers les enfants, du 24 octobre 1956* (article premier); *Convention concernant la reconnaissance et l'exécution des décisions en matière d'obligations alimentaires envers les enfants, du 15 avril 1958* (article premier); *Convention concernant la compétence des autorités et la loi applicable en matière de protection des mineurs, du 5 octobre 1961* (article 12); *Convention concernant la compétence des autorités, la loi applicable et la reconnaissance des décisions en matière d'adoption, du 15 novembre 1965* (article premier)
[32] *Cf.* Doc. trav. No 4 (Proposition de la délégation belge) et P.-v. No 4.

based on co-operation among authorities can only become fully operational after the relationships envisaged come into existence as among Contracting States.

77 The age limit for application of the Convention raises two important questions. Firstly, the matter of age in the strict sense gave rise to virtually no dispute. The Convention kept the age at sixteen, and therefore held to a concept of 'the child' which is more restrictive than that accepted by other Hague Conventions.[31] The reason for this derives from the objects of the Convention themselves; indeed, a person of more than sixteen years of age generally has a mind of his own which cannot easily be ignored either by one or both of his parents, or by a judicial or administrative authority.
As for deciding upon the point at which this age should exclude the Convention's application, the most restrictive of the various options available was retained by the Convention. Consequently, no action or decision based upon the Convention's provisions can be taken with regard to a child after its sixteenth birthday.

78 The second problem deals with the situation of children under sixteen years of age who have the right to choose their own place of residence. Considering that this right to choose one's residence generally forms part of the right to custody, a proposal was put forward to the effect that the Convention should not apply in such cases.[32] However, this proposal was rejected on various grounds, *inter alia* the following: (1) the difficulty of choosing the legal system which should determine whether such a possibility exists, since there are at least three different laws which could be applicable, namely, national law, the law of habitual residence prior to the child's removal, and the law of the State of refuge; (2) the excessive restriction which this proposal would place upon the scope of the Convention, particularly with regard to access rights; (3) the fact that the right to decide a child's place of residence is only one possible element of the right to custody which does not itself deprive it of all content.
On the other hand, the decision taken in this regard cannot be isolated from the provision in article 13, second paragraph, which allows the competent authorities to have regard to the opinion of the child as to its return, once it has reached an appropriate age and degree of maturity. Indeed, this rule leaves it open to judicial or administrative authorities, whenever they are faced with the possibility of returning a minor legally entitled to decide on his place of residence, to take the view that the opinion of the child should always be the decisive factor. The point could therefore be reached where an optional provision of the Convention becomes automatically applicable, but such a result seems preferable to an overall reduction in the Convention's scope.

*b The holders of custody and access rights*

79 The problems raised by both of these rights in this regard are quite different. Firstly, as regards access rights, it is obvious, by the very nature of things, that they will always be held by individuals, whose identity will depend on the law which applies to the organizing of these rights. These persons will as a rule be close relatives of the child, and normally will be either its father or mother.

[31] For example: *Convention of 24 October 1956 on the Law Applicable to Maintenance Obligations in Respect of Children* (article 1); *Convention of 15 April 1958 on the Recognition and Enforcement of Decisions Relating to Maintenance Obligations in Respect of Children* (article 1); *Convention of 5 October 1961 Concerning the Powers of Authorities and the Law Applicable in Respect of the Protection of Minors* (article 12); *Convention of 15 November 1965 on Jurisdiction, Applicable Law and Recognition of Decisions Relating to Adoptions* (article 1).
[32] *Cf.* Working Document No 4 (*Proposition de la délégation belge*) and *P.-v.* No 4

80 Par contre, des personnes morales peuvent aussi être titulaires d'un droit de garde, au sens de la Convention. A cet égard, l'article 3 considère la possibilité de l'attribution du droit de garde à «une institution ou tout autre organisme», en utilisant sciemment une expression vague et large. En effet, au cours de la Quatorzième session, l'inclusion dans le domaine conventionnel des hypothèses où la personne de l'enfant est confiée à une institution a été acceptée sans débats. Or, étant donné qu'il y a des organismes autres que les institutions qui ont à leur charge les soins de certains enfants, on a élargi l'expression utilisée pour y faire rentrer aussi bien les organismes ayant une personnalité juridique que ceux qui sont liés à l'organisation étatique et dépourvus d'une personnalité indépendante.

*c Les éventuels «enleveurs»*

81 La Convention ne contient aucune disposition expresse à ce propos. Néanmoins, de l'ensemble du texte, nous pouvons déduire deux remarques qui éclairent cet aspect relatif au domaine d'application *ratione personae* de la Convention. La première concerne les personnes physiques qui peuvent être responsables du déplacement ou du non-retour d'un enfant. Sur ce sujet, la Convention maintient le point de vue adopté par la Commission spéciale de ne pas attribuer de telles actions exclusivement à des parents.[33] L'idée de famille étant plus ou moins large selon les différentes conceptions culturelles, il est préférable de s'en tenir à une vue large qui permette, par exemple, de qualifier d'enlèvement d'enfant, au sens de la Convention, les déplacements faits par un grand-père ou un père adoptif.

82 La deuxième remarque a trait à la possibilité de ce qu'une «institution ou tout autre organisme» agisse comme «enleveur». A cet égard, il est difficilement imaginable qu'un organisme quelconque puisse déplacer, par la force ou par la ruse, un enfant d'un pays étranger vers son propre pays. D'autre part, si un enfant a été confié, par une décision judiciaire ou administrative (c'est-à-dire, au cas d'un placement forcé de l'enfant), à un tel organisme dans le pays de sa résidence habituelle, le parent qui prétend obtenir la jouissance effective d'un droit de garde sur celui-ci aura peu de chance de pouvoir invoquer la Convention. En effet, du fait que les organismes visés exercent en principe leurs compétences, abstraction faite de l'éventuelle reconnaissance de l'autorité parentale,[34] une telle prétention ne rentrerait pas dans le domaine conventionnel, puisque la garde au sens de la Convention appartiendrait à l'organisme en question.

*Article 5 — De certaines expressions utilisées dans la Convention*

83 Suivant une tradition bien établie de la Conférence de La Haye, la Convention ne définit pas les concepts juridiques dont elle se sert. Pourtant, dans cet article, elle précise le sens dans lequel sont utilisées les notions de droit de garde et de droit de visite, étant donné qu'une interprétation incorrecte de leur portée risquerait de compromettre les objectifs conventionnels.

84 En ce qui concerne le droit de garde, la Convention se limite à souligner qu'il comprend «le droit portant sur les soins de la personne de l'enfant», en marge des mécanismes

[33] Une approche plus restrictive se trouvait initialement dans le Rapport Dyer, cité *supra*, intitulé *Rapport sur l'enlèvement international d'un enfant par un de ses parents.*
[34] Voir sur ce point, Cour internationale de Justice, Arrêt du 28 novembre 1958, Affaire relative à l'application de la Convention de 1902 pour régler la tutelle des mineurs, *Recueil des arrêts* 1958, p. 55 et suiv.

80 On the other hand, legal persons can also, in terms of the Convention, hold rights of custody. Article 3 envisages the possibility of custody rights being attributed to 'an institution or any other body', and is expressed in deliberately vague and wide terms. In fact, during the Fourteenth Session, the inclusion within the scope of the Convention of situations in which the child is entrusted to an institution was not challenged. Now, since there are bodies other than institutions which have children in their care, the term used was extended so as to apply equally to those bodies with legal personality and to those which, as an arm of the State, lack separate personality.

*c The potential 'abductors'*

81 The Convention contains no express provision on this matter. Nevertheless, two comments may be drawn from the text as a whole, which shed light upon this question in relation to the Convention's scope *ratione personae*. The first concerns the physical persons who may be responsible for the removal or retention of a child. On this, the Convention upholds the point of view adopted by the Special Commission by not attributing such acts exclusively to one of the parents.[33] Since the idea of 'family' was more or less wide, depending on the different cultural conceptions which surround it, it was felt better to hold a wide view which would, for example, allow removals by a grandfather or adoptive father to be characterized as child abduction, in accordance with the Convention's use of that term.

82 The second comment relates to the possibility of an 'institution or any other body' acting as an 'abductor'. In this regard, it is difficult to imagine how any body whatever could remove, either by force or by deception, a child from a foreign country to its own land. On the other hand, if a child were entrusted, by virtue of a judicial or administrative decision (*i.e.* compulsory placement of the child) to such a body in the country of its habitual residence, the parent who sought to obtain the actual enjoyment of custody rights would stand little chance of being able to invoke the provisions of the Convention. In fact, by virtue of the fact that such bodies would as a rule exercise jurisdiction, except as regards the possible recognition of parental authority,[34] such a claim would not come within the scope of the Convention, since custody, in the sense understood by the Convention, would belong to the body in question.

*Article 5 — Certain terms used in the Convention*

83 The Convention, following a long-established tradition of the Hague Conference, does not define the legal concepts used by it. However, in this article, it does make clear the sense in which the notions of custody and access rights are used, since an incorrect interpretation of their meaning would risk compromising the Convention's objects.

84 As regards custody rights, the Convention merely emphasizes the fact that it includes in the term 'rights relating to the care of the person of the child', leaving aside the

[33] A more restrictive approach was to be found initially in the Dyer Report, referred to above, entitled *Report on international child abduction by one parent.*
[34] See the Judgment of the International Court of Justice, dated 28 November 1958, on the case concerning the application of the Convention of 1902 for regulating the guardianship of minors, *ICJ Reports* 1958, p. 55 *et seq.*

possibles de protection de ses biens. Il s'agit donc d'une notion plus restrictive que celle de «protection des mineurs»,[35] malgré les tentatives faites au cours de la Quatorzième session pour introduire l'idée de «protection», en vue surtout de couvrir les cas des enfants confiés à des institutions ou organismes. Mais, tous les efforts faits pour préciser la notion de droit de garde par rapport à ces situations ayant échoué, il faut s'en tenir au concept générique mentionné ci-dessus. La Convention essaie de le préciser en mettant en relief, comme indice des «soins» dont il s'agit, le droit de décider du lieu de résidence de l'enfant. Cependant, lorsque l'enfant, quoique mineur du point de vue juridique, a la faculté de fixer lui-même son lieu de résidence, le contenu du droit de garde sera déterminé en fonction des autres droits portant sur sa personne.

D'autre part, bien que dans cet article rien ne soit dit sur la possibilité que la garde soit exercée par son titulaire seul ou conjointement, il est évident que cette possibilité est envisagée. En effet, une règle classique du droit des traités exige que l'interprétation de ses termes soit effectuée dans son contexte et en tenant compte de l'objet et du but du traité;[36] or, la teneur de l'article 3 ne laisse pas de doute sur l'inclusion de la garde conjointe parmi les situations que la Convention entend protéger. Quant à savoir quand existe une garde conjointe, c'est une question qui doit être déterminée dans chaque cas d'espèce à la lumière du droit de la résidence habituelle de l'enfant.

85 Quant au droit de visite, la lettre *b* de cet article se limite à signaler qu'il comprend «le droit d'emmener l'enfant pour une période limitée dans un lieu autre que celui de sa résidence habituelle». L'intention de la Convention n'est évidemment pas d'exclure toutes les autres modalités du droit de visite; plus simplement, elle a voulu souligner que cette notion s'étend aussi au droit dit d'hébergement, manifestation du droit de visite que la personne qui a la garde de l'enfant redoute spécialement. De plus, étant donné que cette norme explicative ne qualifie point ce «lieu autre» où l'enfant peut être emmené, il faut conclure que le droit de visite, selon la Convention, inclut également le droit de visite transfrontière.

86 Une proposition a été faite en vue d'inclure dans cet article une définition des autorités judiciaires ou administratives visées tout au long des normes conventionnelles.[37] Les difficultés rencontrées tant pour la localisation d'un point de vue systématique que pour trouver une rédaction large qui englobe toutes les hypothèses possibles ont conseillé sa non-inclusion. Or il est clair qu'il s'agit, comme nous l'avons déjà souligné,[38] des autorités compétentes pour décider soit de la garde, soit de la protection des enfants, d'après la loi interne de chaque Etat contractant. D'ailleurs, c'est justement en raison des différences entre ces lois que l'on parle toujours des autorités «judiciaires ou administratives», en vue de recouvrir toutes les autorités ayant compétence en la matière, sans égard à la qualification juridique qu'elles reçoivent dans chaque Etat.

CHAPITRE II — AUTORITÉS CENTRALES

*Article 6 — Création des Autorités centrales*

87 Le rôle joué par les Autorités centrales, pièces clés dans

[35] Voir par exemple la *Convention concernant la compétence des autorités et la loi applicable en matière de protection des mineurs, du 5 octobre 1961.*
[36] En ce sens, l'article 31, alinéa premier, de la Convention de Vienne sur le droit des traités du 23 mai 1969.
[37] Voir Doc. trav. No 7 (*Proposal of the United States delegation*) et P.-v. Nos 4 et 14.
[38] Voir *supra* No 45.

possible ways of protecting the child's property. It is therefore a more limited concept than that of 'protection of minors',[35] despite attempts made during the Fourteenth Session to introduce the idea of 'protection' so as to include in particular those cases where children are entrusted to institutions or bodies. But since all efforts to define custody rights in regard to those particular situations failed, one has to rest content with the general description given above. The Convention seeks to be more precise by emphasizing, as an example of the 'care' referred to, the right to determine the child's place of residence. However, if the child, although still a minor at law, has the right itself to determine its own place of residence, the substance of the custody rights will have to be determined in the context of other rights concerning the person of the child.

On the other hand, although nothing is said in this article about the possibility of custody rights being exercised singly or jointly, such a possibility is clearly envisaged. In fact, a classic rule of treaty law requires that a treaty's terms be interpreted in their context and by taking into account the objective and end sought by the treaty,[36] and the whole tenor of article 3 leaves no room for doubt that the Convention seeks to protect joint custody as well. As for knowing when joint custody exists, that is a question which must be decided in each particular case, and in the light of the law of the child's habitual residence.

85 As regards access rights, sub-paragraph *b* of this article merely points out that they include 'the right to take a child for a limited period of time to a place other than the child's habitual residence'. Clearly, therefore, it is not intended that the Convention exclude all other ways of exercising access rights. Quite simply, it seeks to emphasize that access rights extend also to what is called 'residential access', that aspect of access rights about which the person who has custody of the child is particularly apprehensive. Moreover, since this explanatory provision in no way qualifies this 'other place' to which the child may be taken, one must conclude that access rights, in terms of the Convention, also include the right of access across national frontiers.

86 A proposal was made to include in this article a definition of the judicial or administrative authorities mentioned throughout the Convention's rules.[37] The difficulties encountered as much in reaching a systematic viewpoint on this as in devising a definition wide enough to encompass all possible contingencies made for its exclusion. Now, as was mentioned earlier,[38] it is clear that these are the authorities who have the power, according to the internal law of each Contracting State, to determine questions concerning a child's custody or protection. Besides, it is precisely because of differences amongst these laws that reference is always made to 'judicial or administrative' authorities, so as to embrace all authorities which have jurisdiction in the matter, without regard to their legal characterization in each State.

CHAPTER II — CENTRAL AUTHORITIES

*Article 6 — Creation of Central Authorities*

87 The role played by the Central Authorities, crucial

[35] See, for example, the *Convention of 5 October 1961 concerning the powers of authorities and the applicable law in respect of the protection of minors.*
[36] See article 31(1) of the Vienna Convention of 23 May 1969 on the law of treaties.
[37] See Working Document No 7 (Proposal of the United States delegation) and *P.-v.* Nos 4 and 14.
[38] See *supra*, No 45.

l'affaire devra transmettre la demande à l'Autorité centrale de l'Etat où l'on suppose que l'enfant se trouve. Or, cette obligation n'est pas précisée à l'article 7, mais plus tard, dans le contexte de l'article 9. D'autre part, il est évident aussi que les Autorités centrales ne sont pas tenues de remplir, dans chaque cas d'espèce, toutes les obligations énumérées dans cet article; en effet, ce sont les circonstances du cas précis qui vont déterminer les démarches à faire par les Autorités centrales: par exemple, on ne peut pas soutenir qu'une Autorité centrale quelconque soit tenue de «localiser» l'enfant quand le demandeur sait avec exactitude où se trouve celui-ci.

91 En plus de la localisation de l'enfant, chaque fois que cela s'avère nécessaire (lettre *a*), l'Autorité centrale doit prendre ou faire prendre toute mesure provisoire qui semble utile pour prévenir de «nouveaux dangers pour l'enfant ou des préjudices pour les parties concernées» (lettre *b*). La rédaction de ce sous-alinéa met à nouveau en relief un fait souligné auparavant: la capacité d'agir des Autorités centrales peut varier d'un Etat à un autre. Quant au fond, les mesures provisoires qui ont été envisagées se centrent tout particulièrement sur l'idée d'éviter un nouveau déplacement de l'enfant.

92 La lettre *c* consacre le devoir des Autorités centrales d'essayer de trouver une solution extrajudiciaire à l'affaire. En effet, d'après l'expérience évoquée par certains délégués, le nombre de cas qu'il est possible de résoudre sans avoir besoin de recourir aux tribunaux est considérable. Mais, encore une fois, c'est l'Autorité centrale qui, dans ces étapes précédant une éventuelle procédure judiciaire ou administrative, dirige l'évolution du problème; donc c'est à elle de décider à quel moment les tentatives faites, soit pour assurer la «remise volontaire» de l'enfant, soit pour faciliter une «solution amiable», ont échouées.

93 La lettre *d* porte sur les échanges d'informations relatives à la situation sociale de l'enfant. L'obligation à cet effet est subordonnée au critère des Autorités centrales impliquées dans chaque cas d'espèce. En effet, l'introduction du membre de phrase «si cela s'avère utile» montre que l'on n'a pas voulu imposer une obligation rigide sur ce point: la possibilité qu'il n'existe pas d'informations à fournir, ainsi que la peur qu'elles puissent être employées dans le cadre d'une tactique dilatoire des parties, sont quelques-uns des arguments qui ont conseillé cette attitude. D'autre part, on a rejeté une proposition rendant possible que certaines informations soient transmises à condition qu'elles restent confidentielles.[40]

94 L'obligation faite aux Autorités centrales de fournir des informations sur le contenu du droit dans leur Etat pour l'application de la Convention apparaît à la lettre *e*. Ce devoir couvre notamment deux aspects: d'une part dans le cas où le déplacement s'est produit avant qu'il n'y ait eu une décision sur la garde de l'enfant, l'Autorité centrale de l'Etat de la résidence habituelle de l'enfant pourra produire une attestation sur le contenu du droit de cet Etat, en vue de l'application de la Convention; d'autre part, l'Autorité centrale devra renseigner les particuliers sur le fonctionnement de la Convention et des Autorités centrales, ainsi que sur les procédures possibles à suivre. Par contre, la possibilité d'aller plus loin, c'est-à-dire d'obliger les Autorités centrales à donner des conseils juridiques sur des cas concrets, n'est pas envisagée dans cette norme.

[40] Voir Doc. trav. No 9 (*Proposal of the United Kingdom delegation*) et P.-v. No 5.

application to the Central Authority of the State in which the child is thought to be. Now, this obligation is not spelled out in article 7, but later, in the context of article 9. On the other hand, it is also clear that the Central Authorities are not obliged to fulfil, in every specific case, all the duties listed in this article. In fact, the circumstances of each particular case will dictate the steps which are to be taken by the Central Authorities; for example, it cannot be maintained that every Central Authority must discover the whereabouts of a child when the applicant knows full well where it is.

91 In addition to finding the whereabouts of the child, where necessary (sub-paragraph *a*), the Central Authority must take or cause to be taken any provisional measures which could help prevent 'further harm to the child or prejudice to interested parties' (sub-paragraph *b*). The drafting of this sub-paragraph clearly brings out once again a fact which was emphasized above, namely, that the ability of Central Authorities to act will vary from one State to another. Basically, the provisional measures envisaged are designed in particular to avoid another removal of the child.

92 Sub-paragraph *c* sets out the duty of Central Authorities to try to find an extrajudicial solution. In actual fact, in the light of experience as spoken to by some delegates, a considerable number of cases can be settled without any need to have recourse to the courts. But, once again, it is the Central Authorities which, in those stages preceding the possible judicial or administrative proceedings, will direct the development of the problem; it is therefore for them to decide when the attempts to secure the 'voluntary return' of the child or to bring about an 'amicable resolution', have failed.

93 Sub-paragraph *d* relates to the exchange of information about the social background of the child. This duty is made subject to the criteria adopted by the Central Authorities involved in a particular case. Indeed, the insertion of the phrase 'where desirable' demonstrates that there is no wish to impose an inflexible obligation here: the possibility of there being no information to provide, as well as the fear that reference to this provision might be used by the parties as a delaying tactic, are some of the arguments which prompted this approach. On the other hand, a proposal which would have made the transmission of certain information conditional upon its remaining confidential, was rejected.[40]

94 The obligation laid upon Central Authorities to provide information on the content of the law in their own States for the application of the Convention appears in sub-paragraph *e*. This duty applies in particular to two situations. Firstly, where the removal occurs prior to any decision as to the custody of the child, the Central Authority of the State of the child's habitual residence is to produce, for the purposes of the Convention's application, a certificate on the relevant law of that State. Secondly, the Central Authority must inform the individuals about how the Convention works and about the Central Authorities, as well as about the procedures available. On the other hand, the possibility of going further, by obliging the Central Authorities to give legal advice in individual cases, is not envisaged by this rule.

[40] See Working Document No 9 (Proposal of the United Kingdom delegation) and P.-v. No 5.

l'application de la Convention, a déjà été longuement présenté.[39]
En ce qui concerne les Etats susceptibles de désigner plus d'une Autorité centrale, c'est l'idée que le critère déterminant à cet effet devait être l'existence de plusieurs organisations territoriales en matière de protection des mineurs qui a prévalu. En conséquence, on a ajouté aux hypothèses des Etats fédéraux et plurilégislatifs le cas des Etats «ayant des organisations territoriales autonomes», expression qui doit être interprétée dans un sens large.

*Article 7 – Obligations des Autorités centrales*

88 Cet article résume le rôle des Autorités centrales dans la mise en oeuvre du système instauré par la Convention. L'article est structuré en deux alinéas, dont le premier, rédigé en termes généraux, établit une obligation globale de coopération, tandis que le second énumère, de la lettre *a* à la lettre *i*, quelques-unes des principales fonctions que les Autorités centrales doivent remplir. Tous deux sont le résultat du compromis entre, d'une part les délégations qui désiraient des Autorités centrales fortes avec des compétences d'action et d'initiative amples et d'autre part les délégations qui envisageaient lesdites Autorités comme de simples mécanismes administratifs pour faciliter l'action des parties. Or, puisque ces diverses attitudes reflétaient la plupart des profondes différences existant entre les systèmes représentés à la Conférence, la solution à retenir devait être souple, de manière à permettre à chaque Autorité centrale d'agir selon le droit dans lequel elle est appelée à s'insérer. Donc, bien que la Convention précise les principales obligations confiées à la charge des Autorités centrales, elle laisse à chaque Etat contractant la détermination des mesures appropriées pour les exécuter. D'ailleurs, c'est dans ce sens qu'il faut interpréter la phrase qui introduit le second alinéa, et qui spécifie que les Autorités centrales doivent remplir les fonctions énumérées «soit directement, soit avec le concours de tout intermédiaire»: c'est à chaque Autorité centrale de choisir entre l'une ou l'autre option en fonction de son propre droit interne et dans l'esprit du devoir général de coopération que lui impose le premier alinéa.

89 Comme nous venons de le dire, la norme insérée dans le *premier alinéa* énonce l'obligation générale de coopérer des Autorités centrales, en vue d'assurer l'accomplissement des objectifs de la Convention. Une telle coopération doit se développer à deux niveaux: les Autorités centrales doivent d'abord coopérer entre elles; mais, de surcroît, elles doivent promouvoir la collaboration entre les autorités compétentes pour les matières visées dans leurs Etats respectifs. La réalisation effective de cette promotion dépendra dans une large mesure de la capacité d'action que chaque droit interne accorde aux Autorités centrales.

90 Les fonctions détaillées au *deuxième alinéa* essaient de suivre, dans leurs grandes lignes, les différents stades de l'intervention des Autorités centrales dans un cas type de déplacements d'enfants. Néanmoins, il est évident que cette énumération n'est pas exhaustive; par exemple, puisque l'intervention des Autorités centrales exige qu'elles aient été saisies au préalable, soit directement par le demandeur, soit par l'Autorité centrale, d'un autre Etat contractant, dans la seconde hypothèse, l'Autorité centrale initialement saisie de

[39] Voir *supra* Nos 43 à 48

factors as they are in the application of the Convention, has already been dealt with at length.[39]
As for those States which may appoint more than one Central Authority, the idea which prevailed was that the determining factor should be the existence of several territorial organizations for the protection of minors. Thus there was added to those cases of Federal States and States with more than one system of law that of States 'having autonomous territorial organizations', a term which is to be interpreted broadly.

*Article 7 – Obligations of Central Authorities*

88 This article summarizes the role played by Central Authorities in bringing into play the system established by the Convention. The article is structured in two paragraphs, the first of which, drafted in general terms, sets out an overall duty of co-operation, while the second lists, from sub-paragraphs *a* to *i*, some of the principal functions which the Central Authorities have to discharge. Both result from a compromise between, on the one hand, those delegations which wanted strong Central Authorities with wide-ranging powers of action and initiative, and on the other hand those which saw these Authorities as straightforward administrative mechanisms for promoting action by the parties. Now, since these diverse attitudes reflected most of the deep differences which existed amongst the systems represented at the Conference, the ultimate solution had to be flexible, and such as would allow each Central Authority to act according to the law within which it has to operate. Therefore, although the Convention clearly sets out the principal obligations laid upon the Central Authorities, it lets each Contracting State decide upon the appropriate means for discharging them. And it is in this sense that the sentence occurring at the beginning of the second paragraph must be understood, which states that the Central Authorities are to discharge their listed functions 'either directly, or through any intermediary'. It is for each Central Authority to choose one or the other options, while working within the context of its own internal law and within the spirit of the general duty of co-operation imposed upon it by the first paragraph.

89 As we have just said, the rule in the *first paragraph* sets out the general duty of Central Authorities to co-operate, so as to ensure the Convention's objects are achieved. Such co-operation has to develop on two levels: the Central Authorities must firstly co-operate with each other; however, in addition, they must promote co-operation among the authorities competent for the matters dealt with within their respective States. Whether this co-operation is promoted effectively will depend to a large extent on the freedom of action which each internal law confers upon the Central Authorities.

90 The functions listed in the *second paragraph* seek to trace, in broad outline, the different stages of intervention by Central Authorities in the typical case of child removal. Nonetheless, it is clear that this list is not exhaustive. For example, since the intervention of Central Authorities necessarily depends on their having been initially seized of the matter, either directly by the applicant or by the Central Authority of a Contracting State, then in the latter case the Central Authority initially seized will have to send the

[39] See *supra*, Nos 43 to 48.

95 Quand il est nécessaire, pour obtenir le retour de l'enfant, de faire intervenir les autorités judiciaires ou administratives de l'Etat où il se trouve, l'Autorité centrale doit introduire elle-même — si cela est possible selon son droit interne — ou favoriser l'ouverture d'une procédure; obligation qui s'étend aussi aux procédures qui s'avèrent nécessaires pour permettre l'organisation ou l'exercice effectif du droit de visite (lettre *f*).

96 Dans les cas où l'Autorité centrale ne peut pas saisir directement les autorités compétentes dans son propre Etat, elle doit accorder ou faciliter au demandeur l'obtention de l'assistance judiciaire, aux termes de l'article 25 (lettre *g*). Il convient de préciser très brièvement que l'expression «le cas échéant» dans ce sous-alinéa fait référence à la carence de ressources économiques du demandeur, sur la base des critères établis par la loi de l'Etat où cette assistance est sollicitée; elle ne fait donc pas allusion à des considérations abstraites sur la convenance ou non de l'octroyer.

97 Au terme du processus suivi par ce paragraphe, la lettre *h* inclut, parmi les obligations des Autorités centrales la mise en oeuvre des mesures administratives nécessaires et opportunes dans chaque cas d'espèce, pour assurer le retour sans danger de l'enfant.

98 En dernier lieu, la lettre *i* énonce une obligation des Autorités centrales qui ne concerne pas directement les particuliers mais la Convention elle-même: il s'agit du devoir de «se tenir mutuellement informées sur le fonctionnement de la Convention et, autant que possible, de lever les obstacles éventuellement rencontrés lors de son application». Cette obligation devra jouer à deux niveaux complémentaires: d'une part, sur le plan des relations bilatérales entre Etats parties à la Convention; d'autre part, au niveau multilatéral, en participant le cas échéant aux commissions réunies à cet effet par le Bureau Permanent de la Conférence de La Haye.

CHAPITRE III — RETOUR DE L'ENFANT

*Article 8 — La saisine des Autorités centrales*

99 D'après le *premier alinéa*, une demande en vue d'obtenir le retour d'un enfant peut être adressée à toute Autorité centrale qui, dès lors, sera tenue par toutes les obligations conventionnelles. Cela signifie que le demandeur est libre de saisir l'Autorité centrale qu'il estime la plus adéquate; néanmoins, pour des raisons d'efficacité, une mention expresse de l'Autorité centrale de la résidence habituelle de l'enfant est faite dans le texte — mention qui ne doit pourtant pas être interprétée comme signifiant que les demandes adressées aux autres Autorités centrales devraient être exceptionnelles.

100 Etant donné que l'utilisation de la formule modèle est simplement recommandée, il était indispensable d'inclure dans le texte de la Convention les éléments que doit contenir une demande introduite devant une Autorité centrale pour être recevable, ainsi que les documents facultatifs qui peuvent accompagner ou compléter une telle demande. Les éléments que doit contenir toute demande adressée à une Autorité centrale, dans ce contexte, sont énumérés au *deuxième alinéa* de l'article 8. Il s'agit notamment des données qui permettent l'identification de l'enfant et des parties concernées, ainsi que de celles qui peuvent aider à localiser l'enfant (lettres *a*, *b* et *d*). En ce qui concerne l'information sur la date de naissance de l'enfant, la Convention signale qu'elle sera apportée seulement «s'il est possible de se la procurer». Par cette précision, on a entendu favoriser l'action du demandeur qui ignore une telle circonstance; il

95 When it is necessary, in order to obtain the child's return, for the judicial or administrative authorities of the State in which it is located to intervene, the Central Authority must itself initiate proceedings (if that can be done under its internal law) or facilitate the institution of proceedings. This duty also extends to proceedings which prove to be necessary for organizing or securing the effective exercise of rights of access (sub-paragraph *f*).

96 Where the Central Authority is not able to apply directly to the competent authorities in its own State, it must provide or facilitate the provision of legal aid and advice for the applicant, in terms of article 25 (sub-paragraph *g*). It is appropriate to point out here very briefly that the phrase 'where the circumstances so require' in this sub-paragraph refers to the applicant's lack of economic resources, as determined by the criteria laid down by the law of the State in which such assistance is sought, and that it does not therefore refer to abstract considerations as to the convenience or otherwise of granting legal aid.

97 Following the method adopted by this paragraph, sub-paragraph *h* includes among the Central Authorities' obligations the bringing into play in each case of such administrative arrangements as may be necessary and appropriate to secure the safe return of the child.

98 Finally, sub-paragraph *i* sets forth an obligation on the part of Central Authorities which does not directly concern individuals but only the Convention itself. It is the duty 'to keep each other informed with respect to the operation of the Convention, and, as far as possible, to eliminate any obstacles to its application'. This obligation is to operate on two complementary levels, firstly at the level of bilateral relations between States which are Party to the Convention, and secondly on a multilateral level, through participating when required in commissions called for this purpose by the Permanent Bureau of the Hague Conference.

CHAPTER III — RETURN OF THE CHILD

*Article 8 — Applications to Central Authorities*

99 In terms of the *first paragraph*, an application for the return of a child can be addressed to any Central Authority which, from that point, will be bound by all the obligations laid down by the Convention. This demonstrates that the applicant is free to apply to the Central Authority which in his opinion is the most appropriate. However, for reasons of efficiency, the Central Authority of the child's habitual residence is expressly mentioned in the text, but this must not be understood as signifying that applications directed to other Central Authorities are to be regarded as exceptional.

100 Since use of the model form is merely recommended, it was necessary to include in the text of the Convention the elements which any application submitted to a Central Authority must contain in order to be admissible, as well as the optional documents which may accompany or supplement such an application. The elements which every application to a Central Authority must contain, in this context, are those listed in the *second paragraph* of article 8. In particular, they are facts which allow the child and interested parties to be identified, such as those which may be able to help in locating the child (sub-paragraphs *a*, *b*, and *d*). As regards information on the child's date of birth, the Convention makes it clear that this should be supplied only 'where available'. This provision is intended to favour action by an applicant who is ignorant of such a fact but who will, however, always have to supply precise information on the

devra pourtant toujours fournir des indices exacts sur l'âge de l'enfant, étant donné que le contenu de l'article 4 de la Convention peut déterminer le rejet de sa demande aux termes de l'article 27.
De plus, il faut que la demande contienne «les motifs sur lesquels se base le demandeur pour réclamer le retour de l'enfant» (lettre *c*). Ceci est une exigence logique, qui permettra d'ailleurs l'application de l'article 27 concernant la faculté qu'ont les Autorités centrales de rejeter les demandes manifestement non fondées. Les motifs invoqués doivent, en principe, se référer aux deux éléments, juridique et de fait, retenus à l'article 3. Or, puisque l'élément juridique peut notamment s'appuyer sur le contenu du droit de la résidence habituelle de l'enfant, sur une décision ou sur un accord, on aurait pu songer à exiger un soutien documentaire à ce stade initial. Pourtant, la Convention a choisi une voie différente et place cette preuve parmi les documents qui, d'une manière facultative, peuvent accompagner ou compléter la demande. La raison en est que l'obtention des documents en question sera parfois difficile; de plus, elle peut exiger un temps précieux pour une localisation rapide de l'enfant. D'ailleurs, chaque fois que l'Autorité centrale réussit à obtenir la remise volontaire de l'enfant ou une solution amiable de l'affaire, ils peuvent apparaître comme accessoires.

101 En ce sens, les deux premières lettres du *troisième alinéa* concernant la documentation facultative qui peut accompagner, ou compléter à un moment ultérieur, la demande, se réfèrent aux documents qui sont à la base de la réclamation en retour de l'enfant. A cet effet, il faut souligner d'abord que l'exigence que les copies de toute décision ou tout accord soient authentifiées ne s'oppose pas à la disposition de l'article 23, d'après laquelle «aucune légalisation ni formalité similaire ne sera requise dans le contexte de la Convention». Il s'agit simplement de vérifier des copies ou des documents privés à l'origine pour en garantir la concordance avec les originaux et en assurer, par ce biais, la libre circulation.
En second lieu, la preuve du contenu du droit de l'Etat de la résidence habituelle de l'enfant peut être établie soit par une attestation, soit par une déclaration avec affirmation, c'est-à-dire moyennant des documents incorporant des déclarations solennelles qui engagent la responsabilité de leurs auteurs. Quant à savoir qui peut produire lesdites déclarations, la Convention a choisi une formule large, qui doit faciliter la tâche du demandeur (lettre *f*). Ainsi, en plus des Autorités centrales et des autres autorités compétentes de l'Etat de la résidence habituelle de l'enfant, elles peuvent émaner de toute personne qualifiée — par exemple, d'un notaire, d'un avocat ou d'institutions scientifiques.
D'autre part, il convient de souligner que dans une phase ultérieure, c'est-à-dire quand les autorités judiciaires ou administratives de l'Etat de refuge sont appelées à intervenir, celles-ci peuvent demander, selon l'article 15, la production de certains des documents considérés comme facultatifs au moment de la saisine des Autorités centrales.
Finalement, la Convention admet la possibilité que la demande soit accompagnée ou complétée par «tout autre document utile» (lettre *g*). En principe, étant donné que la demande est introduite par le gardien dépossédé, c'est lui qui pourra apporter ces documents complémentaires. Ce qui n'empêche pas que, si la demande est transmise à une autre Autorité centrale, l'Autorité centrale initialement saisie puisse accompagner la demande notamment des informations relatives à la situation sociale de l'enfant — si elle en dispose et les considère utiles —, en vertu de la fonction que lui attribue l'article 7, alinéa 2*d*.

age of the child, since the provisions of article 4 may result in his application being rejected, in terms of article 27.

Moreover, the application must contain 'the grounds on which the applicant's claim for return of the child is based' (sub-paragraph *c*). This requirement is logical, in that it allows the application of article 27 concerning the right of Central Authorities to reject applications which are clearly not well-founded. The grounds must in principle refer to the two elements, legal and factual, contained in article 3. Now, since the legal element in particular may depend on the provisions of the law of the child's habitual residence, or upon a decision or agreement, it might have been expected that documentary support would be required at this initial stage. However, the Convention chose to follow a different route and placed this evidence amongst those documents which may, optionally, accompany or supplement the application. The reason for this is that obtaining the documents in question is sometimes difficult and, what is more, could take up precious time better spent in speedily discovering the whereabouts of the child. Moreover, whenever a Central Authority succeeds in bringing about the voluntary return of the child or an amicable resolution of the affair, such requirements may seem merely accessory.

101 Understood thus, the first two sub-paragraphs of the *third paragraph*, dealing with the optional provision of documents which may accompany or supplement applications, are seen to refer to documents which are fundamental to a claim for the return of the child. It must be emphasized firstly that the requirement that copies of any decision or agreement be authenticated in no way contradicts the provision in article 23 that 'no legalization or similar formality may be required in the context of this Convention'. It is simply a matter of verifying what were originally copies or private documents so as to guarantee that they correspond to the originals and thus to secure their free circulation.
Secondly, proof of the substantive law of the State of the child's habitual residence may be established by either certificates or affidavits, that is to say documents which include solemn statements for which those who make them assume responsibility. As regards those persons who may adduce such statements, the Convention chose to define them widely, a fact which must make the task of the applicant easier (sub-paragraph *f*). Thus, they may emanate from any qualified person — for example, an attorney, solicitor, or barrister or research institution — as well as from the Central Authorities and the other competent authorities of the State of the child's habitual residence.
On the other hand, it should be stressed that at a later stage, when the judicial or administrative authorities of the State of refuge have been called upon to intervene, they may, in terms of article 15, request the production of certain documents which were considered to be optional at the time of application to the Central Authorities.
Lastly, the Convention acknowledges that the application may be accompanied or supplemented by 'any other relevant document' (sub-paragraph *g*). In theory, since it is the dispossessed guardian of the child who brings the application, it is for him to provide these supplementary documents. This does not preclude the Central Authority to which the application was originally made, where the application is sent to another Central Authority, from accompanying the application by, *inter alia*, information concerning the social background of the child (if it has such information at its disposal and considers it to be useful), by virtue of the task laid upon it by article 7, paragraph 2*d*.

*Article 9 — Transmission de la demande à l'Autorité centrale de l'Etat où se trouve l'enfant*

102 Une conséquence directe de la liberté dont jouit le demandeur de s'adresser à l'Autorité centrale de son choix est l'obligation qui pèse sur celle-ci de transmettre la demande à l'Autorité centrale de l'Etat où elle a des raisons de penser que l'enfant se trouve; obligation qui va aussi se présenter quand l'Autorité centrale qui connaît d'une affaire par une autre Autorité centrale arrivera à la conclusion que l'enfant se trouve dans un pays différent. Il s'agit là d'une fonction qui vient compléter le cadre esquissé à l'article 7, puisqu'elle est en rapport direct avec l'obligation de coopérer entre Autorités centrales qu'établit le premier alinéa dudit article.
Or, si le sens de l'article 9 est clair, sa rédaction n'en est pas très heureuse. «L'Autorité centrale requérante» à laquelle cet article se réfère existe seulement lorsque la demande introduite conformément à l'article 8 a été transmise à une *autre* Autorité centrale aux termes de l'article 9 lui-même. En conséquence, l'obligation d'informer une «Autorité centrale requérante» n'existe que lorsque la demande a été transmise à une troisième Autorité centrale, l'enfant ne se trouvant pas dans l'Etat de la deuxième Autorité centrale saisie. Par contre, l'obligation de transmettre une demande en vertu de cet article incombe à *toute* Autorité centrale, indépendamment du fait qu'elle soit première saisie ou saisie par l'intermédiaire d'une autre Autorité centrale, en raison du fait que cette disposition doit être interprétée comme s'appliquant aux deux hypothèses qu'elle a l'intention de couvrir.

*Article 10 — La remise volontaire de l'enfant*

103 La fonction des Autorités centrales visée à l'article 7, alinéa 2*c* de «prendre toutes les mesures appropriées pour assurer la remise volontaire de l'enfant», trouve à cet article un traitement préférentiel qui met en relief l'intérêt accordé au recours à cette voie. Dans le texte de la Convention, on a supprimé le membre de phrase qui introduisait, dans l'avant-projet, cette disposition et qui situait dans le temps («avant l'ouverture de toute procédure judiciaire ou administrative») l'obligation qu'elle incorpore. La raison en était la difficulté éprouvée par certains systèmes juridiques pour accepter qu'une autorité publique, telle que l'Autorité centrale, puisse agir avant l'introduction d'une demande auprès des autorités compétentes; la teneur de la disposition conventionnelle n'empêche pas que les Autorités centrales des autres Etats agissent de la sorte. D'autre part, il ne sera jamais question d'une obligation rigide, dans un double sens: d'une part, les efforts pour la remise volontaire de l'enfant peuvent se poursuivre après la saisine des autorités judiciaires ou administratives s'ils ont commencé avant; d'autre part, dans la mesure où l'initiative en vue du retour de l'enfant ne se transfert pas à ces autorités, c'est l'Autorité centrale qui doit décider si les tentatives en vue de tel objectif ont échoué.

D'ailleurs, il est entendu que les démarches visées dans cet article ne doivent pas préjuger de l'action des Autorités centrales pour empêcher un nouveau déplacement de l'enfant, selon l'article 7, alinéa 2*b*.

*Article 11 — L'utilisation des procédures d'urgence par les autorités judiciaires ou administratives*

104 L'importance du facteur temps dans toute la matière apparaît de nouveau dans cet article. Si l'article 2 de la Convention impose aux Etats contractants l'obligation d'utiliser des procédures d'urgence le *premier alinéa* de cet article reproduit cette obligation à l'égard des autorités de

*Article 9 — Transmission of the application to the Central Authority of the State where the child is located*

102 A direct consequence of the applicant's right to apply to the Central Authority of his choice is the duty imposed on the latter to transmit the application to the Central Authority of the State in which it has reason to believe the child is located; this duty arises also when the Central Authority which is informed of a case by another Central Authority reaches the conclusion that the child is in fact located in a different country. This is a task which supplements the framework of duties outlined in article 7, since it relates directly to the duty of co-operation amongst Central Authorities established by the first paragraph of that article.

Now, although the meaning of article 9 may be clear, it has not been very artfully drafted. The 'requesting Central Authority' to which this article refers exists only where the application submitted in accordance with article 8 has been transmitted to *another* Central Authority in terms of article 9 itself. Consequently, the duty to inform a 'requesting Central Authority' exists only when the application has been transmitted to a third Central Authority, the child not being located in the State of the second Central Authority to which the application was sent. But on the other hand, the duty to transmit an application in terms of this article devolves upon *any* Central Authority, independently of the fact that it was seized of the matter either directly or through the intervention of another Central Authority, since this provision must be understood as applying to both of the cases it is meant to cover.

*Article 10 — Voluntary return of the child*

103 The duty of Central Authorities, stated in article 7(2)(*c*), to 'take all appropriate measures to secure the voluntary return of the child', is given preferential treatment in this article, which highlights the interest of the Convention in seeing parties have recourse to this way of proceeding. The phrase 'before the institution of any legal or administrative proceedings' which preceded this provision in the Preliminary Draft, and restricted the duty included within it to a particular point in time, was deleted from the text of the Convention. The reason for this deletion is the difficulty experienced by some legal systems in accepting that a public authority, such as a Central Authority, could act before an application had been brought before the competent authorities; however, the whole tenor of the provision shows that the Central Authorities of other States are not precluded from acting in that way. On the other hand, it is in no way an inflexible obligation, for two reasons: firstly, efforts to secure the voluntary return of the child which were begun prior to the referral of the matter to the judicial or administrative authorities may be pursued thereafter, and secondly, in so far as the initiative for the return of the child has not been transferred to those authorities, it is for the Central Authority to decide whether the attempts to achieve this objective have failed.
Moreover, the measures envisaged in this article are not intended to prejudice the efforts of Central Authorities to prevent further removals of the child, pursuant to article 7(2)(*b*).

*Article 11 — The use of expeditious procedures by judicial or administrative authorities*

104 The importance throughout the Convention of the time factor appears again in this article. Whereas article 2 of the Convention imposes upon Contracting States the duty to use expeditious procedures, the *first paragraph* of this article restates the obligation, this time with regard to the authori-

l'Etat où l'enfant a été emmené et qui doivent statuer sur la remise de celui-ci. L'obligation considérée a un double aspect: d'une part, l'utilisation des procédures les plus rapides connues par leur système juridique; d'autre part le traitement prioritaire, dans toute la mesure du possible, des demandes visées.

105 Dans son désir de pousser les autorités internes à accorder une priorité maximum aux problèmes soulevés par les déplacements internationaux d'enfants, le *deuxième alinéa* établit un délai non contraignant de six semaines, après lequel le demandeur ou l'Autorité centrale de l'Etat requis peuvent solliciter une déclaration sur les motifs du retard. De plus quand l'Autorité centrale de l'Etat requis aura reçu la réponse, elle aura à nouveau une obligation de renseignement, soit envers l'Autorité centrale de l'Etat requérant, soit envers le demandeur, si c'est lui qui l'a directement saisie. En somme, l'importance de cette disposition ne peut pas être mesurée par rapport à l'exigibilité des obligations qu'elle consacre, mais par le fait même qu'elle attire l'attention des autorités compétentes sur le caractère décisif du facteur temps dans les situations concernées et qu'elle fixe le délai maximum que devrait prendre l'adoption d'une décision à cet égard.

*Articles 12 et 18 – Obligation de retourner l'enfant*

106 Ces deux articles peuvent être examinés ensemble car, malgré leur nature différente, ils présentent un certain caractère complémentaire.
*L'article 12* constitue une pièce essentielle de la Convention, étant donné que c'est lui qui précise les situations dans lesquelles les autorités judiciaires ou administratives de l'Etat où se trouve l'enfant sont tenues d'ordonner son retour. C'est pourquoi il convient de souligner, une fois encore, que la remise non volontaire d'un enfant s'appuie, d'après la Convention, sur une décision adoptée par les autorités compétentes à cet égard dans l'Etat requis; en conséquence, l'obligation de retour dont traite cet article s'impose auxdites autorités. A cet effet, l'article distingue deux hypothèses: la première concerne le devoir des autorités lorsqu'elles ont été saisies dans le délai d'un an après le déplacement ou le non-retour illicites d'un enfant; la seconde a trait aux conditions qui entourent ce devoir quand l'introduction de la demande est postérieure au délai susmentionné.

107 Dans le premier alinéa, l'article apporte une solution unique au problème soulevé par la détermination de la période pendant laquelle les autorités en question doivent ordonner le retour immédiat de l'enfant. Le problème est important car, dans la mesure où le retour de l'enfant est envisagé dans son intérêt, il est certain que lorsque l'enfant est intégré dans un nouveau milieu, son retour ne devrait se produire qu'après un examen du fond du droit de garde – ce qui nous situe en dehors de l'objectif conventionnel. Or, les difficultés que rencontre toute tentative de traduire le critère de l'intégration de l'enfant sous forme d'une norme objective ont conduit à la fixation d'un délai, qui est peut-être arbitraire, mais qui constitue la «moins mauvaise» réponse aux soucis exprimés sur ce point.

108 Dans l'approche adoptée, il a fallu affronter une pluralité de questions: *primo*, le moment à partir duquel commence le délai; *secundo*, l'extension du délai; *tertio*, le moment d'expiration du délai. En ce qui concerne le premier point, c'est-à-dire la détermination du moment où commence à courir le délai, l'article se réfère au déplacement ou non-retour illicites; la concrétisation de la date décisive en cas de non-retour devant être entendue comme celle à laquelle l'enfant aurait dû être remis au gardien, ou à laquelle le titulaire de la garde a refusé son consentement à

ties of the State to which the child has been taken and which are to decide upon its return. There is a double aspect to this duty: firstly, the use of the most speedy procedures known to their legal system; secondly, that applications are, so far as possible, to be granted priority treatment.

105 The *second paragraph*, so as to prompt internal authorities to accord maximum priority to dealing with the problems arising out of the international removal of children, lays down a non-obligatory time-limit of six weeks, after which the applicant or Central Authority of the requested State may request a statement of reasons for the delay. Moreover, after the Central Authority of the requested State receives the reply, it is once more under a duty to inform, a duty owed either to the Central Authority of the requesting State or to the applicant who has applied to it directly. In short, the provision's importance cannot be measured in terms of the requirements of the obligations imposed by it, but by the very fact that it draws the attention of the competent authorities to the decisive nature of the time factor in such situations and that it determines the maximum period of time within which a decision on this matter should be taken.

*Articles 12 and 18 – Duty to return the child*

106 These two articles can be examined together since they complement each other to a certain extent, despite their different character.
*Article 12* forms an essential part of the Convention, specifying as it does those situations in which the judicial or administrative authorities of the State where the child is located are obliged to order its return. That is why it is appropriate to emphasize once again the fact that the compulsory return of the child depends, in terms of the Convention, on a decision having been taken by the competent authorities of the requested State. Consequently, the obligation to return a child with which this article deals is laid upon these authorities. To this end, the article highlights two cases; firstly, the duty of authorities where proceedings have begun within one year of the wrongful removal or retention of a child and, secondly, the conditions which attach to this duty where an application is submitted after the aforementioned time-limit.

107 In the first paragraph, the article brings a unique solution to bear upon the problem of determining the period during which the authorities concerned must order the return of the child forthwith. The problem is an important one since, in so far as the return of the child is regarded as being in its interests, it is clear that after a child has become settled in its new environment, its return should take place only after an examination of the merits of the custody rights exercised over it – something which is outside the scope of the Convention. Now, the difficulties encountered in any attempt to state this test of 'integration of the child' as an objective rule resulted in a time-limit being fixed which, although perhaps arbitrary, nevertheless proved to be the 'least bad' answer to the concerns which were voiced in this regard.

108 Several questions had to be faced as a result of this approach: firstly, the date from which the time-limit was to begin to run; secondly, extension of the time-limit; thirdly, the date of expiry of the time-limit. As regards the first point, *i.e.* how to determine the date on which the time-limit should begin to run, the article refers to the wrongful removal or retention. The fixing of the decisive date in cases of wrongful retention should be understood as that on which the child ought to have been returned to its custodians or on which the holder of the right of custody refused to agree to

un prolongement du séjour de l'enfant dans un autre lieu que celui de sa résidence habituelle. En second lieu, la consécration d'un délai unique d'un an, abstraction faite des difficultés rencontrées dans la localisation de l'enfant, constitue une amélioration substantielle du système prévu dans l'article 11 de l'avant-projet élaboré par la Commission spéciale. En effet, par ce biais on a clarifié l'application de la Convention, en éliminant les difficultés inhérentes à la preuve des éventuels problèmes suscités par la localisation de l'enfant. Troisièmement, en ce qui concerne le *terminus ad quem*, l'article retient le moment de l'introduction de la demande, au lieu de la date de la décision, le retard possible dans l'action des autorités compétentes ne devant pas nuire aux intérêts des parties protégées par la Convention.

En résumé, chaque fois que les circonstances que nous venons d'examiner se trouvent réunies dans un cas d'espèce, les autorités judiciaires ou administratives doivent ordonner le retour immédiat de l'enfant, sauf si elles constatent l'existence d'une des exceptions prévues par la Convention elle-même.

109 Le deuxième alinéa répond à la nécessité, ressentie tout au long des travaux préparatoires,[41] d'assouplir les conséquences de l'adoption d'un délai rigide passé lequel la Convention ne pourrait pas être invoquée. La solution finalement retenue[42] étend nettement le domaine d'application de la Convention en consacrant, pour une période indéfinie, une véritable obligation de retourner l'enfant. De toute façon, on ne peut pas ignorer qu'une telle obligation disparaît si on arrive à établir que «l'enfant s'est intégré dans son nouveau milieu». La disposition ne précise point qui doit prouver cette circonstance; pourtant, il semble logique de penser qu'une telle tâche incombe à l'enleveur ou à la personne qui s'oppose au retour de l'enfant, tout en sauvegardant l'éventuel pouvoir d'appréciation des autorités internes à cet égard. En tout cas, la preuve ou la constatation du nouvel enracinement de l'enfant ouvre la porte à la possibilité d'une procédure plus longue que celle visée au premier alinéa. En définitive, tant pour ces raisons que du fait que le retour se produira toujours, par la nature même des choses, beaucoup plus tard qu'un an après l'enlèvement, la Convention ne parle pas dans ce contexte de retour «immédiat», mais simplement de retour.

110 Un problème commun aux deux situations examinées est la détermination du *lieu* où il faut retourner l'enfant. A cet égard, la Convention n'a pas retenu une proposition tendant à préciser que le retour se ferait toujours vers l'Etat de la résidence habituelle de l'enfant avant son déplacement. Certes, une des raisons sous-jacentes à l'idée de retourner l'enfant est le souci d'éviter que la compétence «naturelle» des tribunaux de l'Etat de sa résidence ne soit bafouée par une voie de fait; néanmoins, l'inclusion d'une telle précision dans le texte de la Convention en aurait rendu l'application inutilement rigide. En effet, nous ne devons pas ignorer que ce qu'on entend protéger en luttant contre les enlèvements internationaux d'enfants, c'est le droit de ceux-ci à ne pas être écartés d'un certain milieu qui, parfois, sera fondamentalement familial. Or, si le demandeur n'habite plus l'Etat de la résidence habituelle antérieure au déplacement, le retour de l'enfant dans cet Etat poserait des problèmes pratiques difficiles à résoudre. Le silence de la Convention sur ce point doit donc être interprété comme permettant aux autorités de l'Etat de refuge de renvoyer

[41] Voir Rapport de la Commission spéciale No 92.
[42] Voir Doc. trav. No 25 (Proposition de la délégation de la République fédérale d'Allemagne), et P.-v. Nos 7 et 10.

an extension of the child's stay in a place other than that of its habitual residence. Secondly, the establishment of a single time-limit of one year (putting on one side the difficulties encountered in establishing the child's whereabouts) is a substantial improvement on the system envisaged in article 11 of the Preliminary Draft drawn up by the Special Commission. In fact, the application of the Convention was thus clarified, since the inherent difficulty in having to prove the existence of those problems which can surround the locating of the child was eliminated. Thirdly, as regards the *terminus ad quem*, the article has retained the date on which proceedings were commenced, instead of the date of decree, so that potential delays in acting on the part of the competent authorities will not harm the interests of parties protected by the Convention.

To sum up, whenever the circumstances just examined are found to be present in a specific case, the judicial or administrative authorities must order the return of the child forthwith, unless they aver the existence of one of the exceptions provided for in the Convention itself.

109 The second paragraph answered to the need, felt strongly throughout the preliminary proceedings,[41] to lessen the consequences which would flow from the adoption of an inflexible time-limit beyond which the provisions of the Convention could not be invoked. The solution finally adopted[42] plainly extends the Convention's scope by maintaining indefinitely a real obligation to return the child. In any event, it cannot be denied that such an obligation disappears whenever it can be shown that 'the child is now settled in its new environment'. The provision does not state how this fact is to be proved, but it would seem logical to regard such a task as falling upon the abductor or upon the person who opposes the return of the child, whilst at the same time preserving the contingent discretionary power of internal authorities in this regard. In any case, the proof or verification of a child's establishment in a new environment opens up the possibility of longer proceedings than those envisaged in the first paragraph. Finally, and as much for these reasons as for the fact that the return will, in the very nature of things, always occur much later than one year after the abduction, the Convention does not speak in this context of return 'forthwith' but merely of return.

110 One problem common to both of these situations was determining the *place* to which the child had to be returned. The Convention did not accept a proposal to the effect that the return of the child should always be to the State of its habitual residence before its removal. Admittedly, one of the underlying reasons for requiring the return of the child was the desire to prevent the 'natural' jurisdiction of the courts of the State of the child's residence being evaded with impunity, by force. However, including such a provision in the Convention would have made its application so inflexible as to be useless. In fact, we must not forget that it is the right of children not to be removed from a particular environment which sometimes is a basically family one, which the fight against international child abductions seeks to protect. Now, when the applicant no longer lives in what was the State of the child's habitual residence prior to its removal, the return of the child to that State might cause practical problems which would be difficult to resolve. The Convention's silence on this matter must therefore be understood as allowing the authorities of the State of refuge

[41] See Report of the Special Commission, No 92.
[42] See Working Document No 25 (Proposal of the delegation of the Federal Republic of Germany) and *P.-v.* Nos 7 and 10.

l'enfant directement au demandeur, sans égard au lieu de la résidence actuelle de celui-ci.

111 Le troisième alinéa de l'article 12 introduit une idée tout à fait logique, inspirée par des soucis d'économie procédurale, en vertu de laquelle les autorités qui connaissent d'une affaire peuvent suspendre la procédure ou rejeter la demande, lorsqu'elles ont des raisons de croire que l'enfant a été emmené dans un autre Etat. Les moyens par lesquels elles peuvent arriver à une telle conviction ne sont pas envisagés dans l'article; ils dépendront par conséquent du droit interne de l'Etat concerné.

112 Finalement, *l'article 18* signale que rien dans ce chapitre ne limite le pouvoir de l'autorité judiciaire ou administrative saisie d'ordonner le retour de l'enfant à tout moment. Rédigée sur la base de l'article 15 de l'avant-projet, cette disposition, qui n'impose aucune obligation, souligne la nature non exhaustive, complémentaire, de la Convention. En effet, elle autorise les autorités compétentes à ordonner le retour de l'enfant en invoquant d'autres dispositions plus favorables à ce but. Ceci peut surtout se produire dans les situations envisagées au deuxième alinéa de l'article 12, c'est-à-dire quand, du fait que l'autorité a été saisie après que se soit écoulé plus d'un an depuis le déplacement, le retour peut être refusé si l'enfant s'est intégré dans son nouveau milieu social et familial.

*Articles 13 et 20 — Exceptions possibles au retour de l'enfant*

113 Dans la première partie de ce Rapport nous avons commenté longuement la justification, l'origine et la portée des exceptions consacrées dans les articles examinés.[43] Nous nous limiterons ici à faire quelques considérations sur sa teneur littérale. En termes généraux, il convient d'insister sur le fait que les exceptions visées dans les deux articles en question ne sont pas d'application automatique, en ce sens qu'elles ne déterminent pas inévitablement le non-retour de l'enfant; par contre, la nature même de ces exceptions est de donner aux juges la possibilité — non pas de leur imposer l'obligation — de refuser le retour dans certaines circonstances.

114 En ce qui concerne *l'article 13*, le paragraphe introductif du premier alinéa met en relief que le fardeau de la preuve des circonstances énoncées aux sous-alinéas *a* et *b* est à la charge de celui qui s'oppose au retour de l'enfant, c'est-à-dire à une personne, institution ou organisme qui peut parfois ne pas coïncider avec l'enleveur. La solution retenue se limite certes à préciser une maxime générale de droit, selon laquelle celui qui invoque un fait (ou un droit) doit le prouver; mais en adoptant cette optique, la Convention a entendu équilibrer la position de la personne dépossédée par rapport à l'enleveur qui, en principe, a pu choisir le for de sa convenance.

115 Les exceptions retenues à la lettre *a* sont établies en raison du fait que la conduite du prétendu gardien permet de douter de l'existence d'un déplacement ou d'un non-retour illicites, au sens de la Convention. D'une part, il s'agit des situations où celui qui avait le soin de la personne de l'enfant n'exerçait pas effectivement le droit de garde à l'époque du déplacement ou du non-retour. La Convention

[43] Voir *supra* Nos 28 à 35.

to return the child directly to the applicant, regardless of the latter's present place of residence.

111 The third paragraph of article 12 introduces a perfectly logical provision, inspired by considerations of procedural economy, by virtue of which the authorities which are acquainted with a case can stay the proceedings or dismiss the application, where they have reason to believe that the child has been taken to another State. The reasons by which they may come to such a conclusion are not stated in the article, and will therefore depend on the internal law of the State in question.

112 Finally, *article 18* indicates that nothing in this chapter limits the power of a judicial or administrative authority to order the return of the child at any time. This provision, which was drafted on the basis of article 15 of the Preliminary Draft, and which imposes no duty, underlines the non-exhaustive and complementary nature of the Convention. In fact, it authorizes the competent authorities to order the return of the child by invoking other provisions more favourable to the attainment of this end. This may happen particularly in the situations envisaged in the second paragraph of article 12, *i.e.* where, as a result of an application being made to the authority after more than one year has elapsed since the removal, the return of the child may be refused if it has become settled in its new social and family environment.

*Articles 13 and 20 — Possible exceptions to the return of the child*

113 In the first part of this Report we commented at length upon the reasons for, the origins and scope of, the exceptions contained in the articles concerned.[43] We shall restrict ourselves at this point to making some observations on their literal meaning. In general, it is appropriate to emphasize that the exceptions in these two articles do not apply automatically, in that they do not invariably result in the child's retention; nevertheless, the very nature of these exceptions gives judges a discretion — and does not impose upon them a duty — to refuse to return a child in certain circumstances.

114 With regard to *article 13*, the introductory part of the first paragraph highlights the fact that the burden of proving the facts stated in sub-paragraphs *a* and *b* is imposed on the person who opposes the return of the child, be he a physical person, an institution or an organization, that person not necessarily being the abductor. The solution adopted is indeed limited to stating the general legal maxim that he who avers a fact (or a right) must prove it, but in making this choice, the Convention intended to put the dispossessed person in as good a position as the abductor who in theory has chosen what is for him the most convenient forum.

115 The exceptions contained in *a* arise out of the fact that the conduct of the person claiming to be the guardian of the child raises doubts as to whether a wrongful removal or retention, in terms of the Convention, has taken place. On the one hand, there are situations in which the person who had the care of the child did not actually exercise custody rights at the time of the removal or retention. The Conven-

[43] See *supra*, Nos 28 to 35.

n'inclut pas une définition de ce qu'il faut entendre par «exercice effectif» de la garde, mais cette disposition se réfère de façon expresse au soin de la personne de l'enfant; donc, si l'on en compare le texte avec celui de la définition du droit de garde contenue à l'article 5, on peut conclure qu'il y a garde effective quand le gardien s'occupe des soins de la personne de l'enfant, même si, pour des raisons plausibles (maladie, séjour d'études, etc.), dans chaque cas concret, enfant et gardien n'habitent pas ensemble. Il s'ensuit que la détermination du caractère effectif ou non d'une garde doit être établi par le juge d'après les circonstances qui entourent chaque cas d'espèce.
D'ailleurs en mettant en relation ce paragraphe avec la définition du déplacement ou du non-retour illicites de l'article 3, il faut conclure que la preuve que la garde n'était pas effective ne constitue pas une exception à l'obligation de retourner l'enfant lorsque le gardien dépossédé n'exerçait pas de façon effective son droit à cause précisément de l'action de l'enleveur. En effet, la délimitation des situations protégées, contenue à l'article 3, préside toute la Convention et on ne peut interpréter aucun de ses articles en contradiction avec cette délimitation.
D'autre part, la conduite du gardien peut aussi altérer la qualification de l'action du ravisseur, au cas où il aurait consenti ou acquiescé postérieurement au déplacement qu'il combat maintenant. Cette précision a donné la possibilité de supprimer toute référence à l'exercice de «bonne foi» du droit de garde, en évitant simultanément que la Convention puisse être utilisée comme instrument d'un «marchandage» possible entre les parties.

116 Les exceptions consacrées à la lettre *b* concernent des situations dans lesquelles l'enlèvement international d'un enfant s'est vraiment produit, mais où le retour de l'enfant serait contraire à son intérêt, tel qu'il est apprécié dans ce sous-alinéa. Chacun des termes employés dans cette disposition reflète un délicat compromis atteint au cours des travaux de la Commission spéciale et qui s'est maintenu inchangé; en conséquence, on ne peut pas déduire, *a contrario*, des interprétations extensives du rejet, au cours de la Quatorzième session, des propositions tendant à inclure une allusion expresse à l'impossibilité d'invoquer cette exception lorsque le retour de l'enfant pourrait nuire à ses perspectives économiques ou éducatives.[44]

117 Il n'y a rien à ajouter aux commentaires déjà faits sur le deuxième alinéa de cet article (notamment, *supra* No 31).

Quant au troisième alinéa, il contient une disposition de nature très différente: il s'agit, en effet, d'une disposition procédurale qui vise, d'une part, à équilibrer la charge de la preuve imposée à la personne qui s'oppose au retour de l'enfant et d'autre part, à renforcer l'utilité des informations fournies par les autorités de l'Etat de la résidence habituelle de l'enfant. De telles informations, qui peuvent émaner soit de l'Autorité centrale, soit de toute autre autorité compétente, peuvent en particulier être précieuses pour permettre aux autorités requises de constater l'existence des circonstances à la base des exceptions visées aux deux premiers alinéas de cet article.

118 La possibilité reconnue à *l'article 20* de ne pas retourner un enfant quand ce retour «ne serait pas permis par les principes fondamentaux de l'Etat requis sur la sauvegarde des droits de l'homme et des libertés fondamentales», a été placée significativement dans le dernier

[44] Voir Doc trav No 12 (*Proposal of the United States delegation*) et No 42 (Proposition de la délégation hellenique), ainsi que le P.-v No 8.

tion includes no definition of 'actual exercise' of custody, but this provision expressly refers to the care of the child. Thus, if the text of this provision is compared with that of article 5 which contains a definition of custody rights, it can be seen that custody is exercised effectively when the custodian is concerned with the care of the child's person, even if, for perfectly valid reasons (illness, education, etc.) in a particular case, the child and its guardian do not live together. It follows from this that the question of whether custody is actually exercised or not must be determined by the individual judge, according to the circumstances of each particular case.
Moreover, by relating this paragraph to the definition of wrongful removal or retention in article 3, one must conclude that proof that custody was not actually exercised does not form an exception to the duty to return the child if the dispossessed guardian was unable actually to exercise his rights precisely because of the action of the abductor. In fact, the categorization of protected situations, contained in article 3, governs the whole Convention, and cannot be contradicted by a contrary interpretation of any of the other articles.
On the other hand, the guardian's conduct can also alter the characterization of the abductor's action, in cases where he has agreed to, or thereafter acquiesced in, the removal which he now seeks to challenge. This fact allowed the deletion of any reference to the exercise of custody rights 'in good faith', and at the same time prevented the Convention from being used as a vehicle for possible 'bargaining' between the parties.

116 The exceptions contained in *b* deal with situations where international child abduction has indeed occurred, but where the return of the child would be contrary to its interests, as that phrase is understood in this sub-paragraph. Each of the terms used in this provision is the result of a fragile compromise reached during the deliberations of the Special Commission and has been kept unaltered. Thus it cannot be inferred, *a contrario*, from the rejection during the Fourteenth Session of proposals favouring the inclusion of an express provision stating that this exception could not be invoked if the return of the child might harm its economic or educational prospects,[44] that the exceptions are to receive a wide interpretation.

117 Nothing requires to be added to the preceding commentary on the second paragraph of this article (notably in No 31, *supra*.
The third paragraph contains a very different provision which is in fact procedural in nature and seeks on the one hand to compensate for the burden of proof placed on the person who opposes the return of the child, and on the other hand to increase the usefulness of information supplied by the authorities of the State of the child's habitual residence. Such information, emanating from either the Central Authority or any other competent authority, may be particularly valuable in allowing the requested authorities to determine the existence of those circumstances which underlie the exceptions contained in the first two paragraphs of this article.

118 It is significant that the possibility, acknowledged in *article 20*, that the child may not be returned when its return 'would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms' has been placed in the

[44] See Working Documents Nos 12 (Proposal of the United States delegation) and 42 (*Proposition de la délégation hellénique*), and also *P.-v.* No 8

article du chapitre; on a voulu souligner de la sorte le caractère nettement exceptionnel que doit toujours revêtir son application. Quant à savoir quel est le contenu de cette disposition, nous nous limiterons à faire deux remarques: en premier lieu, même si sa teneur littérale rappelle fortement la terminologie des textes internationaux en matière de protection des droits de l'homme, cette norme ne vise pas les développements atteints sur le plan international; par contre, elle ne concerne que les principes admis dans le droit de l'Etat requis, soit par voie de droit international général ou conventionnel, soit par voie législative interne. En conséquence, pour pouvoir refuser un retour sur la base de cet article, il sera nécessaire que les principes fondamentaux en la matière acceptés par l'Etat requis ne le permettent pas; il ne suffit pas que le retour soit incompatible, ou même manifestement incompatible avec ces principes. En second lieu, l'invocation de tels principes ne devra en aucun cas être plus fréquente ni plus facilement admise qu'elle ne le serait pour régler des situations purement internes. Le contraire serait discriminatoire en soi, c'est-à-dire opposé à l'un des principes fondamentaux les plus généralement reconnus dans les droits internes. Or, l'étude de la jurisprudence des différents pays montre que l'application par le juge ordinaire de la législation concernant les droits de l'homme et les libertés fondamentales se fait avec une prudence qu'il faut s'attendre à voir maintenue à l'égard des situations internationales que vise la Convention.

*Article 14 – Assouplissement de la preuve du droit étranger*

119 Du moment que la Convention fait dépendre le caractère illicite d'un déplacement d'enfants du fait qu'il se soit produit en violation de l'exercice effectif d'un droit de garde attribué par le droit de la résidence habituelle de l'enfant, il est évident que les autorités de l'Etat requis devront prendre ce droit en considération pour décider du retour de l'enfant. En ce sens, la disposition incluse dans l'article 13 de l'avant-projet,[45] d'après laquelle ces autorités «tiendront compte» du droit de la résidence habituelle de l'enfant pouvait être considérée comme superflue. Cependant, une telle disposition, d'une part, soulignait bien qu'il ne s'agissait pas d'appliquer un droit, mais de l'utiliser comme instrument dans l'appréciation de la conduite des parties; d'autre part, dans la mesure où elle était applicable aux décisions qui pouvaient être à la base du droit de garde violé, elle faisait apparaître la Convention comme une sorte de *lex specialis*, d'après laquelle les décisions visées auraient eu dans l'Etat requis un effet indirect qui ne pouvait pas être conditionné par l'obtention d'un exequatur ou de toute autre modalité de reconnaissance des décisions étrangères.

Puisque le premier aspect découlait nécessairement d'autres dispositions conventionnelles, la teneur actuelle de l'article 14 s'occupe seulement du second. L'article se présente donc comme une disposition facultative concernant la preuve du droit de la résidence habituelle de l'enfant, en vertu de laquelle l'autorité saisie «peut tenir compte directement du droit et des décisions judiciaires ou administratives reconnues formellement ou non dans l'Etat de la résidence habituelle de l'enfant, sans avoir recours aux procédures

[45] Voir Rapport de la Commission spéciale, Nos 102-103.

last article of the chapter: it was thus intended to emphasize the always clearly exceptional nature of this provision's application. As for the substance of this provision, two comments only are required. Firstly, even if its literal meaning is strongly reminiscent of the terminology used in international texts concerning the protection of human rights, this particular rule is not directed at developments which have occurred on the international level, but is concerned only with the principles accepted by the law of the requested State, either through general international law and treaty law, or through internal legislation. Consequently, so as to be able to refuse to return a child on the basis of this article, it will be necessary to show that the fundamental principles of the requested State concerning the subject-matter of the Convention do not permit it; it will not be sufficient to show merely that its return would be incompatible, even manifestly incompatible, with these principles. Secondly, such principles must not be invoked any more frequently, nor must their invocation be more readily admissible than they would be in their application to purely internal matters. Otherwise, the provision would be discriminatory in itself, and opposed to one of the most widely recognized fundamental principles in internal laws. A study of the case law of different countries shows that the application by ordinary judges of the laws on human rights and fundamental freedoms is undertaken with a care which one must expect to see maintained in the international situations which the Convention has in view.

*Article 14 – Relaxation of the requirements of proof of foreign law*

119 Since the wrongful nature of a child's removal is made to depend, in terms of the Convention, on its having occurred as the result of a breach of the actual exercise of custody rights conferred by the law of the child's habitual residence, it is clear that the authorities of the requested State will have to take this law into consideration when deciding whether the child should be returned. In this sense, the provision in article 13 of the preliminary draft Convention,[45] that the authorities 'shall have regard to' the law of the child's habitual residence, could be regarded as superfluous. However, such a provision would on the one hand underline the fact that there is no question of applying that law, but merely of using it as a means of evaluating the conduct of the parties, while on the other hand, in so far as it applied to decisions which could underlie the custody rights that had been breached, it would make the Convention appear to be a sort of *lex specialis*, according to which those decisions would receive effect indirectly in the requested State, an effect which would not be made conditional on the obtaining of an *exequatur* or any other method of recognition of foreign judgments.

Since the first aspect of article 14 necessarily derives from other provisions of the Convention, the actual purport of article 14 is concerned only with the second. The article therefore appears as an optional provision for proving the law of the child's residence and according to which the authority concerned 'may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of habitual residence of the child, without recourse to the specific procedures for the

[45] See Report of the Special Commission, Nos 102-103.

spécifiques sur la preuve de ce droit ou pour la reconnaissance des décisions étrangères qui seraient autrement applicables». Il n'est pas nécessaire d'insister sur l'importance pratique que cette norme peut avoir pour aboutir aux décisions rapides qui sont à la base du mécanisme conventionnel.

*Article 15 – Possibilité de demander une décision ou une attestation des autorités de la résidence habituelle de l'enfant*

120 Cet article répond aux difficultés que les autorités compétentes de l'Etat requis peuvent éprouver à statuer sur la demande en retour de l'enfant sans être certaines de l'application au cas d'espèce du droit de la résidence habituelle de celui-ci. Si tel est le cas, les autorités en question peuvent demander «la production par le demandeur d'une décision ou d'une attestation émanant des autorités de l'Etat de la résidence habituelle de l'enfant». A ce propos, nous ferons seulement deux remarques. La première concerne la nature non contraignante de la pétition, en ce sens que le retour de l'enfant ne peut pas être conditionné par son accomplissement; une telle conclusion s'impose en effet au vu tant de la teneur littérale de l'article (qui parle de «demander» et non pas d'«exiger») que de la possibilité, reconnue par la même disposition, du fait que l'obtention des documents sollicités ne soit pas possible dans l'Etat de la résidence de l'enfant. Or, sur ce dernier point, l'obligation que l'article impose aux Autorités centrales d'assister le demandeur pour obtenir la décision ou attestation doit faciliter sa tâche, étant donné que l'Autorité centrale peut produire une attestation concernant son droit en matière de garde, selon l'article 8*f*. En second lieu, le contenu de la décision ou attestation doit porter sur le caractère illicite, au sens de la Convention, du déplacement ou du non-retour; cela signifie, à notre avis, que l'une ou l'autre devra se prononcer sur les deux éléments retenus à l'article 3, et donc constater que le déplacement a interrompu une garde effective et légitime *prima facie*, d'après le droit de la résidence habituelle de l'enfant.

*Article 16 – Prohibition de statuer sur le fond du droit de garde*

121 En vue de faciliter la réalisation de l'objectif conventionnel relatif au retour de l'enfant, cet article essaie d'éviter qu'une décision sur le fond du droit de garde ne soit prise dans l'Etat de refuge. Dans ce but, il interdit aux autorités compétentes de cet Etat de statuer sur ce point, si elles sont informées que l'enfant concerné a été déplacé ou retenu illicitement, selon la Convention. Cette prohibition disparaîtra: lorsqu'il sera établi qu'il n'y a pas lieu de renvoyer l'enfant, d'après la Convention; ou lorsqu'une période raisonnable ne se sera pas écoulée sans qu'une demande en application de la Convention ait été introduite. Les deux circonstances qui peuvent mettre fin au devoir consacré dans cet article sont très différentes, tant par leur justification que par leurs conséquences. En effet, il est absolument logique de prévoir que l'obligation cesse dès qu'on constate que les conditions pour un retour de l'enfant ne sont pas réunies, soit parce que les parties sont arrivées à une solution amiable, soit parce qu'il y a lieu d'apprécier une des exceptions prévues aux articles 13 et 20; de surcroît, dans de tels cas, la décision sur le fond du droit de garde réglera l'affaire de façon définitive.

Par contre, étant donné que «l'information» sur laquelle on peut justifier une prohibition de statuer doit procéder, soit de l'introduction d'une demande en retour de l'enfant,

proof of that law or for the recognition of foreign decisions which would otherwise be applicable'. There is no need to stress the practical importance this rule may have in leading to the speedy decisions which are fundamental to the working of the Convention.

*Article 15 – The possibility of requesting a decision or other determination from the authorities of the child's habitual residence*

120 This article answers to the difficulties which the competent authorities of the requested State might experience in reaching a decision on an application for the return of a child through being uncertain of how the law of the child's habitual residence will apply in a particular case. Where this is so, the authorities concerned can request 'that the applicant obtain from the authorities of the State of the habitual residence of the child a decision or other determination'. Only two comments will be made here. The first concerns the voluntary nature of the request, in the sense that the return of the child cannot be made conditional upon such decision or other determination being provided. This conclusion arises in fact as much from the actual terms of the article (which speaks of 'requesting' and not 'requiring') as from the fact acknowledged in the same provision, that it may be impossible to obtain the requested documents in the State of the child's residence. Now, with regard to this last point, the duty which the article places upon Central Authorities to help the applicant obtain the decision or determination must make his task easier, since the Central Authority can provide a certificate concerning its relevant law in terms of article 8(3)(*f*). Secondly, the contents of the decision or certificate must have a bearing upon the wrongful nature, in the Convention sense, of the removal or retention. This means, in our opinion, that one or the other will have to contain a decision on the two elements in article 3, and thus establish that the removal was in breach of custody rights which, *prima facie*, were being exercised legitimately and in actual fact, in terms of the law of the child's habitual residence.

*Article 16 – Prohibition against deciding upon the merits of custody rights*

121 This article, so as to promote the realization of the Convention's objects regarding the return of the child, seeks to prevent a decision on the merits of the right to custody being taken in the State of refuge. To this end, the competent authorities in this State are forbidden to adjudicate on the matter when they have been informed that the child in question has been, in terms of the Convention, wrongfully removed or retained. This prohibition will disappear when it is shown that, according to the Convention, it is not appropriate to return the child, or where a reasonable period of time has elapsed without an application under the Convention having been lodged. The two sets of circumstances which can put an end to the duty contained in the article are very different, both in the reasons behind them and in their consequences. In fact, it is perfectly logical to provide that this obligation will cease as soon as it is established that the conditions for a child's return have not been met, either because the parties have come to an amicable arrangement or because it is appropriate to consider on the exceptions provided for in articles 13 and 20. Moreover, in such cases, the decision on the merits of the custody rights will finally dispose of the case.
On the other hand, since the 'notice' which may justify the prohibition against deciding upon the merits of the case must derive either from an application for the return of the

directement par le demandeur, soit d'une communication officielle de l'Autorité centrale du même Etat, il est difficile d'imaginer que les cas où l'information n'est pas suivie d'une demande ne seraient pas compris dans la première hypothèse. D'ailleurs, si de telles situations existent, l'ambiguïté de l'expression «période raisonnable» peut conduire à l'adoption d'une décision avant l'expiration de la période d'un an, retenue à l'article 12, alinéa premier; or, dans un tel cas, la décision adoptée coexisterait avec l'obligation de retourner l'enfant, d'après la Convention, posant ainsi un problème dont traite l'article 17.

*Article 17 — Existence d'une décision relative à la garde dans l'Etat requis*

122 La genèse de cet article montre clairement l'objectif qu'il poursuit: la Première commission a initialement adopté une disposition qui donnait priorité absolue à l'application de la Convention, en faisant prévaloir l'obligation de retourner l'enfant sur toute autre décision relative à la garde, rendue ou susceptible d'être reconnue dans l'Etat requis. En même temps, elle a accepté la possibilité d'une réserve qui aurait permis de refuser ce retour, quand il se serait avéré incompatible avec une décision existant dans l'Etat de refuge, antérieure à «l'enlèvement».[46] Le texte actuel est donc le produit d'un compromis en vue d'éliminer une réserve dans la Convention, sans en diminuer le degré d'acceptabilité par les Etats.[47] En ce sens, on a remanié la disposition originale en soulignant que ne fera pas obstacle au retour de l'enfant la *seule* existence d'une décision, et en donnant la possibilité au juge de prendre en considération les motifs de cette décision pour décider sur la demande de retour.

123 La solution incorporée dans l'article s'accorde parfaitement au but conventionnel de décourager les éventuels enleveurs qui ne pourront protéger leur action ni par une décision «morte», antérieure au déplacement, mais jamais exécutée, ni par une décision obtenue postérieurement et qui sera, dans la plupart des cas, entâchée de fraude. Par conséquent, l'autorité compétente de l'Etat requis devra considérer la demande de retour comme la preuve de ce qu'un élément nouveau est intervenu, qui l'oblige à remettre en question une décision non effective, ou adoptée sur la base de critères abusifs de compétence, ou encore ne respectant pas les droits de défense de toutes les parties concernées. D'ailleurs, étant donné que la décision sur le retour de l'enfant ne concerne pas le fond du droit de garde, les motifs de la décision qui pourront être pris en considération se limitent à ce qui concerne «l'application de la Convention». Quant à la situation provoquée par une décision rendue par les autorités de l'Etat de la résidence habituelle de l'enfant avant son «enlèvement», accordant la garde à l'«enleveur», elle serait normalement résolue par l'application de l'article 3 de la Convention, puisque l'existence du droit de garde réclamé doit être apprécié selon le droit dudit Etat.

*Article 19 — Portée des décisions sur le retour de l'enfant*

124 Cette disposition exprime l'idée qui se trouve à la base même de toute la Convention; en fait, nous nous en sommes

[46] Doc. trav. No 53, paragraphe 2 (*Proposal of the United Kingdom delegation*), No 32, article XG (*Proposal of the Netherlands delegation*) et No 19 (*Proposal of the Japanese delegation*), ainsi que P.-v. No 12.
[47] Voir Doc. trav. No 77 (Proposition du Président, appuyée par le Rapporteur et les délégations de la République fédérale d'Allemagne, de l'Australie, du Canada, de l'Espagne, de la Finlande, de la France, de l'Irlande, du Royaume-Uni et de la Suisse) et le P.-v. No 17.

child which is submitted directly by the applicant, or from an official communication from the Central Authority of the same State, it is difficult to see how cases in which the notice is not followed by an application would not be contained within the first hypothesis. Moreover, if such situations do exist, the ambiguity in the phrase 'reasonable time' could lead to decisions being taken before the period of one year, contained in article 12, first paragraph, has expired; in such a case, this decision would coexist alongside the duty to return the child, in accordance with the Convention, thus giving rise to a problem which is dealt with in article 17.

*Article 17 — The existence of a decision on custody in the requested State*

122 The origins of this article clearly demonstrate the end pursued. The First Commission initially adopted a provision which gave absolute priority to the application of the Convention, by making the duty to return the child prevail over any other decision on custody, which had been issued or was likely to be issued in the requested State. At the same time, it accepted the possibility of a reservation allowing the return of the child to be refused, when its return was shown to be incompatible with a decision existing in the State of refuge, prior to the 'abduction'.[46] The current text is therefore the result of a compromise which was reached in order to eliminate a reservation in the Convention, without at the same time reducing the extent of its acceptability to the States.[47] In this way, the original provision was recast by emphasizing that the sole fact that a decision existed would not of itself prevent the return of the child, and by allowing judges to take into consideration the reasons for this decision in coming to a decision themselves on the application for the child's return.

123 The solution contained in this article accords perfectly with the object of the Convention, which is to discourage potential abductors, who will not be able to defend their action by means either of a 'dead' decision taken prior to the removal but never put into effect, or of a decision obtained subsequently, which will, in the majority of cases, be vitiated by fraud. Consequently, the competent authority of the requested State will have to regard the application for the child's return as proof of the fact that a new factor has been introduced which obliges it to reconsider a decision which has not been put into effect, or which was taken on the basis of exorbitant grounds of jurisdiction, or else failed to have regard to the right of all the parties concerned to state their case. Moreover, since the decision on the return of the child is not concerned with the merits of custody rights, the reasons for the decision which may be taken into consideration are limited to those which concern 'the application of the Convention'. A situation brought about by a decision issued by the authorities of the State of a child's habitual residence prior to its 'abduction' and which granted custody to the 'abductor', would normally be resolved by applying article 3 of the Convention, since the existence of a claimed right to custody must be understood in accordance with the law of that State.

*Article 19 — Scope of the decisions on the return of the child*

124 This provision expresses an idea which underlies the whole of the Convention; as a matter of fact, in this Report

[46] Working Documents Nos 53, paragraph 2 (Proposal of the United Kingdom delegation), 32, article XG (Proposal of the Netherlands delegation), and 19 (Proposal of the Japanese delegation), as well as *P.-v.* No 12.
[47] See Working Document No 77 (Proposal of the Chairman, supported by the Rapporteur and the delegations of Australia, Canada, Finland, France, the Federal Republic of Germany, Ireland, Spain, Switzerland and the United Kingdom) and *P.-v.* No 17.

déjà occupé à plusieurs reprises dans ce Rapport, en ce qui concerne tant sa justification que son commentaire. Cet article se limite à préciser la portée du retour de l'enfant que la Convention essaie de garantir; un retour qui, pour pouvoir être «immédiat» ou «rapide», ne doit pas préjuger du fond du droit de garde et qui cherche précisément à éviter qu'une décision ultérieure sur ce droit puisse être influencée par un changement des circonstances, introduit unilatéralement par une des parties.

## CHAPITRE IV — DROIT DE VISITE

### *Article 21*

125 Avant tout, il s'impose de reconnaître que la Convention n'essaie pas d'établir une réglementation exhaustive du droit de visite, ce qui aurait sans doute débordé les objectifs conventionnels. En effet, même si l'attention prêtée au droit de visite répond à la conviction qu'il doit être le corollaire normal du droit de garde, au niveau des buts de la Convention il suffisait d'assurer la coopération des Autorités centrales en ce qui concerne, soit son organisation, soit la protection de son exercice effectif. Par ailleurs le temps particulièrement court que lui a consacré la Première commission est peut-être le meilleur indicatif du haut degré de consensus atteint à son égard.

126 Comme nous venons de l'indiquer, l'article repose dans son ensemble sur la coopération entre Autorités centrales. Une proposition visant à introduire, dans un nouvel alinéa, la seule compétence en matière de droit de visite tant des autorités que de la loi de l'Etat de la résidence habituelle de l'enfant a été rejetée à une large majorité.[48] L'organisation et la protection de l'exercice effectif du droit de visite sont donc toujours envisagées par la Convention comme une fonction essentielle des Autorités centrales. En ce sens, le premier alinéa consacre deux points importants: d'un côté la liberté des particuliers pour saisir l'Autorité centrale de leur choix; de l'autre côté, l'objet de la demande adressée à l'Autorité centrale peut être, soit l'organisation d'un droit de visite, c'est-à-dire son établissement, soit la protection de l'exercice d'un droit de visite déjà déterminé. Or, surtout quand la demande vise l'organisation du droit prétendu, ou lorsque son exercice se heurte à l'opposition du titulaire de la garde, le recours à des procédures légales s'imposera très fréquemment; à cet effet, le troisième alinéa de l'article envisage la possibilité pour les Autorités centrales d'entamer ou de favoriser de telles procédures, soit directement, soit par des intermédiaires.

127 Les problèmes abordés au deuxième alinéa sont de nature très différente. Il s'agit d'assurer l'exercice paisible du droit de visite sans qu'il mette en danger le droit de garde. Dans ce sens, cette disposition contient des éléments importants pour atteindre ce but. Au centre même de la solution esquissée, il faut situer, une fois encore, la coopération entre Autorités centrales, une coopération qui vise tant à faciliter l'exercice du droit de visite qu'à garantir l'accomplissement de toute condition à laquelle un tel exercice serait soumis.

[48] Voir Doc. trav. No 31 (*Proposal of the Danish delegation*) et P.-v. No 13.

we have already been concerned on several occasions as much with the reasons for it as with commenting upon it. This article is restricted to stating the scope of decisions taken regarding the return of the child which the Convention seeks to guarantee, a return which, so as to be 'forthwith' or 'speedy', must not prejudge the merits of custody rights; this provision seeks to prevent a later decision on these rights being influenced by a change of circumstances brought about by the unilateral action of one of the parties.

## CHAPTER IV — RIGHTS OF ACCESS

### *Article 21*

125 Above all, it must be recognized that the Convention does not seek to regulate access rights in an exhaustive manner; this would undoubtedly go beyond the scope of the Convention's objectives. Indeed, even if the attention which has been paid to access rights results from the belief that they are the normal corollary of custody rights, it sufficed at the Convention level merely to secure co-operation among Central Authorities as regards either their organization or the protection of their actual exercise. In other respects, the best indication of the high level of agreement reached regarding access rights is the particularly short amount of time devoted to them by the First Commission.

126 As we have just pointed out, the article as a whole rests upon co-operation among Central Authorities. A proposal which sought to insert a provision in a new paragraph that both the authorities and the law of the State of the child's habitual residence should have exclusive jurisdiction in questions of access rights, was rejected by a large majority.[48] The organizing and securing of the actual exercise of access rights was thus always seen by the Convention as an essential function of the Central Authorities. Understood thus, the first paragraph contains two important points: in the first place, the freedom of individuals to apply to the Central Authority of their choice, and secondly the fact that the purpose of the application to the Central Authority can be either the organization of access rights, *i.e.* their establishment, or the protection of the exercise of previously determined access rights. Now, recourse to legal proceedings will arise very frequently, especially when the application seeks to organize rights which are merely claimed or when their exercise runs up against opposition from the holder of the rights of custody. With this in view, the article's third paragraph envisages the possibility of Central Authorities initiating or assisting in such proceedings, either directly, or through intermediaries.

127 The nature of the problems tackled in the second paragraph is very different. Here it is a question of securing the peaceful enjoyment of access rights without endangering custody rights. This provision therefore contains important elements for the attainment of this end. Once again, co-operation among Central Authorities is placed, of necessity, in the very centre of the picture, and it is a co-operation designed as much to promote the exercise of access rights as to guarantee the fulfilment of any conditions to which their exercise may be subject.

[48] See Working Document No 31 (Proposal of the Danish delegation) and *P.-v.* No 13.

Parmi les moyens concrets d'assurer l'exercice du droit de visite, l'article 21 en retient seulement un, lorsqu'il signale que l'Autorité centrale doit essayer que «soient levés, dans toute la mesure du possible, les obstacles de nature à s'y opposer»; obstacles qui, notamment, peuvent être légaux ou dérivés d'éventuelles responsabilités de type pénal. Le reste est laissé à la coopération entre Autorités centrales, considérée comme la meileure méthode pour obtenir que les conditions imposées à l'exercice du droit de visite soient respectées. En effet, ce respect constitue, pour le titulaire de la garde, la seule garantie qu'un tel exercice ne serait pas nuisible à ses propres droits.

128 Sur la question de savoir comment les Autorités centrales vont organiser cette coopération en vue d'assurer le caractère «innocent» de l'exercice d'un droit de visite, la Convention ne donne pas d'exemples, car ils auraient pu être interprétés restrictivement. On peut donc mentionner, à titre purement indicatif, comme le faisait le Rapport de l'avant-projet,[49] qu'il convient d'éviter que l'enfant figure sur le passeport du titulaire du droit de visite et, en cas de visite «transfrontière», qu'il serait judicieux que celui-ci prenne l'engagement, devant l'Autorité centrale de l'Etat de la résidence habituelle de l'enfant, de le renvoyer à une date précise en indiquant le ou les endroits où il a l'intention d'habiter avec l'enfant. Une copie d'un tel compromis serait, par la suite, transmise tant à l'Autorité centrale de la résidence habituelle du titulaire du droit de visite, qu'à celle de l'Etat où il a déclaré qu'il séjournerait avec l'enfant. Cela permettrait de connaître à tout moment la localisation de l'enfant et de déclencher la procédure pour assurer son retour, dès l'expiration du délai fixé. Evidemment, aucune des mesures avancées ne peut, à elle seule, assurer l'exercice correct du droit de visite; de toute façon nous ne croyons pas que ce Rapport puisse aller plus loin: les mesures concrètes que pourront prendre les Autorités centrales impliquées dépendront des circonstances de chaque cas d'espèce et de la capacité d'agir reconnue à chaque Autorité centrale.

CHAPITRE V — DISPOSITIONS GÉNÉRALES

129 Ce chapitre contient une série de dispositions hétérogènes en raison de la matière dont elles s'occupent, mais qu'il fallait traiter en dehors des chapitres précédents. Il s'agit, d'une part de certaines dispositions procédurales communes aux procès visant tant le retour de l'enfant que l'organisation du droit de visite; d'autre part de la réglementation des problèmes posés par l'application de la Convention dans les Etats plurilégislatifs, ainsi que de ses relations avec d'autres conventions et de son domaine d'application *ratione temporis*.

*Article 22* — «Cautio judicatum solvi»

130 Suivant une tendance marquée en faveur de la suppression conventionnelle des mesures procédurales discriminatoires envers les étrangers, cet article déclare qu'aucune caution, qu'aucun dépôt, sous quelque dénomination que ce soit, ne peut être imposé dans le contexte de la

[49] Voir Rapport de la Commission spéciale, No 110

Of all the specific ways of securing the execise of access rights, article 21 contains only one, where it points out that the Central Authority must try 'to remove, as far as possible, all obstacles to the exercise of such rights', obstacles which may be legal ones or may originate in possible criminal liability. The rest is left up to the co-operation among Central Authorities, which is regarded as the best means of ensuring respect for the conditions imposed upon the exercise of access rights. In fact, such respect is the only means of guaranteeing to the custodian that their exercise will not harm his own rights.

128 The Convention gives no examples of how Central Authorities are to organize this co-operation so as to secure the 'innocent' exercise of access rights, since such examples could have been interpreted restrictively. Mention could however be made purely indicatively as in the Report of the preliminary draft Convention,[49] of the fact that it would be advisable that the child's name not appear on the passport of the holder of the right of access, whilst in 'transfrontier' access cases it would be sensible for the holder of the access rights to give an undertaking to the Central Authority of the child's habitual residence to return the child on a particular date and to indicate also the places where he intends to stay with the child. A copy of such an undertaking would then be sent to the Central Authority of the habitual residence of the holder of the access rights, as well as to the Central Authority of the State in which he has stated his intention of staying with the child. This would enable the authorities to know the whereabouts of the child at any time and to set in motion proceedings for bringing about its return, as soon as the stated time-limit has expired. Of course, none of the measures could by itself ensure that access rights are exercised properly, but in any event we believe that this Report can go no further: the specific measures which the Central Authorities concerned are able to take will depend on the circumstances of each case and on the capacity to act enjoyed by each Central Authority.

CHAPTER V — GENERAL PROVISIONS

129 This chapter contains a series of provisions which differ according to the topics with which they deal, and which had to be dealt with outside the framework of the foregoing chapters. On the one hand, there are certain procedural provisions common both to the proceedings for the return of the child and to the organization of access rights, and on the other hand there are provisions for regulating the problems arising out of the Convention's application in States with more than one system of law, as well as those which concern its relationship with other conventions and its scope *ratione temporis*.

*Article 22* — 'Cautio judicatum solvi'

130 Following a marked tendency to favour the deletion from the Convention of procedural measures which discriminated against foreigners, this article declares that no security, bond or deposit, however described, shall be required within the context of the Convention. Two short

[49] See Report of the Special Commission, No 110.

Convention. Le texte mérite deux brefs commentaires. Le premier concerne le domaine d'application *ratione personae* de la prohibition consacrée; sur ce point, la solution retenue est largement généreuse, comme l'exigeait une convention construite sur l'idée sous-jacente de la protection des enfant.[50] En second lieu, la caution ou dépôt dont sont exonérés les étrangers sont ceux qui, dans chaque système juridique et sous différentes dénominations, visent à garantir qu'ils respecteront le contenu des décisions en ce qui concerne le paiement des frais et dépens découlant d'un procès. Dans un souci de cohérence, l'article précise que la règle joue seulement par rapport aux «procédures judiciaires ou administratives visées par la Convention», en évitant une formule plus large qui aurait pu être interprétée comme s'appliquant, par exemple aux procès visant directement la détermination du fond du droit de garde. D'autre part, il se déduit clairement de ce qui précède qu'elle n'interdit pas d'autres cautions ou dépôts possibles exigés, notamment les cautions imposées en vue de garantir l'exercice correct d'un droit de visite.

comments are in order here. The first concerns the scope of the stated prohibition *ratione personae*; on this point, an extremely liberal solution was arrived at, such as was required by a convention built upon the basic idea of protecting children.[50] Secondly, the security, bond or deposit from which foreigners are exempt are those which, in any legal system and howsoever described, are meant to guarantee respect for decisions on the payment of costs and expenses arising out of legal proceedings. The article, in its concern for coherence, states that the rule will apply only to those 'judicial or administrative proceedings falling within the scope of the Convention', and avoids a wider formulation which could have been interpreted as applicable, for example, to proceedings raised directly for a decision on the merits of custody rights. On the other hand, it can clearly be inferred from the preceding observations that it does not prevent other types of security, bond or deposit being required, particularly those which are imposed so as to guarantee the proper exercise of access rights.

*Article 23 — Exemption de légalisation*

131 Cet article reproduit à la lettre le texte de l'article parallèle de l'avant-projet, qui se limitait à exprimer dans une disposition séparée une idée contenue dans toutes les Conventions de La Haye, impliquant la transmission de documents entre Etats contractants. Il se déduit de sa rédaction ouverte qu'il n'interdit pas seulement les «légalisations diplomatiques», mais toute autre exigence de ce genre; cependant, reste en dehors de cette disposition l'exigence possible d'authentification des copies ou documents privés, selon la loi interne des autorités concernées.

*Article 23 — Exemption from legalization*

131 This article repeats word for word the text of the equivalent article in the preliminary draft Convention, which merely set forth in a separate provision an idea which is to be found in all Hague Conventions, involving the transmission of documents among Contracting States. The fact that it has been drafted in wide terms means that not only 'diplomatic legalization', but also any other similar sort of requirement, is forbidden. However, any requirement of the internal law of the authorities in question that copies or private documents be authenticated remains outside the scope of this provision.

*Article 24 — Traduction des documents*

132 En ce qui concerne les langues à utiliser dans les relations entre Autorités centrales, la Convention a maintenu la solution retenue dans l'avant-projet, en vertu de laquelle les documents seront envoyés dans leur langue d'origine et accompagnés d'une traduction dans une des langues officielles de l'Etat requis ou, lorsque cette traduction s'avère difficilement réalisable, d'une traduction en français ou en anglais.[51] Sur ce point, d'ailleurs, la Convention admet la possibilité de formuler une réserve aux termes de l'article 42, en vertu de laquelle un Etat contractant pourra s'opposer à l'utilisation d'une des langues de substitution; la réserve ne pourra évidemment pas exclure l'utilisation des deux langues. Finalement, il faut souligner, d'une part que le système établi prétend être un système de facilité *minimum*, qui peut être amélioré par d'autres conventions excluant entre les Etats parties toute exigence de traduction; d'autre part qu'il n'a trait qu'aux communications entre Autorités centrales. En conséquence de quoi, les demandes et autres documents adressés aux autorités judiciaires ou administratives internes devront respecter les règles imposées par la loi de chaque Etat en matière de traduction.

*Article 24 — Translation of documents*

132 As regards the languages which are to be used as among Central Authorities, the Convention upheld the approach in the Preliminary Draft, by which documents are to be sent in their original language, accompanied by a translation into one of the official languages of the requested State or, where that is not feasible, a translation into French or English.[51] In this matter, the Convention also allows a reservation to be made in terms of article 42, under which a Contracting State can object to the use of one or other of the substitute languages, but this reservation cannot of course exclude the use of both. Finally, it must be emphasized firstly that the scheme which has been chosen offers only a *minimal* facility and may be improved upon by other conventions which exclude any requirement of translation as among States which are Party to them, and secondly that it governs only communications among Central Authorities. Consequently, applications and other documents sent to internal judicial or administrative authorities will have to conform to the rules regarding translation laid down by the law of each State.

[50] Voir la construction plus restrictive incorporée à l'article 14 de la *Convention tendant à faciliter l'accès international à la justice*, Convention adoptée aussi au cours de la Quatorzième session de la Conférence.
[51] Une solution partiellement différente est consacrée à l'article 7 de la *Convention tendant à faciliter l'accès international à la justice*, citée *supra*.

[50] See the more restrictive construction which was incorporated in article 14 of the *Convention on International Access to Justice*, also adopted during the Fourteenth Session of the Conference.
[51] A somewhat different approach is found in article 7 of the *Convention on International Access to Justice*, referred to *supra*.

*Article 25 – Assistance judiciaire et juridique*

133 La disposition sur ce point élargit le domaine de l'assistance judiciaire dans une double perspective: d'un côté, par l'inclusion parmi les éventuels bénéficiaires, en plus des nationaux des Etats parties, des personnes qui auraient dans ces Etats leur résidence habituelle; de l'autre, par l'extension de l'assistance visée à la consultation juridique, un aspect qui n'est pas toujours couvert par les divers systèmes étatiques d'assistance judiciaire.[52]

*Article 26 – Frais découlant de l'application de la Convention*

134 Le principe exprimé au premier alinéa, d'après lequel chaque Autorité centrale assumera ses propres frais en appliquant la Convention, n'a pas rencontré d'opposition. Il implique avant tout qu'une Autorité centrale ne peut pas réclamer ces frais à une autre Autorité centrale. Quant à savoir quels sont les frais visés, il faut convenir qu'ils dépendront des services réels offerts par chaque Autorité centrale, en accord avec les possibilités d'action que lui reconnaît la loi interne de l'Etat concerné.

135 Par contre, le second alinéa a trait à l'un des points les plus controversés au cours de la Quatorzième session et qui a finalement été résolu par l'acceptation de la réserve figurant au troisième alinéa de ce même article. En effet, on n'a pu mettre fin à la controverse entre les délégations qui voulaient assurer au demandeur la gratuité totale dans l'application de la Convention (en incluant l'exonération des frais et dépens non couverts par le système d'assistance judiciaire et juridique, qui pourraient découler d'un procès ou éventuellement, des frais entraînés par la participation d'un avocat), et les délégations favorables à la solution contraire retenue dans l'avant-projet,[53] que par l'inclusion d'une réserve en faveur des secondes. La raison en est que, étant donné que les différents critères prenaient leurs racines dans la structure des systèmes juridiques impliqués, toute tentative de faire prévaloir, en termes absolus, une position sur l'autre, aurait conduit à l'exclusion *a priori* de la Convention d'un certain nombre d'Etats; or, personne ne souhaitait un tel résultat.[54] Par contre, l'accord a été total en ce qui concerne la norme incluse dans la dernière phrase du deuxième alinéa, qui autorise les Autorités centrales à «demander le paiement des dépenses causées ou qui seraient causées par les opérations liées au retour de l'enfant».

136 Le quatrième alinéa incorpore une disposition de nature tout à fait différente, en vertu de laquelle les autorités compétentes internes peuvent mettre à la charge de «l'enleveur» ou de celui qui empêche l'exercice du droit de visite, le paiement de certains frais engagés par le demandeur ou en son nom, notamment «des frais de voyage, des frais de représentation judiciaire du demandeur et de retour de l'enfant, ainsi que tous les coûts et dépenses faits pour localiser l'enfant». Mais étant donné qu'il s'agit d'une norme simplement facultative, qui respecte le pouvoir d'appréciation concrète des tribunaux dans chaque cas d'espèce, sa portée semble être surtout symbolique, celle d'un éventuel élément de dissuasion d'une conduite contraire aux objectifs conventionnels.

[52] Voir, dans un sens similaire, les articles 1 et 2 de la *Convention tendant à faciliter l'accès international à la justice*, cité *supra*.
[53] Article 22, alinéa 2*a* de l'avant-projet élaboré par la Commission spéciale.
[54] Voir Doc. trav. Nos 51 et 61 (Propositions de la délégation belge) et Nos 57 et 67 (Propositions des délégations des Etats-Unis, du Canada et des Pays-Bas), ainsi que les P.-v. Nos 11 et 14.

*Article 25 – Legal aid and advice*

133 The relevant provision here enlarges the scope of legal aid in two respects. Firstly, it includes among the possible beneficiaries persons habitually resident in a Contracting State as well as that State's own nationals. Secondly, the legal aid available is extended to cover legal advice as well, which is not invariably included in the various systems of legal aid operated by States.[52]

*Article 26 – Costs arising out of the Convention's application*

134 The principle enunciated in the first paragraph, under which each Central Authority bears its own costs in applying the Convention, met no opposition. Quite simply, it means that a Central Authority cannot claim costs from another Central Authority. It must however be admitted that the costs envisaged will depend on the actual services provided by each Central Authority, according to the freedom of action conferred upon it by the internal law of the State concerned.

135 On the other hand, the second paragraph refers to one of the most controversial matters dealt with by the Fourteenth Session, a matter which in the end had to be resolved by accepting the reservation in the third paragraph of the same article. In fact, the argument between those delegations which wanted the applicant to be exempt from all costs arising out of the application of the Convention (including exemption from all costs and expenses not covered by the legal aid and advice system such as those which arise out of legal proceedings or, where applicable, the participation of counsel or legal advisers), and those which favoured the opposite solution adopted by the preliminary draft Convention,[53] was resolved only by including a reservation favouring the latter's point of view. The reason for this was that, since different criteria for the granting of legal aid were rooted in the very structure of the legal systems concerned, any attempt to make one approach prevail absolutely over the others would have led to the automatic exclusion of certain States from the Convention, a result which no one wanted.[54] However, there was total agreement as regards the rule contained in the last sentence of the second paragraph, authorizing the Central Authorities to 'require the payment of the expenses incurred or to be incurred in implementing the return of the child'.

136 The fourth paragraph contains a quite different type of provision, by which the competent internal authorities may direct the 'abductor' or the person who prevented the exercise of access rights, to pay necessary expenses incurred by or on behalf of the applicant, including 'travel expenses, any costs incurred or payments made for locating the child, the costs of legal representation of the applicant, and those of returning the child'. But since this rule is only an optional provision, which recognizes the discretion which may be exercised by the courts in each case, its scope would seem to be particularly symbolic, a possible deterrent to behaviour which is contrary to the objects of the Convention.

[52] See, in similar vein, articles 1 and 2 of the *Convention on International Access to Justice*, referred to *supra*.
[53] Article 22(2)(*a*) of the Preliminary Draft prepared by the Special Commission.
[54] See Working Documents Nos 51 and 61 (*Propositions de la délégation belge*) and Nos 57 and 67 (Proposals of the Canadian, Netherlands and United States delegations) and also P.-v. Nos 11 and 14.

*Article 27 — Possibilité de rejeter une demande*

137 Le bon sens indique qu'on ne peut pas obliger les Autorités centrales à accepter les demandes qui se situent hors du domaine d'application de la Convention ou qui sont manifestement sans fondement. Dans ces cas-là, la seule obligation des Autorités centrales est d'informer «immédiatement de leurs motifs le demandeur ou, le cas échéant, l'Autorité centrale qui leur a transmis la demande». Cela signifie que le rejet d'une demande peut être fait tant de l'Autorité centrale directement saisie par le demandeur que d'une Autorité centrale saisie originairement par une autre Autorité centrale.

*Article 28 — Procuration exigée par l'Autorité centrale*

138 La disposition contenue dans cet article n'est qu'une autre manifestation du point de vue adopté par la Convention en ce qui concerne l'organisation et les compétences des Autorités centrales. Puisqu'on veut éviter que les Etats aient à changer leur droit pour pouvoir l'accepter, la Convention prend en considération le fait que, selon le droit des divers Etats membres de la Conférence, l'Autorité centrale pourra avoir besoin d'une autorisation du demandeur. De fait, la «formule modèle» introduit, comme exemple des pièces produites éventuellement (note au No IX), une référence à la «procuration conférée à l'Autorité centrale», procuration qui devra donc être jointe, chaque fois qu'une Autorité centrale l'exigera, aux éléments envisagés à l'article 8 et aux demandes introduites en application de l'article 21.

*Article 29 — Saisine directe des autorités internes compétentes*

139 La Convention n'essaie pas d'établir un système exclusif entre les Etats contractants pour obtenir le retour des enfants. Elle se présente au contraire comme un instrument complémentaire se proposant d'aider les personnes dont le droit de garde ou de visite a été violé. Par conséquent, ces personnes ont le choix entre recourir aux Autorités centrales — c'est-à-dire utiliser les mécanismes propres à la Convention — ou bien choisir la voie d'une action directe devant les autorités compétentes en matière de garde et de visite de l'Etat où se trouve l'enfant. Dans la seconde hypothèse, donc quand les personnes concernées optent pour saisir directement les autorités en question, elles peuvent encore faire un deuxième choix et introduire leur demande «par application ou non des dispositions de la Convention». Dans le dernier cas, évidemment, les autorités ne seront pas tenues d'appliquer les dispositions conventionnelles, à moins que l'Etat ne les ait converties en règles internes, suivant en cela l'article 2 de la Convention.

*Article 30 — Recevabilité des documents*

140 Par cette disposition, la Convention a entendu résoudre le problème existant dans certains Etats membres de la Conférence en ce qui concerne la recevabilité des documents. Il s'agit donc simplement de faciliter l'admission par les autorités judiciaires ou administratives des Etats contractants des demandes introduites directement ou par l'intermédiaire d'une Autorité centrale, ainsi que des documents pouvant être annexés ou fournis par les Autorités centrales. En effet, on ne doit pas interpréter cet article comme incorporant une règle sur la valeur de preuve qu'il faut accorder à ces documents; ce problème tombe absolument hors du domaine conventionnel.[55]

[55] Voir article 26 de l'avant-projet, Doc. trav. No 49 (*Proposal of the United States delegation*) et P.-v. No 11.

*Article 27 — Possible rejection of an application*

137 Common sense would indicate that Central Authorities cannot be obliged to accept applications which belong outside the scope of the Convention or are manifestly without foundation. In such cases, the only duty of Central Authorities is to 'inform forthwith the applicant or the Central Authority through which the application was submitted, as the case may be, of its reasons'. This means that an application may be rejected by the Central Authority to which the applicant applied directly as well as by a Central Authority which was initially brought into the case by another Central Authority.

*Article 28 — Authorization required by the Central Authority*

138 The provision in this article is merely another example of the Convention's attitude to the organization and powers of Central Authorities. Since the aim is to avoid requiring States to change their own law in order to be able to accept the Convention, the Convention takes into consideration the fact that, in terms of the law of various Member States of the Conference the Central Authority would have the power to require some authorization from the applicant. As a matter of fact, the 'model form', as an example of the documents which might be attached to an application (see note to No IX), brings in a reference to 'the authorization empowering the Central Authority to act on behalf of the applicant', an authorization which, every time it is required by a Central Authority, will have to accompany those matters listed in article 8 and the applications submitted under article 21.

*Article 29 — Direct application to competent internal authorities*

139 The Convention does not seek to establish a system for the return of children which is exclusively for the benefit of the Contracting States. It is put forward rather as an additional means for helping persons whose custody or access rights have been breached. Consequently, those persons can either have recourse to the Central Authorities — in other words, use the means provided in the Convention — or else pursue a direct action before the competent authorities in matters of custody and access in the State where the child is located. In the latter case, whenever the persons concerned opt to apply directly to the relevant authorities, a second choice is open to them in that they can submit their application 'whether or not under the provisions of this Convention'. In the latter case the authorities are not of course obliged to apply the provisions of the Convention, unless the State has incorporated them into its internal law, in terms of article 2 of the Convention.

*Article 30 — Admissibility of documents*

140 This provision was intended to resolve the problem which existed in some Member States regarding the admissibility of documents. It merely seeks to facilitate admission before the judicial or administrative authorities of Contracting States of applications submitted either directly or through the intervention of a Central Authority, as well as documents which may be attached or supplied by the Central Authorities. In fact, this article must not be understood to contain a rule on the evidential value which is to be placed on these documents, since that problem falls quite outwith the scope of the Convention.[55]

[55] See article 26 of the preliminary draft Convention, Working Document No 49 (Proposal of the United States delegation) and *P.-v.* No 11.

*Articles 31 à 33 – Application de la Convention en ce qui concerne les Etats plurilégislatifs*

141 Ces trois articles règlent l'application de la Convention en ce qui concerne les Etats à systèmes juridiques non unifiés. A l'instar des dernières conventions élaborées par la Conférence de La Haye, une distinction est faite entre les Etats ayant plusieurs systèmes de droit d'application territoriale, et les Etats ayant plusieurs systèmes de droit applicables à des catégories différentes de personnes. Plus précisément, les solutions retenues s'inspirent de celles adoptées dans les conventions élaborées au cours de la Treizième session de la Conférence.[56]
En ce qui concerne le premier groupe d'Etats, l'article 31 précise comment il faut comprendre, d'une part la référence à la résidence habituelle de l'enfant, et d'autre part la référence au droit de l'Etat d'une telle résidence.
En ce qui concerne le deuxième groupe d'Etats, l'article 32 confie la détermination du droit dont il faut tenir compte aux règles en vigueur dans chaque Etat.
Finalement, sur le contenu de ces deux articles, il faut souligner que leur intérêt ne se limite pas aux Etats directement envisagés; en effet, les normes en question devront être prises en considération par tout Etat contractant dans ses relations avec eux, par exemple chaque fois qu'un enfant sera déplacé d'un de ses Etats vers un autre Etat ayant un système de droit unifié ou non.

142 D'autre part, l'article 33 délimite les cas dans lesquels les Etats plurilégislatifs sont tenus d'appliquer la Convention, en excluant les situations où un Etat ayant un système de droit unifié ne serait pas tenu de le faire. En somme, cet article se limite à déclarer que la Convention n'est applicable qu'aux relations internationales, en même temps qu'il qualifie de relations internes toutes celles qui se passent à l'intérieur d'un Etat, plurilégislatif ou non.

*Article 34 – Relations avec d'autres conventions*

143 Cet article a été commenté dans la première partie de ce Rapport (Nos 39 et 40).

*Article 35 – Domaine d'application* ratione temporis *de la Convention*

144 La question de déterminer si la Convention devait s'appliquer aux enlèvements qui se seraient produits entre deux Etats contractants antérieurement à son entrée en vigueur, ou seulement à ceux qui auraient eu lieu après cette date, s'est vue proposer différentes solutions au cours de la Quatorzième session. La première était sans doute la plus généreuse, puisqu'elle prévoyait l'application de la Convention à tout «enlèvement», indépendamment du moment de sa réalisation.[57] Cependant, cette décision a été suivie plus tard par l'acceptation de la possibilité pour tout Etat contractant de faire une déclaration en vue de limiter l'application de la Convention aux «enlèvements» intervenus après son entrée en vigueur dans cet Etat.[58] La situation restait ainsi largement ouverte, tout en reconnaissant néanmoins à chaque Etat la possibilité de restreindre l'application de la Convention, s'il le jugeait nécessaire. Il est clair

[56] Voir notamment le Rapport de M. von Overbeck sur la Convention sur la loi applicable aux régimes matrimoniaux, *Actes et documents de la Treizième session*, tome II, p. 374 et s.
[57] Voir Doc. trav. No 53 (*Proposal of the United Kingdom delegation*) et P.-v. No 13.
[58] Voir Doc. trav. No 68 (Proposition de la délégation du Canada) et P.-v. No 15.

*Articles 31 to 33 – Application of the Convention in relation to States with more than one system of law*

141 These three articles govern the Convention's application to States with non-unitary legal systems. As in recent conventions of the Hague Conference, a distinction has been drawn between States which have several systems of law applicable in different territorial units, and those with several systems of law applicable to different categories of persons. To be more precise, the solution adopted received its inspiration from that reached by the conventions drawn up during the Thirteenth Session of the Conference.[56]

As regards the first group of States, article 31 explains how references to the child's habitual residence and to the law of the State of its habitual residence are to be understood.

As regards the second type, article 32 leaves the determination of the applicable law to the rules in force in each State.

Finally, it must be emphasized that the substantive provisions of these two articles are not restricted to the States directly concerned. In actual fact, the relevant rules are to be taken into consideration by all Contracting States in their relations with each other, for example whenever a child is removed from one of those States to another State with a unified or non-unified legal system.

142 On the other hand, article 33 limits the occasions where States with more than one system of law are obliged to apply the Convention, by excluding those in which a State with a unified system of law would not be bound to do so. Put shortly, this article merely states that the Convention applies only at the international level and at the same time characterizes as internal all those relationships which arise within a State, whether or not that State has more than one system of law.

*Article 34 – Relationship to other conventions*

143 This article was commented upon in the first part of the Report (Nos 39 and 40).

*Article 35 – Scope of the Convention* ratione temporis

144 The question as to whether the Convention should apply to abductions involving two States and which occurred prior to its entry into force or only to those occurring thereafter, was met with different proposed solutions during the Fourteenth Session. The first proposal was undoubtedly the most liberal, since it envisaged the Convention's applying to all 'abductions', irrespective of when it came into effect.[57] However, this decision was followed by acceptance of the idea that any Contracting State could declare that the Convention would apply only to 'abductions' which occurred after its entry into force in that State.[58] The situation therefore remained largely unresolved, with each State, where it deemed this necessary, being able to limit the Convention's application. It was clear that the operation of such declarations within a convention which is clearly bilateral in its application would create some technical problems, to

[56] See in particular Mr von Overbeck's Report on the Convention on the Law Applicable to Matrimonial Property Regimes, in *Acts and Documents of the Thirteenth Session*, Book II, p. 374 *et seq.*
[57] See Working Document No 53 (Proposal of the United Kingdom delegation) and *P.-v.* No 13.
[58] See Working Document No 68 (Proposal of the Canadian delegation) and *P.-v.* No 15.

que le jeu de telles déclarations dans le contexte d'une convention d'application nettement bilatérale posait quelques problèmes techniques. Pour y pallier, la Première commission s'est finalement prononcée en faveur de la solution contraire à la première, c'est-à-dire pour la plus restrictive. C'est donc celle qui apparaît à l'article 35, d'après lequel la Convention ne s'applique entre les Etats contractants, «qu'aux enlèvements ou aux non-retours illicites qui se sont produits après son entrée en vigueur dans ces États».[59] D'autre part, de l'ensemble des dispositions conventionnelles (et notamment de l'article 12, alinéa 2) on doit déduire qu'il n'existe pas de limite pour introduire l'action, dès lors que l'enfant n'a pas atteint l'âge de seize ans, selon l'article 4. En effet, l'introduction de l'action après l'expiration de la période d'un an, envisagée au premier alinéa de l'article 12, ne fait que nuancer l'obligation de faire retourner l'enfant, en admettant qu'elle ne s'impose pas lorsqu'il est établi que l'enfant s'est intégré dans son nouveau milieu.

145 La disposition a sans doute le mérite d'être claire. On ne peut cependant pas ignorer que son application est destinée à frustrer les expectatives légitimes des particuliers concernés. Mais étant donné qu'il s'agit en définitive d'une restriction à l'obligation de retourner l'enfant, rien ne s'oppose à ce que deux ou plusieurs Etats conviennent entre eux d'y déroger conformément à l'article 36, c'est-à-dire qu'ils se mettent d'accord pour appliquer rétroactivement la Convention.

D'ailleurs, la disposition ne concerne que les dispositions conventionnelles visant le retour de l'enfant. En effet, la réglementation conventionnelle du droit de visite ne peut être invoquée, par la nature même des choses, qu'à propos du refus de son exercice s'étant produit ou continuant à se produire après l'entrée en vigueur de la Convention.

*Article 36 – Possibilité de limiter conventionnellement les restrictions au retour de l'enfant*

146 En concordance avec les principes généraux qui inspirent la Convention et sur la base de l'expérience d'autres Conventions de la Conférence de La Haye,[60] cet article admet la possibilité que deux ou plusieurs Etats contractants conviennent de déroger entre eux aux dispositions de la Convention pouvant impliquer des restrictions au retour des enfants, notamment celles visées aux articles 13 et 20. Cela montre d'une part le caractère de compromis de certaines dispositions conventionnelles et la possibilité d'adopter des critères plus favorables à l'objectif principal de la Convention dans les relations entre États de conceptions juridiques très homogènes, et d'autre part que, comme nous l'avons souligné à plusieurs reprises au cours de ce Rapport, la Convention n'est inspirée par aucune idée d'exclusivité dans son domaine d'application. Or, si de telles conventions complémentaires voient le jour, il faudrait éviter un effet négatif, redouté par certaines délégations: le fait qu'en dehors du domaine d'application géographiquement restreint de tels accords, les États parties soient tentés de donner une interprétation large aux restrictions incluses dans cette Convention, de manière à affaiblir sa portée.[61]

[59] Voir Doc. trav. No 81 (Proposition du Président avec l'accord des délégations de l'Autriche, de la République fédérale d'Allemagne, de la Suisse et du Royaume-Uni) et P.-v. No 18. Une proposition orale du Rapporteur tendant à étendre la Convention aux situations créées au cours de l'année antérieure à son entrée en vigueur n'a pas été retenue.

[60] Par exemple la *Convention relative à la procédure civile, du premier mars 1954.*

[61] Voir sur cet article, les Doc. trav. No 70 (Proposition des délégations belge, française et luxembourgeoise) et No 80 (*Proposal of the United States delegation*), ainsi que les P.-v. Nos 15 et 18.

alleviate which the First Commission finally pronounced itself in favour of the opposite solution to that first adopted, *i.e.* the more restrictive. It is seen therefore in article 35, by which the Convention is to apply as among Contracting States 'only to wrongful removals or retentions occurring after its entry into force in those States'.[59] On the other hand, the inference must be drawn from the Convention's provisions as a whole (and in particular article 12, second paragraph) that no time-limit is imposed on the submission of applications, provided the child has not reached sixteen years of age, in terms of article 4. In fact, the commencement of an action after the expiry of the one year period stated in the first paragraph of article 12, merely lessens the obligation to cause the child to be returned, whilst it is recognized that the obligation will not arise if the child is shown to have become settled in its new environment.

145 The provision certainly has the merit of being clear. However, it cannot be denied that its application is fated to frustrate the legitimate expectations of the individuals concerned. But since in the last resort it is a limitation on the duty to return the child, it in no way prevents two or more States agreeing amongst themselves to derogate from it in terms of article 36, by agreeing to apply the Convention retroactively.

Moreover, the provision concerns only those provisions in the Convention regarding the return of the child. In actual fact, the provision of the Convention governing access rights can, in the nature of things, only be invoked where their exercise is refused or continues to be refused after the Convention has come into force.

*Article 36 — Possibility of limiting by agreement the restrictions on the return of the child*

146 This article, conform to the general principles underlying the Convention, which are based on the experience derived from other Hague Conventions,[60] allows two or more Contracting States to agree to derogate as amongst themselves from any of the Convention's provisions which may involve restrictions on the return of the child, in particular those contained in articles 13 and 20. This demonstrates, on the one hand, the compromise character of some of the Convention's provisions and the possibility that criteria more favourable to the principal object of the Convention may be adopted to govern relationships among States which share very similar legal concepts; while on the other hand, as we have emphasized on several occasions throughout this Report, the Convention is not to be regarded as in any way exclusive in its scope. Now, if such supplementary conventions see the light of day, one negative consequence, feared by some delegations, will have to be avoided, namely that beyond the geographical limits of such agreements, the States concerned will be tempted to interpret the limitations contained in the Convention in a wide sense, thus weakening its scope.[61]

[59] See Working Document No 81 (Proposal of the Chairman with the consent of the delegations of Austria, the Federal Republic of Germany, Switzerland and the United Kingdom) and *P.-v.* No 18. An oral proposal of the Reporter that the Convention be extended to cover situations which occurred during the year prior to its entry into force was not accepted.

[60] See, for example, the *Convention of 1 March 1954 on civil procedure.*

[61] See Working Documents Nos 70 (*Proposition des délégations belge, française et luxembourgeoise*) and 80 (Proposal of the United States delegation) as well as *P.-v.* Nos 16 and 18.

147 Les clauses finales contenues aux articles 37 à 45 de la Convention sont rédigées conformément aux dispositions adoptées à cet effet par les dernières sessions de la Conférence de La Haye. Il n'est donc pas nécessaire d'en faire le commentaire détaillé et nous nous limiterons à quelques brèves remarques à leur propos.

La première concerne l'adaptation des clauses finales à la décision adoptée en ce qui concerne l'ouverture sous condition de la Convention à des Etats non-membres de la Conférence. Ce point ayant été déjà abordé auparavant,[62] il suffit de souligner ici que la nature semi-fermée de la Convention provient du mécanisme de la déclaration d'acceptation par les Etats parties et non pas de l'existence d'une restriction quelconque relative aux Etats pouvant y adhérer (article 38).

148 Quant au «degré» de l'acceptation de la Convention par les Etats qui comprennent deux ou plusieurs unités territoriales dans lesquelles des systèmes de droit différents s'appliquent aux matières régies par la Convention, l'article 40 prévoit qu'ils pourront déclarer — au moment de la signature, de la ratification, de l'acceptation, de l'approbation ou de l'adhésion — que la Convention s'applique à toutes ou seulement à certaines des unités territoriales en question. Cette déclaration pourra être modifiée à tout moment par une autre déclaration plus extensive. En effet, une modification de la déclaration tendant à restreindre l'application de la Convention devrait être considérée comme une dénonciation partielle selon l'article 44, alinéa 3.

D'après l'article 39, la même solution s'applique pour les territoires représentés sur le plan international par certains Etats; en effet, bien que de telles situations soient appelées à disparaître comme une conséquence logique de l'application progressive du principe qui proclame le droit des peuples à disposer d'eux-mêmes, la Conférence a considéré souhaitable de maintenir une clause qui peut encore s'avérer utile.

149 Il convient enfin de dire un mot sur l'article 41, la disposition étant tout à fait nouvelle dans une Convention de La Haye; elle fut introduite, de même d'ailleurs que dans l'autre Convention adoptée lors de la Quatorzième session, à savoir la *Convention tendant à faciliter l'accès international à la justice*, à la demande expresse de la délégation australienne.

Le but de cet article est de préciser que la ratification de la Convention par un Etat n'entraîne aucune conséquence quant à la répartition interne des autorités de cet Etat dans le partage des pouvoirs exécutif, judiciaire et législatif.

La chose semble aller de soi, et c'est bien dans ce sens qu'il faut comprendre l'intervention du chef de la délégation canadienne lors des débats de la Quatrième commission où fut décidée l'introduction de cette disposition dans les deux Conventions (voir P.-v. No 4 de la Séance plénière); la délégation canadienne, exprimant ouvertement l'opinion d'un grand nombre de délégations, estimait l'introduction de cet article dans les deux Conventions comme inutile. L'article 41 fut néanmoins adopté, en grande partie pour donner satisfaction à la délégation australienne, pour qui l'absence d'une telle disposition semblait poser une difficulté constitutionnelle insurmontable.

150 En ce qui concerne le problème des réserves, la Con-

[62] Voir *supra* No 42.

147 The final clauses in articles 37 to 45 of the Convention have been drafted in accordance with similar provisions adopted by the most recent sessions of the Hague Conference. No detailed commentary is therefore necessary and we shall make only a few brief comments on them.

Firstly, the adaptation of the final clauses to the decision which was taken on the conditional opening of the Convention to non-Member States. This point has been dealt with earlier,[62] and it is sufficient merely to emphasize here that the 'semi-closed' character of the Convention derives from the means by which States Parties may declare their acceptance and not from any restriction placed on the States which may accede to it (article 38).

148 With regard to the 'degree' of acceptance of the Convention by States which contain two or more territorial units in which different systems of law are applicable to matters dealt with in this Convention, article 40 provides that they may declare — at the time of signature, ratification, acceptance, approval or accession — that the Convention shall extend to all its territorial units or only to one or more of them. Such a declaration can be modified at any time by another more extensive declaration. Actually, any modification of a declaration which tends to limit the applicability of the Convention ought to be regarded as a partial denunciation in terms of article 44, third paragraph.

Under article 39, the same result will occur with regard to States which are responsible for the international relations of other territories. Although such situations are meant to disappear as a logical consequence of the progressive application of the principle which proclaims the right of peoples to self-determination, the Conference felt it advisable to keep a clause which might yet prove to be useful.

149 Finally, a word should be said on article 41, since it contains a wholly novel provision in Hague Conventions. It also appears in the other Convention adopted at the Fourteenth Session, *i.e.* the *Convention on International Access to Justice*, at the express request of the Australian delegation.

This article seeks to make it clear that ratification of the Convention by a State will carry no implication as to the internal distribution of executive, judicial and legislative powers in that State.

This may seem self-evident, and this is the point which the head of the Canadian delegation made during the debates of the Fourth Commission where it was decided to insert such a provision in both Conventions (see *P.-v.* No 4 of the Plenary Session). The Canadian delegation, openly expressing the opinion of a large number of delegations, regarded the insertion of this article in the two Conventions as unnecessary. Nevertheless, article 41 was adopted, largely to satisfy the Australian delegation, for which the absence of such a provision would apparently have created insuperable constitutional difficulties.

150 On the question of reservations, the Convention

[62] See *supra*, No 42.

vention ne permet que celles prévues aux articles 24 et 26. Aucune autre réserve ne sera admise. D'autre part, l'article 42 précise, comme il est habituel, qu'un Etat pourra «à tout moment, retirer une réserve qu'il aura faite».

151 Finalement, il convient de souligner l'importance accrue de l'obligation de notification assumée par le Ministère des Affaires Etrangères du Royaume des Pays-Bas (article 45), dans le contexte d'une convention comme celle-ci, en raison notamment du jeu des déclarations d'acceptation des adhésions éventuelles.

Madrid, avril 1981

ELISA PÉREZ-VERA

allows only those provided for in articles 24 and 26. No other reservation is permitted. Moreover, article 42 sets forth the customary provision whereby a State can 'at any time withdraw a reservation it has made'.

151 Finally, the importance placed on the duty which was assumed by the Ministry of Foreign Affairs of the Kingdom of the Netherlands (article 45) to notify Member States and Contracting States should be emphasized, particularly in view of the role played by declarations of acceptance of future accessions in a convention such as this.

Madrid, April 1981

ELISA PÉREZ-VERA